UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOSHE CHAIM PANZER,<br><br>                    Plaintiff/State-Court<br>                    Petitioner,<br><br>                    -v-<br><br>JOEL EPSTEIN,<br><br>                    Defendant/State-Court<br>                    Respondent. | 21 Civ. ___ (  )<br><br>**NOTICE OF REMOVAL**<br><br>Supreme Court, New York County<br>Index No. 654909/2021 |

**PLEASE TAKE NOTICE** that Defendant/State-Court Respondent ("Defendant"),

Joel Epstein, by his attorneys, Mukasey Frenchman LLP, hereby removes this action from the

Supreme Court of the State of New York, County of New York (the "State Court"), to the United

States District Court for the Southern District of New York.  In filing this Notice of Removal,

Defendant does not waive, but rather expressly preserves, any and all rights, claims and defenses

that he has or may have.

1.    On August 13, 2021, Plaintiff/State-Court Petitioner commenced this action,

known in New York practice as a special proceeding, by filing a Petition and a proposed Order to

Show Cause in the State Court, with Index Number 654909/2021.

**GROUND FOR REMOVAL**

2.    The subject matter of this action, pending in the State Court, relates to an

arbitration agreement falling under 9 U.S.C. § 202, in that the arbitration agreement arises out of

a legal relationship, both contractual and otherwise, which is considered as commercial,

including a transaction, contract, or agreement evidencing a transaction in commerce described

in 9 U.S.C. § 2.

1

3.     The agreement arising out of such relationship is not entirely between citizens of the United States.  In the alternative, the relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

4.     This action is therefore removed, pursuant to 9 U.S.C. § 205, to the United States District Court for the Southern District of New York.

Dated: New York, New York
        August 16, 2021                          MUKASEY FRENCHMAN LLP


                                        By:     /s/ Kenneth A. Caruso_____
                                                Kenneth A. Caruso

                                                570 Lexington Avenue, Suite 3500
                                                New York, New York 10022
                                                212-466-6400
                                                Ken.caruso@mfsllp.com

                                                *Attorneys for Defendant*

TO:     Clerk of the Court
        United States District Court
          for the Southern District of New York
        500 Pearl Street
        New York, New York 10007

        Clerk of the Court
        County of New York
        60 Centre Street
        New York, New York 10007

        Avery Mehlman, Esq.
        Herrick, Feinstein LLP
        2 Park Avenue
        New York, New York 10016
        *Attorneys for Plaintiff*

2

# ATTACHMENTS TO NOTICE OF REMOVAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of:                       :     Index No.     /2021
                                                          :
MOSHE CHAIM PANZER,                                        :
                                                          :
                     Petitioner,        :     **VERIFIED PETITION FOR A**
                                                          :     **PERMANENT STAY OF**
For a Permanent Stay of Arbitration Pursuant to           :     **ARBITRATION PURUSUANT**
Article 75 of the Civil Practice Law and Rules            :     **TO CPLR 7503**
                                                          :
                 -against-                   :
                                                          :
JOEL EPSTEIN,                                             :
                                                          :
                    Respondent.        :
                                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Petitioner Moshe Chaim Panzer, by and through his attorneys, Herrick, Feinstein LLP, as and for its Verified Petition against Respondent Joel Epstein, alleges as follows:

## NATURE OF ACTION

1.       This is a Petition pursuant to Article 75 of the New York Civil Practice Law and Rules for a permanent stay of the American Arbitration Association proceeding entitled *Joel Epstein v. Moshe Chaim Panzer*, AAA Case No. 1-21-0004-9666 (the "Arbitration).

2.       The parties are business partners and co-owners of Fabuwood Cabinetry Corp. (the "Company"), which imports and wholesales kitchen cabinets.   Petitioner is the Company's majority shareholder and, despite being experiencing health issues and an emotionally taxing divorce, is devoted to the Company—founded with his capital—and seeks to maintain an active involvement in its affairs.

3.       Smelling blood in the water, Respondent commenced a procedurally deficient arbitration proceeding seeking to compel a forced sale of Petitioner's shares of the Company for pennies on the dollar by improperly invoking a buyout provision in the shareholder's agreement

1

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

between the parties.  To add insult to injury, Respondent appointed his close friend, who has advised Respondent in his business dealings with Petitioner and who has no formal education or business experience relevant to this dispute, as his selection to the arbitration panel.  But Respondent's efforts to turn a AAA panel into a kangaroo court are futile, as Respondent unambiguously failed to satisfy numerous conditions precedent to trigger these buyout rights and permit Respondent to commence an arbitration under the shareholder agreement's dispute resolution provisions.

4.      Meanwhile, Respondent has shut out Petitioner out from nearly all aspects of the Company's affairs.  Upon information and belief, in clear violation of the shareholder's agreement, Respondent continues to commit the Company to major expenditures and indebtedness without approval of Petitioner—the majority owner of the Company, whose personal finances guaranty the Company's debt and ensures its liquidity.

5.      Therefore, the Arbitration should be permanently stayed until any of the buyout rights are actually triggered, if ever, and the provisions of the shareholders agreement are satisfied. And during the pendency of this proceeding, Respondent should enjoined from committing the Company to any further indebtedness or renegotiating any existing indebtedness and/or financing without Petitioner's approval, as required in the shareholder's agreement.

## PARTIES

6.      Petitioner Moshe Chaim Panzer is a resident of Kings County, residing at 1626 47 St. Brooklyn, New York 11204.

7.      Respondent Joel Epstein is a resident of Rockland County, residing at 8 Frankfurt Road, Unit 301, Monroe, New York 10950.

## JURISDICTION AND VENUE

2

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

8.      The Court has jurisdiction over Respondent pursuant to CPLR 301 because Respondent is a resident of New York chose to initiate arbitration proceedings in New York.

9.      Venue is proper pursuant to CPLR 7502(a)(i) because this proceeding is brought in the county where the arbitration is being held.

## RELEVANT FACTS

**Respondent's Predatory Attempt to Seize Control of the Company**

10.     Petitioner is the company's majority shareholder owning 52.5% of its outstanding shares.

11.     Petitioner also serves as the Company's Chief Executive Officer and President, granting him "the exclusive right and authority to manage (i) the Company's relationships and arrangements with suppliers of materials and manufacturers of its products, (ii) the import of the Company's products to the United States and (iii) the composition and activities of the Company's domestic sales and marketing staff."

12.     Respondent—the Company's Chief Operating Officer, Vice President, and Treasurer—is a minority shareholder with a 36.5% stake in the Company.

13.     On or about November 10, 2017 the parties, together with other minority owners of the Company, entered a certain Amended and Restated Shareholders Agreement (the "Agreement"), effective as of January 1, 2017, a true and accurate copy of which is annexed hereto as **Exhibit A**.

14.     Together, Petitioner and Respondent serve as the only Directors of the Company's Board of Directors.

15.     Petitioner seeks to maintain an active role in managing the corporation.

3

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

16.     Respondent, however, saw Petitioner's recent personal troubles as an opportunity to wrest control of the Company away from Petitioner.

17.     Over the past few months, Respondent embarked on a campaign to turn the Company's employees against Petitioner and shut Petitioner out from all corporate decisions, despite that fact that Petitioner is the Company's majority shareholder, CEO, and President.

18.     Then, in February 2020, Respondent escalated his efforts to seize control of the Company, and sought to force a sale of Petitioner's shares in the Company for pennies on the dollar without *any* legal basis for doing.

**Deadlock Remedies Under the Agreement**

19.     Under Section 2.05 of the Agreement, if the Board is unable to reach a consensus on any Major Decision, as that term is defined in Section 2.04 of the Agreement, "***submitted by either Director for consideration by the Board at two successive meetings of the Board*** (a "Deadlock"), then the Director who introduced the proposal for the Major Decision shall provide written notice to the other Director confirming its status as a Deadlock (a "Deadlock Notice")[.]" (emphasis supplied).

20.     Thereafter,  Petitioner and Respondent "have the sequential rights, but not the obligation (the "Buyout Rights"), to purchase all of the Shares ("Buyout Shares") owned by the other Shareholder and his Affiliates ("Buyout Parties") in an all-cash transaction at the Fair Market Value of the Buyout Shares determined under Section 2.05(b) ("Appraised Value")."

21.     If the Director who initially submitted the Major Decision to the Board and is thus responsible for providing the Deadlock Notice fails to timely invoke his Buyout Rights:

>    the other Director may provide such Deadlock Notice, with the same effect of triggering such Buyout Rights hereunder. The Buyout Rights of Panzer shall be exercisable for a period of fifteen (15) Business Days ***after receipt of the written valuation of the Buyout Shares by the Independent Appraiser, by notice to the***

4

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

> ***Buyout Parties (a "Buyout Notice"), accompanied by a copy of the valuation***. If Epstein has not received a Buyout Notice from Panzer within such period, the Buyout Rights of Panzer shall expire, and the Buyout Rights of Epstein shall vest and be exercisable for a period of fifteen (15) Business Days after the expiration of Panzer's Buyout Rights, by delivery of a Buyout Notice to Panzer. If a Shareholder exercises his Buyout Rights to resolve a Deadlock, the Buyout Parties shall be obligated to sell their Buyout Shares to such Shareholder in accordance with Section 2.05(c). ***If neither Panzer nor Epstein exercise their respective Buyout Rights following a Deadlock and the Major Decision causing the Deadlock has not been resolved by the Board upon expiration of Epstein's Buyout Rights, it shall be considered a Dispute subject to the Dispute resolution provisions of Section 5.06.***

(emphasis supplied).

22.     Thus, as a condition precedent to arbitrating a dispute with respect to a Deadlock or Buyout rights, one party must first properly declare a Deadlock and properly trigger the parties' Buyout rights.

23.     With the respect to the retention and qualifications of the Independent Appraiser, the Agreement provides that:

> Within fifteen (15) Business Days after the delivery of a Deadlock Notice under Section 2.05(a), ***the Company shall engage a nationally recognized investment banking firm to be selected by the Board (an "Independent Appraiser") to determine the Appraised Value of the Buyout Shares.*** The Company shall timely furnish the Independent Appraiser with such information as it may request in order to render its valuation, including information regarding the Company's assets, financial condition and results of operations. The Board shall instruct the Independent Appraiser to render its valuation in writing within thirty (30) Business Days of its appointment, which determination shall be final and binding for all purposes of this Agreement. The fees and expenses of the Independent Appraiser shall be borne by the Company and reimbursed to the Company in equal proportions by Panzer and Epstein.

**Dispute Resolution Requirements Under the Agreement**

24.     Under Section 5.06 of the Agreement, any dispute arising out of the Agreement. "including any Deadlock of the Board, shall initially be submitted to non-binding mediation

5

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

conducted by the Kossover Rebbe of Brooklyn and then, if unsuccessful, to the AAA for binding

arbitration."

**Acknowledgement of Irreparable Harm**

25.    Under Section 5.07 of the Agreement,

Each Party acknowledges that the other Parties would be irreparably damaged in
the event of a breach or threatened breach by such Party or any of his
Representatives of any of his obligations under this Agreement and hereby agrees
that in the event of a breach or a threatened breach by such Party of any such
obligations, each of the other Parties, in addition to any other rights and remedies
that may be available to them in respect of such breach, shall be entitled to an
injunction from a court of competent jurisdiction, without any requirement to post
bond, granting such Parties specific performance by such Party of his obligations
under this Agreement.

**Respondent Calls a Deadlock Before Any**
**Board Meeting is Held to Resolve the Alleged Deadlocks**

26.    On February 1, 2021, Respondent wrote  to Petitioner—in a letter annexed

hereto as **Exhibit B**—that he sought to end their business relationship, claiming that their

"vision and management philosophies and processes hav[e] diverged significantly" due to

Petitioner's "health issues over the years, [Petitioner's] divorce case which has been going

on for years," and "other personal issues that [Petitioner] has been facing over the last 4 to

5 years."

27.    But instead of offering to buyout Petitioner's at a fair price, Respondent

improperly attempted to invoke his Buyout Rights in violation of the plain language of the

Agreement.

28.    On the same day, February 1, 2021, Respondent tendered to Petitioner, a

Deadlock Notice, Buyout Notice, and Voting Agreement, annexed hereto as **Exhibits C-**
**E**, respectively.

6

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

29.     In the Deadlock Notice, Respondent alleges, among other things, that the parties have reached an impasse with respect to decisions related the Company that purportedly qualify as Deadlocks of a Major Decision under the terms of the Agreement, thereby, in Respondent's estimation, permitting him to invoke his Buyout Rights.

30.     At no time prior to the service of the Deadlock Notice were any of the alleged Deadlocks set forth therein submitted by Respondent at a single meeting of the Board of Directors, let alone two successive meetings.

31.     Upon information and belief, the Board has not met for over a year.

32.     To date, no Deadlock has been submitted for consideration at *any* Company Board of Directors meeting.

33.      Nowhere in the Deadlock Notice is any Board of Directors meeting even mentioned.

34.     Thus, there can be no Deadlock as defined by the Agreement.

**Respondent Tenders a Premature Buyout Notice**

35.     Under Section 2.05 of the Agreement, because Respondent issued the Deadlock Notice, Petitioner's Buyout Rights would be triggered first following issuance of an appraisal from a "nationally recognized investment banking firm" selected by the Company's Board.

36.     The Board of Directors never hired an Independent Appraiser as required by the Agreement.

37.     Instead, the Buyout Notice indicated that an appraisal of the Company was performed by Mark S. Gottlieb, CPA, PC on January 25, 2021.

7

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

38.     In blantant violation of the Agreement, the appraisal was not submitted along with the Buyout Notice, depriving Petitioner any opportunity to verify the veracity or accuracy of the valuation.

39.     For months, Respondent refused to provide a copy of the appraisal, despite persistent demands from Petitioner's counsel.

40.     Worse yet, Mr. Gottlieb is not associated with a "nationally recognized investment banking firm," was not hired by the Company's Board of Directors, and is not independent because, among other reasons, he was a court appointed appraiser in Petitioner's divorce proceedings.

41.     Thus, he is not an Independent Appraiser as required by the Agreement and, consequently, the Buyout Rights of neither party were triggered even if a Deadlock had existed.

42.     Even if Buyout Rights were triggered, Petitioner's Buyout Rights would be triggered first and, only after they lapsed, would Respondent enjoy Buyout Rights.

43.     Nevertheless, on the same day that Respondent issued the Deadlock Notice, Respondent tendered a Buyout Notice under Section 2.05 of the Agreement.

44.     So even if there were a Deadlock, and even if an Independent Appraiser was properly and timely hired by the Company, the Buyout Notice would still be premature and defective.

45.     To add insult to injury, the Buyout Notice consists of an offer to purchase Petitioner's shares of the Company at $143,000 per share, for a total purchase price of $15,015,000.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

46.     Upon information and belief, Mr. Gottlieb's appraisal is predicated on incorrect information fed to Mr. Gottlieb by Respondent to generate an artificially depressed Buyout price.  A legitimate appraisal, procured through the procedures set forth in the Agreement, would show that the price per share of the Company is far greater than $143,000.

47.     No further appraisals of the Company were conducted.

**The Parties' Dispute Escalates Without the**
**Occurrence of Any Conditions Precedent to a Deadlock or Buyout**

48.     On February 9, 2021, Petitioner's counsel served a letter, annexed hereto as **Exhibit F**, on Respondent in which Petitioner objected to Respondent's purported Deadlock Notice and Buyout Notice for the reasons set forth above.

49.     Respondent did not immediately respond to this letter.

50.     On February 15, Petitioner's counsel was forced to write another letter to Respondent, annexed hereto as **Exhibit G**, because Respondent was spending large sums of Company money without proper Board approval.

51.     The following day, Respondent's counseled replied via email, annexed hereto as **Exhibit H**, and incorrectly alleged that the dispute over the unapproved financial commitments represents a Deadlock on Major Decision, despite the fact that not a single Board of Directors meeting was held or was even alleged to have been held to resolve the issue.

52.     In the meantime, the parties agreed to proceed to mediation with Kossover Rebbe to resolve their disputes.

9

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

53.     In connection with mediation, Respondent consistently requested in emails annexed hereto as **Exhibit I** for a copy of the alleged appraisal report of Mr. Gottlieb, which was not provided until mid-April.

54.     Respondent's counsel did not respond to Petitioner's February 9 letter until February 24, 2021.  In an email, annexed hereto as **Exhibit J**, Respondent's counsel notified Petitioner that Petitioner's Buyout Right had expired, thus triggering Respondent's Buyout Rights, which Respondent's counsel purported to exercise.

55.     As a tacit admission that Petitioner's Buyout Rights would be triggered first in the event of Deadlock, this email completely undermines the validity and efficacy of the Respondent's Buyout Notice, in which Respondent sought priority in exercising his Buyout Rights.  Again, no follow-up or corrected Buyout Notice was issued thereafter.

**Respondent Commences Arbitration**

56.     Mediation with the Kossover Rebbe eventually failed to solve the parties' dispute.

57.     On July 29, 2021, Respondent served a Demand for Arbitration ("Demand"), annexed hereto as **Exhibit K**, seeking that the Panel

      a.  declare that a Deadlock has occurred under the terms of the Shareholders Agreement;

      b.  declare that Petitioner has failed to timely exercise his Buyout Right, and, accordingly, declare that Petitioner's Buyout Right has expired; and

10

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

    c.   direct, order and instruct Petitioner to sell his Buyout Shares to Claimant at a price of $143,000 per share for a total purchase price of $15,015,000.

58.    Acknowledging that Mr. Gottlieb is not a qualified Independent Appraiser under the terms of the Agreement, Respondent alternatively seeks that the Panel:

    a.   Declare that a Deadlock has occurred under the terms of the Shareholders Agreement;

    b.   Appoint a different investment banking firm/appraiser to perform another independent appraisal of the Company; and

    c.   Direct, order and instruct Petitioner to sell his Buyout Shares to Claimant, at the price per share set forth in the appraisal report, Respondent having waived his right to exercise his Buyout Right by his failure to exercise such right timely.

59.    Nowhere in the Demand did Respondent even alleged to have participated in a Board of Directors meeting with respect to any alleged Major Decision.

60.    Curiously, the Demand named Jacob Sofer, who is not a lawyer and has no professional experience relevant to this dispute, as an arbitrator

61.    Mr. Sofer is a close friend and advisor of Respondent, who even appeared with Respondent at the mediation.

62.    In clear violation of the AAA rules, Mr. Sofer is not an independent arbitrator and has no business adjudicating this or any dispute between the parties.

11

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

63.     Petitioner has until August 28, 2021 to name an arbitrator of his choosing. Thereafter, if the Arbitration proceeds, the two selected arbitrators will then mutually select another arbitrator to round out the panel.

**CLAIM FOR RELIEF**
**(Stay Pursuant to CPLR 7503(b))**

64.     Petitioner repeats and realleges, as if set forth fully herein, the allegations contained in each of the foregoing paragraphs.

65.     Petitioner seeks, among other things, an order and judgement staying arbitration of the claims asserted against it in the Demand.

66.     Petitioner has not participated in any such arbitration.

67.     Under CPLR 7503(b), "a party who has not participated in the arbitration may apply to stay arbitration on the ground that a valid agreement was not made or has not been complied with[.]"

68.     Here, two critical conditions precedent to any arbitration regarding a Deadlock or Buyout have not been met. *First*, it is undisputed that there never were two consecutive meetings of the Company's Board of Directors with respect to any Major Decision alleged by Respondent. *Second,* the Company's Board of Directors never retained an Independent Appraiser to provide a valuation of the Company as set forth in Section 2.05 of the Agreement.

69.     Under Section 2.05, a Deadlock only arises after two consecutive meetings of the Board of Directors that fail to result in a consensus with respect to any Major Decision. Because that never happened, and was never alleged to have happened, there can be no Deadlock under the Agreement. Therefore, any arbitration seeking to resolve a parties' rights with respect to a Deadlock is premature.

12

70.     Under Section 2.05, the parties' Buyout Rights are triggered by the delivery of an appraisal report—prepared by a nationally recognized investment banking firm retained by the Company's Board of Directors—detailing the value of the Company's shares.  No such appraiser was retained by the Company.  Instead, an appraiser who unequivocally does not meet the qualifications under the Agreement prepared an appraisal report that was not tendered to Petitioner until April, months after Respondent served his Deadlock Notice and Buyout Notice.  Accordingly, the condition precedents to any parties' Buyout Rights did not occur, and thus any arbitration with respect to a Buyout is grossly premature.

71.     Respondent cannot seek an arbitration to determine the existence of Deadlock and opine on the parties' Buyout Rights, when the conditions precedent for those rights unequivocally did not occur.

72.     By reason of the foregoing, the Court should issue a permanent stay of the Arbitration and award costs, attorney's fees, and expenses as provided for by the Agreement.

### NO PRIOR APPLICATION

73.     No prior application for this or any similar relief has been made in any court.

### REQUESTS FOR RELIEF

**WHEREFORE**, Petitioner requests judgment pursuant to CPLR 7503(b) as follows:

a.   Permanently staying the Arbitration;

13

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

b.   Granting Petitioner permission to conduct pre-arbitration discovery as to the

Company's books and records;

c.   Attorneys' fees, costs, and expenses pursuant to the Agreement; and

d.   Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 11, 2021

                                  **HERRICK, FEINSTEIN LLP**
                                  *Attorneys for Petitioner Moshe*
                                  *Chaim Panzer*

                                  By: *\_/s/ Avery S. Mehlman\_\_\_\_\_*
                                       Avery S. Mehlman
                                       Joshua S. Stricoff
                                  2 Park Avenue
                                  New York, New York 10016
                                  (212) 592-1400

14

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

### VERIFICATION UNDER CPLR 2106(b)

I, Moshe Chaim Panzer, am the Petitioner in this action, being physically located in Israel at the time of execution, hereby affirm under CPLR Rule 2106(b) this 11th day of August 2021, under the penalties of perjury under the laws of New York and the United States, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing Verified Petition is true to the best of my knowledge, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: August 11, 2021

Moshe Chaim Panzer
_____
Moshe Chaim Panzer

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 1

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## ATTORNEY VERIFICATION

I, Avery Mehlman, Esq., an attorney duly admitted to practice law in the State of New York, under penalties of perjury, affirms the following:

That deponent is the attoenys for Petitioner in this special proceeding; that deponent has read the foregoing Verified Petition and knows the contents thereof; that the same is true to the deponent's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters believes it to be true; and the reason this verification is made by deponent is that Petitioner is not presently located in the county where the deponent-attorney maintains his office.

Dated: August 11, 2021

*/s/ Avery Mehlman*
AVERY MEHLMAN

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

[EXECUTED]

# AMENDED AND RESTATED

# SHAREHOLDERS AGREEMENT

among

# FABUWOOD CABINETRY CORP.

and

# THE SHAREHOLDERS NAMED HEREIN

**Effective as of**

**January 1, 2017**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM          INDEX NO. 654909/2021

NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 08/13/2021

# TABLE OF CONTENTS

**Page No.**

ARTICLE I          DEFINITIONS .................................................................... 1

ARTICLE II         MANAGEMENT AND OPERATIONS OF THE COMPANY ................. 7

Section 2.01       Board of Directors ........................................................... 7
Section 2.02       Actions of the Board and the Shareholders ................................. 7
Section 2.03       Business Expansion .......................................................... 8
Section 2.04       Major Decisions ............................................................. 8
Section 2.05       Deadlock Remedies .......................................................... 10
Section 2.06       Executive Officers .......................................................... 11
Section 2.07       Annual Operating Plans ...................................................... 13
Section 2.08       Indemnification ............................................................. 14
Section 2.09       Exculpation ................................................................ 16

ARTICLE III        SHARE ISSUANCES ........................................................ 16

Section 3.01       Pre-Emptive Rights ......................................................... 16
Section 3.02       No Capital Commitments ..................................................... 17

ARTICLE IV         TRANSFER OF INTERESTS .................................................. 17

Section 4.01       General Restrictions on Transfer ............................................ 17
Section 4.02       Permitted Transfers ........................................................ 19
Section 4.03       Conditions to Permitted Transfers .......................................... 19
Section 4.04       Bankruptcy of a Shareholder ................................................ 20
Section 4.05       Termination of Employment .................................................. 21
Section 4.06       Death of a Shareholder ..................................................... 22
Section 4.07       Minority Buyout Options .................................................... 23
Section 4.08       Release from Certain Obligations ........................................... 24

ARTICLE V          NON-COMPETE AND OTHER OBLIGATIONS ................................. 24

Section 5.01       Non-Compete ............................................................... 24
Section 5.02       Blue Pencil ............................................................... 25
Section 5.03       Unrestricted Corporate Opportunities ....................................... 25
Section 5.04       Confidentiality ........................................................... 25
Section 5.05       Subchapter S Obligations .................................................. 26
Section 5.06       Dispute Resolution ........................................................ 26
Section 5.07       Equitable Remedies ........................................................ 27

ARTICLE VI         REGISTRATION RIGHTS ................................................... 28

Section 6.01       Piggyback Rights .......................................................... 28
Section 6.02       Pro Rata Reduction ........................................................ 28
Section 6.03       Shareholder Obligations ................................................... 28
Section 6.04       Registration Expenses ..................................................... 28

ARTICLE VII        INFORMATION RIGHTS .................................................... 28

Section 7.01       Financial Statements ...................................................... 28
Section 7.02       Bank Accounts ............................................................. 29
Section 7.03       Books and Records ......................................................... 29

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

| | | |
|---|---|---|
| ARTICLE VIII | REPRESENTATIONS AND WARRANTIES | 30 |
| Section 8.01 | Representations and Warranties of the Shareholders | 30 |
| Section 8.02 | Representations and Warranties of the Company | 31 |
| ARTICLE IX | TERM AND TERMINATION | 32 |
| Section 9.01 | Term and Termination | 32 |
| Section 9.02 | Effect of Termination | 32 |
| ARTICLE X | MISCELLANEOUS | 32 |
| Section 10.01 | Notices | 32 |
| Section 10.02 | Interpretation | 33 |
| Section 10.03 | Headings | 34 |
| Section 10.04 | Severability | 34 |
| Section 10.05 | Entire Agreement | 34 |
| Section 10.06 | Successors and Assigns | 34 |
| Section 10.07 | No Third-Party Beneficiaries | 34 |
| Section 10.08 | Amendment and Modification; Waiver | 34 |
| Section 10.09 | Governing Law | 34 |
| Section 10.10 | Counterparts | 34 |
| EXHIBIT A | Form of Joinder Agreement | |

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# AMENDED AND RESTATED
# SHAREHOLDERS AGREEMENT

This Amended and Restated Shareholders Agreement is entered into on November 10, 2017 by and among **FABUWOOD CABINETRY CORP.**, a New York corporation (the "Company"), **MOSHE C. PANZER**, ("Panzer"), **JOEL EPSTEIN** ("Epstein"), **JOEL EPSTEIN 2014 FAMILY TRUST**, a New York trust (the "Joel Epstein Trust"), **JUDITH EPSTEIN 2014 FAMILY TRUST**, a New York trust (the "Judith Epstein Trust" and, together with the Joel Epstein Trust, the "JE Trusts"), **RAIZY FREUND** ("Freund") and **JOEL WEINSTEIN** ("Weinstein" and, together with Panzer, Epstein, the JE Trusts and Freund, the "Shareholders" and, collectively with the Company, the "Parties"), effective as of January 1, 2017 (the "Effective Date").

## RECITALS

**A.** The Company was incorporated in the State of New York on September 4, 2008 under the name Woodstone Cabinetry Corp., and its corporate name was changed to Fabuwood Cabinetry Corp. in February 2009;

**B.** The Company is engaged in the business of sourcing and importing stock lines of knock-down kitchen and bathroom cabinetry for assembly in the United States and distribution to dealers having showrooms in the United States and Canada (the "Business");

**C.** The Company, Panzer, Epstein, Josef Freund, the spouse of Freund, and Weinstein are parties to a Stockholders Agreement dated as of July 1, 2009 (the "Original Stockholders Agreement") relating to the operations, management and policies of the Company and dispositions of common stock, no par value, of the Company ("Common Stock"); and

**D**. The Parties desire to amend in part and restate in its entirety the Original Stockholders Agreement as set forth herein, effective as of the Effective Date, with the objectives of memorializing their arrangements for the ownership and disposition of Common Stock now held or hereafter acquired by the Shareholders (the "Shares"), including the voting and transfer of the Shares, clarifying the respective rights, powers and duties of the individual Shareholders in managing the Business and providing unequivocal remedies for any breach of this Agreement by a Shareholder.

Accordingly, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Article I, and all references to Recitals, Articles, Sections or Exhibits, when underlined, refer to associated components of this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

"**Affiliate**" means any Person directly or indirectly controlling or controlled by or under direct or indirect common control with a specified Person, and "control" when used with respect to any specified Person means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble hereof and includes any amendment adopted from time to time in accordance with Section 10.08.

"**Annual Operating Plans**" has the meaning set forth in Section 2.07(a).

"**Applicable Law**" means, to the extent applicable to the Company or the Business, all provisions of (a) constitutions, treaties, statutes, laws, rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, (b) consents or approvals of any Governmental Authority and (c) orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Appraised Value**" has the meaning set forth in Section 2.05(a).

"**Bankrupt Shareholder**" and "**Bankruptcy Shares**" have the meanings set forth in Section 4.04(a).

"**Bankruptcy**" means, with respect to a Shareholder, (a) the entry of a decree or order for relief against the Shareholder by a court of competent jurisdiction in an involuntary case brought against the Shareholder under any Debtor Relief Laws, (b) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for a Shareholder or for any substantial part of his assets or property, (c) the ordering of the winding up or liquidation of a Shareholder that is not a natural Person, (d) the filing of a petition in an involuntary case against the Shareholder under any Debtor Relief Laws, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to section 305 of the United States Bankruptcy Code, (e) the commencement by the Shareholder of a voluntary case under any Debtor Relief Laws, (f) the consent by the Shareholder to the entry of an order for relief in an involuntary case under any Debtor Relief Laws or (g) the making of any general assignment by the Shareholder for the benefit of creditors.

"**BCL**" means the New York Business Corporation Law.

"**Board**" has the meaning set forth in Section 2.01(a).

"**Book Value**" means the total shareholders' equity of the Company or any assets included therein, as reflected on its balance sheet as of the end of any relevant accounting period, determined in accordance with GAAP and reviewed by the Company's independent certified public accountants.

"**Business**" has the meaning set forth in Recital B, *provided* that if the Business is modified by the Board in accordance with this Agreement to (a) expand or reduce the types of products distributed by the Company, including the planned expansion into closet cabinetry contemplated by Section 2.03, or (b) to alter the channels of distribution for its product lines, then all references herein to the Business after the implementation of such modification shall be deemed to encompass the modification, unless otherwise specifically provided in this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

"**Business Day**" means a day other than (a) Saturdays, (b) Sundays, (c) days on which commercial banks in the City of New York are closed and designated by the Board as Company holidays and (d) Jewish holidays designated by the Board as Company holidays.

"**Buyout Notice**," "**Buyout Parties**," "**Buyout Rights**" and "**Buyout Shares**" have the meanings set forth in Section 2.05(a).

"**By-laws**" means the by-laws of the Company, as amended, modified, supplemented or restated from time to time in accordance with the terms of this Agreement.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as filed on September 4, 2008 with the Secretary of State of the State of New York and as amended or restated from time to time in accordance with the terms of this Agreement.

"**Change of Control**" means any transaction or series of related transactions that results in (a) any Third Party Purchaser or "group" (within the meaning of Section 13(d)(3) of the Exchange Act) of Third Party Purchasers acquiring beneficial ownership, directly or indirectly, of a majority of the then issued and outstanding Common Stock or (b) the sale, lease, exchange, conveyance, transfer or other disposition of all or substantially all of the property and assets of the Company and its Subsidiaries (if any), on a consolidated basis, to any Third Party Purchaser or "group" (within the meaning of Section 13(d)(3) of the Exchange Act) of Third Party Purchasers.

"**Claimant**" has the meaning set forth in Section 5.06(c).

"**Code**" means the Internal Revenue Code of 1986.

"**Common Stock**" has the meaning set forth in Recital B and includes any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

"**Company**" has the meaning set forth in the preamble hereof and includes any successor by operation of Applicable Law in accordance with the terms of this Agreement.

"**Competitor**" means any Person that directly or indirectly competes with the Business in any manner conducted or planned by the Company in any market from which sales of the Company's products are derived, targeted or planned.

"**Counselor**" has the meaning set forth in Section 5.06(b).

"**Covered Person**" means each Shareholder in his capacity as a Director or an officer or employee of the Company.

"**Deadlock**" and "**Deadlock Notice**" haves the meanings set forth in Section 2.05(a).

"**Debtor Relief Laws**" means any applicable bankruptcy, insolvency or other similar laws generally affecting the rights of creditors and relief of debtors in effect from time to time.

"**Derivative Securities**" has the meaning set forth in Section 8.02(e).

"**Direct Family Member**" has the meaning set forth in Section 4.02(a).

"**Director**" has the meaning set forth in Section 2.01(a).

3

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

"**Disability**" means, with respect to a Shareholder in his capacity as an executive officer of the Company, the Shareholder's inability to perform his duties under Section 2.06 due to physical incapacity or illness for a period of ninety (90) consecutive days or the declaration of legal incompetency by a court with competent jurisdiction over such Shareholder.

"**Dispute**" has the meaning set forth in Section 5.06(a).

"**Effective Date**" has the meaning set forth in the preamble hereof.

"**Eligible Director**" has the meaning set forth in Section 2.01(b).

"**Empire**" means Empire State Supply Corp., a New York corporation affiliated with Panzer.

"**Employee Shareholder**" has the meaning set forth in Section 5.01(a).

"**Epstein**" has the meaning set forth in the preamble hereof and includes any of his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Estate Shares**" and "**Estate Holders**" have the meanings set forth in Section 4.06(a).

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Claim**" has the meaning set forth in Section 5.06(c).

"**Excluded Securities**" means any Common Stock or other equity securities of the Company issued pursuant to (a) any stock option, stock purchase or similar equity-based employee benefit plan adopted by the Board after the Effective Date; (b) any acquisition by the Company of the stock, assets, properties or business of any Person; (c) any merger, consolidation or other business combination or series of transactions involving a Change of Control; (d) any Qualified Public Offering; (e) a stock split, stock dividend or any similar recapitalization of the Company and (f) any Financing Equity.

"**Fair Market Value**" means the price a willing buyer and a willing seller would agree upon as fair consideration for the sale of Shares to a bona fide purchaser in an arm's length transaction.

"**Financing Equity**" means up to one percent (1%) of the outstanding Common Stock or warrants to purchase up to two percent (2%) of the Common Stock issued to lenders or other institutional investors in an arm's length debt financing transaction with the Company.

"**Fiscal Year**" means for financial accounting purposes, January 1 to December 31.

"**Freund**" has the meaning set forth in the preamble hereof and includes any of her heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares, and "**Freund Holder**" has the meaning set forth in Section 4.07(a).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Government Approval**" means any authorization, consent, approval, waiver, exception, variance, order, exemption, publication, filing, declaration, concession, grant, franchise, agreement, permission, permit or license of, from or with any Governmental Authority, the giving of notice to, or registration with, any Governmental Authority or any other action required by the Company under Applicable Law in respect of any Governmental Authority.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority, or any arbitrator, court or tribunal of competent jurisdiction.

"**Independent Appraiser**" has the meaning set forth in <u>Section 2.05(b)</u>.

"**Information**" has the meaning set forth in <u>Section 5.04(a)</u>.

"**Insider Shares**" has the meaning set forth in <u>Section 6.01</u>.

"**Issuance Notice**" has the meaning set forth in <u>Section 3.01(b)</u>.

"**IRS**" means the United States Internal Revenue Service.

"**JE Trusts**" means the Joel Epstein Trust and the Judith Epstein Trust, collectively.

"**Joel Epstein Trust**" has the meaning set forth in the preamble hereof and includes its successors and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Joinder Agreement**" means the joinder agreement in the form of <u>Exhibit A</u>.

"**Judith Epstein Trust**" has the meaning set forth in the preamble hereof and includes any of its successors and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Lien**" means any lien, claim, charge, mortgage, pledge, security interest, option, preferential arrangement, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever.

"**Major Decisions**" has the meaning set forth in <u>Section 2.04</u>.

"**Minority Holders**" has the meaning set forth in <u>Section 4.07(a)</u>.

"**New Securities**" has the meaning set forth in <u>Section 4.02(a)</u>.

"**Organizational Documents**" means the By-laws and the Certificate of Incorporation of the Company.

"**Original Stockholders Agreement**" has the meaning set forth in <u>Recital B</u>.

"**Panzer**" has the meaning set forth in the preamble hereof and includes any of his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Parties**" has the meaning set forth in the preamble to this Agreement and includes any Permitted Transferee of Shares following the execution and delivery of a Joinder Agreement among the Permitted Transferee, the Company and the assignor of such Shares.

"**Permitted Transfer**" has the meaning set forth in <u>Section 4.02(a)</u>.

"**Permitted Transferee**" means a Person acquiring Shares pursuant to a Permitted Transfer that satisfies the conditions set forth in <u>Section 4.02</u> and <u>Section 4.03</u>.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

"**Percentage Interest**" means the percentage equity ownership of the Company of each Shareholder, as set forth in Section 8.02(f) as of the Effective Date, and as thereafter adjusted for any Permitted Transfers or issuances of New Securities or Excluded Securities in accordance with this Agreement.

"**Pre-emptive Shareholder**" and "**Pre-emptive Pro Rata Portion**" have the respective meanings set forth in Section 3.01(a) and Section 3.01(e).

"**Qualified Public Offering**" means the public sale of the Common Stock pursuant to a registration statement that has become effective under the Securities Act, with net proceeds to the Company of at least Twenty-Five Million Dollars ($25,000,000).

"**Qualified Trust**" means a trust that (a) is solely the benefit of a grantor Shareholder or the spouse of the grantor Shareholder (b) is a "qualified subchapter S trust," as defined in the Code; (c) has a situs in one of the states or territories of the United States and (d) does not provide any interest to any Person that is not subject to service of process issued from a district federal court or any Person that is not qualified under Code section 501(c)(3).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Request**" and "**Respondent**" have the meanings set forth in Section 5.06(c).

"**Restriction Period**" has the meaning set forth in Section 5.01(a).

"**SEC**" means United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933.

"**Shareholders**" has the meaning set forth in the preamble hereof and includes their respective successors, heirs, legal representatives and other Permitted Transferees.

"**Terminated Shareholder,**" "**Termination Shares,**" "**Termination Share Holders**" and "**Termination Share Price**" have the respective meanings set forth in Section 4.05(a).

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Common Stock or (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Common Stock.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, any Common Stock owned by a Person or any interest (including a beneficial interest) in any Common Stock owned by a Person, or to enter into any contract, option or other arrangement or understanding with respect thereto, including any disposition arising out of or resulting from a judgment or decree in divorce or any separation agreement incorporated therein.

"**Unrestricted Corporate Opportunity**" has the meaning set forth in Section 5.03(a).

"**Weinstein**" has the meaning set forth in the preamble hereof and includes his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares, and "**Weinstein Holder**" has the meaning set forth in Section 4.07(a).

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## ARTICLE II
### MANAGEMENT AND OPERATIONS OF THE COMPANY

**Section 2.01   Board of Directors.**

(a)   All aspects of the Business shall be managed by the Company's board of directors (the "Board"), which shall consist of two (2) members (each, a "Director"), each of whom shall have one (1) vote on each matter submitted for consideration by the Board.   The Board shall not have any committees for any purpose.  No Person other than the Directors then in office may attend, observe or participate in any other manner in any regular or special meetings of the Board or be invited for such purpose without the prior written consent of both Directors. The Directors in office as of the Effective Date and the date of this Agreement are Panzer and Epstein.

(b)   As long as (i) Panzer or (ii) Epstein, together with the JE Trusts, continue to own beneficially and of record at least 20% of the outstanding Common Stock (an "Eligible Director"), each Shareholder shall vote all Shares over which such Shareholder has voting control and shall take all other necessary actions within such Shareholder's control, whether at regular or special meetings of the Shareholders or by written consent in lieu of a meeting, to re-elect each such Eligible Director to the Board as the sole Directors.  The foregoing undertakings shall apply to any successor Director serving in such capacity pursuant to Section 2.01(c) without regard to the Share ownership condition for an Eligible Director.

(c)   Upon the death or declaration of legal incompetency of a Director by a court with competent jurisdiction, such Director shall be contemporaneously succeeded in such office, without any action or consent of any Party, by Benzion Panzer, in the case of Panzer, or by Yitzchak Epstein, in the case of Epstein, and each such incumbent Director hereby irrevocably appoints his named successor, upon such succession, as his attorney-in-fact for the purpose of exercising all of prerogatives and responsibilities of such succeeded Director under this Agreement prior to his death or declaration of legal incompetency.  The power granted by each incumbent Director hereunder is coupled with an interest and shall survive the death or declaration of legal incompetency of such Director, *provided* that a Director succeeded in such capacity hereunder by reason of his declaration of legal incompetency shall be entitled to reinstatement as a Director in lieu of his appointed successor upon any cessation of such Disability.

**Section 2.02.   Actions of the Board and the Shareholders.**

(a)   The presence of both Directors in office at the time of any meeting of the Board shall constitute a quorum in accordance with the By-laws.  All decisions of the Board shall require the affirmative vote or consent of both Directors.  The Board shall meet no less than four (4) times a year within thirty (30) days following the end of each fiscal quarter of the Company to conduct regular meetings during normal business hours at the principal corporate office of the Company.  Special meetings of the Board may be called by either Director on no less than ten (10) Business Days prior written notice of its time, place and agenda.  The Company shall pay all fees, charges and expenses incurred by each Director in connection with attending the meetings of the Board, including travel and related expenses.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(b)    Any action required or permitted to be taken at any meeting of the Board as set forth in Section 2.02 may be taken without a meeting if (i) one Director transmits a written proposal for the proposed action to the other Director in accordance with Section 10.01, setting forth in reasonable detail the nature of the proposed action, the recommendation of the Director proposing the action and the basis for such recommendation, including all relevant cost/benefit analyses, (ii) both Directors consent thereto in writing and (iii) each Director delivers his written consent or objection to such action to the other Director and the Company in accordance with Section 10.01, which written consent or objection shall be filed with the minutes of proceedings of the Board. Written consents or objections to a proposed action by the Board shall be delivered within three (3) Business Days following the transmission of request therefor.  Any failure to respond to a proposal for action of the Board by written consent within such timeframe shall be deemed for all purposes to be an objection to such proposed action, subject to subsequent reconsideration of such proposal or any proposed modification at the election of either Director under the procedures set forth herein.

(c)    The Directors or the Shareholders may participate in any meeting of the Board or the Shareholders, respectively, by means of video conference, teleconference or other similar communications equipment enabling all participants in such meeting to hear each other, and such participation shall constitute each such Party's presence in person at the meeting.

(d)    The Directors have proposed, and the Shareholders hereby consent, to the adoption and filing, in the office of the New York Secretary of State, of a certificate of amendment to the Certificate of Incorporation, amending Article Fourth thereof as follows:

"FOURTH:    The aggregate number of shares of capital stock that the corporation shall have authority to issue is three hundred (300) shares of common stock, no par value."

**Section 2.03    Business Expansion.**    The Directors have agreed in principle to expand the Business to include closet cabinetry for distribution to dealers having showrooms anywhere in the world, subject to adoption by the Board of a business plan for such expansion covering all relevant items contemplated by Section 2.07(b).

**Section 2.04    Major Decisions.**    The following matters ("Major Decisions") shall require prior approval from the Board following reasonable written disclosure to the Directors in accordance with Section 10.01 specifying the nature of the Major Decision, the recommendation of the Person proposing the matter and the basis for such recommendation, including all relevant cost/benefit analyses.  No action or commitment of any nature involving a Major Decision shall be taken or made on behalf of the Company by any Shareholder in any capacity, including his capacity as an executive officer of the Company, without the prior authorization of the Board and an express directive from the Board for implementing the Major Decision.  Major Decisions shall constitute any proposed transaction or series of transactions involving the following:

(a)    Any issuance of New Securities or incurrence of any indebtedness by the Company to fund any of its capital expenditures or working capital;

(b)    Any amendment of the Organizational Documents, this Agreement or any agreements or instruments to which the Company is a party as a result of a previously implemented Major Decision, including any outstanding loan or credit agreements or other debt or related security instruments of the Company and any employment agreements or consultancy agreements to which the Company is a party;

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(c)   The sale, transfer or other disposition or the grant of any Lien on any of the Company's assets, other than in the ordinary course of the Business;

(d)   The commencement of any discussions or the execution of any agreements or undertakings providing for or contemplating the merger, consolidation or dissolution of the Company;

(e)   Any transaction or matter involving the commitment or obligation of the Company to make any expenditure or grant any discount in excess of Fifty Thousand Dollars ($50,000), except expenditures covered by the prevailing Annual Operating Plan and current liabilities incurred in the ordinary course of business, any adjustment, settlement or compromise of any claim, obligation, debt, demand, suit, arbitration or judgment by or against the Company in excess of such amount or the assignment, transfer, compromise or release any of the claims or accounts receivable of the Company in excess of such amount;

(f)   The filing or consent to the filing of a petition or other similar action by or on behalf of the Company for any form of relief under the Debtor Relief Laws;

(g)   Any expansion, reduction or other material modification of the Business in effect on the Effective Date with respect to the types of products distributed by the Company or the channels of distribution utilized for marketing its product lines, *provided* that any failure by the Directors to reach a consensus on a Major Decision covered by this Section 2.04(g) or the business plan for the expansion of the Business contemplated by Section 2.03 shall not constitute a Deadlock for purposes of Section 2.05;

(h)   The hiring, engagement or termination by the Company of any employee or consultant whose annual compensation exceeds One-Hundred Thousand Dollars ($100,000);

(i)   The form and content of any financial forecasts to be provided by or on behalf of the Company to any Person;

(j)   Any other matter involving (i) a change in the Company's commercial banking arrangements or insurance coverage, (ii) a related party transaction involving the Company and a Shareholder or his Affiliates, (iii) a declaration or payment of any dividend or distribution on the outstanding Common Stock, (iv) the approval of each Annual Operating Plan pursuant to Section 2.07 and any amendment to an Annual Operating Plan, (v) decisions involving indemnification of Covered Persons pursuant to Section 2.08, except advances by the Company of legal expenses pursuant to Section 2.08(d) to a Covered Person that is or was a Director, (vi) the engagement of professionals on matters involving exculpation pursuant to Section 2.09, except any professionals engaged by a Covered Person who is or was a Director, (vii) determinations involving the capital account maintained by the Company for each Shareholder, (viii) the creation or expansion of the Company's cash reserves other than on a temporary basis, (ix) a material change in the accounting principles or methods of the Company or its internal controls over financial matters or (xi) an agreement or commitment on behalf of the Company to take any of the foregoing actions.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Section 2.05   Deadlock Remedies.**

(a)   Except as provided by Section 2.04(g), if the Directors are unable to reach a consensus on any Major Decision submitted by either Director for consideration by the Board at two successive meetings of the Board (a "Deadlock"), then the Director who introduced the proposal for the Major Decision shall provide written notice to the other Director confirming its status as a Deadlock (a "Deadlock Notice"), whereupon Panzer and Epstein shall have the sequential rights, but not the obligation (the "Buyout Rights"), to purchase all of the Shares ("Buyout Shares") owned by the other Shareholder and his Affiliates ("Buyout Parties") in an all-cash transaction at the Fair Market Value of the Buyout Shares determined under Section 2.05(b) ("Appraised Value").  If the Director responsible for providing a Deadlock Notice fails to do so on a timely basis, the other Director may provide such Deadlock Notice, with the same effect of triggering such Buyout Rights hereunder.  The Buyout Rights of Panzer shall be exercisable for a period of fifteen (15) Business Days after receipt of the written valuation of the Buyout Shares by the Independent Appraiser, by notice to the Buyout Parties (a "Buyout Notice"), accompanied by a copy of the valuation.  If Epstein has not received a Buyout Notice from Panzer within such period, the Buyout Rights of Panzer shall expire, and the Buyout Rights of Epstein shall vest and be exercisable for a period of fifteen (15) Business Days after the expiration of Panzer's Buyout Rights, by delivery of a Buyout Notice to Panzer.  If a Shareholder exercises his Buyout Rights to resolve a Deadlock, the Buyout Parties shall be obligated to sell their Buyout Shares to such Shareholder in accordance with Section 2.05(c).  If neither Panzer nor Epstein exercise their respective Buyout Rights following a Deadlock and the Major Decision causing the Deadlock has not been resolved by the Board upon expiration of Epstein's Buyout Rights, it shall be considered a Dispute subject to the Dispute resolution provisions of Section 5.06.

(b)   Within fifteen (15) Business Days after the delivery of a Deadlock Notice under Section 2.05(a), the Company shall engage a nationally recognized investment banking firm to be selected by the Board (an "Independent Appraiser") to determine the Appraised Value of the Buyout Shares.  The Company shall timely furnish the Independent Appraiser with such information as it may request in order to render its valuation, including information regarding the Company's assets, financial condition and results of operations.  The Board shall instruct the Independent Appraiser to render its valuation in writing within thirty (30) Business Days of its appointment, which determination shall be final and binding for all purposes of this Agreement.  The fees and expenses of the Independent Appraiser shall be borne by the Company and reimbursed to the Company in equal proportions by Panzer and Epstein.

(c)   A closing of the purchase and sale of the Buyout Shares covered by any Buyout Notice under Section 2.05(a) shall be held within five (5) Business Days after delivery of the applicable Buyout Notice to the Buyout Parties.  At such closing, the Buyout Parties shall deliver to the Shareholder who has exercised his Buyout Rights all certificates representing the Buyout Shares, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective transfer thereof to such Shareholder, free and clear of any Liens, and such Shareholder shall deliver to the Buyout Parties the purchase price for their Buyout Shares at their Appraised Value, by certified bank check or wire transfer of immediately available funds, allocated proportionately among the Buyout Parties based on their respective ownership of the Buyout Shares.  Upon confirmation of such wire transfers, the Buyout Parties shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(d)    During the continuation of any Deadlock and prior to the resolution of any associated Dispute pursuant to Section 2.05(a) or the exercise of Buyout Rights and purchase of associated Buyout Shares pursuant to Section 2.05(c), the Company shall continue to operate in a manner consistent with the prevailing Annual Operating Plan and the terms of this Agreement until the Deadlock is reconciled as provided herein or as otherwise resolved by the Board.

**Section 2.06   Executive Officers.**

(a)    For as long as Panzer is an Eligible Director, he shall serve as Chief Executive Officer and President of the Company and shall have the prerogatives and responsibilities commensurate with such positions, the prevailing Annual Operating Plan and the terms of this Agreement.  In such capacities, Panzer shall have the exclusive right and authority to manage (i) the Company's relationships and arrangements with suppliers of materials and manufacturers of its products, (ii) the import of the Company's products to the United States and (iii) the composition and activities of the Company's domestic sales and marketing staff.  The hiring by the Company of a Customer Service Director and a Chief Sales Officer contemplated by Section 2.06(g) shall not affect the foregoing delegation of authority to Panzer.  No delegation of authority to Panzer under this Section 2.06(a) shall limit the rights or ability of Epstein, as Chief Operating Officer of the Company, to interact with other employees or consultants of the Company on matters pertaining to any aspect of the Business, *provided* that Epstein shall not hold any meetings or engage in any discussions with such employees or consultants in anticipation of any initiative or transaction involving a Major Decision without first consulting with Panzer and obtaining his consent thereto or election to participate therein.  Subject to Section 715(h) of the BCL, Panzer shall devote such time as is necessary and appropriate for carrying out the responsibilities delegated to him hereunder in the best interest of the Company.

(b)    As long as Epstein is an Eligible Director, he shall serve as Chief Operating Officer, Vice President and Treasurer of the Company and shall have the prerogatives and responsibilities commensurate with such positions, the prevailing Annual Operating Plan and the terms of this Agreement, subject to the delegation of authority over financial matters to a Chief Financial Officer contemplated by Section 2.06(f).  In such capacities, Epstein shall have the exclusive right and authority to manage all aspects of the Business not delegated to Panzer under Section 2.06(a) or to a Chief Financial Officer under Section 2.06(f), upon the hiring thereof, including operations of the Company's facilities within the United States, collections and other day-to-day domestic operations of the Company.  No delegation of authority to Epstein under this Section 2.06(b) shall limit the rights or ability of Panzer, as Chief Executive Officer and President of the Company, to interact with other employees or consultants of the Company on matters pertaining to any aspect of the Business, *provided* that Panzer shall not hold any meetings or engage in any discussions with such employees or consultants in anticipation of any initiative or transaction involving a Major Decision without first consulting with Epstein and obtaining his consent thereto or election to participate therein.  Subject to Section 715(h) of the BCL, Epstein shall devote substantially all of his working time to carrying out the responsibilities delegated to him hereunder in the best interest of the Company.

(c)    Each of Panzer and Epstein shall receive an annual salary of at least Three-Hundred-Twelve Thousand Dollars ($312,000), payable in accordance with the Company's usual payroll policies, subject to automatic annual increases by a percentage equal to any percentage increase from the preceding year in the Consumer Price Index for all Urban Consumers in the

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

New York – Northeastern New Jersey Metropolitan Area, or any successor thereto, based on data published by the Bureau of Labor Statistics of the United States Department of Labor and any further increases implemented by the Board.  In addition, as soon as practicable after the date hereof, the Company shall hire (i) a full-time administrative assistant for Panzer to be identified by him and approved by the Board, to provide support exclusively to Panzer in the execution of his responsibilities pursuant to Section 2.06(a) and (ii) a full-time administrative assistant for Epstein to be identified by him and approved by the Board, to provide support exclusively to Epstein in the execution of his responsibilities pursuant to Section 2.06(b), in each case at an annual salary of up to One-Hundred-Twenty-Five Thousand Dollars ($125,000).

(d)   The compensation and benefits provided by the Company to Panzer and Epstein shall include (i) any bonus compensation that the Board may determine from time to time, (ii) all medical, dental, pension, retirement and all other benefits generally available to executive officers of the Company, (iii) reimbursement for documented expenses incurred in performing their duties to the Company and (iv) the use an automobile provided by the Company for the Business or reimbursement for the direct cost for leasing and operating an automobile for that purpose.  The aggregate amount of the Company's expenditures to cover any such benefits provided to Epstein but declined by Panzer for any reason shall be determined bi-annually by the Company's independent certified public accountants and timely paid by the Company to Panzer as a cash bonus in lieu of such benefits.  The aggregate amount of the Company's expenditures to cover any such benefits provided to Panzer but declined by Epstein for any reason shall be determined bi-annually by the Company's independent certified public accountants and timely paid by the Company to Epstein as a cash bonus in lieu of such benefits.

(e)   If either Panzer or Epstein is unable to perform their respective responsibilities under Section 2.06 due to Disability for a period of ninety (90) consecutive days, then such non-performing Party shall, at his election, either resign as an executive officer of the Company or take a voluntary leave of absence from the Company in such capacity for such period as he may determine.  In that event, the Board shall select a qualified individual to perform the relinquished executive responsibilities on a long-term basis or an interim basis, as appropriate based on the foregoing election.  No such election shall affect the rights or obligations of Panzer or Epstein as Directors under Article II, except as provided in Section 2.01(c), and no election hereunder for a voluntary leave of absence from the Company shall trigger any purchase rights or sale obligations under Section 4.05.

(f)   As soon as practicable after the date hereof, the Company shall identify and hire a full-time Chief Financial Officer, who shall report directly to the Board and shall be primarily responsible for managing all financial, accounting and cash management aspects of the Business, including the institution of appropriate processes for evaluating and maintaining the effectiveness of the Company's internal control environment, addressing any material weaknesses or other internal control deficiencies and implementing an effective control environment commensurate with the growth of the Company.  These initiatives shall include the design and maintenance of effective controls over the Company's (i) financial statement disclosures to ensure completeness and accuracy, (ii) recording and retention of all journal entries with sufficient supporting documentation, review and approval procedures to ensure the accuracy and completeness of the journal entries and (iii) income tax accounting.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(g)     As soon as practicable after the date hereof, the Company shall (i) identify and hire a full-time Customer Service Director to be primarily responsible for managing all customer service aspects of the Business, including coordination with the Company's shipping department, and (ii) identify and hire a full-time Chief Sales Officer to be primarily responsible for managing the activities of the Company's domestic sales and marketing staff, including the institution of appropriate processes for evaluating and maintaining the effectiveness of the Company's sales policies and procedures commensurate with the growth of the Company.  Each of such officers shall report directly to Panzer; *provided* that Epstein may direct or counsel either of such officers on any matter within their delegated responsibilities that requires their immediate or time-sensitive action but access to Panzer for such resolution or guidance is unavailable for any reason, whether physically or by cell phone or email, as long as the matter in question does not require a Major Decision and a summary of the background and resolution of the matter is contemporaneously provided by email to Panzer.

(h)     Weinstein shall devote his full working time to the Business and shall receive an annual salary of Two-Hundred-Eight Thousand Dollars ($208,000), payable in accordance with the Company's usual payroll policies, subject to periodic review by the Board.

(i)     The Company shall retain an employee benefit and executive recruitment consulting firm to be selected by the Board as soon as practicable after the Effective Date to (i) review and analyze the Company's employment structure, (ii) make detailed recommendations for optimizing the Company's administrative policies and compensation plans for all employees other than the Directors in their capacities as executive officers of the Company and (iii) assist the Board in identifying a Chief Financial Officer contemplated by Section 2.06(f) and a Customer Service Director and Chief Sales Officer contemplated by Section 2.06(g).

(j)     Any Direct Family Member hired or engaged as an employee, agent or consultant of the Company in accordance with Section 2.04(h) shall be subject to the same performance standards and be entitled to the same benefits as all other employees, agents or consultants of the Company holding comparable or similar positions or engagements.

(k)     Any electronic communications made on behalf of the Company by any Shareholder in his capacity as a Director or executive officer of the Company to other employees or to consultants, contractors or customers of the Company in connection with the implementation of any Major Decision or the creation of any other binding obligation of the Company shall be made utilizing the email system maintained by the Company for the Business.

### Section 2.07   Annual Operating Plans.

(a)     For each Fiscal Year during the term of this Agreement, a proposed annual operating plan of the Company for that year ("Annual Operating Plan") shall be prepared for review, modification, if required, and adoption by the Board, if approved.  The Annual Operating Plan for 2017 shall be prepared by Panzer and Epstein, following consultations the Company's independent certified public accountants, and shall be delivered to the Board within thirty (30) Business Days after the execution of this Agreement.  A proposed Annual Operating Plan for each subsequent Fiscal Year of the Company shall be prepared by the Chief Financial Officer to be hired pursuant to Section 2.06(f), based on consultations with Panzer and Epstein, and delivered to the Board within ten (10) Business Days after the commencement of such Fiscal Year.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(b)   Each Annual Operating Plan shall include the following information with respect to the Business: (i) an itemization of revenues and expenses for the prior Fiscal Year and a narrative discussion and analysis of those results of operations and the Company's financial condition at year end; (ii) a reasonable estimate of the Company's anticipated sales revenues and total expenses, including debt service, capital expenditures and working capital requirements for the ensuing Fiscal Year; (iii) the Company's current working capital, contingencies and anticipated sources and applications of funds with respect to each segment of the Business for the ensuing Fiscal Year; together with a detailed operating budget derived therefrom; (iv) a summary of the cost structure and deliverables for each factory utilized for manufacture of the Company's products or components thereof in the prior Fiscal Year and an evaluation of the strengths and weaknesses of such supply chain; (v) a backup plan for addressing any disruptions in such supply chain; (vi) a review of the Company's product lines in the prior Fiscal Year and an evaluation of any proposed additions thereto or other modifications thereof for the ensuing Fiscal Year and the proposed supply chain for the manufacturing of any such additional products or components thereof; an (vii) such additional information as may be necessary or appropriate to fully inform the Board of all pending financial and operating considerations and planned initiatives relevant to the Business.

(c)   Any comments of the Directors on a proposed Annual Operating Plan shall be promptly incorporated therein, and the revised Annual Operating Plan shall be timely distributed to the Board for its consideration.

(d)   Either Panzer or Epstein may propose amendments to a prevailing Annual Operating Plan deemed appropriate to reflect a material change in any of the information contained therein or the underlying assumptions, whereupon such amended Annual Operating Plan shall be distributed to the Board for its consideration.

**Section 2.08   Indemnification.**

(a)   In any action, suit or proceeding to which a Covered Person was or is a party by reason of the fact that he was acting as a Director or executive officer or other employee of the Company, involving an alleged cause of action arising from the activities of the Covered Person in the management of the affairs of the Company, or which relates to the Company, its property or the Business, the Company shall indemnify the Covered Person against attorneys' fees and disbursements, judgments, fines and amounts paid in settlement actually and reasonably incurred by the Covered Person in connection with the action, suit or proceeding ("Indemnified Amounts"), if the Covered Person acted in good faith and in a manner believed to be in the best interests of the Company and if the conduct of the Covered Person does not constitute gross negligence or willful misconduct (the "Standard of Care").  The termination of a proceeding by judgment, order, settlement or conviction or upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create a presumption that a Covered Person did not meet the Standard of Care.

(b)   Promptly after receipt by a Covered Person of written notice of the commencement of any proceeding against such Covered Person covered by Section 2.08(a), such Covered Person shall, if a claim for indemnification in respect thereof shall be made against the Company, give written notice to the Board of the commencement of such proceeding, together with a copy of the written notice thereof received by such Covered Person, *provided* that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Section 2.08, except to the extent that the Company is prejudiced by such failure to give notice.

(c)    In case any proceeding covered by Section 2.08(a) is brought against a Covered Person, other than a proceeding by or in the right of the Company, after the Company has acknowledged in writing its obligation to indemnify and hold harmless the Covered Person, subject to the conditions of Section 2.08, the Company shall be entitled to assume the defense of such proceeding; *provided*, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain his own counsel at his own expense, and (ii) if the Covered Person shall give notice to the Company that he meets the Standard of Care and that in his good faith judgment certain claims made against him in such proceeding could have a material adverse effect on the Covered Person or his Affiliates other than as a result of monetary damages and the Company is not a party to such proceeding, the Covered Person shall have the right to control the defense of such specific claims against the Covered Person, but not with respect to any other Covered Person, at his own expense and with counsel reasonably satisfactory to the Company; and *provided further* that if a Covered Person so elects to control the defense of such specific claim, he shall not consent to the entry of a judgment or enter into a settlement that would require the Company to pay any Indemnified Amounts respect to such claim or otherwise under Section 2.08.  After notice from the Company to such Covered Person consenting to the defense of such claim by the Covered Person under the foregoing conditions, the Company shall not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof.  Without the consent of such Covered Person, the Company shall not consent to the entry of any judgment or enter into any settlement with respect to such claim that does not include a release from all liability arising out of such claim as an unconditional term thereof given by the claimant or plaintiff to such Covered Person.

(d)    Reasonable legal fees and expenses incurred by a Covered Person in any proceeding covered by Section 2.08 shall be advanced by the Company to the Covered Person from time to time throughout the pendency of the proceeding upon receipt by the Company of each written instrument executed by the Covered Person, (i) certifying that he meets the Standard of Care in connection therewith, (ii) setting forth in reasonable detail the basis for such certification and (iii) undertaking to repay any amount so advanced, with interest at a market rate from the date of each advance, upon any ultimate determination by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified by the Company for such legal fees and expenses.  Any claim for advancement of legal fees and expenses under this Section 2.08(d) shall also be accompanied by copies of the invoices covered by such claim.  In any claim for indemnification for matters involving federal or state securities law violations, the Covered Person seeking indemnification shall place before the court the position of the Securities and Exchange Commission with respect to indemnification for securities law violations.

(e)    The Company shall not be obligated to reimburse or pay a Covered Person any Indemnified Amounts for which payment has been made directly to such Covered Person under any directors and officers liability insurance policy maintained by the Company or for which the Covered Person has been otherwise indemnified or reimbursed.

(f)    Any decision that is required to be made by the Company pursuant to Section 2.08 shall be made on its behalf by the Board, except as otherwise provided in Section 2.04(j).  Any indemnification under Section 2.08, unless excepted under Section 2.04(j) or ordered by a court, shall be made by the Company only as authorized in the specific case and only upon a determination by the Board that indemnification of the Covered Person is proper.

The Company will have no obligation to indemnify a Covered Person under Section 2.08 for any amounts paid in settlement of any proceeding effected without written authorization from the Board.  Any indemnification under Section 2.08 shall be made only out of the assets or insurance coverage of the Company.  The provisions of Section 2.08 are for the benefit of Covered Persons and shall not be deemed to create any rights for the benefit of any other Persons.

**Section 2.09   Exculpation.**   Except as provided herein, no Covered Person shall be liable to the Company or any other Party for any loss or liability arising out of any act or omission of such Covered Person in connection with the Business to the extent that such act or omission was taken or omitted in good faith and in a manner the Covered Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal act, the Covered Person had no reasonable cause to believe such Covered Person's conduct was unlawful.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company, with copies to the Board, by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and who has been selected by the Board.

**ARTICLE III**
**SHARE ISSUANCES**

**Section 3.01   Pre-emptive Rights.**

(a)   Each Shareholder (each, a "Pre-emptive Shareholder") shall have the right to purchase a pro rata portion of any Common Stock or Excluded Securities ("New Securities") that the Board may authorize the Company for issuance or sale to Third Party Purchasers.

(b)   The Company shall give written notice to the Pre-emptive Shareholders (an "Issuance Notice") of any proposed issuance or sale of New Securities within five (5) Business Days following any meeting of the Board at which any such issuance or sale is approved.  The Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including (i) the class and number of New Securities proposed to be issued and the percentage of the Company's outstanding Common Stock that the New Securities would represent on a fully diluted basis, (ii) the proposed issuance date, which shall be no less than twenty (20) Business Days from the date of the Issuance Notice, and (iii) the proposed consideration to be received by the Company for the New Securities and the class of Persons comprising the proposed Third Party Purchasers.  If the New Securities include warrants or any other securities other than Common Stock, the Issuance Notice shall also include a full legal description thereof.

(c)   By delivering a written notice of election to the Company no later than ten (10) Business Days following the receipt of an Issuance Notice, each Pre-emptive Shareholder shall have the irrevocable right to purchase, at the purchase price and on the other terms and conditions set forth in the Issuance Notice, the number of New Securities determined by multiplying the total number of New Securities by a fraction, (i) the numerator of which is the number of Shares then held by such Pre-emptive Shareholder, and (ii) the denominator of which is the total number of shares of Common Stock then outstanding (the "Pre-emptive Pro Rata Portion").  Each such election by a Pre-emptive Shareholder to purchase New Securities shall be binding and irrevocable.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(d)    No later than five (5) Business Days following the expiration of the exercise period specified in Section 3.01(c), the Company shall notify each Pre-emptive Shareholder in writing of the Pre-emptive Pro Rata Portion of New Securities, if any, that such Shareholder has agreed to purchase.  Each electing Pre-emptive Shareholder shall thereafter enter into such agreements with the Company and take such other actions as may be reasonably necessary to consummate the purchase and sale of his Pre-emptive Pro Rata Portion of New Securities.

(e)    Within thirty (30) Business Days after the date of the Issuance Notice, the Company shall issue the Pre-emptive Pro Rata Portion of New Securities to the electing Pre-emptive Shareholders and the balance of the New Securities to the class of Third Party Purchasers described in the Issuance Notice, in each case for the per share consideration and on the other terms and conditions set forth in the Issuance Notice, subject to extension of such issuance date for up to thirty (30) Business Days to the extent necessary to obtain any required Government Approvals for such issuance or sale.  At such closing, each electing Pre-emptive Shareholder shall deliver to the Company the purchase price for the New Securities purchased by him by certified or official bank check or wire transfer of immediately available funds, and the Company shall deliver to each electing Pre-emptive Shareholder a certificate evidencing his Pre-emptive Pro Rata Portion of New Securities, which New Securities shall be duly authorized for issuance, free and clear of any Liens, other than those attributable to actions of such Pre-emptive Shareholder.

(f)    In the event that New Securities covered by an Issuance Notice are not issued or sold within the time period contemplated by Section 3.01(e), the Company shall not thereafter issue or sell any New Securities without again fully complying with the provisions of Section 3.01.

**Section 3.02   No Capital Commitments**.  The Shareholders shall not have any capital commitments to the Company or any obligations to make loans or advances to the Company.

### ARTICLE IV
#### TRANSFER OF SHARES

**Section 4.01   General Restrictions on Transfer.**

(a)    Except as provided in Section 2.05, Section 4.04, Section 4.05, Section 4.06 or Article VI, no Shareholder shall Transfer any of his Shares to any Person other than a Permitted Transferee in accordance with Section 4.02 or a Third Party Purchaser in a business combination with the Company approved by the Board and any requisite Shareholder vote.

(b)    Any purported Transfer of Shares that is not made in compliance with this Agreement shall be null and void and of no effect whatsoever, and the purported transferee shall not be treated, and the purported transferor shall continue be treated, as the owner of such Shares for purposes of this Agreement; *provided* that, if the Company is required to recognize a Transfer that is not made in compliance with this Agreement, the rights underlying the Shares so transferred will be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Shares.  Any such allocations and distributions may be applied, without limiting any other legal or equitable rights of the Company to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Shares may have to the Company or the other Shareholders, and neither the transferor nor the transferee shall have any voting rights or other rights in the management of the Company with respect to such transferred Shares.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)     For any purported Transfer of Shares that is not made in compliance with this Agreement, except a purported Transfer to a separated or divorced spouse of a Shareholder covered by Section 4.01(e), the Company shall have the option to purchase such Shares from the transferee by delivering written notice of its intention thereof to the transferee at any time within one (1) year after the Company has knowledge of such purported Transfer.  The Company may assign all or part of its right to purchase such Shares to the nontransferring Shareholders on a pro rata basis or such other basis as the Board determines.  The purchase price for such Shares shall be an amount equal to the Book Value thereof, and the other terms of such sale shall be determined by the Board in its sole discretion.  If the transferor in such purported Transfer is a Director or an Affiliate of a Director, such determination of the Board shall be made without the participation of such Director.

(d)     The Company may refuse to recognize any purported Transfer of Shares if the Board determines that the Transfer would have a material adverse effect on the Company by triggering any regulatory or other restrictions on the Company under Applicable Law.

(e)     Notwithstanding any provision of Section 4.02 to the contrary, no purported Transfer to or for the benefit of a separated or divorced spouse of a Shareholder by agreement, court order or otherwise shall be treated as a Permitted Transfer hereunder.  At any time during a period of one (1) year after the Shareholder from whom such Shares were purportedly Transferred has knowledge thereof, such Shareholder shall have the absolute, irrevocable right and option, but not the obligation, to purchase all or any portion of such Shares from the purported transferee thereof in an amount equal to their Book Value, determined as of the end of the most recently completed fiscal quarter of the Company, exercisable by delivering written notice to such purported transferee or her Representative in such separation or divorce proceeding, summarizing the purchase rights of such Shareholder hereunder and setting forth his election to exercise such rights, the number of such Shares to be purchased, the Book Value thereof and the date established for the closing of such purchase.  At such closing, the separated or divorced spouse of such Shareholder shall deliver an assignment and stock power covering such Shares to such Shareholder, duly executed and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof to such Shareholder, free and clear of any Liens, and such Shareholder shall deliver to such separated or divorced spouse or her Representative in such separation or divorce proceeding the purchase price for those Shares at their Book Value, payable by certified bank check or wire transfer of immediately available funds.  Upon confirmation of such wire transfer, the transferor of such Shares shall deliver to the Company and the Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company, *provided* that no failure to provide such release shall invalidate a buyback of Shares hereunder.

(f)     Each certificate representing Shares shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS AGREEMENT ON FILE WITH THE SECRETARY OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SHAREHOLDERS AGREEMENT AND AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933 OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  BY ACCEPTANCE OF THIS CERTIFICATE, THE HOLDER AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SHAREHOLDERS AGREEMENT."

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

Section 4.02   **Permitted Transfers.**  Subject to the terms, conditions and restrictions set forth in <u>Section 4.03</u>, the Shares of any Shareholder may be Transferred (a "<u>Permitted Transfer</u>") in accordance with the following provisions:

(a)   A Shareholder who is a natural Person may Transfer all or any portion of his Shares by gift or will to (i) his parents, spouse, natural or adopted children and spouses of such children, but only during coverture or as a result of a testamentary transfer (each, a "<u>Direct Family Member</u>"), (ii) a trust for the benefit of one or more Direct Family Members, (iii) a corporation of which such Shareholder and/or one or more of his Direct Family Members or a trust for their benefit are the sole shareholders or (iv) a partnership or limited liability company in which such Shareholder and/or his Direct Family Members or a trust for their benefit hold all of the partnership or limited liability company interests.  In addition, Freund may Transfer Shares to Epstein, and Weinstein may Transfer Shares to Panzer.

(b)   A Shareholder that is a partnership, corporation, limited liability company, trust or other entity may Transfer all or any portion of its Shares to one or more partners, shareholders, members, beneficiaries or similar owners such Shareholder or to a trust substantially for the benefit of one or more equity owners of such Shareholder or their Direct Family Members.

Section 4.03   **Conditions to Permitted Transfers**.  A Transfer of Shares will only be treated as a Permitted Transfer under <u>Section 4.02</u> if the following conditions are satisfied:

(a)   The Transfer of Shares shall be made in a manner that provides control of the Shares by a legal entity or competent adult, unless the Transfer is to (i) a custodian for a minor Person under an Applicable Law covering transfers to minors or (ii) the trustee of a trust for the benefit of such minor Person.

(b)   As long as the Company maintains its election to be treated as an S-corporation for federal income tax purposes in accordance with the requirements under subchapter S of the Code, the Transfer will not adversely affect the treatment of the Company as an S-corporation or cause an increase in the number of Persons holding or deemed to be holding the Company's capital stock for purposes of Code section 1361(b)(1)(A) and, if the Transfer is made to a trust, the transferee is a Qualified Trust.

(c)   The transferor of such Shares shall have provided the Board with prior written notice of the proposed Transfer.  If the proposed Transfer is approved by the Board, the transferee shall join as a Party to this Agreement and agree to be bound by all of the applicable provisions hereof by executing and delivering a Joinder Agreement to the Company, and the transferor and transferee shall execute and deliver to the Company any additional documents and instruments of conveyance as may be necessary or appropriate, in the reasonable opinion of counsel to the Company, to (i) effect such Transfer, (ii) confirm that the Transfer constitutes a Permitted Transfer hereunder, (iii) provide the Company with the transferee's taxpayer identification number and any other information necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns, it being understood that the Company will not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Shares until it has received such information.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(d)    The Transfer shall be permitted under the Securities Act and other applicable federal or state securities laws and, if requested by the Company, the transferor shall deliver to the Company an opinion of counsel in form and substance satisfactory to the Company to the effect that (i) such Transfer may be effected without registration under the Securities Act, (ii) it would not cause the Company to be treated as an investment company under the Investment Company Act of 1940 and (iii) it would not cause the assets of the Company to be deemed plan assets as defined under the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company.

**Section 4.04   Bankruptcy of a Shareholder.**

(a)    In the event of the Bankruptcy of an individual Shareholder or the trustee of a JE Trust, such individual Shareholder or JE Trust (a "Bankrupt Shareholder") shall be deemed to have offered to sell all of his Shares ("Bankruptcy Shares"), immediately prior to such Bankruptcy, first to the Company and then to the other Shareholders, at their Book Value and on the terms and conditions set forth in Section 4.04.

(b)    As soon as practicable after the Bankruptcy of a Shareholder, the Bankrupt Shareholder shall give written notice thereof to the Board and the other Shareholders, disclosing the nature of the Bankruptcy, the date upon which it occurred, the reason for its occurrence, the name and address of the transferee of the Bankruptcy Shares and the number of Bankruptcy Shares.  If the notice is not given within five (5) Business Days after the date of the Bankruptcy, the Company may give the notice, which shall have the same effect as if given by the Bankrupt Shareholder.

(c)    The Company shall have the irrevocable first option, but not the obligation, to purchase all or any portion of the Bankruptcy Shares for an amount equal to the Book Value attributable to those Shares, determined as of the end of the most recently completed fiscal quarter of the Company, and the transferee thereof shall be obligated to sell those Shares to Company for that repurchase price.  No later than ten (10) Business Days after delivery or deemed delivery of the notice of Bankruptcy contemplated by Section 4.04(b), the Board shall determine the number of Bankruptcy Shares to be repurchased by the Company, if any, and the Company shall notify the Bankrupt Shareholder, the presiding justice of the bankruptcy court assigned to the Bankruptcy estate of the Bankrupt Shareholder, the trustee of such estate, if then appointed, and the other Shareholders of such election and the Book Value attributable to the Bankruptcy Shares.

(d)    To the extent that the Company elects to repurchase less than all of the Bankruptcy Shares, the Shareholders other than the Bankrupt Shareholder shall have the irrevocable second options, but not the obligation, to purchase all or any of their respective pro rata portions of such remaining Bankruptcy Shares at their Book Value, exercisable by notice to the Company and the other Shareholders within ten (10) Business Days after delivery of the Company's repurchase election under Section 4.04(c), and the transferee thereof shall be obligated to sell those Shares to such Shareholders for that purchase price.

(e)    Not less than five (5) Business Days after the expiration of the exercise period for the second options held by the Shareholders other than the Bankrupt Shareholder under Section 4.04(d), the Company shall give written notice the Shareholders, the presiding justice of the Bankruptcy court assigned to the Bankruptcy estate of the Bankrupt Shareholder and the

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

trustee of such estate, if then appointed, specifying the number of Bankruptcy Shares to be Transferred under Section 4.04, the Book Value attributable to those Shares and the date, time and location of the closing for the Transfer thereof to the Company and/or the Shareholders exercising their purchase options hereunder, which shall be no longer than sixty (60) Business Days after the date of such notice.

(f)   At the closing of any purchase and sale of Bankruptcy Shares pursuant to Section 4.04(e), the holder of such Shares shall deliver all certificates representing such Shares to the Company and/or the Shareholders electing to purchase the same, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof upon repurchase by the Company or purchase by such electing Shareholders, free and clear of any Liens, together with any other documents reasonably necessary for the effective Transfer thereof to such purchasers, and the Company and such electing Shareholders shall deliver to such holder the purchase price for those Shares at their Book Value, payable by certified bank check or wire transfer of immediately available funds. Upon confirmation of such wire transfers, the transferor of the Bankruptcy Shares shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

(g)   In the event that any Bankruptcy Shares are not purchased from a Bankrupt Shareholder or his Bankruptcy estate by the Company or the other Shareholders for any reason within the period and on the terms and conditions contemplated by Section 4.04 and the Company is required to recognize a Transfer of such Bankruptcy Shares, then the rights underlying such unpurchased Bankruptcy Shares will be strictly limited as set forth in the proviso under Section 4.01(b).

**Section 4.05   Termination of Employment.**

(a)   In the event that the employment of an Employee Shareholder with the Company is terminated for any reason other than by death or as provided in Section 2.06(e), then such Shareholder (a "Terminated Shareholder") shall be deemed to have offered to sell all of the Shares then owned by the Terminated Shareholder and any of his Affiliates or Permitted Transferees (the "Termination Shares") to the Company, and the Company shall repurchase all of the Termination Shares from such holders (the "Termination Share Holders") for an aggregate repurchase price (the "Termination Share Price") equal to the greater of the Book Value or the Appraised Value attributable to the Termination Shares, determined in accordance with Section 2.05(b) as of the end of the most recently completed fiscal quarter of the Company, and on the terms and conditions set forth in Section 4.05.

(b)   No later than five (5) Business Days after the Independent Appraiser delivers its valuation of the Termination Shares under Section 4.05(a), the Company shall give written notice to the Termination Share Holders, specifying the Appraised Value and the Book Value thereof and the date, time and location of the closing for the repurchase thereof by the Company, which shall be no longer than ten (10) Business Days after the date of such notice, and the Termination Share Holders shall be obligated to sell those Shares to the Company at such closing for the Termination Share Price, payable in accordance with Section 4.05(c).

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)   At the closing of any purchase and sale of Termination Shares pursuant to Section 4.05, the Termination Share Holders shall deliver all certificates representing such Shares to the Company, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof upon repurchase by the Company, free and clear of any Liens, together with any other documents reasonably necessary for the effective Transfer thereof to the Company, and the Company shall deliver to such holders the Termination Share Price for those Shares, allocated proportionately among the Termination Share Holders based on their respective ownership of Termination Shares.  To the extent that the Company has available working capital, the Termination Share Price shall be payable by certified bank check or wire transfer of immediately available funds. Any unpaid balance of such Termination Share Price shall be payable by delivery to each Termination Share Holder of a non-transferable promissory note of the Company, dated as of the date of the closing, in the principal amount of such unpaid balance, allocated proportionately among such holders based on their respective ownership of the of Termination Shares, and payable over a period of five (5) years in equal quarterly installments, beginning at the end of the second full calendar quarter after the closing, with interest on the unpaid principal amount thereof at a rate equal to 110% of the prevailing federal rate, determined in accordance with the provisions of Code section 1274, during the calendar quarter for which such interest obligation accrued.  Upon receipt of such consideration, the Termination Share Holders shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties, other than obligations of the Company under such promissory notes, in form and substance reasonably satisfactory to the Company.

**Section 4.06   Death of a Shareholder.**

(a)   Upon the death of an individual Shareholder or the trustee of a JE Trust, the Company shall repurchase all of the Shares ("Estate Shares") held by the legal representatives, heirs or legatees of such deceased Shareholder or trustee (the "Estate Holders"), and the Estate Holders shall sell their Estate Shares to the Company on the terms and conditions set forth in Section 4.06.

(b)   The purchase price for the Estate Shares shall be the Appraised Value thereof, determined in accordance with Section 2.05(b).  As soon as practicable after the date hereof, to supplement the proceeds to be received from Fabusure, LLC under whole life insurance policies it maintains for the Shareholders and is obligated to remit to the Company pursuant to its Amended and Restated Operating Agreement with the Shareholders, the Company shall purchase term key-man term life insurance policies covering the Shareholders in amounts determined by the Board, *provided* that the Company is named beneficiary of such policies and the absolute owner thereof, with all right, title and interest therein.  The Company shall use its best efforts to (i) maintain such policies or replacements thereof in full force and effect, (ii) pay all premiums thereon as they become due, (iii) not, without the prior approval of the Board, borrow against the proceeds thereof and (iii) not apply the proceeds thereof to satisfy any obligations of the Company other than any obligation to purchase Estate Shares pursuant to Section 4.06(c).

(c)   Not less than five (5) Business Days after the Independent Appraiser delivers it valuation of the Estate Shares under Section 4.06(a), the Company shall give written notice to the Estate Holders, specifying the Appraised Value of their Estate Shares and the date, time and location of the closing for the repurchase thereof by the Company, which shall be no longer than

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

ten (10) Business Days after the date of such notice.  At such closing, the Estate Holders shall deliver all certificates representing their Estate Shares to the Company, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof to the Company, free and clear of any Liens, together with any other documents reasonably necessary for such Transfer, and the Company shall deliver to the Estate Holders the purchase price for their Estate Shares at their Appraised Value, allocated proportionately among the Estate Holders based on their respective ownership of the of Estate Shares.  Such purchase price shall be payable by certified bank check or wire transfer of immediately available funds to the extent that the Company has available working capital, including the proceeds to be received from Fabusure, LLC under life insurance policies covering the individual Shareholders and the proceeds from key-man term life insurance policies to be maintained by the Company on the lives of the individual Shareholders under Section 4.06(b). Any unpaid balance of such purchase price shall be payable by delivery to each Estate Holder of a non-transferable promissory note of the Company, dated as of the date of the closing, in the principal amount of such unpaid balance, allocated proportionately among the Estate Holders based on their respective ownership of the of Estate Shares, and payable over a period of ten (10) years in equal quarterly installments, beginning at the end of the second full calendar quarter after the closing, with interest on the unpaid principal amount thereof at a rate equal to 110% of the prevailing federal rate, determined in accordance with the provisions of Code section 1274, during the calendar quarter for which such interest obligation accrued.  Upon receipt of the consideration for the Estate Shares, the Estate Holders shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

Section 4.07   **Minority Buyout Options**.

(a)   In the event that the Company has provided notice of a closing for the repurchase of Bankruptcy Shares under Section 4.04(c), Termination Shares under Section 4.05(b) or Estate Shares under Section 4.06(c), it shall have the irrevocable option, but not the obligation, to repurchase contemporaneously (i) from Weinstein and any Permitted Transferee of his Shares (each, a "Weinstein Holder"), if such Shares are being repurchased from Panzer or his successors or assigns, or (ii) from Freund and any Permitted Transferee of his Shares (each, a "Freund Holder" and, collectively with the Weinstein Holders, the "Minority Holders"), if such Shares are being repurchased from Epstein and the JE Trusts or their successors or assigns, on the same repurchase terms applicable to such Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be, a number of Shares held by the applicable Minority Holders that will result in their aggregate Percentage Interests remaining unchanged after giving effect the Company's retirement of the repurchased Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be.  If the Company elects to exercise its repurchase option under this Section 4.07(a), it shall give notice thereof to the applicable Minority Holders and the other Parties, accompanied by a copy of the valuation for the Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 4.04(c), Section 4.05(c) or Section 4.06(c), as the case may be, and such Minority Holders shall be obligated to sell the applicable portion of their Shares to the Company at such closing based on such valuation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(b)   In the event that Panzer elects to purchase from Epstein and the JE Trusts or their successors or assigns any Buyout Shares under Section 2.05(a) or Bankruptcy Shares under Section 4.04(d), Panzer shall have the irrevocable option, but not the obligation, to purchase contemporaneously from the Freund Holders all or any portion of the Shares held by them on the same terms and conditions applicable to such Buyout Shares or Bankruptcy Shares, as the case may be.  If Panzer elects to exercise his purchase option under this Section 4.07(b), he shall give notice thereof to the Freund Holders and the other Parties, accompanied by a copy of the valuation for the Buyout Shares or Bankruptcy Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 2.05(c) or Section 4.04(g), as the case may be, and the Freund Holders shall be obligated to sell the applicable portion of their Shares to Panzer at such closing based on such valuation.

(c)   In the event that Epstein elects to purchase from Panzer or his successors or assigns any Buyout Shares under Section 2.05(a) or Bankruptcy Shares under Section 4.04(d), Epstein shall have the irrevocable option, but not the obligation, to purchase contemporaneously from the Weinstein Holders all or any portion of the Shares held by them on the same terms and conditions applicable to such Buyout Shares or Bankruptcy Shares, as the case may be.  If Epstein elects to exercise his purchase option under this Section 4.07(c), he shall give notice thereof to the Weinstein Holders and the other Parties, accompanied by a copy of the valuation for the Buyout Shares or Bankruptcy Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 2.05(c) or Section 4.04(g), as the case may be, and the Weinstein Holders shall be obligated to sell the applicable portion of their Shares to Epstein at such closing based on such valuation.

**Section 4.08   Release from Certain Obligations**.  In the event any Shareholder shall Transfer all of the Shares held by such Shareholder in compliance with the provisions of this Agreement without retaining any direct, indirect or other beneficial interest therein, then such Shareholder shall cease to be a Party to this Agreement and shall have no further obligations arising hereunder from and after the date of such Transfer, except for ongoing obligations under Article V, and the Company shall use its best efforts to obtain the release for such Shareholder from any guaranty executed by such Shareholder guaranteeing any liabilities or obligations of the Company.

## ARTICLE V
## NON-COMPETE AND OTHER OBLIGATIONS

**Section 5.01   Non-Compete**.

(a)   For so long as an individual Shareholder is employed by the Company (an "Employee Shareholder") and for a period of two (2) years following the termination of an Employee Shareholder's employment with the Company for any reason (the "Restriction Period"), the Employee Shareholder shall not directly or indirectly through one or more Affiliates own, manage, operate, control or participate in the ownership, management, operation or control of any Competitor, and neither such Shareholder nor any of his Permitted Transferees, directly or indirectly through one or more of their respective Affiliates, shall serve as a member of the board of directors or similar body of such Competitor; *provided* that nothing in this Section 5.01(a) shall prohibit any Employee Shareholder from acquiring or owning directly or indirectly (i) up to five percent (5%) of the aggregate voting securities of any Competitor that is a publicly traded Person or (ii) up to two percent (2%) of the aggregate voting securities of any Competitor that is not a publicly traded Person.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(b)    Empire shall not be deemed a Competitor for any purposes of this Agreement as long as Empire and any of its successors or assigns refrains from distributing kitchen, bathroom and closet cabinets to dealers having showrooms anywhere in the world.

**Section 5.02    Blue Pencil**.  If a court of competent jurisdiction determines that any of the restrictions set forth in Section 5.01 are unenforceable because of their geographic scope or the length of the Restriction Period, such court shall have the power to reduce the scope or duration of such restrictions, which shall then be enforceable in their reduced form.

**Section 5.03    Unrestricted Corporate Opportunities.**

(a)    Except as otherwise provided in Section 5.03(b) and subject to each Shareholder's obligations under Section 5.01, no Shareholder or any of his Permitted Transferees owning Shares or any of their respective Representatives shall have any duty to communicate or present to the Board (i) any investment or business opportunity that does not involve the Company's lines of Business, as then conducted or planned, or (ii) any other prospective transaction that could provide an economic advantage to the Company but is outside the scope of the Business, as then conducted or planned (an "Unrestricted Corporate Opportunity"), and such Persons shall not be deemed to have breached any fiduciary or other duty to the Company or the other Shareholders by pursuing or acquiring an interest in any such Unrestricted Corporate Opportunity.

(b)    The Company relinquishes any interest in or rights to pursue or participate in any Unrestricted Corporate Opportunity or to any expectancy that an Unrestricted Corporate Opportunity will be offered to the Company by any Shareholder or his Permitted Transferees owning Shares or any of their respective Representatives.

**Section 5.04    Confidentiality**.

(a)    Each Shareholder shall and shall cause his Representatives to keep confidential and not divulge any information, including all budgets, business plans and analyses, concerning the Company, including its assets, business, operations, financial condition or prospects ("Information"), and to use, and cause its Representatives to use, such Information only on behalf of the Company in connection with the operation of the Business; *provided* that nothing herein shall prevent any Shareholder from disclosing such Information (i) upon the order of any court of competent jurisdiction or Government Authority having jurisdiction over such Shareholder, (ii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iii) to the extent necessary in connection with the exercise of any remedy hereunder, (iv) to other Shareholders, (v) to such Shareholder's Representatives that in the reasonable judgment of such Shareholder need to know such Information and are subject to confidentiality obligations comparable to those of such Shareholders under this Section 5.04(a) or (vi) to any Permitted Transferee of Shares from such Shareholder as long as such Person agrees to be bound by the provisions of this Section 5.04(a) as if already a Shareholder; and *provided, further* that such Shareholder shall have first notified the Board of the proposed disclosure as far in advance of such disclosure as practicable and shall have used reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment to the fullest extent practicable.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(b)    Information subject to the restrictions of Section 5.04(a) shall not include (i) information that is or becomes generally available to the public other than as a result of a disclosure by a Shareholder or any of his Representatives in violation of this Agreement, (ii) information that is or has been independently developed or conceived by such Shareholder outside the course of his employment by the Company without use of any Information or (iii) information that becomes available to the receiving Shareholder or any of his Representatives on a non-confidential basis from a source other than the Company, any other Shareholder or any of their respective Representatives, *provided* that such source is not known by the recipient of the information to be bound by a confidentiality agreement in favor of any other Person.

Section 5.05   **Subchapter S Obligations**.   Unless and until the Company completes a Qualified Public Offering or the Board determines that the Company should relinquish its subchapter S status, no Shareholder shall take any action that could cause a termination of the election by the Company to be a subchapter S corporation for federal income tax purposes.  Each Shareholder shall execute such instruments and take such other actions from time to time as may be necessary or advisable, in the sole judgment of the Board, for the Company to maintain its subchapter S election.   If a Shareholder Transfers any Shares or takes any other action that causes or could cause a termination of the Company's subchapter S election, the Board may cause the Company to seek a waiver of the terminating event from the IRS on the grounds of inadvertency or to seek approval from the IRS to file a new election to be treated as an S corporation before the five (5) year waiting period after termination of a subchapter S election has expired.  If the Company attempts to obtain approval from the IRS to retain subchapter S status or to file a new subchapter S election after an inadvertent termination, the Shareholder responsible for termination of the Company's subchapter S election shall bear all expenses associated with such procedure, including reasonable attorneys' fees and disbursements.

Section 5.06   **Dispute Resolution**.

(a)    Any dispute, controversy or claim arising out of, relating to or in connection with this Agreement or any breach of any provisions hereof, including any Deadlock of the Board (a "Dispute"), shall (i) initially be submitted to non-binding consultation pursuant to Section 5.06(b) and, if not resolved under those procedures, then (ii) finally be settled by arbitration pursuant to Section 5.06(c).

(b)    If a Dispute remains unresolved for seven (7) Business Days, then the Dispute shall be submitted to the incumbent Kosover Rebbe of Brooklyn (the "Counselor"), who shall use his best efforts to seek a consensual resolution of the Dispute during a period not to exceed fifteen (15) Business Days from the time the Dispute is submitted to the Counselor.   The Counselor shall employ such procedures as he deems appropriate in his sole discretion.   If the Counselor named herein shall be unavailable to act in that capacity for any reason, the Directors shall select a mutually acceptable Rabbi to act as Counselor hereunder.   Any recommendations made by the Counselor in the course of such consultation procedures shall not be binding on the Parties.   Each Party to the Dispute shall bear his own costs in connection with the non-binding consultation procedures hereunder, including fees and disbursements of his counsel and financial advisors.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)   A Dispute that remains unresolved after completion of the non-binding consultation procedures conducted pursuant to Section 5.06(b) shall, within seven (7) Business Days after the culmination thereof, be submitted to binding arbitration in accordance with this Section 5.06(c).   The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the Parties.  The seat of the arbitration shall be New York, NY and shall be conducted by three arbitrators.  The Party initiating the arbitration (the "Claimant") shall appoint one arbitrator in his request for arbitration (a "Request").   The other Party involved in the Dispute (the "Respondent") shall appoint a second arbitrator within thirty (30) Business Days after receipt of the Request and shall notify the Claimant of such appointment in writing.  If the Respondent fails to appoint an arbitrator within such period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.  Otherwise, the two arbitrators appointed by the Claimant and the Respondent shall appoint a third arbitrator within thirty (30) Business Days after the Respondent has notified the Claimant of the appointment of the second arbitrator.  When the arbitrators appointed by the Parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the arbitrators shall promptly notify the Parties of such appointment.  If the two arbitrators appointed by the Claimant and the Respondent fail or are unable to appoint a third arbitrator or to notify the Claimant and the Respondent of such appointment, then the third arbitrator shall be appointed by the President of the American Arbitration Association, which shall promptly notify the Claimant and the Respondent of the appointment of the third arbitrator.  The third arbitrator shall act as chairman of the arbitration panel for the Dispute.

(d)   The decision and award in any arbitration under Section 5.06(c) shall be in writing, shall set forth in reasonable detail the basis for the decision and shall be final and binding on the Claimant and the Respondent therein.  The award shall include an award of costs, including reasonable attorney's fees and disbursements of both the Claimant and the Respondent in such arbitration, payable (i) by the Claimant to the Respondent if the Respondent is the prevailing party in such arbitration or (ii) by the Respondent to the Claimant if the Claimant is the prevailing party in such arbitration.  Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the non-prevailing party in the arbitration or his assets.

**Section 5.07   Equitable Remedies**.  Each Party acknowledges that the other Parties would be irreparably damaged in the event of a breach or threatened breach by such Party or any of his Representatives of any of his obligations under this Agreement and hereby agrees that in the event of a breach or a threatened breach by such Party of any such obligations, each of the other Parties, in addition to any other rights and remedies that may be available to them in respect of such breach, shall be entitled to an injunction from a court of competent jurisdiction, without any requirement to post bond, granting such Parties specific performance by such Party of his obligations under this Agreement.  In the event that any Party files a suit to enforce the covenants contained in this Agreement or obtain any other remedy in respect of any breach thereof, the prevailing Party in the suit shall be entitled to reimbursement of the costs incurred by such Party in conduction the suit, including reasonable attorney's fees and expenses.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## ARTICLE VI
### REGISTRATION RIGHTS

**Section 6.01   Piggyback Rights**.  If at any time after the Company has completed a Qualified Public Offering, the Company proposes to file a registration statement under the Securities Act for any underwritten sale of its Common Stock (except for registrations effected under Form S-4, Form S-8 or any successor form thereof), and the Company proposes to include any Shares held by Panzer or Epstein for resale to the underwriters thereunder ("Insider Shares"), the Company shall give written notice of such registration to the other Shareholders no later than ten (10) Business Days before filing such registration statement with the SEC.  If a Shareholder so requests in writing within five (5) Business Days after receipt of such notice, the Company shall use reasonable commercial efforts include in such registration statement for resale to the underwriters thereunder the number of Shares held by such Shareholder that bears the same proportion as the number of Insider Shares bears to the total Shares held by Panzer and Epstein (the "Registrable Securities"), subject to pro rata reduction under Section 6.02.  The conditional registration rights covered by Article 6 shall not be assignable in whole or in part.

**Section 6.02   Pro Rata Reduction**.  The Company shall not be obligated to include any Registrable Securities of any Shareholder for resale to the underwriters under a registration statement covered by Section 6.01 to the extent such underwriters determine that the inclusion of such Registrable Securities could jeopardize the successful sale of Common Stock thereunder by the Company the desired price to the public or would otherwise be against the best interests of the Company, in which case the number of such Registrable Securities shall be reduced accordingly on a pro rata basis.

**Section 6.03   Shareholder Obligations**.  If any Registrable Securities of a Shareholder are included for resale to the underwriters under a registration statement covered by Section 6.01, the Shareholder shall furnish to the Company such information regarding the Shareholder, the Registrable Securities held by the Shareholder and the distribution proposed by the Shareholder as the Company may request in writing and as shall be required by the underwriters in connection with such registration.  Any refusal to furnish such information by the Shareholder or to join as a party to the underwriting agreement for such registration shall relieve the Company of its obligations to that Shareholder under Article VI.

**Section 6.04   Registration Expenses**.  All registration and filing fees, professional fees and disbursements, printing and ancillary expenses for any registration and sale of Common Stock under registration statement subject to Article VI shall be borne by the Company.

## ARTICLE VII
### FINANCIAL MATTERS

**Section 7.01   Financial Statements**.  In addition to any rights that a Shareholder may have to inspection of the books and records of the Company under Applicable Law, the Company shall furnish the following information to each of Panzer and Epstein on a regular and timely basis in such electronic or other format or medium as each such Director may request:

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(a)   As soon as available, and in any event within one-hundred-eighty (180) days after the end of each Fiscal Year, the audited balance sheet of the Company as at the end of such Fiscal Year and the audited statements of income, cash flows and changes in shareholders' equity for such year, accompanied by the certification of independent certified public accountants of recognized national standing selected by the Board, to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of its operations and changes in its cash flows and shareholders' equity for the periods covered thereby;

(b)   As soon as available, and in any event within sixty (60) days after the end of each fiscal quarter, the unaudited balance sheet of the Company at the end of such quarter and the unaudited statements of income, cash flows and changes in shareholders' equity for such quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied, and certified by the Treasurer of the Company or by the Chief Financial Officer for all periods following his employment by the Company pursuant to Section 2.06(f); and

(c)   As soon as available, any annual reports, quarterly reports and other periodic reports prepared by the Company, with any exhibits thereto, that the Company may be required to file or deliver to any Person pursuant to Applicable Law.

**Section 7.02   Bank Accounts**.  The Company shall maintain commercial bank accounts for its funds in its name with financial institutions selected by the Board.  All checks, money order, electronic payments or transfers and any other cash management transactions on behalf of the Company under such accounts shall require the signature of any one of either Panzer or Epstein.  Panzer and Epstein shall each shall have the right to issue checks on one or more of such accounts in the conduct of the Business on behalf of the Company, in their capacity as executive officers of the Company under Section 2.06, *provided* that a copy of each check so issued shall be delivered to the Company as soon as practicable after the issuance thereof.  No funds of the Company shall be used as compensating balances for the benefit of any other Person or commingled with the funds of any other Person.

**Section 7.03   Books and Records**.   The Company shall maintain at its principal corporate office comprehensive books and records, which shall be updated in accordance with the Company's internal controls over financial matters.  The Company's books and records shall include all financial ledgers, accountants working papers and copies of bank statements, as well as a full and accurate account of all transactions by any Shareholder in any capacity with or on behalf of the Company.  Each of Panzer and Epstein shall have full access to the Company's QuickBooks files and any other books and records of the Company maintained in electronic medium for review on a real-time basis.  If Weinstein or Freund desire access to financial information about the Company's assets, financial condition or results of operations or access to its books and records, they shall be limited to obtaining that information from Panzer or Epstein, respectively, as they may deem appropriate.

# ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

**Section 8.01    Representations and Warranties of the Shareholders**.  Each Shareholder, or the Shareholder named in <u>Section 8.01(d)</u>, severally and not jointly, represents and warrants to the Company and each other Shareholder as of the Effective Date and the date of this Agreement that:

(a)    Such Shareholder has full power and authority to execute and deliver this Agreement, to perform his obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by such Shareholder, the performance of his obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of such Shareholder.  Such Shareholder has duly executed and delivered this Agreement.

(b)    This Agreement constitutes the legal, valid and binding obligation of such Shareholder, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, whether enforcement is sought by proceedings in equity or at law.  The execution, delivery and performance of this Agreement by such Shareholder and the consummation by such Shareholder of the transactions contemplated hereby require no action by or in respect of any Governmental Authority.

(c)    The execution, delivery and performance of this Agreement by such Shareholder and the consummation of the transactions contemplated hereby do not and will not (i) conflict with or result in any violation or breach of any provision of any of the organizational documents of such Shareholder, if other than a natural Person, (ii) conflict with or result in any violation or breach of any provision of any Applicable Law or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which such Shareholder is a party or by which such Shareholder is bound.

(d)    Such Shareholder has good and marketable title to the Shares registered in his name and listed in <u>Section 8.02(f)</u>, free and clear of any Liens.  Each of the JE Trusts (i) is a Permitted Transferee of the Shares registered in its name and listed in <u>Section 8.02(f)</u>, (ii) is a permitted shareholder as provided in Code section 1361(c)(2) and (iii) otherwise meets the criteria for a Qualified Trust.  Each of the JE Trusts has furnished to the Company with a true, complete and correct copy of the trust instrument under which such Shares are held and the election by the beneficiary of such trust to treat such trust as a Qualified Trust or the election by the trustee of such trust under Code section 1361(e)(3).

(e)    Such Shareholder is a citizen or resident of the United States or otherwise qualifies as a United States person as defined in Code section 7701(a)(30).

(f)    There are no outstanding debt obligations of the Company in favor of such Shareholder or any of his Affiliates.

(g)    Such Shareholder or its trustee has been advised by his own legal counsel in connection with the negotiation of this Agreement on his behalf and fully understands its terms, conditions and effects.  Such Shareholder or its trustee is not affected by any disability that would prevent him from knowingly and voluntarily providing the undertakings and covenants contained herein, all of which have been made without any duress, coercion or undue influence.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Section 8.02   Representations and Warranties of the Company**.   The Company represents and warrants to each Shareholder as of the Effective Date and the date of this Agreement that:

(a)   The Company is a corporation duly organized and existing in good standing under the laws of the State of New York and has all requisite corporate authority to own its properties and to carry on the Business as now conducted.  The Company does not have any Subsidiaries and does not own or control, directly or indirectly, any other Person.

(b)   The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement.  The execution and delivery of this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all necessary corporate action, and no further consent or authorization is required by any other Person.  This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, whether enforcement is sought by proceedings in equity or at law.  The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby require no action by or in respect of any Governmental Authority.

(c)   Neither the execution, delivery or performance of this Agreement by the Company nor the consummation by the Company of the transactions contemplated hereby (i) will conflict with the Organizational Document or violate any Applicable Law, (ii) will result in any breach of or default under any provision of any contract or agreement of any kind to which the Company is a party or is bound or to which any of its properties or assets are subject or (iii) is prohibited by or requires the Company to obtain or make any consent, authorization, approval, registration or filing under any contract to which it is a party or pursuant to any Applicable Law.

(d)   The Company has elected subchapter S status for federal income tax purposes and has duly filed and maintained a subchapter S election on Form 2553 with the IRS in accordance with the requirements under subchapter S of the Code.

(e)   Subject to the filing of an Amendment to the Certificate of Incorporation contemplated by Section 2.02(e), the Company's authorized capital stock consists solely of 200 shares of Common Stock.  As of the Effective Date and the date of this Agreement, there are 200 shares of Common Stock outstanding, all of which have been duly and validly authorized and issued, are owned of record by the Shareholders and are fully paid and nonassessable, except as otherwise provided by Applicable Law.  The Company has not issued any securities that are convertible into or exchangeable for its capital stock or any warrants, options or other rights to subscribe for or purchase its capital stock or any such convertible or exchangeable securities (collectively, "Derivative Securities").  No Person has any agreement, right or commitment entitling it to acquire Derivative Securities from the Company.  There are no agreements or other instruments of any kind to which the Company or any Person is a party relating to the voting of the Shares other than the By-laws and this Agreement.  The Shares have no restrictions imposed by the Company upon their Transfer or sale by the Shareholders except as set forth in this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(f)    The Shares are owned of record by the Shareholders on the date hereof as set forth below, resulting in the following Percentage Interests in the Company as of such date:

| Name of Shareholder | Number of Shares | Percentage Interest |
| --- | --- | --- |
| Panzer...................................... | 105.00 | 52.50% |
| Epstein..................................... | 15.00 | 7.50 |
| Joel Epstein Trust................... | 27.50 | 13.75 |
| Judith Epstein Trust ............... | 27.50 | 13.75 |
| Freund .................................... | 15.00 | 7.50 |
| Weinstein ............................... | 10.00 | 5.00 |
| Total .................................... | 200.00 | 100.00% |

(g)    There are no outstanding debt obligations owed by the Company to any Shareholder or the Affiliates of any Shareholder as of the Effective Date or the date first above written.

## ARTICLE IX
### TERM AND TERMINATION

**Section 9.01    Term and Termination**.  Except for the continuing obligations specified in Section 9.02, all of which shall survive any termination of this Agreement, this Agreement shall terminate upon the earliest of (a) the consummation of a Qualified Public Offering, (b) the consummation of a merger or other business combination or transaction resulting in a Change of Control or the liquidation and winding up of the Company, (c) the date on which none of the Shareholders holds any Common Stock or (d) upon the unanimous agreement of Panzer and Epstein.

**Section 9.02    Effect of Termination**.  The termination of this Agreement shall not affect any of the obligations of the Shareholders with respect to (a) non-competition obligations set forth in Section 5.01, confidentiality obligations set forth in Section 5.04, (c) obligations involving Dispute resolution set forth in Section 5.06 or (d) obligations to pay or reimburse any amounts arising on or prior to the date of such termination, or as a result of or in connection with such termination, each of which obligations shall survive any such termination in accordance with the respective terms thereof.

## ARTICLE X
### MISCELLANEOUS

**Section 10.01    Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing, with a copy to the individuals specified below, and shall be deemed to have been given to a Party (a) when delivered by hand, with written confirmation of receipt by such Party, (b) when received by such Party if sent by a nationally recognized overnight courier, receipt requested, (c) on the date sent by email if sent during normal business hours of such Party or on the next Business Day if sent after normal business hours of such Party, or (d) on the third business day after the date mailed to such Party, by certified or registered mail, return receipt requested, postage prepaid.  Such communications shall be sent to the respective Parties at the following addresses or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.01:

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

| | |
|---|---|
| <u>If to the Company</u>: | Fabuwood Cabinetry Corp. |
| | 99 Caven Point Road |
| | Jersey City, NJ 07305 |
| | Attn: Moshe C. Panzer and Joel Epstein |
| | Email: mp@fabuwood.com; joele@fabuwood.com |
| | |
| <u>If to Panzer</u>: | Moshe C. Panzer |
| | 1626 - 47th Street |
| | Brooklyn, NY 11204 |
| | Email: mp@fabuwood.com |
| | mpfabu@gmail.com |
| | |
| <u>If to Epstein</u>: | Joel Epstein |
| | 8 Frankfurt Road, Unit 301 |
| | Monroe, NY 10950 |
| | Email: joele@fabuwood.com |
| | |
| With a copy to: | Avi Lew, Esq. |
| | Warshaw Burstein, LLP |
| | 555 Fifth Avenue |
| | New York, NY 10017 |
| | Email: alew@wbny.com |
| | |
| <u>If to Freund</u>: | Raizy Freund |
| | 150 South 8th Street |
| | Brooklyn, NY 11211 |
| | Email: joseph9368@gmail.com |
| | |
| <u>If to Weinstein</u>: | Joel Weinstein |
| | 481 Park Avenue, Unit 2A |
| | Brooklyn, NY 11205 |
| | Email: joelw@fabuwood.com |

**Section 10.02   Interpretation**.    For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.   The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Unless the context otherwise requires, references herein to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder, and references to a Governmental Authority includes any successor thereto.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 2

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Section 10.03   Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.04   Severability**.  If any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction or affect any other provision of this Agreement.  Upon any such determination that a provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to implement their original intent as closely as possible in a mutually acceptable manner to ensure that the transactions and arrangements provided for herein are consummated or implemented as originally contemplated.

**Section 10.05   Entire Agreement**.  This Agreement and the Organizational Documents constitute the sole and entire agreement of the Parties with respect to the subject matter hereof, and this Agreement supersedes the Original Stockholders Agreement and any other prior or contemporaneous understandings and agreements, whether written and oral, with respect to such subject matter.  In the event of any inconsistency or conflict between this Agreement and any Organizational Document, the Parties shall, to the extent permitted by Applicable Law, amend such Organizational Document to comply with the terms of this Agreement.

**Section 10.06   Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and Permitted Transferees.

**Section 10.07   No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.08   Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly provided in writing and signed by each Party.  No waiver by either Party shall operate as a waiver of any other prior or future failure or breach not expressly identified by such written waiver.

**Section 10.09   Governing Law**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule, whether of the State of New York or any other jurisdiction, that would cause the application of the laws of any jurisdiction other than those of the State of New York.

**Section 10.10   Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A copy of this Agreement with all signed counterparts delivered by email shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature page and exhibit follow]*

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties have executed this Agreement on November 10, 2017, effective as of the Effective Date.

**The Company:**

**FABUWOOD CABINETRY CORP.**

By: _____
Moshe C. Panzer, CEO and President

By: _____
Joel Epstein, COO, Vice President and Treasurer

**The Shareholders:**

_____
**MOSHE C. PANZER**

_____
**JOEL EPSTEIN**

**JOEL EPSTEIN 2014 FAMILY TRUST**

By: _____
Judith Epstein, Trustee

**JUDITH EPSTEIN 2014 FAMILY TRUST**

By: _____
Joel Epstein, Trustee

_____
**JOEL WEINSTEIN**

_____
**RAIZY FREUND**

35

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 2

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties have executed this Agreement on November 10, 2017, effective as of the Effective Date.

**The Company:**

**FABUWOOD CABINETRY CORP.**

By:_____
    Moshe C. Panzer, CEO and President

By:_____
    Joel Epstein, COO, Vice President and Treasurer

**The Shareholders:**

_____

**MOSHE C. PANZER**

_____

**JOEL EPSTEIN**

**JOEL EPSTEIN 2014 FAMILY TRUST**

By: Judith Epstein
    Judith Epstein, Trustee

**JUDITH EPSTEIN 2014 FAMILY TRUST**

By:_____
    Joel Epstein, Trustee

_____

**JOEL WEINSTEIN**

_____

**RAIZY FREUND**

35

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 3

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**JOEL EPSTEIN**
**8 Frankfurt Unit 301**
**Monroe, NY 10950**

February 1, 2021

<u>**VIA E-MAIL**</u>
Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204
Via email: mp@faubwood.com; mpfabu@gmail.com

Re: <u>**Fabuwood Cabinetry Corp.**</u>

Dear Moshe Chaim:

Thank you for our years together in partnership as we built Fabuwood Cabinetry Corp. ("**Fabuwood**") to the kitchen cabinet manufacturer it is now.

We have faced many challenges together in the past and have overcome them together. But Fabuwood is facing challenges today that are the most demanding and burdensome to date, such as relentless attacks on its overseas supply chain as demonstrated by the Vietnam anti-dumping case on kitchen cabinets after our successful push out from China and filed by the same companies that filed the China anti-dumping case on kitchen cabinets,

Increasing prices on solid wood and plywood and availability of plywood resulting in higher prices for costs of goods sold, overseas and in the U.S.

The need for more investments in machinery and technology, particularly robotic solutions to counter increased NJ and NY minimum wages and workforce shortages, and the effects of COVID-19 on Fabuwood's business, and much more that we both know.

I firmly believe that Fabuwood now, more than ever, requires a unified and a fast moving and responsive executive management team to guide it successfully through these challenges.

Unfortunately, with your health issues over the years, your divorce case which has been going on for years and which you don't expect to settle anytime soon, and other personal issues you have been facing over the last 4 to 5 years, our vision and management philosophies and processes having diverged significantly.  It is best for you, for me, and for **Fabuwood** that we part ways at this time.

I would like to do so in the best and nicest way possible.

Yours Truly,

*Joel Epstein*

Joel Epstein

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 4

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

February 1, 2021

**CONFIDENTIAL**

Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204
Via email: mp@faubwood.com; mpfabu@gmail.com

Re: Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("**Fabuwood**") and its Shareholders effective as of January 1, 2017 (the "**Shareholders Agreement**"). Capitalized terms used but not defined in this Deadlock Notice shall have the meanings ascribed to such terms in the Shareholders Agreement.

Dear Mr. Panzer:

This letter is sent pursuant to Section 2.05 (the "**Deadlock Provision**") of the Shareholders Agreement and serves as the **Deadlock Notice** thereunder.

As of the date hereof, you and I, in our capacity as Fabuwood Directors are in Deadlock as shown by our inability to reach a consensus on matters that qualify as Major Decisions under Section 2.04.

For instance, Section 2.04(b) provides that "any amendment of…any agreement or instruments to which Fabuwood is a party as a result of a previously implemented Major Decision, including any outstanding loan or credit agreements" is a Major Decision.

You have repeatedly told me that you are not willing to put $1 more in Fabuwood and that you are not willing to sign for any bank loans, including increasing the current amounts under Fabuwood's financing facility with Sterling National Bank (the "Sterling Credit Facility"), despite Fabuwood's cash flow problems during COVID-19.

Further, as of the date of this letter, you have not provided to Sterling your 2019 personal US Income Tax Return or your personal financial statements as required under the Sterling Credit Facility. Your failure and refusal to comply with your obligations under Sterling Credit Facility have exposed Fabuwood to default proceedings, giving Sterling the right to require full payment of Fabuwood's $45 million loan, which if it happens will result in bankruptcy not just for Fabuwood but also personally for both of us because we have personally guaranteed the full payment of the Sterling Credit Facility. Your failure and refusal have also left Fabuwood unable to get additional funding amend its existing credit agreement so as to extend the term therein.

Your foregoing failure and refusal to agree to an amendment of the Sterling Credit Facility to allow for much needed cash infusion into Fabuwood and to so comply under the Sterling Credit Facility are each a Deadlock on a Major Decision under Section 2.05.

For another instance, Section 2.04(e) provides that "any transaction or matter involving the commitment or obligation of Fabuwood to make any expenditure…in excess of Fifty Thousand Dollars" is a Major Decision.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 4

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

I have approached you multiple times, both orally and in writing, regarding Fabuwood's commitment to participate in the KBIS 2021 virtual exhibition. You remain opposed to participation in that exhibition, while I firmly believe that Fabuwood must participate in KBIS 2021, as it has done in the prior years, so as to maintain its market position and its industry visibility. You have told me in my office that you want to be on record that you are totally against our participation in KBIS 2021. Neither of us can be persuaded to change his position with respect to this Major Decision.

In addition, and similarly, I have approached you multiple times, both orally and in writing, regarding the establishment of a partnership with Plywood Source for manufacturing operations in Mexico. To date, we have not agreed on what needs to be done, Fabuwood is running out of time and resources.

Each of the decisions relating to KBIS 2021 and the manufacturing operations in Mexico requires a commitment from Fabuwood in excess of Fifty Thousand Dollars. Each is, therefore, a Major Decision. And our disagreement over each is a Deadlock on a Major Decision under Section 2.05.

Accordingly, I hereby elect to exercise the Buyout Rights provided under Section 2.05. Attached hereto is the Buyout Notice as provided under Section 2.05(a).

In summary, I am offering to buy all of your shares in Fabuwood, consisting of 52.50% ownership interest therein (the "**Panzer Interests**"), for a purchase price of $143,000 per share or $15,015,000. I believe my offer is above the current fair market value of Fabuwood considering its current challenges. My offer is conditioned on your sale of your Fabuwood shares, free and clear of all liens and encumbrances.

Alternatively, you can buy all of my shares in Fabuwood, consisting of 36.50% ownership interest therein, for the same purchase price of $143,000 per share or $10,439,000.

My offer is a binding commitment and obligation on my part to buy from you, and a binding commitment and obligation on your part to sell to me, all of the Panzer Interests (the "**Buyout**") once you accept my offer, subject to the terms and conditions in the Buyout Notice. The other principal terms of my offer are set forth therein,

Very truly yours,

Joel Epstein

2

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 5

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Confidential**

February 1, 2021

Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204

Re: **Buyout Notice**[1]

Dear Mr. Panzer:

This letter serves as the Buyout Notice under Section 2.05(a) following the Deadlock Notice delivered to you on the date hereof.

I am offering (the "**Offer**") to purchase from you all of your ownership interests (the "**Panzer Interests**") in Fabuwood and its related entities, including but not limited to Fabuwood Marketing LLC, Fabusure LLC, Fabusure 112 Corp. and Intime Freight Logistics Corp. (together, the "**Fabuwood Entities**").

This Buyout Notice is a binding commitment and obligation on my part to buy from you, and a binding commitment and obligation on your part to sell to me, all of the Panzer Interests (the "**Buyout**") once you accept this Buyout Notice by signing your acceptance below, subject to the terms and conditions herein.

The principal terms of my Offer are as follows:

1.    Purchase Price for the Fabuwood Entities.  The Purchase Price is an amount equal to: (i) $143,000 per share or $15,015,000 in the aggregate (the "**Fabuwood Purchase Price**") for the 105 shares held by you, directly or indirectly, in Fabuwood (the "**Fabuwood Stock**"), which per share price is above the current market value of Fabuwood, plus (ii) the net book value of the assets held by the other Fabuwood Entities multiplied by the percentage of your ownership interests in such Fabuwood Entities (together the "**Purchase Price**").  The enterprise value of Fabuwood shall be deemed to include the net book value of Fabuwood Marketing LLC and Intime Freight Logistics Corp., which for the purposes of clause (ii) herein shall both be valued at zero.  My Offer assumes that the Fabuwood Stock and the other Panzer Interests will be transferred to me or my designee at the closing of the Buyout (the "**Closing**") free and clear of all liens, claims, and interests of any nature or kind whatsoever.

2.    Acceptance of Offer.  Concurrently with the execution, delivery and acceptance by you of my Offer and this Buyout Notice, you will execute and deliver the following:

---

[1] Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("**Fabuwood**") and its Shareholders effective as of January 1, 2017 (the "**Shareholders Agreement**").  Capitalized terms used but not defined in this Buyout Notice shall have the meanings ascribed to such terms in the Shareholders Agreement.

(i)     The Voting Trust Agreement attached hereto (the "**Voting Trust Agreement**") whereby you agree to designate me as your proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote or act by written consent in your place effective as the date of your acceptance of this Buyout Notice; and

(ii)    Your resignation letter whereby you resign as director, officer and employee of all Fabuwood Entities (the "**Resignation Letter**").

3.      Good Faith Deposit.  No later than five (5) business days from the acceptance of this Buyout Notice, I will deposit $100,000 as a good faith deposit (the "**Deposit**") in an escrow account to be held by my counsel.  The Deposit will be applied to the Purchase Price at the Closing or returned to me, and I will have no further obligation to you whatsoever in the event the Closing does not occur due to the failure to satisfy the conditions set forth in Paragraph 4 herein.

4.      Conditions.  This Offer is subject to the following conditions:

(i)     You and I expressly agree that my obligation to pay the Purchase Price and otherwise consummate this Buyout Notice is fully conditioned on: (A) my obtaining an unconditional binding written commitment for acquisition financing, whether by way of debt financing, equity investment, or otherwise, on terms acceptable to me, in my sole and absolute discretion, (the "**Financing Contingency**") on or before the expiration of the 90 day period after your acceptance of my Offer (the "**Financing Period**"); and (B) the funding of such financing, on or before the Closing.

(ii)    An independent appraisal of Fabuwood has been performed by Mark S. Gottlieb and a copy of his appraisal report dated January 25, 2021 is available for your review. Nevertheless, you may elect to require another independent appraisal of Fabuwood be made by a qualified independent appraiser of your choosing, at your expense, provided that such appraisal is completed and a report issued no later than February 22, 2021.  If you elect to exercise your option under this clause (ii) and the appraised value of the Fabuwood Stock, as determined by the enterprise value of Fabuwood resulting from such appraisal, exceeds or is less than the Fabuwood Purchase Price by at least five percent (5%), then the Fabuwood Purchase Price will be adjusted accordingly.  Your right under this clause (ii) will expire unless written notice of your election to exercise such right is received by me on or before February 10, 2021.  You agree that the Purchase Price is firm and not subject to adjustments other than as set forth in this Paragraph 4(ii).

(iii)   Sterling National Bank agrees to release you of your personal guaranty for the Fabuwood financing facility on or before the Closing (the "**Guaranty Release**").

(iv)    Your execution and delivery, at Closing, of a Confidentiality, Non-Compete, Non-Solicitation and Non-Disparagement Agreement, in a form acceptable to me, whereby you agree, directly or indirectly: (A) to keep confidential all non-public, confidential, trade and proprietary information of the Fabuwood Entities, (B) not to compete with the business of Fabuwood for two (2) years following the Closing, (C) not to hire or solicit any employee, independent contractor or agent to terminate or materially adversely change his, her or its employment or business relationships with Fabuwood, (D) not to solicit or encourage any present or future vendor, customer or supplier of Fabuwood to terminate or otherwise alter his, her or its relationship with Fabuwood and (E) not to

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 5

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Fabuwood Entities, or their respective businesses, or any of their respective employees, officers, and existing and prospective clients, investors, and other associated third parties.

(v)     The continuing validity and enforcement of the Voting Trust Agreement until the Closing.

5.     Proposed Definitive Agreement. As soon as reasonably practicable after the execution and delivery of this Buyout Notice, we will commence to negotiate a definitive purchase agreement and related documents (the "**Definitive Agreements**") relating to my acquisition of the Panzer Interests, to be drafted by my counsel. The Definitive Agreements would provide for an effective date of January 1, 2021 for the Buyout and include the terms summarized in this Buyout Notice and such other representations, warranties, conditions, covenants, indemnities and other terms that are customary for transactions of this kind and are not inconsistent with the terms herein.

6.     Time is of the Essence. Because of the challenges faced by Fabuwood, **time is of the essence** with respect to the Closing, which must occur no later than 30 days from the later of (i) the satisfaction of the Financing Contingency and (ii) the agreement by Sterling National Bank to release you from your personal guaranty as of the Closing. If the Closing does not occur by such date, you agree that the Purchase Price shall be reduced by 10% for each week of delay.

7.     Further Covenants. From the date of your acceptance to the Closing, you hereby agree, as follows:

(i)     to cooperate with Sterling National Bank or any other financial institution or lending entity in connection with any Fabuwood financing facility, which cooperation may include, without limitation, signing extensions of existing credit facilities and providing any and all personal information promptly, without delay, including but not limited to personal financial statements and income tax return requested by such lending entities;

(ii)     so as to keep our transaction confidential and avoid rumors that Fabuwood is closing and possible confusion of employees, sales representatives, customers, vendors and suppliers as to the management of Fabuwood, not to communicate or otherwise get in touch with, directly or indirectly, verbally, in writing or otherwise (including emails, whatsapp or text messages), any employee, independent contractor, sales representative, vendor, supplier, customer or other business relationship of Fabuwood for purposes of soliciting information regarding Fabuwood, its business, operations and property, offering advice as to Fabuwood, its business, operations and property or otherwise interfering with or discussing Fabuwood, its business, operations and property;

(iii)     to keep away from and avoid and not be present in any Fabuwood sponsored location, whether such location is temporary such as a location for a Fabuwood Sales Meeting or permanent, including but not limited to its offices and building at 69 Blanchard St., Newark, NJ 07105 and 99 Caven Point, Jersey City, NJ 07305; and

**FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM**  INDEX NO. 654909/2021

NYSCEF DOC. NO. 5  RECEIVED NYSCEF: 08/13/2021

(iv)  keep confidential all non-public, confidential, trade or proprietary information of Fabuwood, whether oral, visual, written, electronic, other tangible or intangible form, and not use any such information except for the purpose of negotiations with respect to the Definitive Agreements.

8.  Matrimonial Action. You agree that a portion of the Purchase Price will be paid and held in escrow to the extent required by your legal counsel for your current matrimonial action. Other than as set forth in the foregoing sentence, you agree that your matrimonial action shall not have any other legal effect on the consummation of the Buyout.

9.  Termination.

(i)  This Buyout Notice will automatically terminate and be of no further force and effect upon the earlier of (A) our execution and delivery of the Definitive Agreements, or (B) our mutual agreement to terminate the Buyout Notice.

(ii)  In addition, you may terminate the Buyout Notice if (A) the Financing Contingency is not satisfied on the expiration of the Financing Period, or (B) the Guaranty Release does not occur at Closing.

(iii)  Upon the termination of this Buyout Notice pursuant to Paragraph 9(i)(B) or Paragraph 9(ii), then the Voting Trust Agreement will be deemed terminated and you will be restored to the positions named in the Resignation Letter, in each case, without further action from any of us.

10.  Offer Expiration. This Buyout Notice will remain in effect until **12 Noon, February 10, 2021** unless accepted or rejected by you, or withdrawn by me prior to that time.

11.  Buyout Right Under Section 2.05(a). Upon your acceptance of my Offer and this Buyout Notice, you hereby agree and acknowledge that you have chosen not to exercise your Buyout Right Under Section 2.05(a) of the Shareholders Agreement.

12.  Confidentiality. This Buyout Notice is confidential and may not be disclosed to any third party without our consent except to our advisors and agents to the extent needed to advise us in the transactions contemplated herein and who agree to keep such information confidential.

13.  Expenses. Except for the independent appraisal fees as set forth in Paragraph 4(ii), we will each pay our own transaction expenses, including the fees and expenses of our advisors, incurred in connection with this Buyout Notice.

14.  BINDING AGREEMENT. **THIS BUYOUT NOTICE REFLECTS OUR INTENTIONS WITH RESPECT TO THE BUY-OUT AND SHALL BE LEGALLY BINDING AND ENFORCEABLE OBLIGATION ON US. WE AGREE THAT THE DEFINITIVE AGREEMENTS WILL PROVIDE TERMS TO SUPPLEMENT THE TERMS OF THE BUYOUT BUT THAT THERE HAS BEEN A MEETING OF THE MINDS BETWEEN US WITH RESPECT TO THE MATERIAL TERMS OF THE BUYOUT.**

15.  Miscellaneous. This Buyout Notice may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Buyout Notice shall be governed by and construed in accordance with internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 5

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York.  Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than us and our successors or assigns, any rights or remedies under or by reason of this Buyout Notice.

[signature page immediately follows]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 5

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

I hope you find the terms of this Buyout Notice acceptable.

Very truly yours,

_____
Joel Epstein

Agreed:

_____
Moshe Chaim Panzer

State of New York      )
                       ) ss.:
County of _____ )

On the _____ day of February in the year 2021, before me, the undersigned notary public, personally appeared Moshe Chaim Panzer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 6

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Voting Agreement

This Voting Agreement (this "**Agreement**"), dated as of February ⎯⎯, 2021, is entered into by and between the undersigned stockholders of Fabuwood Cabinetry Corp., a New York corporation (the "**Company**").

WHEREAS, concurrently with or following the execution of this Agreement, Michael Panzer ("**Panzer**") has accepted the offer of Joel Epstein ("**Epstein**") to purchase all of Panzer's ownership interests in the Company and its related entities pursuant to the binding Buyout Notice between Panzer and Epstein dated of February 1, 2021 (the "**Buyout Notice**"); and

WHEREAS, as a condition to Panzer's acceptance of the Buyout Notice, Epstein has required that Panzer, and Panzer has agreed to, execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth below and for other good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    **Definitions.** For purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Buyout Notice.

2.    **Representations of Panzer.** Panzer represents and warrants to Epstein that:

     (a)   **Ownership of Fabuwood Stock**. Panzer: (i) is the beneficial owner of all of the Fabuwood Stock free and clear of any proxy, voting restriction, adverse claim, or other liens, other than those created by this Agreement or under applicable federal or state securities laws; and (ii) has the sole voting power over all of the Fabuwood Stock. Except pursuant to this Agreement, there are no options, warrants, or other rights, agreements, arrangements, or commitments of any character to which Panzer is a party relating to the pledge, disposition, or voting of any of the Fabuwood Stock and there are no voting trusts or voting agreements with respect to the Fabuwood Stock.

     (b)   **Power and Authority; Binding Agreement.** Panzer has full power and authority and legal capacity to enter into, execute, and deliver this Agreement and to perform fully Panzer's obligations hereunder (including the proxy described in Section 3 below). This Agreement has been duly and validly executed and delivered by Panzer and constitutes the legal, valid, and binding obligation of Panzer, enforceable against Panzer in accordance with its terms except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

     (c)   **No Conflict.** The execution and delivery of this Agreement by Panzer does not, and the consummation of the transactions contemplated hereby and the compliance with the provisions hereof will not, conflict with or violate any law applicable to Panzer or result in any breach of or violation of, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration, or cancellation of, or result in the creation of any lien on any of the Fabuwood Stock pursuant to, any agreement or other instrument or obligation binding upon Panzer or any of the Fabuwood Stock.

     (d)   **No Consents.** No consent, approval, order, or authorization of, or registration, declaration, or filing with, any governmental entity or any other person or entity on the part of Panzer is required in connection with the valid execution and delivery of this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

INDEX NO. 654909/2021

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 08/13/2021

(e)     **No Litigation.** There is no action, suit, investigation, or proceeding (whether judicial, arbitral, administrative, or other) pending against, or, to the knowledge of Panzer, threatened against or affecting, Panzer that could reasonably be expected to materially impair or materially adversely affect the ability of Panzer to perform Panzer's obligations hereunder or to consummate the transactions contemplated by this Agreement on a timely basis.

**3.**     **Irrevocable Proxy.**  Panzer hereby appoints Epstein and any designee of Epstein, and each of them individually, his proxies and attorneys-in-fact, with full power of substitution and resubstitution, to vote or act by written consent, in Epstein's sole and absolute discretion, during the term of this Agreement with respect to the Fabuwood Stock in any matter submitted to the vote of stockholders of the Company and for any action or matter that requires Panzer's consent or action in his capacity as a Company stockholder under any agreement, including but not limited to the Amended and Restated Shareholders Agreement between the Company and its stockholders dated November 10, 2017 and the Settlement Agreement between Panzer and Epstein dated November 10, 2017. This proxy and power of attorney is given to secure the performance of the duties and obligations of Panzer under the Buyout Notice and to further the purposes of the Buyout Notice. Panzer shall take such further action or execute such other instruments as may be necessary to effectuate the intent of this proxy. This proxy and power of attorney granted by Panzer shall be irrevocable during the term of this Agreement, shall be deemed to be coupled with an interest sufficient in law to support an irrevocable proxy, and shall revoke any and all prior proxies granted by Panzer with respect to the Fabuwood Stock. The power of attorney granted by Panzer herein is a durable power of attorney and shall survive the bankruptcy, death, or incapacity of Panzer. The proxy and power of attorney granted hereunder shall terminate upon the termination of this Agreement.

**4.**     **No Voting Trusts or Other Arrangement.** Panzer agrees that during the term of this Agreement Panzer will not, and will not permit any entity under Panzer's control to, deposit any of the Fabuwood Stock in a voting trust, grant any proxies with respect to the Fabuwood Stock, or subject any of the Fabuwood Stock to any arrangement with respect to the voting of the Fabuwood Stock other than agreements entered into with Epstein.

5.     **Transfer and Encumbrance.**  Panzer agrees that during the term of this Agreement, Panzer will not, directly or indirectly, transfer, sell, offer, exchange, assign, pledge, convey any legal or beneficial ownership interest in or otherwise dispose of, by operation of law, or otherwise, or encumber ("**Transfer**") any of the Fabuwood Stock or enter into any contract, option, or other agreement with respect to, or consent to, a Transfer of, any of the Fabuwood Stock or Panzer's voting or economic interest therein. Any attempted Transfer of Fabuwood Stock or any interest therein in violation of this Section 5 shall be null and void.

6.     **Additional Fabuwood Stock.**  Panzer agrees that all shares of the Company that Panzer purchases, acquires the right to vote, or otherwise acquires beneficial ownership of after the execution of this Agreement and prior to Closing Time shall be subject to the terms and conditions of this Agreement and shall constitute Fabuwood Stock for all purposes of this Agreement.

7.     **Termination.**  This Agreement shall terminate upon the termination of the Buyout Notice. Nothing in this Section 7 shall relieve or otherwise limit the liability of any party for any intentional breach of this Agreement prior to such termination.

8.     **Further Assurances.**  Panzer agrees, from time to time, and without additional consideration, to execute and deliver such additional proxies, documents, and other instruments and to take all such further action as Epstein may reasonably request to consummate and make effective the transactions contemplated by this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 6

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

9.    **Specific Performance.** Panzer hereto acknowledges that it will be impossible to measure in money the damage to Epstein if Panzer fails to comply with any of the obligations imposed by this Agreement, that every such obligation is material and that, in the event of any such failure, Epstein will not have an adequate remedy at law or damages. Accordingly, Panzer agrees that injunctive relief or other equitable remedy, in addition to remedies at law or damages, is the appropriate remedy for any such failure and will not oppose the seeking of such relief on the basis that Epstein has an adequate remedy at law. Panzer agrees that it will not seek, and agrees to waive any requirement for, the securing or posting of a bond in connection with Epstein's seeking or obtaining such equitable relief.

10.    **Miscellaneous.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Agreement shall be governed by and construed in accordance with internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than us and our successors or assigns, any rights or remedies under or by reason of this Agreement.

[SIGNATURE PAGE FOLLOWS]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 6

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first written above.

JOEL EPSTEIN

MOSHE CHAIM PANZER

Number of Fabuwood Stock Beneficially Owned as of the date of this Agreement: 105 shares

Street Address:  1626 47th St.

City/State/Zip Code:  Brooklyn, NY 11204

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM          INDEX NO. 654109/2021
NYSCEF DOC. NO. 7                                          RECEIVED NYSCEF: 08/13/2021

Subject: Fabuwood Cabinetry Corp.

Date:   2/9/2021 4:23 PM

From:   "Stricoff, Joshua" <jstricoff@herrick.com>

To:     "Marc.mukasey@mukaseylaw.com" <Marc.mukasey@mukaseylaw.com>

Cc:     "joele@fabuwood.com" <joele@fabuwood.com>, "Mehlman, Avery"
        <amehlman@herrick.com>

---

Mr. Mukasey,

Please be advised that this firm represents Moshe Chaim Panzer.  Please find the attached letter in response to
your letter and your client's letters dated February 1, 2021.



**Joshua Stricoff**
**Associate**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.1576  Office
jstricoff@herrick.com

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021



**Avery S. Mehlman**
Partner
Phone: 212.592.5985
Fax: 212.545.3424
amehlman@herrick.com

February 9, 2021

<u>**FEDEX OVERNIGHT DELIVERY AND EMAIL**</u>

Marc L. Mukasey, Esq.
Mukasey Frenchman & Sklaroff, LLP
2 Grand Central Tower
140 East 45th Street, Suite 17A
New York, New York 10017
Marc.mukasey@mfsllp.com

Joel Epstein
8 Frankfurt Road, Unit 301
Monroe, New York 10950
Email: joele@fabuwood.com

> Re:   Amended and Restated Shareholders Agreement among Fabuwood
> Cabinetry Corp. ("Fabuwood") and its Shareholder effective as of January
> 1, 2017 (the "Shareholders Agreement")[1]

Dear Mr. Mukasey:

Please be advised that this law firm is counsel for Moshe Chaim Panzer.  We are in receipt of your letter to Mr. Panzer dated February 1, 2021, as well as Mr. Epstein's purported Deadlock Notice, Buyout Notice and Voting Agreement.

As an initial matter, Mr. Panzer objects to the Deadlock Notice because, *inter alia*, no Deadlock has occurred.  Mr. Panzer further objects to the purported Buyout Notice as being abjectly improper under the terms of the Shareholder Agreement.  Among other things, because there is no Deadlock, then no party has the right to exercise his Buyout Rights.  Moreover, pursuant to Section 2.05 of the Shareholder Agreement, a Buyout Notice may only be issued if, *inter alia*, an Independent Appraiser is retained by Fabuwood's Board and issues an appraisal report that determines the fair market value of the Buyout Shares.  That has not happened.  Thus, the even if there were a Deadlock (which there is not), the Buyout Notice would be premature.

Procedural defects aside, the substance of the Buyout Notice is contrary to the plain language of the Shareholder Agreement.  Among other defects, Mr. Epstein's offer to purchase Mr. Panzer's shares of the Company according to the fair market value determined by an alleged appraisal commissioned by Mr. Epstein is not a "Buyout Right."  Accordingly, Mr. Epstein is not

---

[1] Capitalized terms have the meanings ascribed to them in the Shareholders Agreement.

**HERRICK, FEINSTEIN LLP** • Two Park Avenue • New York, NY 10016 • Phone: 212.592.1400 • Fax: 212.592.1500

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 7

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021



February 9, 2021
Page 2

exercising his Buyout Rights under the Shareholder Agreement, and Mr. Panzer objects to Mr. Epstein's attempt to label his proposal a Buyout under Section 2.05.

And to the extent that the Buyout Notice and Voting Agreement constitute an offer to purchase Mr. Panzer's shares of Fabuwood, that offer is rejected. The fair market value of a Fabuwood shares is far greater than $143,000.

In sum, Mr. Panzer objects to the Deadlock Notice, the Buyout Agreement, and Voting Agreement, and rejects all offers contained therein. Mr. Epstein's attempt to label his lowball offer a "Buyout" is not a good faith attempt to amicably resolve whatever dispute may exist between the parties. It is a willful misapplication of the terms of the Shareholder Agreement and does nothing to further a peaceful resolution.

Nothing herein shall be interpreted as a waiver of any kind; Mr. Panzer reserves all rights and remedies available to him in law or equity.

Very truly yours,

*/s/ Avery S. Mehlman*

Avery S. Mehlman

cc:      Avi Lew, Esq.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 8

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021



**Avery S. Mehlman**
**Partner**
Phone: 212.592.5985
Fax: 212.545.3424
amehlman@herrick.com

February 15, 2021

**BY FEDERAL EXPRESS OVERNIGHT DELIVERY AND EMAIL**

Kenneth Caruso, Esq.
Mukasey Frenchman & Sklaroff, LLP
2 Grand Central Tower
140 East 45th Street, Suite 17A
New York, New York 10017
Ken.Caruso@mfsllp.com

> Re:   Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("Fabuwood") and its Shareholder effective as of January 1, 2017 (the "Shareholders Agreement")[1]

Dear Mr. Caruso:

As you know, this law firm represents Moshe Chaim Panzer.  We have been advised that Joel Epstein continues to commit Fabuwood to large expenditures in excess of $50,000, included but not limited to a recent $250,000 commitment, without authorization from Fabuwood's Board of Directors (the "Board").  These commitments are in clear violation of Section 2.04(e) of the Shareholders Agreement, under which any "obligation of the Company to make any expenditure or grant any discount in excess of Fifty Thousand Dollars" requires "prior authorization of the Board."  No such authorization was sought by Mr. Epstein for any of these expenditures, let alone granted by the Board or Mr. Panzer.

Accordingly, Mr. Epstein's actions represent a default under the Shareholders Agreement. And defaults under the Shareholders Agreement are, pursuant to Section 5.07, considered irreparable injuries entitling the harmed party—in this case Fabuwood and Mr. Panzer—to equitable relief.

If Mr. Epstein continues to authorize expenditures with the Board's or Mr. Panzer's consent, then Mr. Panzer will have no other choice but to commence an action for injunctive relief and all attendant fees recoverable under Section 5.07.

Please consider this letter Mr. Panzer's only and final warning to Mr. Epstein.

---

[1] Capitalized terms have the meanings ascribed to them in the Shareholders Agreement.

**HERRICK, FEINSTEIN LLP** ● Two Park Avenue ● New York, NY 10016 ● Phone: 212.592.1400 ● Fax: 212.592.1500

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 8

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

 HERRICK

February 15, 2021
Page 2

       Nothing herein shall be interpreted as a waiver of any kind; Mr. Panzer reserves all rights and remedies available to him in law or equity.

Very truly yours,

*/s/ Avery S. Mehlman*

Avery S. Mehlman

cc:    Joel Epstein
       Avi Lew, Esq.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 9

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Stricoff, Joshua

| | |
|---|---|
| **From:** | Kenneth Caruso <Ken.Caruso@mfsllp.com> |
| **Sent:** | Tuesday, February 16, 2021 3:53 PM |
| **To:** | Mehlman,  Avery; Stricoff, Joshua |
| **Subject:** | RE: Fabuwood |

I am glad to hear that your client is ready to meet with mine before the Rebbe.  I believe that that process is, in fact, starting.  Without prejudice, I see no need to go back and forth with you on the other matters mentioned below, which, I trust, the Rebbe can mediate.

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Tuesday, February 16, 2021 3:43 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** RE: Fabuwood

As I stated in my email earlier in the week, my client is ready to meet with your client with the Kossovo Rebbe in order to try to resolve their issues.  Although, I was surprised that your client has already visited with the Kossovo Rebbe without letting my client know – for this to work they both must meet together.

Further, contrary to assertion, the fact that your client is violating the agreement does not demonstrate the need to invoke the deadlock provisions.  Partners can disagree on certain issues.  However, your client as no right to allocate funds without my client's express consent, as detailed in the Agreement.

Thanks.

**Avery S. Mehlman**
Partner
Herrick, Feinstein LLP
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Tuesday, February 16, 2021 2:48 PM
**To:** Mehlman, Avery <amehlman@herrick.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** FW: Fabuwood

This responds to your letter (copy attached), dated yesterday, February 15, 2021.  You have the facts wrong regarding what you describe as a "recent $250,000 commitment."  More to the point, however, even on your statement of the facts, your letter demonstrates that the parties have not reached a consensus on a Major Decision, as set forth in section 2.04 of the

1

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 9

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

Shareholders' Agreement.  This yields a Deadlock under section 2.05, which leads to a Dispute, requiring, as a next step, mediation before the Counselor.  We expect you to cooperate, as you previously agreed, in that mediation.  If you also want to take the matter to court under section 5.07, feel free to do so.

**From:** Stricoff, Joshua <jstricoff@herrick.com>
**Sent:** Monday, February 15, 2021 2:20 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Mehlman, Avery <amehlman@herrick.com>
**Subject:** Fabuwood

Kenneth,

Please find the attached letter regarding your client's conduct with respect to Fabuwood.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and delete the original and any copies.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 10

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## Stricoff, Joshua

**From:**          Mehlman,  Avery
**Sent:**           Sunday, April 18, 2021 5:07 PM
**To:**             Kenneth Caruso
**Cc:**             Stricoff, Joshua
**Subject:**        Re: Voice Mail (8 seconds)

First, your statements are both factually and legally incorrect and misplaced.

That being said, it is my understanding that the parties are meeting with the Rebbe this week.

Avery Mehlman
2 Park Ave New York, NY 10016
Office: 212.592.5985
Fax: 1.212.545.3424

> On Apr 18, 2021, at 4:46 PM, Kenneth Caruso <Ken.Caruso@mfsllp.com> wrote:
>
>
> Avery, as you may know, our clients have discussed the appraisal.  My client
> agreed to give the appraisal to your client, and has done so, on the understanding
> that your client would proceed promptly to mediation before the Rebbe.  That,
> however, still has occurred.  Would you please have your client cooperate in this
> effort immediately?  He has dragged this out for a very long time.  Many thanks

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Friday, April 9, 2021 4:25 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** RE: Voice Mail (8 seconds)

Not sure what the game is – just give us the appraisal --

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential,
privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this
communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you
for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Stricoff, Joshua**

| | |
|---|---|
| **From:** | Kenneth Caruso <Ken.Caruso@mfsllp.com> |
| **Sent:** | Sunday, February 14, 2021 10:43 AM |
| **To:** | Mehlman,  Avery |
| **Cc:** | Stricoff, Joshua |
| **Subject:** | RE: Follow-up |

Cutting through to the relevant in your email below, it is my understanding that our clients have agreed to proceed to mediation before the rabbi immediately and that the first mediation session will be "clients only."  Thank you.

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Saturday, February 13, 2021 7:47 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** Re: Follow-up


First your notice was defective and in violation of multiple clauses in the Agreement, as well as full of factually false allegations.

Second, I don't appreciate arbitrary deadlines or veiled threats. If we are going to work with our clients to resolve their differences your current tone and strategy will only lead to prolonged litigation.

That being said my client is not adverse to meeting with the Kossovo Rebbe in the hopes of resolving the issues.

The following is made with a full reservation at law equity or otherwise all of which my client expressly reserves.

All the best,

Avery.



On Feb 12, 2021, at 6:22 PM, Kenneth Caruso <Ken.Caruso@mfsllp.com> wrote:


We await your response to my email of yesterday, set out below.  If we do not hear from you by Sunday, we will conclude that your client does not want to proceed as previously discussed.  For avoidance of doubt, let me reiterate that the clock on the contractual deadlines, which we triggered on February 1, 2021, continues to run.  Many thanks

1

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**From:** Kenneth Caruso
**Sent:** Thursday, February 11, 2021 6:06 PM
**To:** Mehlman, Avery <amehlman@herrick.com>
**Subject:** Follow-up

Hello.  As discussed on the phone yesterday, my client is willing to go to the Counselor immediately, and to have the first mediation session conducted by "clients only."  Have you confirmed this with your client yet?  Please let me know.  Many thanks

Kenneth A. Caruso
Special Counsel
Mukasey Frenchman & Sklaroff LLP
2 Grand Central Tower
140 E 45th Street, Suite 17A
New York, NY 10017
646-599-4970 | mailto:kenneth.caruso@mfsllp.com
www.mfsllp.com
<image001.png>

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and delete the original and any copies.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Stricoff, Joshua

| | |
|---|---|
| **From:** | Stricoff, Joshua |
| **Sent:** | Tuesday, February 16, 2021 4:28 PM |
| **To:** | Kenneth Caruso; Mehlman, Avery |
| **Subject:** | RE: Fabuwood |

In the interest of any settlement, please send to us a copy of (i) the appraisal prepared by Mark S. Gottlieb on or about January 25, 2021, as referenced in your client's purported Buyout Notice dated February 1, 2021, and (ii) proof of how the appraiser was paid.

The request for this appraisal is not an admission of the validity of the appraisal or your client's purported Buyout Notice, which was rejected by letter from my office dated February 9, 2021.  Furthermore, we must mention that the use of Mr. Gottlieb as an appraiser was wholly improper, as he was appointed by the Court to appraise the company in connection with our client's divorce proceedings.

Without waiving the foregoing objections, we nonetheless demand the information requested above.



**Joshua Stricoff**
**Associate**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.1576  Office
jstricoff@herrick.com

---

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Tuesday, February 16, 2021 3:53 PM
**To:** Mehlman, Avery <amehlman@herrick.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** RE: Fabuwood

I am glad to hear that your client is ready to meet with mine before the Rebbe.  I believe that that process is, in fact, starting.  Without prejudice, I see no need to go back and forth with you on the other matters mentioned below, which, I trust, the Rebbe can mediate.

---

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Tuesday, February 16, 2021 3:43 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** RE: Fabuwood

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 10

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

As I stated in my email earlier in the week, my client is ready to meet with your client with the Kossovo Rebbe in order to try to resolve their issues.  Although, I was surprised that your client has already visited with the Kossovo Rebbe without letting my client know – for this to work they both must meet together.

Further, contrary to assertion, the fact that your client is violating the agreement does not demonstrate the need to invoke the deadlock provisions.  Partners can disagree on certain issues.  However, your client as no right to allocate funds without my client's express consent, as detailed in the Agreement.

Thanks.

**Avery S. Mehlman**
**Partner**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

---

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Tuesday, February 16, 2021 2:48 PM
**To:** Mehlman, Avery <amehlman@herrick.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** FW: Fabuwood

This responds to your letter (copy attached), dated yesterday, February 15, 2021.  You have the facts wrong regarding what you describe as a "recent $250,000 commitment."  More to the point, however, even on your statement of the facts, your letter demonstrates that the parties have not reached a consensus on a Major Decision, as set forth in section 2.04 of the Shareholders' Agreement.  This yields a Deadlock under section 2.05, which leads to a Dispute, requiring, as a next step, mediation before the Counselor.  We expect you to cooperate, as you previously agreed, in that mediation.  If you also want to take the matter to court under section 5.07, feel free to do so.

---

**From:** Stricoff, Joshua <jstricoff@herrick.com>
**Sent:** Monday, February 15, 2021 2:20 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Mehlman, Avery <amehlman@herrick.com>
**Subject:** Fabuwood

Kenneth,

Please find the attached letter regarding your client's conduct with respect to Fabuwood.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

INDEX NO. 654909/2021

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 08/13/2021

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and delete the original and any copies.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Stricoff, Joshua

| | |
|---|---|
| **From:** | Mehlman,  Avery |
| **Sent:** | Tuesday, March 2, 2021 7:42 PM |
| **To:** | Kenneth Caruso; Stricoff, Joshua |
| **Subject:** | RE: Fabuwood |

I don't see how there can be meaningful discussions without are review of the Appraisal –which by the way your client is obligated to provide—

Please advise as to where we stand –thanks.



**Avery S. Mehlman**
**Partner**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Thursday, February 18, 2021 4:14 PM
**To:** Mehlman, Avery <amehlman@herrick.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** Fabuwood

Gents, we strongly believe that the next step toward settlement should be a mediation before the Counselor.  Indeed, in our prior communications, both sides agreed to proceed to mediation.  In particular, the next step should be the  fixing of a date for the first mediation session, which, as previously agreed, will be "clients only."  Once a date is fixed, we will certainly reconsider your request, made in your email below, to provide you with a copy of the appraisal.  With respect to the rest of your email below, we disagree with your assertions/position.  And, as I suggested in a phone call last week, if you think another appraisal is necessary, please suggest a name or two of companies/persons who, in your view, should be engaged for that purpose.  Many thanks.

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Thursday, February 18, 2021 8:41 AM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** Re: Fabuwood

Thanks.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

INDEX NO. 654909/2021

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 08/13/2021

On Feb 18, 2021, at 7:11 AM, Kenneth Caruso <Ken.Caruso@mfsllp.com> wrote:

Sorry, I have been tied up in prep for a court appearance today. I will respond to this request later this afternoon or first thing tomorrow. Sorry and thanks

Get Outlook for iOS

---

**From:** Stricoff, Joshua <jstricoff@herrick.com>
**Sent:** Tuesday, February 16, 2021 4:27:35 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>; Mehlman, Avery <amehlman@herrick.com>
**Subject:** RE: Fabuwood

In the interest of any settlement, please send to us a copy of (i) the appraisal prepared by Mark S. Gottlieb on or about January 25, 2021, as referenced in your client's purported Buyout Notice dated February 1, 2021, and (ii) proof of how the appraiser was paid.

The request for this appraisal is not an admission of the validity of the appraisal or your client's purported Buyout Notice, which was rejected by letter from my office dated February 9, 2021.  Furthermore, we must mention that the use of Mr. Gottlieb as an appraiser was wholly improper, as he was appointed by the Court to appraise the company in connection with our client's divorce proceedings.

Without waiving the foregoing objections, we nonetheless demand the information requested above.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

### Stricoff, Joshua

| | |
|---|---|
| **From:** | Mehlman,  Avery |
| **Sent:** | Wednesday, March 24, 2021 2:11 PM |
| **To:** | Kenneth Caruso |
| **Cc:** | Stricoff, Joshua |
| **Subject:** | RE: Fabuwood |

Kenneth:

I hope all is well –

Not sure what the hold-up is – the agreement requires a copy of the appraisal –

We can't have a meaningful conversation without it.

I am available to discuss.  Thanks.



**Avery S. Mehlman**
**Partner**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

---

**From:** Mehlman, Avery
**Sent:** Tuesday, March 2, 2021 7:42 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** RE: Fabuwood

I don't see how there can be meaningful discussions without are review of the Appraisal –which by the way your client is obligated to provide—

Please advise as to where we stand –thanks.



**Avery S. Mehlman**
**Partner**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 10

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Thursday, February 18, 2021 4:14 PM
**To:** Mehlman, Avery <amehlman@herrick.com>; Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** Fabuwood

Gents, we strongly believe that the next step toward settlement should be a mediation before the Counselor.  Indeed, in our prior communications, both sides agreed to proceed to mediation.  In particular, the next step should be the  fixing of a date for the first mediation session, which, as previously agreed, will be "clients only."  Once a date is fixed, we will certainly reconsider your request, made in your email below, to provide you with a copy of the appraisal.  With respect to the rest of your email below, we disagree with your assertions/position.  And, as I suggested in a phone call last week, if you think another appraisal is necessary, please suggest a name or two of companies/persons who, in your view, should be engaged for that purpose.  Many thanks.

---

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Thursday, February 18, 2021 8:41 AM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Cc:** Stricoff, Joshua <jstricoff@herrick.com>
**Subject:** Re: Fabuwood

Thanks.

On Feb 18, 2021, at 7:11 AM, Kenneth Caruso <Ken.Caruso@mfsllp.com> wrote:

Sorry, I have been tied up in prep for a court appearance today. I will respond to this request later this afternoon or first thing tomorrow. Sorry and thanks

Get Outlook for iOS

---

**From:** Stricoff, Joshua <jstricoff@herrick.com>
**Sent:** Tuesday, February 16, 2021 4:27:35 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>; Mehlman, Avery <amehlman@herrick.com>
**Subject:** RE: Fabuwood

In the interest of any settlement, please send to us a copy of (i) the appraisal prepared by Mark S. Gottlieb on or about January 25, 2021, as referenced in your client's purported Buyout Notice dated February 1, 2021, and (ii) proof of how the appraiser was paid.

The request for this appraisal is not an admission of the validity of the appraisal or your client's purported Buyout Notice, which was rejected by letter from my office dated February 9, 2021.  Furthermore, we must mention that the use of Mr. Gottlieb as an appraiser was wholly improper, as he was appointed by the Court to appraise the company in connection with our client's divorce proceedings.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

Without waiving the foregoing objections, we nonetheless demand the information requested above.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Stricoff, Joshua**

| | |
|---|---|
| **From:** | Mehlman, Avery |
| **Sent:** | Monday, April 5, 2021 12:36 PM |
| **To:** | Kenneth Caruso |
| **Cc:** | Stricoff, Joshua |
| **Subject:** | RE: Voice Mail (8 seconds) |

Following up on our conversation  -- a meeting with Kossover must be set up ASAP.

Additionally, before the meeting, as has been requested numerous times, a copy of the appraisal must be turned over.

Please advise.  Thanks.



**Avery S. Mehlman**
Partner
Herrick, Feinstein LLP
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com
website bio

---

**From:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Sent:** Thursday, April 1, 2021 6:18 AM
**To:** Mehlman, Avery <amehlman@herrick.com>
**Subject:** Re: Voice Mail (8 seconds)

Any time at or after 2:00, thanks

Get Outlook for iOS

---

**From:** Mehlman, Avery <amehlman@herrick.com>
**Sent:** Wednesday, March 31, 2021 9:22:01 PM
**To:** Kenneth Caruso <Ken.Caruso@mfsllp.com>
**Subject:** RE: Voice Mail (8 seconds)

Please let me know what time works for you tomorrow –thanks.



**Avery S. Mehlman**
Partner
Herrick, Feinstein LLP
Two Park Avenue | New York, NY 10016
212.592.5985  Office
AMehlman@herrick.com

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 10

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

website bio

---

**From:** KENNETH CARUSO <+16465994970>
**Sent:** Wednesday, March 31, 2021 9:54 AM
**To:** Mehlman, Avery <amehlman@herrick.com>
**Subject:** Voice Mail (8 seconds)

Good morning Kenneth Caruso 646-599-4970. Thank you.

You received a voice mail from KENNETH CARUSO.

---

**Thank you for using Transcription! If you don't see a transcript above, it's because the audio quality was not clear enough to transcribe.**

Set Up Voice Mail

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and delete the original and any copies.

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM**

NYSCEF DOC. NO. 11

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Stricoff, Joshua**

| | |
|---|---|
| **From:** | Kenneth Caruso <Ken.Caruso@mfsllp.com> |
| **Sent:** | Wednesday, February 24, 2021 5:44 PM |
| **To:** | Mehlman, Avery; Stricoff, Joshua |
| **Subject:** | Fabuwood |

I refer to certain correspondence from Marc. L. Mukasey of this firm to your client, Mr. Panzer, dated February 1, 2021.  The 15-business-day period during which your client could have exercised his Buyout Rights expired yesterday, February 23, 2021.  My client's Buyout Rights have now vested, and are hereby exercised.  Please treat this as my client's Buyout Notice, which triggers your client's duty to sell.

I recognize that you disagree with the position that I have stated above.  There is, accordingly, no need for you to re-state your position in response to this email.  I also recognize that the clients are pursuing mediation.  I am encouraging my client's prompt participation in that process, and I trust that you are doing the same with your client.  Best regards.

Kenneth A. Caruso
Special Counsel
Mukasey Frenchman & Sklaroff LLP
2 Grand Central Tower
140 E 45th Street, Suite 17A
New York, NY 10017
646-599-4970 | mailto:kenneth.caruso@mfsllp.com
www.mfsllp.com



This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Are AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL ARBITRATION RULES

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

In the Matter of an Arbitration Between

JOEL EPSTEIN,                                          :          **DEMAND FOR**
                                                       :          **ARBITRATION AND**
                                                                  **STATEMENT OF CLAIM**

                           Claimant(s),          :

            and                                    :

MOSHE CHAIM PANZER,                                    :

                Respondent(s).        :

                                                       :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

**To:** American Arbitration Association and the following Respondent(s) and his counsel:

MOSHE CHAIM PANZER

1626 47 Street

Brooklyn, NY 11204

Phone: (917) 417-8000

Email: mp@fabuwood.com


AVERY S. MEHLMAN

Herrick Feinstein LLP

Two Park Ave.

New York, NY 10016

Phone: (212) 592-5985

Fax: (212) 545-3424

Email: amehlman@herrick.com

**Please take notice** of the commencement of arbitration as described in the following Demand for Arbitration. Copies of the arbitration agreement and this Demand for Arbitration and Statement of Claim are being filed with the AAA with a request to commence administration of the arbitration. Respondent(s) may file an answering statement after notice from the case administrator.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## I. Introduction

1.      This demand for arbitration is made pursuant to Sections 5.06(c) and (d) of the Amended and Restated Shareholders Agreement effective as of January 1, 2017 by and among Fabuwood Cabinetry Corp. (the "**Company**") and the Shareholders named therein (the "**Shareholders Agreement**").

2.      Pursuant to Section 2.05 of the Shareholders Agreement, in the event that Claimant and Respondent are unable to agree (a "**Deadlock**") on a Major Decision (as defined under the Shareholders Agreement), then each had the right to buy out (a "**Buyout Right**") all of the Company shares held, directly or indirectly, by the other (the "**Buyout Shares**"), at a price per share determined by a qualified independent appraiser.  On or about February 1, 2021, Claimant served Respondent with a Deadlock Notice asserting that a Deadlock has occurred under Section 2.05 of the Shareholders Agreement and demanding that Respondent either exercise his Buyout Right, or in the event Respondent failed to timely exercise or refused to exercise his Buyout Right, perform his obligation to sell his Buyout Shares to Claimant pursuant to Claimant's Buyout Right.  Further, on or about February 1, 2021, Claimant served Respondent with a Buyout Notice for Respondent's Buyout Shares at a price of $143,000 per share for a total purchase price of $15,015,000.  On or about February 9, 2021, Respondent objected to the Deadlock Notice, asserted that no Deadlock has occurred, further asserted that the Buyout Notice is premature, and objected to the price per share offered by Claimant.

3.      Claimant seeks relief, and requests and requires specific performance by Respondent to comply with Section 2.05 of the Shareholders Agreement: to wit, a sale to Claimant of the Respondent's Buyout Shares, and an award of costs, including reasonable attorneys' fees and disbursements of both Claimant and Respondent, and such other and further relief as the Panel may deem just and proper under the circumstances.

### A. Claimant

4.      Claimant, JOEL EPSTEIN ("**Claimant**"), is a citizen and resident of 8 Frankfurt Rd., Unit 301, Monroe, NY 10950. Claimant is represented in this arbitration by MARC L. MUKASEY and KENNETH A. CARUSO. Claimant's contact information is as follows:

Joel Epstein, c/o:

Marc L. Mukasey

Kenneth A. Caruso

MukaseyFrenchmanLLP

2 Grand Central Tower

140 East 45th St., Suite 17 A

New York, NY 10017

Phone: (212) 466-6406

Email: Marc.Mukasey@mfsllp.com

Email: Ken.caruso@mfsllp.com

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

### B. Respondent

**5.** Respondent, MOSHE CHAIM PANZER ("**Respondent**"), is a citizen and resident of 1626 47 St., Brooklyn, NY 11204. Respondent's contact information is as follows:

MOSHE CHAIM PANZER

1626 47 Street

Brooklyn, NY 11204

Phone: (917) 417-8000

Email: mp@fabuwood.com

6. Respondent is represented in this arbitration by:

AVERY S. MEHLMAN

Herrick Feinstein LLP

Two Park Ave.

New York, NY 10016

Phone: (212) 592-5985

Fax: (212) 545-3424

Email: amehlman@herrick.com

## II. Arbitration

### A. The Arbitration Agreement

7. This dispute is subject to arbitration under the terms of the Shareholders Agreement, which is attached to this demand as Exhibit A.

### B. Place of Arbitration and Governing Law

8. In the Agreement, the parties agreed that any arbitration will be held in New York, NY (Shareholders Agreement ¶ 5.06(c)).

9. The Agreement is governed by the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (Shareholders Agreement ¶ 10.09).

### C. Service of Demand for Arbitration

10. The Claimant served this demand for arbitration on Respondent and Respondent's counsel through email at their email addresses set forth herein (Shareholders Agreement ¶ 10.01).

3

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

### D. Selection of Arbitrators

11.     In the Agreement, the parties agreed that three (3) arbitrators will be selected, one by Claimant, one by Respondent, and the third by the two appointed arbitrators.  If Respondent fails to appoint an arbitrator within thirty (30) business days after receipt of this Demand for Arbitration, then the arbitrator appointed by Claimant shall decide as the sole arbitrator (Shareholders Agreement ¶ 5.06(c)).  Claimant appoints Jacob Sofer as arbitrator.

## III. Statement of Facts

12.     Claimant and Respondent own, directly and indirectly, 36.50% and 52.50%, respectively, of the outstanding and issued shares of the Company and constitute, together, the Company's entire Board of Directors.

13.     Claimant and Respondent entered into the Shareholders Agreement on or about November 1, 2017, effective January 1, 2017, to provide for the Company's governance and to establish procedures to resolve a deadlock in the Company's two-member Board of Directors arising from the inability of the Board to reach a consensus with respect to any Major Decision (as defined under the Shareholders Agreement).

14.     Pursuant to Section 2.05 of the Shareholders Agreement, in the event that Claimant and Respondent are unable to agree (a "**Deadlock**") on a Major Decision (as defined under the Shareholders Agreement), then each had the right to buy out (a "**Buyout Right**") all of the Company shares held, directly or indirectly, by the other (the "**Buyout Shares**"), at a price per share determined by a qualified independent appraiser.

15.     On or about February 1, 2021, Claimant served Respondent with a Deadlock Notice asserting that a Deadlock has occurred under Section 2.05 of the Shareholders Agreement and demanding that Respondent either exercise his Buyout Right, or in the event Respondent fails to timely exercise or refuses to exercise his Buyout Right, perform his obligation to sell his Buyout Shares to Claimant pursuant to Claimant's Buyout Right.  Attached hereto as Exhibit B is a true and correct copy of the Deadlock Notice.

16.     Further, on or about February 1, 2021, Claimant served Respondent with a Buyout Notice for Respondent's Buyout Shares at a price of $143,000 per share for a total purchase price of $15,015,000.  Attached hereto as Exhibit C is a true and correct copy of the Buyout Notice.

17.     On or about February 9, 2021, Respondent objected to the Deadlock Notice, asserted that no Deadlock has occurred, further asserted that the Buyout Notice is premature in that the independent appraiser was not retained with the consent of Respondent, and objected to the price per share offered by Claimant.  Attached hereto as Exhibit D is a true and correct copy of the Respondent's Response.

18.     Respondent failed to timely exercise his Buyout Right and, accordingly, on February 23, 2021, fifteen (15) Business Days after receipt by Respondent of Claimant's Buyout Notice, Respondent's Buyout Right expired in accordance with the terms of Section 2.05(a) of the Shareholders Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

19.     The Shareholders Agreement provided for the selection by the Company's Board of a nationally recognized investment banking firm as an independent appraiser.  In light of Respondent's refusal to cooperate with Claimant, and the two-member Board's deadlock, Claimant selected and retained, on behalf of the Company, Mark S. Gottlieb, a qualified independent appraiser ("**Gottlieb**") to independently appraise the Company's value.  Attached hereto as Exhibit E is a true and correct copy of the Gottlieb Appraisal Report.

20.     Respondent had previously engaged Gottlieb to appraise the value of the Company in connection with Respondent's divorce proceedings.  In light of Respondent's refusal to cooperate and a deadlocked Board, Claimant selected and retained a qualified independent appraiser whose experience and credentials Respondent had previously and verifiably accepted.  Thus, Claimant asserted that the Buyout Notice is not premature in that the procedural defect alluded to in Respondent's Response had no substantive effect on the exercise of the Buyout Right by either Respondent or Claimant.  Respondent's failure to cooperate, furthermore, works a waiver of any objection to the appraisal.

21.     On or about June 9, 2021, Claimant and Respondent appeared before the Kosover Rebbe of Brooklyn for mediation and non-binding consultation pursuant to Section 5.06(b) of the Shareholders Agreement to resolve the foregoing dispute.  Mediation was unsuccessful.

## IV. Relief Sought

22.     The Claimant requests that the Panel (a) declare that a Deadlock has occurred under the terms of the Shareholders Agreement, (b) declare that Respondent has failed to timely exercise his Buyout Right, and, accordingly, declare that Respondent's Buyout Right has expired, and (c) direct, order and instruct Respondent to sell his Buyout Shares to Claimant at a price of $143,000 per share for a total purchase price of $15,015,000.

23.     In the alternative, if the Panel determines that a different investment banking firm/appraiser must be retained, then Claimant requests that the Panel (a) nevertheless declare that a Deadlock has occurred under the terms of the Shareholders Agreement, (b) appoint a different investment banking firm/appraiser to perform another independent appraisal of the Company, and (c) direct, order and instruct Respondent to sell his Buyout Shares to Claimant, at the price per share set forth in the appraisal report, Respondent having waived his right to exercise his Buyout Right by his failure to exercise such right timely.

24.     The Claimant also requests an award of costs including his reasonable attorney's fees and disbursements.

25.     The Claimant also requests such other and further relief as the Panel may deem just and proper under the circumstances.

26.     The Claimant requests a reasoned award or opinion from the arbitrators.

Dated: July 29, 2021

New York, NY

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

Respectfully submitted,

By: _____

MARC L. MUKASEY

KENNETH A. CARUSO

MukaseyFrenchman LLP

2 Grand Central Tower

140 East 45th St., Suite 17 A

New York, NY 10017

(212) 466-6406

Marc.Mukasey@mfsllp.com

Attorneys for Claimant JOEL EPSTEIN

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## EXHIBIT A

Amended and Restated Shareholders Agreement

Among

Fabuwood Cabinetry Corp, and the Shareholders Named Herein

(attached)

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

[EXECUTED]

AMENDED AND RESTATED

SHAREHOLDERS AGREEMENT

among

FABUWOOD CABINETRY CORP.

and

THE SHAREHOLDERS NAMED HEREIN

Effective as of

January 1, 2017

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## TABLE OF CONTENTS

**Page No.**

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | MANAGEMENT AND OPERATIONS OF THE COMPANY | 7 |
| Section 2.01 | Board of Directors | 7 |
| Section 2.02 | Actions of the Board and the Shareholders | 7 |
| Section 2.03 | Business Expansion | 8 |
| Section 2.04 | Major Decisions | 8 |
| Section 2.05 | Deadlock Remedies | 10 |
| Section 2.06 | Executive Officers | 11 |
| Section 2.07 | Annual Operating Plans | 13 |
| Section 2.08 | Indemnification | 14 |
| Section 2.09 | Exculpation | 16 |
| ARTICLE III | SHARE ISSUANCES | 16 |
| Section 3.01 | Pre-Emptive Rights | 16 |
| Section 3.02 | No Capital Commitments | 17 |
| ARTICLE IV | TRANSFER OF INTERESTS | 17 |
| Section 4.01 | General Restrictions on Transfer | 17 |
| Section 4.02 | Permitted Transfers | 19 |
| Section 4.03 | Conditions to Permitted Transfers | 19 |
| Section 4.04 | Bankruptcy of a Shareholder | 20 |
| Section 4.05 | Termination of Employment | 21 |
| Section 4.06 | Death of a Shareholder | 22 |
| Section 4.07 | Minority Buyout Options | 23 |
| Section 4.08 | Release from Certain Obligations | 24 |
| ARTICLE V | NON-COMPETE AND OTHER OBLIGATIONS | 24 |
| Section 5.01 | Non-Compete | 24 |
| Section 5.02 | Blue Pencil | 25 |
| Section 5.03 | Unrestricted Corporate Opportunities | 25 |
| Section 5.04 | Confidentiality | 25 |
| Section 5.05 | Subchapter S Obligations | 26 |
| Section 5.06 | Dispute Resolution | 26 |
| Section 5.07 | Equitable Remedies | 27 |
| ARTICLE VI | REGISTRATION RIGHTS | 28 |
| Section 6.01 | Piggyback Rights | 28 |
| Section 6.02 | Pro Rata Reduction | 28 |
| Section 6.03 | Shareholder Obligations | 28 |
| Section 6.04 | Registration Expenses | 28 |
| ARTICLE VII | INFORMATION RIGHTS | 28 |
| Section 7.01 | Financial Statements | 28 |
| Section 7.02 | Bank Accounts | 29 |
| Section 7.03 | Books and Records | 29 |

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

ARTICLE VIII    REPRESENTATIONS AND WARRANTIES ......................................... 30

Section 8.01    Representations and Warranties of the Shareholders ............................... 30
Section 8.02    Representations and Warranties of the Company ..................................... 31

ARTICLE IX    TERM AND TERMINATION ...................................................... 32

Section 9.01    Term and Termination ................................................................ 32
Section 9.02    Effect of Termination ................................................................ 32

ARTICLE X    MISCELLANEOUS ................................................................. 32

Section 10.01    Notices ............................................................................ 32
Section 10.02    Interpretation .................................................................... 33
Section 10.03    Headings .......................................................................... 34
Section 10.04    Severability ...................................................................... 34
Section 10.05    Entire Agreement ................................................................. 34
Section 10.06    Successors and Assigns ........................................................... 34
Section 10.07    No Third-Party Beneficiaries ..................................................... 34
Section 10.08    Amendment and Modification; Waiver ............................................... 34
Section 10.09    Governing Law .................................................................... 34
Section 10.10    Counterparts ..................................................................... 34

EXHIBIT A    Form of Joinder Agreement

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# AMENDED AND RESTATED
# SHAREHOLDERS AGREEMENT

This Amended and Restated Shareholders Agreement is entered into on November 10, 2017 by and among **FABUWOOD CABINETRY CORP.**, a New York corporation (the "Company"), **MOSHE C. PANZER,** ("Panzer"), **JOEL EPSTEIN** ("Epstein"), **JOEL EPSTEIN 2014 FAMILY TRUST**, a New York trust (the "Joel Epstein Trust"), **JUDITH EPSTEIN 2014 FAMILY TRUST**, a New York trust (the "Judith Epstein Trust" and, together with the Joel Epstein Trust, the "JE Trusts"), **RAIZY FREUND** ("Freund") and **JOEL WEINSTEIN** ("Weinstein" and, together with Panzer, Epstein, the JE Trusts and Freund, the "Shareholders" and, collectively with the Company, the "Parties"), effective as of January 1, 2017 (the "Effective Date").

## RECITALS

**A.** The Company was incorporated in the State of New York on September 4, 2008 under the name Woodstone Cabinetry Corp., and its corporate name was changed to Fabuwood Cabinetry Corp. in February 2009;

**B.** The Company is engaged in the business of sourcing and importing stock lines of knock-down kitchen and bathroom cabinetry for assembly in the United States and distribution to dealers having showrooms in the United States and Canada (the "Business");

**C.** The Company, Panzer, Epstein, Josef Freund, the spouse of Freund, and Weinstein are parties to a Stockholders Agreement dated as of July 1, 2009 (the "Original Stockholders Agreement") relating to the operations, management and policies of the Company and dispositions of common stock, no par value, of the Company ("Common Stock"); and

**D**. The Parties desire to amend in part and restate in its entirety the Original Stockholders Agreement as set forth herein, effective as of the Effective Date, with the objectives of memorializing their arrangements for the ownership and disposition of Common Stock now held or hereafter acquired by the Shareholders (the "Shares"), including the voting and transfer of the Shares, clarifying the respective rights, powers and duties of the individual Shareholders in managing the Business and providing unequivocal remedies for any breach of this Agreement by a Shareholder.

Accordingly, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Article I, and all references to Recitals, Articles, Sections or Exhibits, when underlined, refer to associated components of this Agreement.

"**Affiliate**" means any Person directly or indirectly controlling or controlled by or under direct or indirect common control with a specified Person, and "control" when used with respect to any specified Person means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble hereof and includes any amendment adopted from time to time in accordance with Section 10.08.

"**Annual Operating Plans**" has the meaning set forth in Section 2.07(a).

"**Applicable Law**" means, to the extent applicable to the Company or the Business, all provisions of (a) constitutions, treaties, statutes, laws, rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, (b) consents or approvals of any Governmental Authority and (c) orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Appraised Value**" has the meaning set forth in Section 2.05(a).

"**Bankrupt Shareholder**" and "**Bankruptcy Shares**" have the meanings set forth in Section 4.04(a).

"**Bankruptcy**" means, with respect to a Shareholder, (a) the entry of a decree or order for relief against the Shareholder by a court of competent jurisdiction in an involuntary case brought against the Shareholder under any Debtor Relief Laws, (b) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for a Shareholder or for any substantial part of his assets or property, (c) the ordering of the winding up or liquidation of a Shareholder that is not a natural Person, (d) the filing of a petition in an involuntary case against the Shareholder under any Debtor Relief Laws, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to section 305 of the United States Bankruptcy Code, (e) the commencement by the Shareholder of a voluntary case under any Debtor Relief Laws, (f) the consent by the Shareholder to the entry of an order for relief in an involuntary case under any Debtor Relief Laws or (g) the making of any general assignment by the Shareholder for the benefit of creditors.

"**BCL**" means the New York Business Corporation Law.

"**Board**" has the meaning set forth in Section 2.01(a).

"**Book Value**" means the total shareholders' equity of the Company or any assets included therein, as reflected on its balance sheet as of the end of any relevant accounting period, determined in accordance with GAAP and reviewed by the Company's independent certified public accountants.

"**Business**" has the meaning set forth in Recital B, *provided* that if the Business is modified by the Board in accordance with this Agreement to (a) expand or reduce the types of products distributed by the Company, including the planned expansion into closet cabinetry contemplated by Section 2.03, or (b) to alter the channels of distribution for its product lines, then all references herein to the Business after the implementation of such modification shall be deemed to encompass the modification, unless otherwise specifically provided in this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

"**Business Day**" means a day other than (a) Saturdays, (b) Sundays, (c) days on which commercial banks in the City of New York are closed and designated by the Board as Company holidays and (d) Jewish holidays designated by the Board as Company holidays.

"**Buyout Notice**," "**Buyout Parties**," "**Buyout Rights**" and "**Buyout Shares**" have the meanings set forth in <u>Section 2.05(a)</u>.

"**By-laws**" means the by-laws of the Company, as amended, modified, supplemented or restated from time to time in accordance with the terms of this Agreement.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as filed on September 4, 2008 with the Secretary of State of the State of New York and as amended or restated from time to time in accordance with the terms of this Agreement.

"**Change of Control**" means any transaction or series of related transactions that results in (a) any Third Party Purchaser or "group" (within the meaning of Section 13(d)(3) of the Exchange Act) of Third Party Purchasers acquiring beneficial ownership, directly or indirectly, of a majority of the then issued and outstanding Common Stock or (b) the sale, lease, exchange, conveyance, transfer or other disposition of all or substantially all of the property and assets of the Company and its Subsidiaries (if any), on a consolidated basis, to any Third Party Purchaser or "group" (within the meaning of Section 13(d)(3) of the Exchange Act) of Third Party Purchasers.

"**Claimant**" has the meaning set forth in <u>Section 5.06(c)</u>.

"**Code**" means the Internal Revenue Code of 1986.

"**Common Stock**" has the meaning set forth in <u>Recital B</u> and includes any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

"**Company**" has the meaning set forth in the preamble hereof and includes any successor by operation of Applicable Law in accordance with the terms of this Agreement.

"**Competitor**" means any Person that directly or indirectly competes with the Business in any manner conducted or planned by the Company in any market from which sales of the Company's products are derived, targeted or planned.

"**Counselor**" has the meaning set forth in <u>Section 5.06(b)</u>.

"**Covered Person**" means each Shareholder in his capacity as a Director or an officer or employee of the Company.

"**Deadlock**" and "**Deadlock Notice**" haves the meanings set forth in <u>Section 2.05(a)</u>.

"**Debtor Relief Laws**" means any applicable bankruptcy, insolvency or other similar laws generally affecting the rights of creditors and relief of debtors in effect from time to time.

"**Derivative Securities**" has the meaning set forth in <u>Section 8.02(e)</u>.

"**Direct Family Member**" has the meaning set forth in <u>Section 4.02(a)</u>.

"**Director**" has the meaning set forth in <u>Section 2.01(a)</u>.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

"**Disability**" means, with respect to a Shareholder in his capacity as an executive officer of the Company, the Shareholder's inability to perform his duties under Section 2.06 due to physical incapacity or illness for a period of ninety (90) consecutive days or the declaration of legal incompetency by a court with competent jurisdiction over such Shareholder.

"**Dispute**" has the meaning set forth in Section 5.06(a).

"**Effective Date**" has the meaning set forth in the preamble hereof.

"**Eligible Director**" has the meaning set forth in Section 2.01(b).

"**Empire**" means Empire State Supply Corp., a New York corporation affiliated with Panzer.

"**Employee Shareholder**" has the meaning set forth in Section 5.01(a).

"**Epstein**" has the meaning set forth in the preamble hereof and includes any of his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Estate Shares**" and "**Estate Holders**" have the meanings set forth in Section 4.06(a).

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Claim**" has the meaning set forth in Section 5.06(c).

"**Excluded Securities**" means any Common Stock or other equity securities of the Company issued pursuant to (a) any stock option, stock purchase or similar equity-based employee benefit plan adopted by the Board after the Effective Date; (b) any acquisition by the Company of the stock, assets, properties or business of any Person; (c) any merger, consolidation or other business combination or series of transactions involving a Change of Control; (d) any Qualified Public Offering; (e) a stock split, stock dividend or any similar recapitalization of the Company and (f) any Financing Equity.

"**Fair Market Value**" means the price a willing buyer and a willing seller would agree upon as fair consideration for the sale of Shares to a bona fide purchaser in an arm's length transaction.

"**Financing Equity**" means up to one percent (1%) of the outstanding Common Stock or warrants to purchase up to two percent (2%) of the Common Stock issued to lenders or other institutional investors in an arm's length debt financing transaction with the Company.

"**Fiscal Year**" means for financial accounting purposes, January 1 to December 31.

"**Freund**" has the meaning set forth in the preamble hereof and includes any of her heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares, and "**Freund Holder**" has the meaning set forth in Section 4.07(a).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Government Approval**" means any authorization, consent, approval, waiver, exception, variance, order, exemption, publication, filing, declaration, concession, grant, franchise, agreement, permission, permit or license of, from or with any Governmental Authority, the giving of notice to, or registration with, any Governmental Authority or any other action required by the Company under Applicable Law in respect of any Governmental Authority.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority, or any arbitrator, court or tribunal of competent jurisdiction.

"**Independent Appraiser**" has the meaning set forth in Section 2.05(b).

"**Information**" has the meaning set forth in Section 5.04(a).

"**Insider Shares**" has the meaning set forth in Section 6.01.

"**Issuance Notice**" has the meaning set forth in Section 3.01(b).

"**IRS**" means the United States Internal Revenue Service.

"**JE Trusts**" means the Joel Epstein Trust and the Judith Epstein Trust, collectively.

"**Joel Epstein Trust**" has the meaning set forth in the preamble hereof and includes its successors and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Joinder Agreement**" means the joinder agreement in the form of Exhibit A.

"**Judith Epstein Trust**" has the meaning set forth in the preamble hereof and includes any of its successors and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Lien**" means any lien, claim, charge, mortgage, pledge, security interest, option, preferential arrangement, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever.

"**Major Decisions**" has the meaning set forth in Section 2.04.

"**Minority Holders**" has the meaning set forth in Section 4.07(a).

"**New Securities**" has the meaning set forth in Section 4.02(a).

"**Organizational Documents**" means the By-laws and the Certificate of Incorporation of the Company.

"**Original Stockholders Agreement**" has the meaning set forth in Recital B.

"**Panzer**" has the meaning set forth in the preamble hereof and includes any of his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares.

"**Parties**" has the meaning set forth in the preamble to this Agreement and includes any Permitted Transferee of Shares following the execution and delivery of a Joinder Agreement among the Permitted Transferee, the Company and the assignor of such Shares.

"**Permitted Transfer**" has the meaning set forth in Section 4.02(a).

"**Permitted Transferee**" means a Person acquiring Shares pursuant to a Permitted Transfer that satisfies the conditions set forth in Section 4.02 and Section 4.03.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Percentage Interest**" means the percentage equity ownership of the Company of each Shareholder, as set forth in Section 8.02(f) as of the Effective Date, and as thereafter adjusted for any Permitted Transfers or issuances of New Securities or Excluded Securities in accordance with this Agreement.

"**Pre-emptive Shareholder**" and "**Pre-emptive Pro Rata Portion**" have the respective meanings set forth in Section 3.01(a) and Section 3.01(e).

"**Qualified Public Offering**" means the public sale of the Common Stock pursuant to a registration statement that has become effective under the Securities Act, with net proceeds to the Company of at least Twenty-Five Million Dollars ($25,000,000).

"**Qualified Trust**" means a trust that (a) is solely the benefit of a grantor Shareholder or the spouse of the grantor Shareholder (b) is a "qualified subchapter S trust," as defined in the Code; (c) has a situs in one of the states or territories of the United States and (d) does not provide any interest to any Person that is not subject to service of process issued from a district federal court or any Person that is not qualified under Code section 501(c)(3).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Request**" and "**Respondent**" have the meanings set forth in Section 5.06(c).

"**Restriction Period**" has the meaning set forth in Section 5.01(a).

"**SEC**" means United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933.

"**Shareholders**" has the meaning set forth in the preamble hereof and includes their respective successors, heirs, legal representatives and other Permitted Transferees.

"**Terminated Shareholder,**" "**Termination Shares,**" "**Termination Share Holders**" and "**Termination Share Price**" have the respective meanings set forth in Section 4.05(a).

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Common Stock or (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Common Stock.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, any Common Stock owned by a Person or any interest (including a beneficial interest) in any Common Stock owned by a Person, or to enter into any contract, option or other arrangement or understanding with respect thereto, including any disposition arising out of or resulting from a judgment or decree in divorce or any separation agreement incorporated therein.

"**Unrestricted Corporate Opportunity**" has the meaning set forth in Section 5.03(a).

"**Weinstein**" has the meaning set forth in the preamble hereof and includes his heirs, legal representatives and other Permitted Transferees holding Shares for matters involving ownership of Shares, and "**Weinstein Holder**" has the meaning set forth in Section 4.07(a).

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## ARTICLE II
### MANAGEMENT AND OPERATIONS OF THE COMPANY

**Section 2.01   Board of Directors.**

(a)   All aspects of the Business shall be managed by the Company's board of directors (the "Board"), which shall consist of two (2) members (each, a "Director"), each of whom shall have one (1) vote on each matter submitted for consideration by the Board.   The Board shall not have any committees for any purpose.  No Person other than the Directors then in office may attend, observe or participate in any other manner in any regular or special meetings of the Board or be invited for such purpose without the prior written consent of both Directors. The Directors in office as of the Effective Date and the date of this Agreement are Panzer and Epstein.

(b)   As long as (i) Panzer or (ii) Epstein, together with the JE Trusts, continue to own beneficially and of record at least 20% of the outstanding Common Stock (an "Eligible Director"), each Shareholder shall vote all Shares over which such Shareholder has voting control and shall take all other necessary actions within such Shareholder's control, whether at regular or special meetings of the Shareholders or by written consent in lieu of a meeting, to re-elect each such Eligible Director to the Board as the sole Directors.  The foregoing undertakings shall apply to any successor Director serving in such capacity pursuant to Section 2.01(c) without regard to the Share ownership condition for an Eligible Director.

(c)   Upon the death or declaration of legal incompetency of a Director by a court with competent jurisdiction, such Director shall be contemporaneously succeeded in such office, without any action or consent of any Party, by Benzion Panzer, in the case of Panzer, or by Yitzchak Epstein, in the case of Epstein, and each such incumbent Director hereby irrevocably appoints his named successor, upon such succession, as his attorney-in-fact for the purpose of exercising all of prerogatives and responsibilities of such succeeded Director under this Agreement prior to his death or declaration of legal incompetency.  The power granted by each incumbent Director hereunder is coupled with an interest and shall survive the death or declaration of legal incompetency of such Director, *provided* that a Director succeeded in such capacity hereunder by reason of his declaration of legal incompetency shall be entitled to reinstatement as a Director in lieu of his appointed successor upon any cessation of such Disability.

**Section 2.02.   Actions of the Board and the Shareholders.**

(a)   The presence of both Directors in office at the time of any meeting of the Board shall constitute a quorum in accordance with the By-laws.  All decisions of the Board shall require the affirmative vote or consent of both Directors.  The Board shall meet no less than four (4) times a year within thirty (30) days following the end of each fiscal quarter of the Company to conduct regular meetings during normal business hours at the principal corporate office of the Company.  Special meetings of the Board may be called by either Director on no less than ten (10) Business Days prior written notice of its time, place and agenda.  The Company shall pay all fees, charges and expenses incurred by each Director in connection with attending the meetings of the Board, including travel and related expenses.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(b)   Any action required or permitted to be taken at any meeting of the Board as set forth in Section 2.02 may be taken without a meeting if (i) one Director transmits a written proposal for the proposed action to the other Director in accordance with Section 10.01, setting forth in reasonable detail the nature of the proposed action, the recommendation of the Director proposing the action and the basis for such recommendation, including all relevant cost/benefit analyses, (ii) both Directors consent thereto in writing and (iii) each Director delivers his written consent or objection to such action to the other Director and the Company in accordance with Section 10.01, which written consent or objection shall be filed with the minutes of proceedings of the Board. Written consents or objections to a proposed action by the Board shall be delivered within three (3) Business Days following the transmission of request therefor.  Any failure to respond to a proposal for action of the Board by written consent within such timeframe shall be deemed for all purposes to be an objection to such proposed action, subject to subsequent reconsideration of such proposal or any proposed modification at the election of either Director under the procedures set forth herein.

(c)   The Directors or the Shareholders may participate in any meeting of the Board or the Shareholders, respectively, by means of video conference, teleconference or other similar communications equipment enabling all participants in such meeting to hear each other, and such participation shall constitute each such Party's presence in person at the meeting.

(d)   The Directors have proposed, and the Shareholders hereby consent, to the adoption and filing, in the office of the New York Secretary of State, of a certificate of amendment to the Certificate of Incorporation, amending Article Fourth thereof as follows:

"FOURTH:   The aggregate number of shares of capital stock that the corporation shall have authority to issue is three hundred (300) shares of common stock, no par value."

**Section 2.03   Business Expansion.**  The Directors have agreed in principle to expand the Business to include closet cabinetry for distribution to dealers having showrooms anywhere in the world, subject to adoption by the Board of a business plan for such expansion covering all relevant items contemplated by Section 2.07(b).

**Section 2.04   Major Decisions.**   The following matters ("Major Decisions") shall require prior approval from the Board following reasonable written disclosure to the Directors in accordance with Section 10.01 specifying the nature of the Major Decision, the recommendation of the Person proposing the matter and the basis for such recommendation, including all relevant cost/benefit analyses.  No action or commitment of any nature involving a Major Decision shall be taken or made on behalf of the Company by any Shareholder in any capacity, including his capacity as an executive officer of the Company, without the prior authorization of the Board and an express directive from the Board for implementing the Major Decision.  Major Decisions shall constitute any proposed transaction or series of transactions involving the following:

(a)   Any issuance of New Securities or incurrence of any indebtedness by the Company to fund any of its capital expenditures or working capital;

(b)   Any amendment of the Organizational Documents, this Agreement or any agreements or instruments to which the Company is a party as a result of a previously implemented Major Decision, including any outstanding loan or credit agreements or other debt or related security instruments of the Company and any employment agreements or consultancy agreements to which the Company is a party;

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)    The sale, transfer or other disposition or the grant of any Lien on any of the Company's assets, other than in the ordinary course of the Business;

(d)    The commencement of any discussions or the execution of any agreements or undertakings providing for or contemplating the merger, consolidation or dissolution of the Company;

(e)    Any transaction or matter involving the commitment or obligation of the Company to make any expenditure or grant any discount in excess of Fifty Thousand Dollars ($50,000), except expenditures covered by the prevailing Annual Operating Plan and current liabilities incurred in the ordinary course of business, any adjustment, settlement or compromise of any claim, obligation, debt, demand, suit, arbitration or judgment by or against the Company in excess of such amount or the assignment, transfer, compromise or release any of the claims or accounts receivable of the Company in excess of such amount;

(f)    The filing or consent to the filing of a petition or other similar action by or on behalf of the Company for any form of relief under the Debtor Relief Laws;

(g)    Any expansion, reduction or other material modification of the Business in effect on the Effective Date with respect to the types of products distributed by the Company or the channels of distribution utilized for marketing its product lines, *provided* that any failure by the Directors to reach a consensus on a Major Decision covered by this Section 2.04(g) or the business plan for the expansion of the Business contemplated by Section 2.03 shall not constitute a Deadlock for purposes of Section 2.05;

(h)    The hiring, engagement or termination by the Company of any employee or consultant whose annual compensation exceeds One-Hundred Thousand Dollars ($100,000);

(i)    The form and content of any financial forecasts to be provided by or on behalf of the Company to any Person;

(j)    Any other matter involving (i) a change in the Company's commercial banking arrangements or insurance coverage, (ii) a related party transaction involving the Company and a Shareholder or his Affiliates, (iii) a declaration or payment of any dividend or distribution on the outstanding Common Stock, (iv) the approval of each Annual Operating Plan pursuant to Section 2.07 and any amendment to an Annual Operating Plan, (v) decisions involving indemnification of Covered Persons pursuant to Section 2.08, except advances by the Company of legal expenses pursuant to Section 2.08(d) to a Covered Person that is or was a Director, (vi) the engagement of professionals on matters involving exculpation pursuant to Section 2.09, except any professionals engaged by a Covered Person who is or was a Director, (vii) determinations involving the capital account maintained by the Company for each Shareholder, (viii) the creation or expansion of the Company's cash reserves other than on a temporary basis, (ix) a material change in the accounting principles or methods of the Company or its internal controls over financial matters or (xi) an agreement or commitment on behalf of the Company to take any of the foregoing actions.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM          INDEX NO. 654909/2021
NYSCEF DOC. NO. 12                                        RECEIVED NYSCEF: 08/13/2021

### Section 2.05    Deadlock Remedies.

(a)    Except as provided by Section 2.04(g), if the Directors are unable to reach a consensus on any Major Decision submitted by either Director for consideration by the Board at two successive meetings of the Board (a "Deadlock"), then the Director who introduced the proposal for the Major Decision shall provide written notice to the other Director confirming its status as a Deadlock (a "Deadlock Notice"), whereupon Panzer and Epstein shall have the sequential rights, but not the obligation (the "Buyout Rights"), to purchase all of the Shares ("Buyout Shares") owned by the other Shareholder and his Affiliates ("Buyout Parties") in an all-cash transaction at the Fair Market Value of the Buyout Shares determined under Section 2.05(b) ("Appraised Value").  If the Director responsible for providing a Deadlock Notice fails to do so on a timely basis, the other Director may provide such Deadlock Notice, with the same effect of triggering such Buyout Rights hereunder.  The Buyout Rights of Panzer shall be exercisable for a period of fifteen (15) Business Days after receipt of the written valuation of the Buyout Shares by the Independent Appraiser, by notice to the Buyout Parties (a "Buyout Notice"), accompanied by a copy of the valuation.  If Epstein has not received a Buyout Notice from Panzer within such period, the Buyout Rights of Panzer shall expire, and the Buyout Rights of Epstein shall vest and be exercisable for a period of fifteen (15) Business Days after the expiration of Panzer's Buyout Rights, by delivery of a Buyout Notice to Panzer.  If a Shareholder exercises his Buyout Rights to resolve a Deadlock, the Buyout Parties shall be obligated to sell their Buyout Shares to such Shareholder in accordance with Section 2.05(c).  If neither Panzer nor Epstein exercise their respective Buyout Rights following a Deadlock and the Major Decision causing the Deadlock has not been resolved by the Board upon expiration of Epstein's Buyout Rights, it shall be considered a Dispute subject to the Dispute resolution provisions of Section 5.06.

(b)    Within fifteen (15) Business Days after the delivery of a Deadlock Notice under Section 2.05(a), the Company shall engage a nationally recognized investment banking firm to be selected by the Board (an "Independent Appraiser") to determine the Appraised Value of the Buyout Shares.  The Company shall timely furnish the Independent Appraiser with such information as it may request in order to render its valuation, including information regarding the Company's assets, financial condition and results of operations.  The Board shall instruct the Independent Appraiser to render its valuation in writing within thirty (30) Business Days of its appointment, which determination shall be final and binding for all purposes of this Agreement.  The fees and expenses of the Independent Appraiser shall be borne by the Company and reimbursed to the Company in equal proportions by Panzer and Epstein.

(c)    A closing of the purchase and sale of the Buyout Shares covered by any Buyout Notice under Section 2.05(a) shall be held within five (5) Business Days after delivery of the applicable Buyout Notice to the Buyout Parties.  At such closing, the Buyout Parties shall deliver to the Shareholder who has exercised his Buyout Rights all certificates representing the Buyout Shares, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective transfer thereof to such Shareholder, free and clear of any Liens, and such Shareholder shall deliver to the Buyout Parties the purchase price for their Buyout Shares at their Appraised Value, by certified bank check or wire transfer of immediately available funds, allocated proportionately among the Buyout Parties based on their respective ownership of the Buyout Shares.  Upon confirmation of such wire transfers, the Buyout Parties shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(d)    During the continuation of any Deadlock and prior to the resolution of any associated Dispute pursuant to Section 2.05(a) or the exercise of Buyout Rights and purchase of associated Buyout Shares pursuant to Section 2.05(c), the Company shall continue to operate in a manner consistent with the prevailing Annual Operating Plan and the terms of this Agreement until the Deadlock is reconciled as provided herein or as otherwise resolved by the Board.

**Section 2.06   Executive Officers.**

(a)    For as long as Panzer is an Eligible Director, he shall serve as Chief Executive Officer and President of the Company and shall have the prerogatives and responsibilities commensurate with such positions, the prevailing Annual Operating Plan and the terms of this Agreement.  In such capacities, Panzer shall have the exclusive right and authority to manage (i) the Company's relationships and arrangements with suppliers of materials and manufacturers of its products, (ii) the import of the Company's products to the United States and (iii) the composition and activities of the Company's domestic sales and marketing staff.  The hiring by the Company of a Customer Service Director and a Chief Sales Officer contemplated by Section 2.06(g) shall not affect the foregoing delegation of authority to Panzer.  No delegation of authority to Panzer under this Section 2.06(a) shall limit the rights or ability of Epstein, as Chief Operating Officer of the Company, to interact with other employees or consultants of the Company on matters pertaining to any aspect of the Business, *provided* that Epstein shall not hold any meetings or engage in any discussions with such employees or consultants in anticipation of any initiative or transaction involving a Major Decision without first consulting with Panzer and obtaining his consent thereto or election to participate therein.  Subject to Section 715(h) of the BCL, Panzer shall devote such time as is necessary and appropriate for carrying out the responsibilities delegated to him hereunder in the best interest of the Company.

(b)    As long as Epstein is an Eligible Director, he shall serve as Chief Operating Officer, Vice President and Treasurer of the Company and shall have the prerogatives and responsibilities commensurate with such positions, the prevailing Annual Operating Plan and the terms of this Agreement, subject to the delegation of authority over financial matters to a Chief Financial Officer contemplated by Section 2.06(f).  In such capacities, Epstein shall have the exclusive right and authority to manage all aspects of the Business not delegated to Panzer under Section 2.06(a) or to a Chief Financial Officer under Section 2.06(f), upon the hiring thereof, including operations of the Company's facilities within the United States, collections and other day-to-day domestic operations of the Company.  No delegation of authority to Epstein under this Section 2.06(b) shall limit the rights or ability of Panzer, as Chief Executive Officer and President of the Company, to interact with other employees or consultants of the Company on matters pertaining to any aspect of the Business, *provided* that Panzer shall not hold any meetings or engage in any discussions with such employees or consultants in anticipation of any initiative or transaction involving a Major Decision without first consulting with Epstein and obtaining his consent thereto or election to participate therein.  Subject to Section 715(h) of the BCL, Epstein shall devote substantially all of his working time to carrying out the responsibilities delegated to him hereunder in the best interest of the Company.

(c)    Each of Panzer and Epstein shall receive an annual salary of at least Three-Hundred-Twelve Thousand Dollars ($312,000), payable in accordance with the Company's usual payroll policies, subject to automatic annual increases by a percentage equal to any percentage increase from the preceding year in the Consumer Price Index for all Urban Consumers in the

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

New York – Northeastern New Jersey Metropolitan Area, or any successor thereto, based on data published by the Bureau of Labor Statistics of the United States Department of Labor and any further increases implemented by the Board.  In addition, as soon as practicable after the date hereof, the Company shall hire (i) a full-time administrative assistant for Panzer to be identified by him and approved by the Board, to provide support exclusively to Panzer in the execution of his responsibilities pursuant to <u>Section 2.06(a)</u> and (ii) a full-time administrative assistant for Epstein to be identified by him and approved by the Board, to provide support exclusively to Epstein in the execution of his responsibilities pursuant to <u>Section 2.06(b)</u>, in each case at an annual salary of up to One-Hundred-Twenty-Five Thousand Dollars ($125,000).

(d)    The compensation and benefits provided by the Company to Panzer and Epstein shall include (i) any bonus compensation that the Board may determine from time to time, (ii) all medical, dental, pension, retirement and all other benefits generally available to executive officers of the Company, (iii) reimbursement for documented expenses incurred in performing their duties to the Company and (iv) the use an automobile provided by the Company for the Business or reimbursement for the direct cost for leasing and operating an automobile for that purpose.  The aggregate amount of the Company's expenditures to cover any such benefits provided to Epstein but declined by Panzer for any reason shall be determined bi-annually by the Company's independent certified public accountants and timely paid by the Company to Panzer as a cash bonus in lieu of such benefits.  The aggregate amount of the Company's expenditures to cover any such benefits provided to Panzer but declined by Epstein for any reason shall be determined bi-annually by the Company's independent certified public accountants and timely paid by the Company to Epstein as a cash bonus in lieu of such benefits.

(e)    If either Panzer or Epstein is unable to perform their respective responsibilities under <u>Section 2.06</u> due to Disability for a period of ninety (90) consecutive days, then such non-performing Party shall, at his election, either resign as an executive officer of the Company or take a voluntary leave of absence from the Company in such capacity for such period as he may determine.  In that event, the Board shall select a qualified individual to perform the relinquished executive responsibilities on a long-term basis or an interim basis, as appropriate based on the foregoing election.  No such election shall affect the rights or obligations of Panzer or Epstein as Directors under <u>Article II</u>, except as provided in <u>Section 2.01(c)</u>, and no election hereunder for a voluntary leave of absence from the Company shall trigger any purchase rights or sale obligations under <u>Section 4.05</u>.

(f)    As soon as practicable after the date hereof, the Company shall identify and hire a full-time Chief Financial Officer, who shall report directly to the Board and shall be primarily responsible for managing all financial, accounting and cash management aspects of the Business, including the institution of appropriate processes for evaluating and maintaining the effectiveness of the Company's internal control environment, addressing any material weaknesses or other internal control deficiencies and implementing an effective control environment commensurate with the growth of the Company.  These initiatives shall include the design and maintenance of effective controls over the Company's (i) financial statement disclosures to ensure completeness and accuracy, (ii) recording and retention of all journal entries with sufficient supporting documentation, review and approval procedures to ensure the accuracy and completeness of the journal entries and (iii) income tax accounting.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(g)    As soon as practicable after the date hereof, the Company shall (i) identify and hire a full-time Customer Service Director to be primarily responsible for managing all customer service aspects of the Business, including coordination with the Company's shipping department, and (ii) identify and hire a full-time Chief Sales Officer to be primarily responsible for managing the activities of the Company's domestic sales and marketing staff, including the institution of appropriate processes for evaluating and maintaining the effectiveness of the Company's sales policies and procedures commensurate with the growth of the Company.  Each of such officers shall report directly to Panzer; *provided* that Epstein may direct or counsel either of such officers on any matter within their delegated responsibilities that requires their immediate or time-sensitive action but access to Panzer for such resolution or guidance is unavailable for any reason, whether physically or by cell phone or email, as long as the matter in question does not require a Major Decision and a summary of the background and resolution of the matter is contemporaneously provided by email to Panzer.

(h)    Weinstein shall devote his full working time to the Business and shall receive an annual salary of Two-Hundred-Eight Thousand Dollars ($208,000), payable in accordance with the Company's usual payroll policies, subject to periodic review by the Board.

(i)    The Company shall retain an employee benefit and executive recruitment consulting firm to be selected by the Board as soon as practicable after the Effective Date to (i) review and analyze the Company's employment structure, (ii) make detailed recommendations for optimizing the Company's administrative policies and compensation plans for all employees other than the Directors in their capacities as executive officers of the Company and (iii) assist the Board in identifying a Chief Financial Officer contemplated by Section 2.06(f) and a Customer Service Director and Chief Sales Officer contemplated by Section 2.06(g).

(j)    Any Direct Family Member hired or engaged as an employee, agent or consultant of the Company in accordance with Section 2.04(h) shall be subject to the same performance standards and be entitled to the same benefits as all other employees, agents or consultants of the Company holding comparable or similar positions or engagements.

(k)    Any electronic communications made on behalf of the Company by any Shareholder in his capacity as a Director or executive officer of the Company to other employees or to consultants, contractors or customers of the Company in connection with the implementation of any Major Decision or the creation of any other binding obligation of the Company shall be made utilizing the email system maintained by the Company for the Business.

**Section 2.07    Annual Operating Plans.**

(a)    For each Fiscal Year during the term of this Agreement, a proposed annual operating plan of the Company for that year ("Annual Operating Plan") shall be prepared for review, modification, if required, and adoption by the Board, if approved.  The Annual Operating Plan for 2017 shall be prepared by Panzer and Epstein, following consultations the Company's independent certified public accountants, and shall be delivered to the Board within thirty (30) Business Days after the execution of this Agreement.  A proposed Annual Operating Plan for each subsequent Fiscal Year of the Company shall be prepared by the Chief Financial Officer to be hired pursuant to Section 2.06(f), based on consultations with Panzer and Epstein, and delivered to the Board within ten (10) Business Days after the commencement of such Fiscal Year.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(b)    Each Annual Operating Plan shall include the following information with respect to the Business: (i) an itemization of revenues and expenses for the prior Fiscal Year and a narrative discussion and analysis of those results of operations and the Company's financial condition at year end; (ii) a reasonable estimate of the Company's anticipated sales revenues and total expenses, including debt service, capital expenditures and working capital requirements for the ensuing Fiscal Year; (iii) the Company's current working capital, contingencies and anticipated sources and applications of funds with respect to each segment of the Business for the ensuing Fiscal Year; together with a detailed operating budget derived therefrom; (iv) a summary of the cost structure and deliverables for each factory utilized for manufacture of the Company's products or components thereof in the prior Fiscal Year and an evaluation of the strengths and weaknesses of such supply chain; (v) a backup plan for addressing any disruptions in such supply chain; (vi) a review of the Company's product lines in the prior Fiscal Year and an evaluation of any proposed additions thereto or other modifications thereof for the ensuing Fiscal Year and the proposed supply chain for the manufacturing of any such additional products or components thereof; an (vii) such additional information as may be necessary or appropriate to fully inform the Board of all pending financial and operating considerations and planned initiatives relevant to the Business.

(c)    Any comments of the Directors on a proposed Annual Operating Plan shall be promptly incorporated therein, and the revised Annual Operating Plan shall be timely distributed to the Board for its consideration.

(d)    Either Panzer or Epstein may propose amendments to a prevailing Annual Operating Plan deemed appropriate to reflect a material change in any of the information contained therein or the underlying assumptions, whereupon such amended Annual Operating Plan shall be distributed to the Board for its consideration.

**Section 2.08    Indemnification.**

(a)    In any action, suit or proceeding to which a Covered Person was or is a party by reason of the fact that he was acting as a Director or executive officer or other employee of the Company, involving an alleged cause of action arising from the activities of the Covered Person in the management of the affairs of the Company, or which relates to the Company, its property or the Business, the Company shall indemnify the Covered Person against attorneys' fees and disbursements, judgments, fines and amounts paid in settlement actually and reasonably incurred by the Covered Person in connection with the action, suit or proceeding ("Indemnified Amounts"), if the Covered Person acted in good faith and in a manner believed to be in the best interests of the Company and if the conduct of the Covered Person does not constitute gross negligence or willful misconduct (the "Standard of Care").  The termination of a proceeding by judgment, order, settlement or conviction or upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create a presumption that a Covered Person did not meet the Standard of Care.

(b)    Promptly after receipt by a Covered Person of written notice of the commencement of any proceeding against such Covered Person covered by Section 2.08(a), such Covered Person shall, if a claim for indemnification in respect thereof shall be made against the Company, give written notice to the Board of the commencement of such proceeding, together with a copy of the written notice thereof received by such Covered Person, *provided* that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Section 2.08, except to the extent that the Company is prejudiced by such failure to give notice.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)    In case any proceeding covered by Section 2.08(a) is brought against a Covered Person, other than a proceeding by or in the right of the Company, after the Company has acknowledged in writing its obligation to indemnify and hold harmless the Covered Person, subject to the conditions of Section 2.08, the Company shall be entitled to assume the defense of such proceeding; *provided*, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain his own counsel at his own expense, and (ii) if the Covered Person shall give notice to the Company that he meets the Standard of Care and that in his good faith judgment certain claims made against him in such proceeding could have a material adverse effect on the Covered Person or his Affiliates other than as a result of monetary damages and the Company is not a party to such proceeding, the Covered Person shall have the right to control the defense of such specific claims against the Covered Person, but not with respect to any other Covered Person, at his own expense and with counsel reasonably satisfactory to the Company; and *provided further* that if a Covered Person so elects to control the defense of such specific claim, he shall not consent to the entry of a judgment or enter into a settlement that would require the Company to pay any Indemnified Amounts respect to such claim or otherwise under Section 2.08.  After notice from the Company to such Covered Person consenting to the defense of such claim by the Covered Person under the foregoing conditions, the Company shall not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof.  Without the consent of such Covered Person, the Company shall not consent to the entry of any judgment or enter into any settlement with respect to such claim that does not include a release from all liability arising out of such claim as an unconditional term thereof given by the claimant or plaintiff to such Covered Person.

(d)    Reasonable legal fees and expenses incurred by a Covered Person in any proceeding covered by Section 2.08 shall be advanced by the Company to the Covered Person from time to time throughout the pendency of the proceeding upon receipt by the Company of each written instrument executed by the Covered Person, (i) certifying that he meets the Standard of Care in connection therewith, (ii) setting forth in reasonable detail the basis for such certification and (iii) undertaking to repay any amount so advanced, with interest at a market rate from the date of each advance, upon any ultimate determination by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified by the Company for such legal fees and expenses.  Any claim for advancement of legal fees and expenses under this Section 2.08(d) shall also be accompanied by copies of the invoices covered by such claim.  In any claim for indemnification for matters involving federal or state securities law violations, the Covered Person seeking indemnification shall place before the court the position of the Securities and Exchange Commission with respect to indemnification for securities law violations.

(e)    The Company shall not be obligated to reimburse or pay a Covered Person any Indemnified Amounts for which payment has been made directly to such Covered Person under any directors and officers liability insurance policy maintained by the Company or for which the Covered Person has been otherwise indemnified or reimbursed.

(f)    Any decision that is required to be made by the Company pursuant to Section 2.08 shall be made on its behalf by the Board, except as otherwise provided in Section 2.04(j).  Any indemnification under Section 2.08, unless excepted under Section 2.04(j) or ordered by a court, shall be made by the Company only as authorized in the specific case and only upon a determination by the Board that indemnification of the Covered Person is proper.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

The Company will have no obligation to indemnify a Covered Person under Section 2.08 for any amounts paid in settlement of any proceeding effected without written authorization from the Board.  Any indemnification under Section 2.08 shall be made only out of the assets or insurance coverage of the Company.  The provisions of Section 2.08 are for the benefit of Covered Persons and shall not be deemed to create any rights for the benefit of any other Persons.

**Section 2.09   Exculpation.**   Except as provided herein, no Covered Person shall be liable to the Company or any other Party for any loss or liability arising out of any act or omission of such Covered Person in connection with the Business to the extent that such act or omission was taken or omitted in good faith and in a manner the Covered Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal act, the Covered Person had no reasonable cause to believe such Covered Person's conduct was unlawful.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company, with copies to the Board, by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and who has been selected by the Board.

**ARTICLE III**
**SHARE ISSUANCES**

**Section 3.01   Pre-emptive Rights.**

(a)   Each Shareholder (each, a "Pre-emptive Shareholder") shall have the right to purchase a pro rata portion of any Common Stock or Excluded Securities ("New Securities") that the Board may authorize the Company for issuance or sale to Third Party Purchasers.

(b)   The Company shall give written notice to the Pre-emptive Shareholders (an "Issuance Notice") of any proposed issuance or sale of New Securities within five (5) Business Days following any meeting of the Board at which any such issuance or sale is approved.  The Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including (i) the class and number of New Securities proposed to be issued and the percentage of the Company's outstanding Common Stock that the New Securities would represent on a fully diluted basis, (ii) the proposed issuance date, which shall be no less than twenty (20) Business Days from the date of the Issuance Notice, and (iii) the proposed consideration to be received by the Company for the New Securities and the class of Persons comprising the proposed Third Party Purchasers.  If the New Securities include warrants or any other securities other than Common Stock, the Issuance Notice shall also include a full legal description thereof.

(c)   By delivering a written notice of election to the Company no later than ten (10) Business Days following the receipt of an Issuance Notice, each Pre-emptive Shareholder shall have the irrevocable right to purchase, at the purchase price and on the other terms and conditions set forth in the Issuance Notice, the number of New Securities determined by multiplying the total number of New Securities by a fraction, (i) the numerator of which is the number of Shares then held by such Pre-emptive Shareholder, and (ii) the denominator of which is the total number of shares of Common Stock then outstanding (the "Pre-emptive Pro Rata Portion").  Each such election by a Pre-emptive Shareholder to purchase New Securities shall be binding and irrevocable.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(d)    No later than five (5) Business Days following the expiration of the exercise period specified in Section 3.01(c), the Company shall notify each Pre-emptive Shareholder in writing of the Pre-emptive Pro Rata Portion of New Securities, if any, that such Shareholder has agreed to purchase.  Each electing Pre-emptive Shareholder shall thereafter enter into such agreements with the Company and take such other actions as may be reasonably necessary to consummate the purchase and sale of his Pre-emptive Pro Rata Portion of New Securities.

(e)    Within thirty (30) Business Days after the date of the Issuance Notice, the Company shall issue the Pre-emptive Pro Rata Portion of New Securities to the electing Pre-emptive Shareholders and the balance of the New Securities to the class of Third Party Purchasers described in the Issuance Notice, in each case for the per share consideration and on the other terms and conditions set forth in the Issuance Notice, subject to extension of such issuance date for up to thirty (30) Business Days to the extent necessary to obtain any required Government Approvals for such issuance or sale.  At such closing, each electing Pre-emptive Shareholder shall deliver to the Company the purchase price for the New Securities purchased by him by certified or official bank check or wire transfer of immediately available funds, and the Company shall deliver to each electing Pre-emptive Shareholder a certificate evidencing his Pre-emptive Pro Rata Portion of New Securities, which New Securities shall be duly authorized for issuance, free and clear of any Liens, other than those attributable to actions of such Pre-emptive Shareholder.

(f)    In the event that New Securities covered by an Issuance Notice are not issued or sold within the time period contemplated by Section 3.01(e), the Company shall not thereafter issue or sell any New Securities without again fully complying with the provisions of Section 3.01.

**Section 3.02   No Capital Commitments**.  The Shareholders shall not have any capital commitments to the Company or any obligations to make loans or advances to the Company.

## ARTICLE IV
### TRANSFER OF SHARES

**Section 4.01   General Restrictions on Transfer.**

(a)    Except as provided in Section 2.05, Section 4.04, Section 4.05, Section 4.06 or Article VI, no Shareholder shall Transfer any of his Shares to any Person other than a Permitted Transferee in accordance with Section 4.02 or a Third Party Purchaser in a business combination with the Company approved by the Board and any requisite Shareholder vote.

(b)    Any purported Transfer of Shares that is not made in compliance with this Agreement shall be null and void and of no effect whatsoever, and the purported transferee shall not be treated, and the purported transferor shall continue be treated, as the owner of such Shares for purposes of this Agreement; *provided* that, if the Company is required to recognize a Transfer that is not made in compliance with this Agreement, the rights underlying the Shares so transferred will be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Shares.  Any such allocations and distributions may be applied, without limiting any other legal or equitable rights of the Company to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Shares may have to the Company or the other Shareholders, and neither the transferor nor the transferee shall have any voting rights or other rights in the management of the Company with respect to such transferred Shares.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(c)     For any purported Transfer of Shares that is not made in compliance with this Agreement, except a purported Transfer to a separated or divorced spouse of a Shareholder covered by Section 4.01(e), the Company shall have the option to purchase such Shares from the transferee by delivering written notice of its intention thereof to the transferee at any time within one (1) year after the Company has knowledge of such purported Transfer.  The Company may assign all or part of its right to purchase such Shares to the nontransferring Shareholders on a pro rata basis or such other basis as the Board determines.  The purchase price for such Shares shall be an amount equal to the Book Value thereof, and the other terms of such sale shall be determined by the Board in its sole discretion.  If the transferor in such purported Transfer is a Director or an Affiliate of a Director, such determination of the Board shall be made without the participation of such Director.

(d)     The Company may refuse to recognize any purported Transfer of Shares if the Board determines that the Transfer would have a material adverse effect on the Company by triggering any regulatory or other restrictions on the Company under Applicable Law.

(e)     Notwithstanding any provision of Section 4.02 to the contrary, no purported Transfer to or for the benefit of a separated or divorced spouse of a Shareholder by agreement, court order or otherwise shall be treated as a Permitted Transfer hereunder.  At any time during a period of one (1) year after the Shareholder from whom such Shares were purportedly Transferred has knowledge thereof, such Shareholder shall have the absolute, irrevocable right and option, but not the obligation, to purchase all or any portion of such Shares from the purported transferee thereof in an amount equal to their Book Value, determined as of the end of the most recently completed fiscal quarter of the Company, exercisable by delivering written notice to such purported transferee or her Representative in such separation or divorce proceeding, summarizing the purchase rights of such Shareholder hereunder and setting forth his election to exercise such rights, the number of such Shares to be purchased, the Book Value thereof and the date established for the closing of such purchase.  At such closing, the separated or divorced spouse of such Shareholder shall deliver an assignment and stock power covering such Shares to such Shareholder, duly executed and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof to such Shareholder, free and clear of any Liens, and such Shareholder shall deliver to such separated or divorced spouse or her Representative in such separation or divorce proceeding the purchase price for those Shares at their Book Value, payable by certified bank check or wire transfer of immediately available funds.  Upon confirmation of such wire transfer, the transferor of such Shares shall deliver to the Company and the Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company, *provided* that no failure to provide such release shall invalidate a buyback of Shares hereunder.

(f)     Each certificate representing Shares shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS AGREEMENT ON FILE WITH THE SECRETARY OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SHAREHOLDERS AGREEMENT AND AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933 OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  BY ACCEPTANCE OF THIS CERTIFICATE, THE HOLDER AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH SHAREHOLDERS AGREEMENT."

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Section 4.02    Permitted Transfers.**  Subject to the terms, conditions and restrictions set forth in Section 4.03, the Shares of any Shareholder may be Transferred (a "Permitted Transfer") in accordance with the following provisions:

(a)    A Shareholder who is a natural Person may Transfer all or any portion of his Shares by gift or will to (i) his parents, spouse, natural or adopted children and spouses of such children, but only during coverture or as a result of a testamentary transfer (each, a "Direct Family Member"), (ii) a trust for the benefit of one or more Direct Family Members, (iii) a corporation of which such Shareholder and/or one or more of his Direct Family Members or a trust for their benefit are the sole shareholders or (iv) a partnership or limited liability company in which such Shareholder and/or his Direct Family Members or a trust for their benefit hold all of the partnership or limited liability company interests.  In addition, Freund may Transfer Shares to Epstein, and Weinstein may Transfer Shares to Panzer.

(b)    A Shareholder that is a partnership, corporation, limited liability company, trust or other entity may Transfer all or any portion of its Shares to one or more partners, shareholders, members, beneficiaries or similar owners such Shareholder or to a trust substantially for the benefit of one or more equity owners of such Shareholder or their Direct Family Members.

**Section 4.03    Conditions to Permitted Transfers**.  A Transfer of Shares will only be treated as a Permitted Transfer under Section 4.02 if the following conditions are satisfied:

(a)    The Transfer of Shares shall be made in a manner that provides control of the Shares by a legal entity or competent adult, unless the Transfer is to (i) a custodian for a minor Person under an Applicable Law covering transfers to minors or (ii) the trustee of a trust for the benefit of such minor Person.

(b)    As long as the Company maintains its election to be treated as an S-corporation for federal income tax purposes in accordance with the requirements under subchapter S of the Code, the Transfer will not adversely affect the treatment of the Company as an S-corporation or cause an increase in the number of Persons holding or deemed to be holding the Company's capital stock for purposes of Code section 1361(b)(1)(A) and, if the Transfer is made to a trust, the transferee is a Qualified Trust.

(c)    The transferor of such Shares shall have provided the Board with prior written notice of the proposed Transfer.  If the proposed Transfer is approved by the Board, the transferee shall join as a Party to this Agreement and agree to be bound by all of the applicable provisions hereof by executing and delivering a Joinder Agreement to the Company, and the transferor and transferee shall execute and deliver to the Company any additional documents and instruments of conveyance as may be necessary or appropriate, in the reasonable opinion of counsel to the Company, to (i) effect such Transfer, (ii) confirm that the Transfer constitutes a Permitted Transfer hereunder, (iii) provide the Company with the transferee's taxpayer identification number and any other information necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns, it being understood that the Company will not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Shares until it has received such information.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(d)     The Transfer shall be permitted under the Securities Act and other applicable federal or state securities laws and, if requested by the Company, the transferor shall deliver to the Company an opinion of counsel in form and substance satisfactory to the Company to the effect that (i) such Transfer may be effected without registration under the Securities Act, (ii) it would not cause the Company to be treated as an investment company under the Investment Company Act of 1940 and (iii) it would not cause the assets of the Company to be deemed plan assets as defined under the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company.

**Section 4.04   Bankruptcy of a Shareholder.**

(a)     In the event of the Bankruptcy of an individual Shareholder or the trustee of a JE Trust, such individual Shareholder or JE Trust (a "<u>Bankrupt Shareholder</u>") shall be deemed to have offered to sell all of his Shares ("<u>Bankruptcy Shares</u>"), immediately prior to such Bankruptcy, first to the Company and then to the other Shareholders, at their Book Value and on the terms and conditions set forth in <u>Section 4.04</u>.

(b)     As soon as practicable after the Bankruptcy of a Shareholder, the Bankrupt Shareholder shall give written notice thereof to the Board and the other Shareholders, disclosing the nature of the Bankruptcy, the date upon which it occurred, the reason for its occurrence, the name and address of the transferee of the Bankruptcy Shares and the number of Bankruptcy Shares.  If the notice is not given within five (5) Business Days after the date of the Bankruptcy, the Company may give the notice, which shall have the same effect as if given by the Bankrupt Shareholder.

(c)     The Company shall have the irrevocable first option, but not the obligation, to purchase all or any portion of the Bankruptcy Shares for an amount equal to the Book Value attributable to those Shares, determined as of the end of the most recently completed fiscal quarter of the Company, and the transferee thereof shall be obligated to sell those Shares to Company for that repurchase price.  No later than ten (10) Business Days after delivery or deemed delivery of the notice of Bankruptcy contemplated by <u>Section 4.04(b)</u>, the Board shall determine the number of Bankruptcy Shares to be repurchased by the Company, if any, and the Company shall notify the Bankrupt Shareholder, the presiding justice of the bankruptcy court assigned to the Bankruptcy estate of the Bankrupt Shareholder, the trustee of such estate, if then appointed, and the other Shareholders of such election and the Book Value attributable to the Bankruptcy Shares.

(d)     To the extent that the Company elects to repurchase less than all of the Bankruptcy Shares, the Shareholders other than the Bankrupt Shareholder shall have the irrevocable second options, but not the obligation, to purchase all or any of their respective pro rata portions of such remaining Bankruptcy Shares at their Book Value, exercisable by notice to the Company and the other Shareholders within ten (10) Business Days after delivery of the Company's repurchase election under <u>Section 4.04(c)</u>, and the transferee thereof shall be obligated to sell those Shares to such Shareholders for that purchase price.

(e)     Not less than five (5) Business Days after the expiration of the exercise period for the second options held by the Shareholders other than the Bankrupt Shareholder under <u>Section 4.04(d)</u>, the Company shall give written notice the Shareholders, the presiding justice of the Bankruptcy court assigned to the Bankruptcy estate of the Bankrupt Shareholder and the

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

trustee of such estate, if then appointed, specifying the number of Bankruptcy Shares to be Transferred under Section 4.04, the Book Value attributable to those Shares and the date, time and location of the closing for the Transfer thereof to the Company and/or the Shareholders exercising their purchase options hereunder, which shall be no longer than sixty (60) Business Days after the date of such notice.

(f)    At the closing of any purchase and sale of Bankruptcy Shares pursuant to Section 4.04(e), the holder of such Shares shall deliver all certificates representing such Shares to the Company and/or the Shareholders electing to purchase the same, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof upon repurchase by the Company or purchase by such electing Shareholders, free and clear of any Liens, together with any other documents reasonably necessary for the effective Transfer thereof to such purchasers, and the Company and such electing Shareholders shall deliver to such holder the purchase price for those Shares at their Book Value, payable by certified bank check or wire transfer of immediately available funds. Upon confirmation of such wire transfers, the transferor of the Bankruptcy Shares shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

(g)    In the event that any Bankruptcy Shares are not purchased from a Bankrupt Shareholder or his Bankruptcy estate by the Company or the other Shareholders for any reason within the period and on the terms and conditions contemplated by Section 4.04 and the Company is required to recognize a Transfer of such Bankruptcy Shares, then the rights underlying such unpurchased Bankruptcy Shares will be strictly limited as set forth in the proviso under Section 4.01(b).

**Section 4.05    Termination of Employment.**

(a)    In the event that the employment of an Employee Shareholder with the Company is terminated for any reason other than by death or as provided in Section 2.06(e), then such Shareholder (a "Terminated Shareholder") shall be deemed to have offered to sell all of the Shares then owned by the Terminated Shareholder and any of his Affiliates or Permitted Transferees (the "Termination Shares") to the Company, and the Company shall repurchase all of the Termination Shares from such holders (the "Termination Share Holders") for an aggregate repurchase price (the "Termination Share Price") equal to the greater of the Book Value or the Appraised Value attributable to the Termination Shares, determined in accordance with Section 2.05(b) as of the end of the most recently completed fiscal quarter of the Company, and on the terms and conditions set forth in Section 4.05.

(b)    No later than five (5) Business Days after the Independent Appraiser delivers its valuation of the Termination Shares under Section 4.05(a), the Company shall give written notice to the Termination Share Holders, specifying the Appraised Value and the Book Value thereof and the date, time and location of the closing for the repurchase thereof by the Company, which shall be no longer than ten (10) Business Days after the date of such notice, and the Termination Share Holders shall be obligated to sell those Shares to the Company at such closing for the Termination Share Price, payable in accordance with Section 4.05(c).

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(c)    At the closing of any purchase and sale of Termination Shares pursuant to Section 4.05, the Termination Share Holders shall deliver all certificates representing such Shares to the Company, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof upon repurchase by the Company, free and clear of any Liens, together with any other documents reasonably necessary for the effective Transfer thereof to the Company, and the Company shall deliver to such holders the Termination Share Price for those Shares, allocated proportionately among the Termination Share Holders based on their respective ownership of Termination Shares.  To the extent that the Company has available working capital, the Termination Share Price shall be payable by certified bank check or wire transfer of immediately available funds. Any unpaid balance of such Termination Share Price shall be payable by delivery to each Termination Share Holder of a non-transferable promissory note of the Company, dated as of the date of the closing, in the principal amount of such unpaid balance, allocated proportionately among such holders based on their respective ownership of the of Termination Shares, and payable over a period of five (5) years in equal quarterly installments, beginning at the end of the second full calendar quarter after the closing, with interest on the unpaid principal amount thereof at a rate equal to 110% of the prevailing federal rate, determined in accordance with the provisions of Code section 1274, during the calendar quarter for which such interest obligation accrued.  Upon receipt of such consideration, the Termination Share Holders shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties, other than obligations of the Company under such promissory notes, in form and substance reasonably satisfactory to the Company.

**Section 4.06   Death of a Shareholder.**

(a)    Upon the death of an individual Shareholder or the trustee of a JE Trust, the Company shall repurchase all of the Shares ("Estate Shares") held by the legal representatives, heirs or legatees of such deceased Shareholder or trustee (the "Estate Holders"), and the Estate Holders shall sell their Estate Shares to the Company on the terms and conditions set forth in Section 4.06.

(b)    The purchase price for the Estate Shares shall be the Appraised Value thereof, determined in accordance with Section 2.05(b).  As soon as practicable after the date hereof, to supplement the proceeds to be received from Fabusure, LLC under whole life insurance policies it maintains for the Shareholders and is obligated to remit to the Company pursuant to its Amended and Restated Operating Agreement with the Shareholders, the Company shall purchase term key-man term life insurance policies covering the Shareholders in amounts determined by the Board, *provided* that the Company is named beneficiary of such policies and the absolute owner thereof, with all right, title and interest therein.  The Company shall use its best efforts to (i) maintain such policies or replacements thereof in full force and effect, (ii) pay all premiums thereon as they become due, (iii) not, without the prior approval of the Board, borrow against the proceeds thereof and (iii) not apply the proceeds thereof to satisfy any obligations of the Company other than any obligation to purchase Estate Shares pursuant to Section 4.06(c).

(c)    Not less than five (5) Business Days after the Independent Appraiser delivers it valuation of the Estate Shares under Section 4.06(a), the Company shall give written notice to the Estate Holders, specifying the Appraised Value of their Estate Shares and the date, time and location of the closing for the repurchase thereof by the Company, which shall be no longer than

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

ten (10) Business Days after the date of such notice.  At such closing, the Estate Holders shall deliver all certificates representing their Estate Shares to the Company, duly endorsed in blank and accompanied by all required documentary transfer stamps and all other documents necessary for the effective Transfer thereof to the Company, free and clear of any Liens, together with any other documents reasonably necessary for such Transfer, and the Company shall deliver to the Estate Holders the purchase price for their Estate Shares at their Appraised Value, allocated proportionately among the Estate Holders based on their respective ownership of the of Estate Shares.  Such purchase price shall be payable by certified bank check or wire transfer of immediately available funds to the extent that the Company has available working capital, including the proceeds to be received from Fabusure, LLC under life insurance policies covering the individual Shareholders and the proceeds from key-man term life insurance policies to be maintained by the Company on the lives of the individual Shareholders under Section 4.06(b). Any unpaid balance of such purchase price shall be payable by delivery to each Estate Holder of a non-transferable promissory note of the Company, dated as of the date of the closing, in the principal amount of such unpaid balance, allocated proportionately among the Estate Holders based on their respective ownership of the of Estate Shares, and payable over a period of ten (10) years in equal quarterly installments, beginning at the end of the second full calendar quarter after the closing, with interest on the unpaid principal amount thereof at a rate equal to 110% of the prevailing federal rate, determined in accordance with the provisions of Code section 1274, during the calendar quarter for which such interest obligation accrued.  Upon receipt of the consideration for the Estate Shares, the Estate Holders shall deliver to the Company and the remaining Shareholders an unconditional release of all claims against such Parties in form and substance reasonably satisfactory to the Company.

**Section 4.07   Minority Buyout Options**.

(a)   In the event that the Company has provided notice of a closing for the repurchase of Bankruptcy Shares under Section 4.04(c), Termination Shares under Section 4.05(b) or Estate Shares under Section 4.06(c), it shall have the irrevocable option, but not the obligation, to repurchase contemporaneously (i) from Weinstein and any Permitted Transferee of his Shares (each, a "Weinstein Holder"), if such Shares are being repurchased from Panzer or his successors or assigns, or (ii) from Freund and any Permitted Transferee of his Shares (each, a "Freund Holder" and, collectively with the Weinstein Holders, the "Minority Holders"), if such Shares are being repurchased from Epstein and the JE Trusts or their successors or assigns, on the same repurchase terms applicable to such Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be, a number of Shares held by the applicable Minority Holders that will result in their aggregate Percentage Interests remaining unchanged after giving effect the Company's retirement of the repurchased Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be.  If the Company elects to exercise its repurchase option under this Section 4.07(a), it shall give notice thereof to the applicable Minority Holders and the other Parties, accompanied by a copy of the valuation for the Bankruptcy Shares, Termination Shares or Estate Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 4.04(c), Section 4.05(c) or Section 4.06(c), as the case may be, and such Minority Holders shall be obligated to sell the applicable portion of their Shares to the Company at such closing based on such valuation.

(b)   In the event that Panzer elects to purchase from Epstein and the JE Trusts or their successors or assigns any Buyout Shares under Section 2.05(a) or Bankruptcy Shares under Section 4.04(d), Panzer shall have the irrevocable option, but not the obligation, to purchase contemporaneously from the Freund Holders all or any portion of the Shares held by them on the same terms and conditions applicable to such Buyout Shares or Bankruptcy Shares, as the case may be.  If Panzer elects to exercise his purchase option under this Section 4.07(b), he shall give notice thereof to the Freund Holders and the other Parties, accompanied by a copy of the valuation for the Buyout Shares or Bankruptcy Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 2.05(c) or Section 4.04(g), as the case may be, and the Freund Holders shall be obligated to sell the applicable portion of their Shares to Panzer at such closing based on such valuation.

(c)   In the event that Epstein elects to purchase from Panzer or his successors or assigns any Buyout Shares under Section 2.05(a) or Bankruptcy Shares under Section 4.04(d), Epstein shall have the irrevocable option, but not the obligation, to purchase contemporaneously from the Weinstein Holders all or any portion of the Shares held by them on the same terms and conditions applicable to such Buyout Shares or Bankruptcy Shares, as the case may be.  If Epstein elects to exercise his purchase option under this Section 4.07(c), he shall give notice thereof to the Weinstein Holders and the other Parties, accompanied by a copy of the valuation for the Buyout Shares or Bankruptcy Shares, as the case may be, at least five (5) Business Days prior to the closing under Section 2.05(c) or Section 4.04(g), as the case may be, and the Weinstein Holders shall be obligated to sell the applicable portion of their Shares to Epstein at such closing based on such valuation.

**Section 4.08   Release from Certain Obligations**.  In the event any Shareholder shall Transfer all of the Shares held by such Shareholder in compliance with the provisions of this Agreement without retaining any direct, indirect or other beneficial interest therein, then such Shareholder shall cease to be a Party to this Agreement and shall have no further obligations arising hereunder from and after the date of such Transfer, except for ongoing obligations under Article V, and the Company shall use its best efforts to obtain the release for such Shareholder from any guaranty executed by such Shareholder guaranteeing any liabilities or obligations of the Company.

## ARTICLE V
## NON-COMPETE AND OTHER OBLIGATIONS

**Section 5.01   Non-Compete**.

(a)   For so long as an individual Shareholder is employed by the Company (an "Employee Shareholder") and for a period of two (2) years following the termination of an Employee Shareholder's employment with the Company for any reason (the "Restriction Period"), the Employee Shareholder shall not directly or indirectly through one or more Affiliates own, manage, operate, control or participate in the ownership, management, operation or control of any Competitor, and neither such Shareholder nor any of his Permitted Transferees, directly or indirectly through one or more of their respective Affiliates, shall serve as a member of the board of directors or similar body of such Competitor; *provided* that nothing in this Section 5.01(a) shall prohibit any Employee Shareholder from acquiring or owning directly or indirectly (i) up to five percent (5%) of the aggregate voting securities of any Competitor that is a publicly traded Person or (ii) up to two percent (2%) of the aggregate voting securities of any Competitor that is not a publicly traded Person.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM   INDEX NO. 654909/2021
NYSCEF DOC. NO. 12                                          RECEIVED NYSCEF: 08/13/2021

(b)    Empire shall not be deemed a Competitor for any purposes of this Agreement as long as Empire and any of its successors or assigns refrains from distributing kitchen, bathroom and closet cabinets to dealers having showrooms anywhere in the world.

**Section 5.02   Blue Pencil**.  If a court of competent jurisdiction determines that any of the restrictions set forth in Section 5.01 are unenforceable because of their geographic scope or the length of the Restriction Period, such court shall have the power to reduce the scope or duration of such restrictions, which shall then be enforceable in their reduced form.

**Section 5.03   Unrestricted Corporate Opportunities.**

(a)    Except as otherwise provided in Section 5.03(b) and subject to each Shareholder's obligations under Section 5.01, no Shareholder or any of his Permitted Transferees owning Shares or any of their respective Representatives shall have any duty to communicate or present to the Board (i) any investment or business opportunity that does not involve the Company's lines of Business, as then conducted or planned, or (ii) any other prospective transaction that could provide an economic advantage to the Company but is outside the scope of the Business, as then conducted or planned (an "Unrestricted Corporate Opportunity"), and such Persons shall not be deemed to have breached any fiduciary or other duty to the Company or the other Shareholders by pursuing or acquiring an interest in any such Unrestricted Corporate Opportunity.

(b)    The Company relinquishes any interest in or rights to pursue or participate in any Unrestricted Corporate Opportunity or to any expectancy that an Unrestricted Corporate Opportunity will be offered to the Company by any Shareholder or his Permitted Transferees owning Shares or any of their respective Representatives.

**Section 5.04   Confidentiality**.

(a)    Each Shareholder shall and shall cause his Representatives to keep confidential and not divulge any information, including all budgets, business plans and analyses, concerning the Company, including its assets, business, operations, financial condition or prospects ("Information"), and to use, and cause its Representatives to use, such Information only on behalf of the Company in connection with the operation of the Business; *provided* that nothing herein shall prevent any Shareholder from disclosing such Information (i) upon the order of any court of competent jurisdiction or Government Authority having jurisdiction over such Shareholder, (ii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iii) to the extent necessary in connection with the exercise of any remedy hereunder, (iv) to other Shareholders, (v) to such Shareholder's Representatives that in the reasonable judgment of such Shareholder need to know such Information and are subject to confidentiality obligations comparable to those of such Shareholders under this Section 5.04(a) or (vi) to any Permitted Transferee of Shares from such Shareholder as long as such Person agrees to be bound by the provisions of this Section 5.04(a) as if already a Shareholder; and *provided, further* that such Shareholder shall have first notified the Board of the proposed disclosure as far in advance of such disclosure as practicable and shall have used reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment to the fullest extent practicable.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM   INDEX NO. 654909/2021
NYSCEF DOC. NO. 12                                     RECEIVED NYSCEF: 08/13/2021

(b)   Information subject to the restrictions of <u>Section 5.04(a)</u> shall not include (i) information that is or becomes generally available to the public other than as a result of a disclosure by a Shareholder or any of his Representatives in violation of this Agreement, (ii) information that is or has been independently developed or conceived by such Shareholder outside the course of his employment by the Company without use of any Information or (iii) information that becomes available to the receiving Shareholder or any of his Representatives on a non-confidential basis from a source other than the Company, any other Shareholder or any of their respective Representatives, *provided* that such source is not known by the recipient of the information to be bound by a confidentiality agreement in favor of any other Person.

**Section 5.05   Subchapter S Obligations**.   Unless and until the Company completes a Qualified Public Offering or the Board determines that the Company should relinquish its subchapter S status, no Shareholder shall take any action that could cause a termination of the election by the Company to be a subchapter S corporation for federal income tax purposes. Each Shareholder shall execute such instruments and take such other actions from time to time as may be necessary or advisable, in the sole judgment of the Board, for the Company to maintain its subchapter S election.   If a Shareholder Transfers any Shares or takes any other action that causes or could cause a termination of the Company's subchapter S election, the Board may cause the Company to seek a waiver of the terminating event from the IRS on the grounds of inadvertency or to seek approval from the IRS to file a new election to be treated as an S corporation before the five (5) year waiting period after termination of a subchapter S election has expired.   If the Company attempts to obtain approval from the IRS to retain subchapter S status or to file a new subchapter S election after an inadvertent termination, the Shareholder responsible for termination of the Company's subchapter S election shall bear all expenses associated with such procedure, including reasonable attorneys' fees and disbursements.

**Section 5.06   Dispute Resolution**.

(a)   Any dispute, controversy or claim arising out of, relating to or in connection with this Agreement or any breach of any provisions hereof, including any Deadlock of the Board (a "<u>Dispute</u>"), shall (i) initially be submitted to non-binding consultation pursuant to <u>Section 5.06(b)</u> and, if not resolved under those procedures, then (ii) finally be settled by arbitration pursuant to <u>Section 5.06(c)</u>.

(b)   If a Dispute remains unresolved for seven (7) Business Days, then the Dispute shall be submitted to the incumbent Kosover Rebbe of Brooklyn (the "<u>Counselor</u>"), who shall use his best efforts to seek a consensual resolution of the Dispute during a period not to exceed fifteen (15) Business Days from the time the Dispute is submitted to the Counselor.   The Counselor shall employ such procedures as he deems appropriate in his sole discretion.   If the Counselor named herein shall be unavailable to act in that capacity for any reason, the Directors shall select a mutually acceptable Rabbi to act as Counselor hereunder.   Any recommendations made by the Counselor in the course of such consultation procedures shall not be binding on the Parties.   Each Party to the Dispute shall bear his own costs in connection with the non-binding consultation procedures hereunder, including fees and disbursements of his counsel and financial advisors.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(c)   A Dispute that remains unresolved after completion of the non-binding consultation procedures conducted pursuant to Section 5.06(b) shall, within seven (7) Business Days after the culmination thereof, be submitted to binding arbitration in accordance with this Section 5.06(c).   The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of the arbitration, except as they may be modified herein or by mutual agreement of the Parties.   The seat of the arbitration shall be New York, NY and shall be conducted by three arbitrators.   The Party initiating the arbitration (the "Claimant") shall appoint one arbitrator in his request for arbitration (a "Request").   The other Party involved in the Dispute (the "Respondent") shall appoint a second arbitrator within thirty (30) Business Days after receipt of the Request and shall notify the Claimant of such appointment in writing.   If the Respondent fails to appoint an arbitrator within such period, the arbitrator named in the Request shall decide the Dispute as the sole arbitrator.   Otherwise, the two arbitrators appointed by the Claimant and the Respondent shall appoint a third arbitrator within thirty (30) Business Days after the Respondent has notified the Claimant of the appointment of the second arbitrator.   When the arbitrators appointed by the Parties have appointed a third arbitrator and the third arbitrator has accepted the appointment, the arbitrators shall promptly notify the Parties of such appointment.   If the two arbitrators appointed by the Claimant and the Respondent fail or are unable to appoint a third arbitrator or to notify the Claimant and the Respondent of such appointment, then the third arbitrator shall be appointed by the President of the American Arbitration Association, which shall promptly notify the Claimant and the Respondent of the appointment of the third arbitrator.   The third arbitrator shall act as chairman of the arbitration panel for the Dispute.

(d)   The decision and award in any arbitration under Section 5.06(c) shall be in writing, shall set forth in reasonable detail the basis for the decision and shall be final and binding on the Claimant and the Respondent therein.   The award shall include an award of costs, including reasonable attorney's fees and disbursements of both the Claimant and the Respondent in such arbitration, payable (i) by the Claimant to the Respondent if the Respondent is the prevailing party in such arbitration or (ii) by the Respondent to the Claimant if the Claimant is the prevailing party in such arbitration.   Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the non-prevailing party in the arbitration or his assets.

**Section 5.07   Equitable Remedies**.   Each Party acknowledges that the other Parties would be irreparably damaged in the event of a breach or threatened breach by such Party or any of his Representatives of any of his obligations under this Agreement and hereby agrees that in the event of a breach or a threatened breach by such Party of any such obligations, each of the other Parties, in addition to any other rights and remedies that may be available to them in respect of such breach, shall be entitled to an injunction from a court of competent jurisdiction, without any requirement to post bond, granting such Parties specific performance by such Party of his obligations under this Agreement.   In the event that any Party files a suit to enforce the covenants contained in this Agreement or obtain any other remedy in respect of any breach thereof, the prevailing Party in the suit shall be entitled to reimbursement of the costs incurred by such Party in conduction the suit, including reasonable attorney's fees and expenses.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## ARTICLE VI
### REGISTRATION RIGHTS

**Section 6.01   Piggyback Rights**.  If at any time after the Company has completed a Qualified Public Offering, the Company proposes to file a registration statement under the Securities Act for any underwritten sale of its Common Stock (except for registrations effected under Form S-4, Form S-8 or any successor form thereof), and the Company proposes to include any Shares held by Panzer or Epstein for resale to the underwriters thereunder ("Insider Shares"), the Company shall give written notice of such registration to the other Shareholders no later than ten (10) Business Days before filing such registration statement with the SEC.  If a Shareholder so requests in writing within five (5) Business Days after receipt of such notice, the Company shall use reasonable commercial efforts include in such registration statement for resale to the underwriters thereunder the number of Shares held by such Shareholder that bears the same proportion as the number of Insider Shares bears to the total Shares held by Panzer and Epstein (the "Registrable Securities"), subject to pro rata reduction under Section 6.02.  The conditional registration rights covered by Article 6 shall not be assignable in whole or in part.

**Section 6.02   Pro Rata Reduction**.  The Company shall not be obligated to include any Registrable Securities of any Shareholder for resale to the underwriters under a registration statement covered by Section 6.01 to the extent such underwriters determine that the inclusion of such Registrable Securities could jeopardize the successful sale of Common Stock thereunder by the Company the desired price to the public or would otherwise be against the best interests of the Company, in which case the number of such Registrable Securities shall be reduced accordingly on a pro rata basis.

**Section 6.03   Shareholder Obligations**.  If any Registrable Securities of a Shareholder are included for resale to the underwriters under a registration statement covered by Section 6.01, the Shareholder shall furnish to the Company such information regarding the Shareholder, the Registrable Securities held by the Shareholder and the distribution proposed by the Shareholder as the Company may request in writing and as shall be required by the underwriters in connection with such registration.  Any refusal to furnish such information by the Shareholder or to join as a party to the underwriting agreement for such registration shall relieve the Company of its obligations to that Shareholder under Article VI.

**Section 6.04   Registration Expenses**.  All registration and filing fees, professional fees and disbursements, printing and ancillary expenses for any registration and sale of Common Stock under registration statement subject to Article VI shall be borne by the Company.

## ARTICLE VII
### FINANCIAL MATTERS

**Section 7.01   Financial Statements**.  In addition to any rights that a Shareholder may have to inspection of the books and records of the Company under Applicable Law, the Company shall furnish the following information to each of Panzer and Epstein on a regular and timely basis in such electronic or other format or medium as each such Director may request:

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(a)   As soon as available, and in any event within one-hundred-eighty (180) days after the end of each Fiscal Year, the audited balance sheet of the Company as at the end of such Fiscal Year and the audited statements of income, cash flows and changes in shareholders' equity for such year, accompanied by the certification of independent certified public accountants of recognized national standing selected by the Board, to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of its operations and changes in its cash flows and shareholders' equity for the periods covered thereby;

(b)   As soon as available, and in any event within sixty (60) days after the end of each fiscal quarter, the unaudited balance sheet of the Company at the end of such quarter and the unaudited statements of income, cash flows and changes in shareholders' equity for such quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied, and certified by the Treasurer of the Company or by the Chief Financial Officer for all periods following his employment by the Company pursuant to Section 2.06(f); and

(c)   As soon as available, any annual reports, quarterly reports and other periodic reports prepared by the Company, with any exhibits thereto, that the Company may be required to file or deliver to any Person pursuant to Applicable Law.

**Section 7.02   Bank Accounts**.  The Company shall maintain commercial bank accounts for its funds in its name with financial institutions selected by the Board.  All checks, money order, electronic payments or transfers and any other cash management transactions on behalf of the Company under such accounts shall require the signature of any one of either Panzer or Epstein.  Panzer and Epstein shall each shall have the right to issue checks on one or more of such accounts in the conduct of the Business on behalf of the Company, in their capacity as executive officers of the Company under Section 2.06, *provided* that a copy of each check so issued shall be delivered to the Company as soon as practicable after the issuance thereof.  No funds of the Company shall be used as compensating balances for the benefit of any other Person or commingled with the funds of any other Person.

**Section 7.03   Books and Records**.   The Company shall maintain at its principal corporate office comprehensive books and records, which shall be updated in accordance with the Company's internal controls over financial matters.  The Company's books and records shall include all financial ledgers, accountants working papers and copies of bank statements, as well as a full and accurate account of all transactions by any Shareholder in any capacity with or on behalf of the Company.  Each of Panzer and Epstein shall have full access to the Company's QuickBooks files and any other books and records of the Company maintained in electronic medium for review on a real-time basis.  If Weinstein or Freund desire access to financial information about the Company's assets, financial condition or results of operations or access to its books and records, they shall be limited to obtaining that information from Panzer or Epstein, respectively, as they may deem appropriate.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

**Section 8.01    Representations and Warranties of the Shareholders**.  Each Shareholder, or the Shareholder named in <u>Section 8.01(d)</u>, severally and not jointly, represents and warrants to the Company and each other Shareholder as of the Effective Date and the date of this Agreement that:

(a)    Such Shareholder has full power and authority to execute and deliver this Agreement, to perform his obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by such Shareholder, the performance of his obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of such Shareholder. Such Shareholder has duly executed and delivered this Agreement.

(b)    This Agreement constitutes the legal, valid and binding obligation of such Shareholder, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, whether enforcement is sought by proceedings in equity or at law.  The execution, delivery and performance of this Agreement by such Shareholder and the consummation by such Shareholder of the transactions contemplated hereby require no action by or in respect of any Governmental Authority.

(c)    The execution, delivery and performance of this Agreement by such Shareholder and the consummation of the transactions contemplated hereby do not and will not (i) conflict with or result in any violation or breach of any provision of any of the organizational documents of such Shareholder, if other than a natural Person, (ii) conflict with or result in any violation or breach of any provision of any Applicable Law or (iii) require any consent or other action by any Person under any provision of any material agreement or other instrument to which such Shareholder is a party or by which such Shareholder is bound.

(d)    Such Shareholder has good and marketable title to the Shares registered in his name and listed in <u>Section 8.02(f)</u>, free and clear of any Liens.  Each of the JE Trusts (i) is a Permitted Transferee of the Shares registered in its name and listed in <u>Section 8.02(f)</u>, (ii) is a permitted shareholder as provided in Code section 1361(c)(2) and (iii) otherwise meets the criteria for a Qualified Trust.  Each of the JE Trusts has furnished to the Company with a true, complete and correct copy of the trust instrument under which such Shares are held and the election by the beneficiary of such trust to treat such trust as a Qualified Trust or the election by the trustee of such trust under Code section 1361(e)(3).

(e)    Such Shareholder is a citizen or resident of the United States or otherwise qualifies as a United States person as defined in Code section 7701(a)(30).

(f)    There are no outstanding debt obligations of the Company in favor of such Shareholder or any of his Affiliates.

(g)    Such Shareholder or its trustee has been advised by his own legal counsel in connection with the negotiation of this Agreement on his behalf and fully understands its terms, conditions and effects.  Such Shareholder or its trustee is not affected by any disability that would prevent him from knowingly and voluntarily providing the undertakings and covenants contained herein, all of which have been made without any duress, coercion or undue influence.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Section 8.02   Representations and Warranties of the Company**.   The Company represents and warrants to each Shareholder as of the Effective Date and the date of this Agreement that:

(a)   The Company is a corporation duly organized and existing in good standing under the laws of the State of New York and has all requisite corporate authority to own its properties and to carry on the Business as now conducted.  The Company does not have any Subsidiaries and does not own or control, directly or indirectly, any other Person.

(b)   The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement.  The execution and delivery of this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all necessary corporate action, and no further consent or authorization is required by any other Person.  This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, whether enforcement is sought by proceedings in equity or at law.  The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby require no action by or in respect of any Governmental Authority.

(c)   Neither the execution, delivery or performance of this Agreement by the Company nor the consummation by the Company of the transactions contemplated hereby (i) will conflict with the Organizational Document or violate any Applicable Law, (ii) will result in any breach of or default under any provision of any contract or agreement of any kind to which the Company is a party or is bound or to which any of its properties or assets are subject or (iii) is prohibited by or requires the Company to obtain or make any consent, authorization, approval, registration or filing under any contract to which it is a party or pursuant to any Applicable Law.

(d)   The Company has elected subchapter S status for federal income tax purposes and has duly filed and maintained a subchapter S election on Form 2553 with the IRS in accordance with the requirements under subchapter S of the Code.

(e)   Subject to the filing of an Amendment to the Certificate of Incorporation contemplated by Section 2.02(e), the Company's authorized capital stock consists solely of 200 shares of Common Stock.  As of the Effective Date and the date of this Agreement, there are 200 shares of Common Stock outstanding, all of which have been duly and validly authorized and issued, are owned of record by the Shareholders and are fully paid and nonassessable, except as otherwise provided by Applicable Law.  The Company has not issued any securities that are convertible into or exchangeable for its capital stock or any warrants, options or other rights to subscribe for or purchase its capital stock or any such convertible or exchangeable securities (collectively, "Derivative Securities").  No Person has any agreement, right or commitment entitling it to acquire Derivative Securities from the Company.  There are no agreements or other instruments of any kind to which the Company or any Person is a party relating to the voting of the Shares other than the By-laws and this Agreement.  The Shares have no restrictions imposed by the Company upon their Transfer or sale by the Shareholders except as set forth in this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(f)   The Shares are owned of record by the Shareholders on the date hereof as set forth below, resulting in the following Percentage Interests in the Company as of such date:

| Name of Shareholder | Number of Shares | Percentage Interest |
|---|---|---|
| Panzer | 105.00 | 52.50% |
| Epstein | 15.00 | 7.50 |
| Joel Epstein Trust | 27.50 | 13.75 |
| Judith Epstein Trust | 27.50 | 13.75 |
| Freund | 15.00 | 7.50 |
| Weinstein | 10.00 | 5.00 |
| Total | 200.00 | 100.00% |

(g)   There are no outstanding debt obligations owed by the Company to any Shareholder or the Affiliates of any Shareholder as of the Effective Date or the date first above written.

## ARTICLE IX
### TERM AND TERMINATION

**Section 9.01   Term and Termination**.  Except for the continuing obligations specified in Section 9.02, all of which shall survive any termination of this Agreement, this Agreement shall terminate upon the earliest of (a) the consummation of a Qualified Public Offering, (b) the consummation of a merger or other business combination or transaction resulting in a Change of Control or the liquidation and winding up of the Company, (c) the date on which none of the Shareholders holds any Common Stock or (d) upon the unanimous agreement of Panzer and Epstein.

**Section 9.02   Effect of Termination**.  The termination of this Agreement shall not affect any of the obligations of the Shareholders with respect to (a) non-competition obligations set forth in Section 5.01, confidentiality obligations set forth in Section 5.04, (c) obligations involving Dispute resolution set forth in Section 5.06 or (d) obligations to pay or reimburse any amounts arising on or prior to the date of such termination, or as a result of or in connection with such termination, each of which obligations shall survive any such termination in accordance with the respective terms thereof.

## ARTICLE X
### MISCELLANEOUS

**Section 10.01   Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing, with a copy to the individuals specified below, and shall be deemed to have been given to a Party (a) when delivered by hand, with written confirmation of receipt by such Party, (b) when received by such Party if sent by a nationally recognized overnight courier, receipt requested, (c) on the date sent by email if sent during normal business hours of such Party or on the next Business Day if sent after normal business hours of such Party, or (d) on the third business day after the date mailed to such Party, by certified or registered mail, return receipt requested, postage prepaid.  Such communications shall be sent to the respective Parties at the following addresses or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.01:

| | |
|---|---|
| If to the Company: | Fabuwood Cabinetry Corp. |
| | 99 Caven Point Road |
| | Jersey City, NJ 07305 |
| | Attn: Moshe C. Panzer and Joel Epstein |
| | Email: mp@fabuwood.com; joele@fabuwood.com |
| If to Panzer: | Moshe C. Panzer |
| | 1626 - 47th Street |
| | Brooklyn, NY 11204 |
| | Email: mp@fabuwood.com |
| | mpfabu@gmail.com |
| If to Epstein: | Joel Epstein |
| | 8 Frankfurt Road, Unit 301 |
| | Monroe, NY 10950 |
| | Email: joele@fabuwood.com |
| With a copy to: | Avi Lew, Esq. |
| | Warshaw Burstein, LLP |
| | 555 Fifth Avenue |
| | New York, NY 10017 |
| | Email: alew@wbny.com |
| If to Freund: | Raizy Freund |
| | 150 South 8th Street |
| | Brooklyn, NY 11211 |
| | Email: joseph9368@gmail.com |
| If to Weinstein: | Joel Weinstein |
| | 481 Park Avenue, Unit 2A |
| | Brooklyn, NY 11205 |
| | Email: joelw@fabuwood.com |

**Section 10.02  Interpretation**.   For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Unless the context otherwise requires, references herein to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder, and references to a Governmental Authority includes any successor thereto.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

Section 10.03   **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 10.04   **Severability**.  If any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction or affect any other provision of this Agreement.  Upon any such determination that a provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to implement their original intent as closely as possible in a mutually acceptable manner to ensure that the transactions and arrangements provided for herein are consummated or implemented as originally contemplated.

Section 10.05   **Entire Agreement**.  This Agreement and the Organizational Documents constitute the sole and entire agreement of the Parties with respect to the subject matter hereof, and this Agreement supersedes the Original Stockholders Agreement and any other prior or contemporaneous understandings and agreements, whether written and oral, with respect to such subject matter.  In the event of any inconsistency or conflict between this Agreement and any Organizational Document, the Parties shall, to the extent permitted by Applicable Law, amend such Organizational Document to comply with the terms of this Agreement.

Section 10.06   **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and Permitted Transferees.

Section 10.07   **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.08   **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly provided in writing and signed by each Party.  No waiver by either Party shall operate as a waiver of any other prior or future failure or breach not expressly identified by such written waiver.

Section 10.09   **Governing Law**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule, whether of the State of New York or any other jurisdiction, that would cause the application of the laws of any jurisdiction other than those of the State of New York.

Section 10.10   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A copy of this Agreement with all signed counterparts delivered by email shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature page and exhibit follow]*

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties have executed this Agreement on November 10, 2017, effective as of the Effective Date.

**The Company:**

**FABUWOOD CABINETRY CORP.**

By: _____
Moshe C. Panzer, CEO and President

By: _____
Joel Epstein, COO, Vice President and Treasurer

**The Shareholders:**

_____
**MOSHE C. PANZER**

_____
**JOEL EPSTEIN**

**JOEL EPSTEIN 2014 FAMILY TRUST**

By: _____
Judith Epstein, Trustee

**JUDITH EPSTEIN 2014 FAMILY TRUST**

By: _____
Joel Epstein, Trustee

_____
**JOEL WEINSTEIN**

_____
**RAIZY FREUND**

35

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties have executed this Agreement on November 10, 2017, effective as of the Effective Date.

**The Company:**

**FABUWOOD CABINETRY CORP.**

By:_____
    Moshe C. Panzer, CEO and President

By:_____
    Joel Epstein, COO, Vice President and Treasurer

**The Shareholders:**

_____

**MOSHE C. PANZER**

_____

**JOEL EPSTEIN**

**JOEL EPSTEIN 2014 FAMILY TRUST**

By:_____
    Judith Epstein, Trustee

**JUDITH EPSTEIN 2014 FAMILY TRUST**

By:_____
    Joel Epstein, Trustee

_____

**JOEL WEINSTEIN**

_____

**RAIZY FREUND**

35

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT A**

**Form of**

**Joinder Agreement**

[*Attached*]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## JOINDER AGREEMENT

This JOINDER AGREEMENT is entered into on _____ [●], 20[●●] by and among Fabuwood Cabinetry Corp., a New York corporation (the "Company"), _____ (the "Assignor") and _____ (the "Assignee").

Reference is made to Amended and Restated Shareholders Agreement dated as of November 10, 2017 (the "Shareholders Agreement") by and among the Company, the Assignor and the other shareholders of the Company named therein (collectively with the Assignor, the "Shareholders"), pursuant to which the Company and the Shareholders memorialized their arrangements for the ownership and disposition of common stock, no par value of the Company ("Common Stock") held or acquired by the Shareholders (the "Shares"), including the voting and transfer of the Shares, clarifying the respective rights, powers and duties of the individual Shareholders in managing the Company and providing unequivocal remedies for any breach of the Shareholders Agreement.

The parties desire to enter into this Agreement to provide for the undertakings and acknowledgements contemplated by the terms of Shareholders Agreement upon assignment of any Shares to a Permitted Transferee, as defined therein.

Accordingly, the parties hereby agree as follows:

1.  The Company acknowledges receipt from the Assignor of a stock power providing for the assignment of the number of Shares specified therein (the "Assigned Shares") to the Assignee.  Upon surrender to the Company of a certificate representing Shares in an amount equal to or greater than the number of Assigned Shares for transfer by the Assignor, the Company shall issue a new certificate to the Assignee, registered in the name of the Assignor, representing the Assigned Shares, bearing a legend in the form provided in the Shareholders Agreement.  If the certificate surrendered by the Assignor exceeds the number of Assigned Shares, the Company shall also issue a new certificate to the Assignor, registered in the name of the Assignor, representing such excess Shares, also bearing a legend in the form provided in the Shareholders Agreement.

2.  The Assignor hereby confirms that the Assignee is a Permitted Transferee (as defined in the Shareholders Agreement) of the Assignor, and the transfer of the Assigned Shares by the Assignor satisfies the conditions set forth in Article IV of the Shareholders Agreement in all respects.

3.  The Assignee (a) hereby joins as a party to the Shareholders Agreement in the capacity of a Shareholder thereunder as of the date hereof, (b) shall be bound by and shall perform all of the undertakings and obligations of a Shareholder thereunder, (c) acknowledges and agrees that the Assignee is acquiring the Assigned Shares for his own account and not with a view towards the resale or distribution thereof, (d) confirms to the Company that the representations and warranties of the Shareholders contained in Section 8.01 of the Shareholders Agreement are true and correct on the date hereof as if made by the Assignee with respect to the Assigned Shares and (e) shall execute and deliver any additional documents and perform any tasks reasonably requested by the Company in connection with the foregoing.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

4.   Each of the parties represents and warrants that he or it is duly authorized to enter into this Agreement.  This Agreement shall be binding on each party and his or its successors and permitted assigns.

5.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.  EACH PARTY AGREES THAT ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT SHALL BE BROUGHT IN A U.S. FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY, CITY AND STATE OF NEW YORK.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF SUCH COURT AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY DEFENSE OF AN INCONVENIENT FORUM OR A LACK OF PERSONAL JURISDICTION TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING AND ANY RIGHT OF JURISDICTION OR VENUE ON ACCOUNT OF THE PLACE OF RESIDENCE OR DOMICILE OF ANY PARTY HERETO.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT HE OR IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

*[The remainder of this page is intentionally left blank]*

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**FABUWOOD CABINETRY CORP.**

By:_____
    Name:
    Title:

**The Assignor:**

_____
Name:

**The Assignee:**

_____
Name:
Title (if a representative):
Tax I.D. Number:

3

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT B**

Deadlock Notice

(attached)

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021



2 Grand Central Tower
140 East 45th Street, Suite 17A
New York, NY 10017

Marc L. Mukasey
Partner
212-466-6406
Marc.mukasey@mfsllp.com

February 1, 2021

**VIA E-MAIL**
Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204
Via email: mp@faubwood.com; mpfabu@gmail.com

Re: **Fabuwood Cabinetry Corp.**

Dear Mr. Panzer:

This firm is litigation counsel to Joel Epstein, a shareholder in Fabuwood Cabinetry Corp. ("the Company"). We write to advise you that Mr. Epstein seeks to end his business relationship with you, and to do so promptly.

At present, it is Mr. Epstein's fervent wish to resolve this matter amicably and without protracted adversarial proceedings. However, if you are unwilling to reach a swift resolution, we are prepared to commence legal action.

Accordingly, attached hereto, please find a Deadlock Notice and a Buyout Notice. Please attend to these documents immediately.

Time is of the essence. The window for an peaceful resolution is open, but it will close.

We reserve all our rights.

Very truly yours,

Marc L. Mukasey
Kenneth A. Caruso

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

February 1, 2021

**CONFIDENTIAL**

Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204
Via email: mp@faubwood.com; mpfabu@gmail.com

Re: Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("**Fabuwood**") and its Shareholders effective as of January 1, 2017 (the "**Shareholders Agreement**").  Capitalized terms used but not defined in this Deadlock Notice shall have the meanings ascribed to such terms in the Shareholders Agreement.

Dear Mr. Panzer:

This letter is sent pursuant to Section 2.05 (the "**Deadlock Provision**") of the Shareholders Agreement and serves as the **Deadlock Notice** thereunder.

As of the date hereof, you and I, in our capacity as Fabuwood Directors are in Deadlock as shown by our inability to reach a consensus on matters that qualify as Major Decisions under Section 2.04.

For instance, Section 2.04(b) provides that "any amendment of…any agreement or instruments to which Fabuwood is a party as a result of a previously implemented Major Decision, including any outstanding loan or credit agreements" is a Major Decision.

You have repeatedly told me that you are not willing to put $1 more in Fabuwood and that you are not willing to sign for any bank loans, including increasing the current amounts under Fabuwood's financing facility with Sterling National Bank (the "Sterling Credit Facility"), despite Fabuwood's cash flow problems during COVID-19.

Further, as of the date of this letter, you have not provided to Sterling your 2019 personal US Income Tax Return or your personal financial statements as required under the Sterling Credit Facility. Your failure and refusal to comply with your obligations under Sterling Credit Facility have exposed Fabuwood to default proceedings, giving Sterling the right to require full payment of Fabuwood's $45 million loan, which if it happens will result in bankruptcy not just for Fabuwood but also personally for both of us because we have personally guaranteed the full payment of the Sterling Credit Facility.  Your failure and refusal have also left Fabuwood unable to get additional funding amend its existing credit agreement so as to extend the term therein.

Your foregoing failure and refusal to agree to an amendment of the Sterling Credit Facility to allow for much needed cash infusion into Fabuwood and to so comply under the Sterling Credit Facility are each a Deadlock on a Major Decision under Section 2.05.

For another instance, Section 2.04(e) provides that "any transaction or matter involving the commitment or obligation of Fabuwood to make any expenditure…in excess of Fifty Thousand Dollars" is a Major Decision.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

I have approached you multiple times, both orally and in writing, regarding Fabuwood's commitment to participate in the KBIS 2021 virtual exhibition. You remain opposed to participation in that exhibition, while I firmly believe that Fabuwood must participate in KBIS 2021, as it has done in the prior years, so as to maintain its market position and its industry visibility. You have told me in my office that you want to be on record that you are totally against our participation in KBIS 2021. Neither of us can be persuaded to change his position with respect to this Major Decision.

In addition, and similarly, I have approached you multiple times, both orally and in writing, regarding the establishment of a partnership with Plywood Source for manufacturing operations in Mexico. To date, we have not agreed on what needs to be done, Fabuwood is running out of time and resources.

Each of the decisions relating to KBIS 2021 and the manufacturing operations in Mexico requires a commitment from Fabuwood in excess of Fifty Thousand Dollars. Each is, therefore, a Major Decision. And our disagreement over each is a Deadlock on a Major Decision under Section 2.05.

Accordingly, I hereby elect to exercise the Buyout Rights provided under Section 2.05. Attached hereto is the Buyout Notice as provided under Section 2.05(a).

In summary, I am offering to buy all of your shares in Fabuwood, consisting of 52.50% ownership interest therein (the "**Panzer Interests**"), for a purchase price of $143,000 per share or $15,015,000. I believe my offer is above the current fair market value of Fabuwood considering its current challenges. My offer is conditioned on your sale of your Fabuwood shares, free and clear of all liens and encumbrances.

Alternatively, you can buy all of my shares in Fabuwood, consisting of 36.50% ownership interest therein, for the same purchase price of $143,000 per share or $10,439,000.

My offer is a binding commitment and obligation on my part to buy from you, and a binding commitment and obligation on your part to sell to me, all of the Panzer Interests (the "**Buyout**") once you accept my offer, subject to the terms and conditions in the Buyout Notice. The other principal terms of my offer are set forth therein,

Very truly yours,

Joel Epstein

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT C**

Buyout Notice

(attached)

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Confidential**

February 1, 2021

Moshe Chaim Panzer
1626 47th St.
Brooklyn, NY 11204

Re: **Buyout Notice**[1]

Dear Mr. Panzer:

This letter serves as the Buyout Notice under Section 2.05(a) following the Deadlock Notice delivered to you on the date hereof.

I am offering (the "**Offer**") to purchase from you all of your ownership interests (the "**Panzer Interests**") in Fabuwood and its related entities, including but not limited to Fabuwood Marketing LLC, Fabusure LLC, Fabusure 112 Corp. and Intime Freight Logistics Corp. (together, the "**Fabuwood Entities**").

This Buyout Notice is a binding commitment and obligation on my part to buy from you, and a binding commitment and obligation on your part to sell to me, all of the Panzer Interests (the "**Buyout**") once you accept this Buyout Notice by signing your acceptance below, subject to the terms and conditions herein.

The principal terms of my Offer are as follows:

1.    Purchase Price for the Fabuwood Entities.  The Purchase Price is an amount equal to: (i) $143,000 per share or $15,015,000 in the aggregate (the "**Fabuwood Purchase Price**") for the 105 shares held by you, directly or indirectly, in Fabuwood (the "**Fabuwood Stock**"), which per share price is above the current market value of Fabuwood, plus (ii) the net book value of the assets held by the other Fabuwood Entities multiplied by the percentage of your ownership interests in such Fabuwood Entities (together the "**Purchase Price**").  The enterprise value of Fabuwood shall be deemed to include the net book value of Fabuwood Marketing LLC and Intime Freight Logistics Corp., which for the purposes of clause (ii) herein shall both be valued at zero.  My Offer assumes that the Fabuwood Stock and the other Panzer Interests will be transferred to me or my designee at the closing of the Buyout (the "**Closing**") free and clear of all liens, claims, and interests of any nature or kind whatsoever.

2.    Acceptance of Offer.  Concurrently with the execution, delivery and acceptance by you of my Offer and this Buyout Notice, you will execute and deliver the following:

---

[1] Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("**Fabuwood**") and its Shareholders effective as of January 1, 2017 (the "**Shareholders Agreement**").  Capitalized terms used but not defined in this Buyout Notice shall have the meanings ascribed to such terms in the Shareholders Agreement.

1

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(i)     The Voting Trust Agreement attached hereto (the "**Voting Trust Agreement**") whereby you agree to designate me as your proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote or act by written consent in your place effective as the date of your acceptance of this Buyout Notice; and

(ii)    Your resignation letter whereby you resign as director, officer and employee of all Fabuwood Entities (the "**Resignation Letter**").

3.     Good Faith Deposit.  No later than five (5) business days from the acceptance of this Buyout Notice, I will deposit $100,000 as a good faith deposit (the "**Deposit**") in an escrow account to be held by my counsel.  The Deposit will be applied to the Purchase Price at the Closing or returned to me, and I will have no further obligation to you whatsoever in the event the Closing does not occur due to the failure to satisfy the conditions set forth in Paragraph 4 herein.

4.     Conditions.  This Offer is subject to the following conditions:

(i)     You and I expressly agree that my obligation to pay the Purchase Price and otherwise consummate this Buyout Notice is fully conditioned on: (A) my obtaining an unconditional binding written commitment for acquisition financing, whether by way of debt financing, equity investment, or otherwise, on terms acceptable to me, in my sole and absolute discretion, (the "**Financing Contingency**") on or before the expiration of the 90 day period after your acceptance of my Offer (the "**Financing Period**"); and (B) the funding of such financing, on or before the Closing.

(ii)    An independent appraisal of Fabuwood has been performed by Mark S. Gottlieb and a copy of his appraisal report dated January 25, 2021 is available for your review.  Nevertheless, you may elect to require another independent appraisal of Fabuwood be made by a qualified independent appraiser of your choosing, at your expense, provided that such appraisal is completed and a report issued no later than February 22, 2021.  If you elect to exercise your option under this clause (ii) and the appraised value of the Fabuwood Stock, as determined by the enterprise value of Fabuwood resulting from such appraisal, exceeds or is less than the Fabuwood Purchase Price by at least five percent (5%), then the Fabuwood Purchase Price will be adjusted accordingly.  Your right under this clause (ii) will expire unless written notice of your election to exercise such right is received by me on or before February 10, 2021.  You agree that the Purchase Price is firm and not subject to adjustments other than as set forth in this Paragraph 4(ii).

(iii)   Sterling National Bank agrees to release you of your personal guaranty for the Fabuwood financing facility on or before the Closing (the "**Guaranty Release**").

(iv)    Your execution and delivery, at Closing, of a Confidentiality, Non-Compete, Non-Solicitation and Non-Disparagement Agreement, in a form acceptable to me, whereby you agree, directly or indirectly: (A) to keep confidential all non-public, confidential, trade and proprietary information of the Fabuwood Entities, (B) not to compete with the business of Fabuwood for two (2) years following the Closing, (C) not to hire or solicit any employee, independent contractor or agent to terminate or materially adversely change his, her or its employment or business relationships with Fabuwood, (D) not to solicit or encourage any present or future vendor, customer or supplier of Fabuwood to terminate or otherwise alter his, her or its relationship with Fabuwood and (E) not to

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM   INDEX NO. 654909/2021
NYSCEF DOC. NO. 12                                      RECEIVED NYSCEF: 08/13/2021

publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Fabuwood Entities, or their respective businesses, or any of their respective employees, officers, and existing and prospective clients, investors, and other associated third parties.

(v)     The continuing validity and enforcement of the Voting Trust Agreement until the Closing.

5.     <u>Proposed Definitive Agreement</u>.  As soon as reasonably practicable after the execution and delivery of this Buyout Notice, we will commence to negotiate a definitive purchase agreement and related documents (the "**Definitive Agreements**") relating to my acquisition of the Panzer Interests, to be drafted by my counsel.  The Definitive Agreements would provide for an effective date of January 1, 2021 for the Buyout and include the terms summarized in this Buyout Notice and such other representations, warranties, conditions, covenants, indemnities and other terms that are customary for transactions of this kind and are not inconsistent with the terms herein.

6.     <u>Time is of the Essence</u>.  Because of the challenges faced by Fabuwood, **time is of the essence** with respect to the Closing, which must occur no later than 30 days from the later of (i) the satisfaction of the Financing Contingency and (ii) the agreement by Sterling National Bank to release you from your personal guaranty as of the Closing.  If the Closing does not occur by such date, you agree that the Purchase Price shall be reduced by 10% for each week of delay.

7.     <u>Further Covenants</u>.  From the date of your acceptance to the Closing, you hereby agree, as follows:

(i)     to cooperate with Sterling National Bank or any other financial institution or lending entity in connection with any Fabuwood financing facility, which cooperation may include, without limitation, signing extensions of existing credit facilities and providing any and all personal information promptly, without delay, including but not limited to personal financial statements and income tax return requested by such lending entities;

(ii)     so as to keep our transaction confidential and avoid rumors that Fabuwood is closing and possible confusion of employees, sales representatives, customers, vendors and suppliers as to the management of Fabuwood, not to communicate or otherwise get in touch with, directly or indirectly, verbally, in writing or otherwise (including emails, whatsapp or text messages), any employee, independent contractor, sales representative, vendor, supplier, customer or other business relationship of Fabuwood for purposes of soliciting information regarding Fabuwood, its business, operations and property, offering advice as to Fabuwood, its business, operations and property or otherwise interfering with or discussing Fabuwood, its business, operations and property;

(iii)     to keep away from and avoid and not be present in any Fabuwood sponsored location, whether such location is temporary such as a location for a Fabuwood Sales Meeting or permanent, including but not limited to its offices and building at 69 Blanchard St., Newark, NJ 07105 and 99 Caven Point, Jersey City, NJ 07305; and

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

(iv)    keep confidential all non-public, confidential, trade or proprietary information of Fabuwood, whether oral, visual, written, electronic, other tangible or intangible form, and not use any such information except for the purpose of negotiations with respect to the Definitive Agreements.

8.    <u>Matrimonial Action</u>.  You agree that a portion of the Purchase Price will be paid and held in escrow to the extent required by your legal counsel for your current matrimonial action.  Other than as set forth in the foregoing sentence, you agree that your matrimonial action shall not have any other legal effect on the consummation of the Buyout.

9.    <u>Termination</u>.

(i)    This Buyout Notice will automatically terminate and be of no further force and effect upon the earlier of (A) our execution and delivery of the Definitive Agreements, or (B) our mutual agreement to terminate the Buyout Notice.

(ii)    In addition, you may terminate the Buyout Notice if (A) the Financing Contingency is not satisfied on the expiration of the Financing Period, or (B) the Guaranty Release does not occur at Closing.

(iii)    Upon the termination of this Buyout Notice pursuant to Paragraph 9(i)(B) or Paragraph 9(ii), then the Voting Trust Agreement will be deemed terminated and you will be restored to the positions named in the Resignation Letter, in each case, without further action from any of us.

10.    <u>Offer Expiration</u>.  This Buyout Notice will remain in effect until **12 Noon, February 10, 2021** unless accepted or rejected by you, or withdrawn by me prior to that time.

11.    <u>Buyout Right Under Section 2.05(a)</u>.  Upon your acceptance of my Offer and this Buyout Notice, you hereby agree and acknowledge that you have chosen not to exercise your Buyout Right Under Section 2.05(a) of the Shareholders Agreement.

12.    <u>Confidentiality</u>. This Buyout Notice is confidential and may not be disclosed to any third party without our consent except to our advisors and agents to the extent needed to advise us in the transactions contemplated herein and who agree to keep such information confidential.

13.    <u>Expenses</u>. Except for the independent appraisal fees as set forth in Paragraph 4(ii), we will each pay our own transaction expenses, including the fees and expenses of our advisors, incurred in connection with this Buyout Notice.

14.    <u>BINDING AGREEMENT</u>. **THIS BUYOUT NOTICE REFLECTS OUR INTENTIONS WITH RESPECT TO THE BUY-OUT AND SHALL BE LEGALLY BINDING AND ENFORCEABLE OBLIGATION ON US.  WE AGREE THAT THE DEFINITIVE AGREEMENTS WILL PROVIDE TERMS TO SUPPLEMENT THE TERMS OF THE BUYOUT BUT THAT THERE HAS BEEN A MEETING OF THE MINDS BETWEEN US WITH RESPECT TO THE MATERIAL TERMS OF THE BUYOUT.**

15.    <u>Miscellaneous</u>. This Buyout Notice may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Buyout Notice shall be governed by and construed in accordance with internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York.  Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than us and our successors or assigns, any rights or remedies under or by reason of this Buyout Notice.

[signature page immediately follows]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

I hope you find the terms of this Buyout Notice acceptable.

Very truly yours,

_____
Joel Epstein

Agreed:

_____
Moshe Chaim Panzer

State of New York          )
                           ) ss.:
County of _____ )

On the _____day of February in the year 2021, before me, the undersigned notary public, personally appeared Moshe Chaim Panzer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## Voting Agreement

This Voting Agreement (this "**Agreement**"), dated as of February ___, 2021, is entered into by and between the undersigned stockholders of Fabuwood Cabinetry Corp., a New York corporation (the "**Company**").

WHEREAS, concurrently with or following the execution of this Agreement, Michael Panzer ("**Panzer**") has accepted the offer of Joel Epstein ("**Epstein**") to purchase all of Panzer's ownership interests in the Company and its related entities pursuant to the binding Buyout Notice between Panzer and Epstein dated of February 1, 2021 (the "**Buyout Notice**"); and

WHEREAS, as a condition to Panzer's acceptance of the Buyout Notice, Epstein has required that Panzer, and Panzer has agreed to, execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth below and for other good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.     <u>**Definitions.**</u> For purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Buyout Notice.

2.     <u>**Representations of Panzer.**</u> Panzer represents and warrants to Epstein that:

    (a)     **Ownership of Fabuwood Stock**. Panzer: (i) is the beneficial owner of all of the Fabuwood Stock free and clear of any proxy, voting restriction, adverse claim, or other liens, other than those created by this Agreement or under applicable federal or state securities laws; and (ii) has the sole voting power over all of the Fabuwood Stock. Except pursuant to this Agreement, there are no options, warrants, or other rights, agreements, arrangements, or commitments of any character to which Panzer is a party relating to the pledge, disposition, or voting of any of the Fabuwood Stock and there are no voting trusts or voting agreements with respect to the Fabuwood Stock.

    (b)     **Power and Authority; Binding Agreement.** Panzer has full power and authority and legal capacity to enter into, execute, and deliver this Agreement and to perform fully Panzer's obligations hereunder (including the proxy described in Section 3 below). This Agreement has been duly and validly executed and delivered by Panzer and constitutes the legal, valid, and binding obligation of Panzer, enforceable against Panzer in accordance with its terms except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

    (c)     **No Conflict.** The execution and delivery of this Agreement by Panzer does not, and the consummation of the transactions contemplated hereby and the compliance with the provisions hereof will not, conflict with or violate any law applicable to Panzer or result in any breach of or violation of, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration, or cancellation of, or result in the creation of any lien on any of the Fabuwood Stock pursuant to, any agreement or other instrument or obligation binding upon Panzer or any of the Fabuwood Stock.

    (d)     **No Consents.** No consent, approval, order, or authorization of, or registration, declaration, or filing with, any governmental entity or any other person or entity on the part of Panzer is required in connection with the valid execution and delivery of this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

(e)      **No Litigation.** There is no action, suit, investigation, or proceeding (whether judicial, arbitral, administrative, or other) pending against, or, to the knowledge of Panzer, threatened against or affecting, Panzer that could reasonably be expected to materially impair or materially adversely affect the ability of Panzer to perform Panzer's obligations hereunder or to consummate the transactions contemplated by this Agreement on a timely basis.

**3.      Irrevocable Proxy.**  Panzer hereby appoints Epstein and any designee of Epstein, and each of them individually, his proxies and attorneys-in-fact, with full power of substitution and resubstitution, to vote or act by written consent, in Epstein's sole and absolute discretion, during the term of this Agreement with respect to the Fabuwood Stock in any matter submitted to the vote of stockholders of the Company and for any action or matter that requires Panzer's consent or action in his capacity as a Company stockholder under any agreement, including but not limited to the Amended and Restated Shareholders Agreement between the Company and its stockholders dated November 10, 2017 and the Settlement Agreement between Panzer and Epstein dated November 10, 2017.  This proxy and power of attorney is given to secure the performance of the duties and obligations of Panzer under the Buyout Notice and to further the purposes of the Buyout Notice.  Panzer shall take such further action or execute such other instruments as may be necessary to effectuate the intent of this proxy.  This proxy and power of attorney granted by Panzer shall be irrevocable during the term of this Agreement, shall be deemed to be coupled with an interest sufficient in law to support an irrevocable proxy, and shall revoke any and all prior proxies granted by Panzer with respect to the Fabuwood Stock.  The power of attorney granted by Panzer herein is a durable power of attorney and shall survive the bankruptcy, death, or incapacity of Panzer.  The proxy and power of attorney granted hereunder shall terminate upon the termination of this Agreement.

**4.      No Voting Trusts or Other Arrangement.**  Panzer agrees that during the term of this Agreement Panzer will not, and will not permit any entity under Panzer's control to, deposit any of the Fabuwood Stock in a voting trust, grant any proxies with respect to the Fabuwood Stock, or subject any of the Fabuwood Stock to any arrangement with respect to the voting of the Fabuwood Stock other than agreements entered into with Epstein.

**5.      Transfer and Encumbrance.**  Panzer agrees that during the term of this Agreement, Panzer will not, directly or indirectly, transfer, sell, offer, exchange, assign, pledge, convey any legal or beneficial ownership interest in or otherwise dispose of, by operation of law, or otherwise, or encumber ("**Transfer**") any of the Fabuwood Stock or enter into any contract, option, or other agreement with respect to, or consent to, a Transfer of, any of the Fabuwood Stock or Panzer's voting or economic interest therein. Any attempted Transfer of Fabuwood Stock or any interest therein in violation of this Section 5 shall be null and void.

**6.      Additional Fabuwood Stock.**  Panzer agrees that all shares of the Company that Panzer purchases, acquires the right to vote, or otherwise acquires beneficial ownership of after the execution of this Agreement and prior to Closing Time shall be subject to the terms and conditions of this Agreement and shall constitute Fabuwood Stock for all purposes of this Agreement.

**7.      Termination.**  This Agreement shall terminate upon the termination of the Buyout Notice. Nothing in this Section 7 shall relieve or otherwise limit the liability of any party for any intentional breach of this Agreement prior to such termination.

**8.      Further Assurances.**  Panzer agrees, from time to time, and without additional consideration, to execute and deliver such additional proxies, documents, and other instruments and to take all such further action as Epstein may reasonably request to consummate and make effective the transactions contemplated by this Agreement.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

9.     **Specific Performance.**  Panzer hereto acknowledges that it will be impossible to measure in money the damage to Epstein if Panzer fails to comply with any of the obligations imposed by this Agreement, that every such obligation is material and that, in the event of any such failure, Epstein will not have an adequate remedy at law or damages. Accordingly, Panzer agrees that injunctive relief or other equitable remedy, in addition to remedies at law or damages, is the appropriate remedy for any such failure and will not oppose the seeking of such relief on the basis that Epstein has an adequate remedy at law.  Panzer agrees that it will not seek, and agrees to waive any requirement for, the securing or posting of a bond in connection with Epstein's seeking or obtaining such equitable relief.

10.     **Miscellaneous.**  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. This Agreement shall be governed by and construed in accordance with internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York.  Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than us and our successors or assigns, any rights or remedies under or by reason of this Agreement.

[SIGNATURE PAGE FOLLOWS]

3

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first written above.

_____

JOEL EPSTEIN

_____

MOSHE CHAIM PANZER

Number of Fabuwood Stock Beneficially Owned as of the date of this Agreement: 105 shares

Street Address:  1626 47th St.

City/State/Zip Code:  Brooklyn, NY 11204

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT D**

Respondent's Response

(attached)

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# HERRICK

**Avery S. Mehlman**
Partner
Phone: 212.592.5985
Fax: 212.545.3424
amehlman@herrick.com

February 9, 2021

**FEDEX OVERNIGHT DELIVERY AND EMAIL**

Marc L. Mukasey, Esq.
Mukasey Frenchman & Sklaroff, LLP
2 Grand Central Tower
140 East 45th Street, Suite 17A
New York, New York 10017
Marc.mukasey@mfsllp.com

Joel Epstein
8 Frankfurt Road, Unit 301
Monroe, New York 10950
Email: joele@fabuwood.com

Re: Amended and Restated Shareholders Agreement among Fabuwood Cabinetry Corp. ("Fabuwood") and its Shareholder effective as of January 1, 2017 (the "Shareholders Agreement")[1]

Dear Mr. Mukasey:

Please be advised that this law firm is counsel for Moshe Chaim Panzer. We are in receipt of your letter to Mr. Panzer dated February 1, 2021, as well as Mr. Epstein's purported Deadlock Notice, Buyout Notice and Voting Agreement.

As an initial matter, Mr. Panzer objects to the Deadlock Notice because, *inter alia*, no Deadlock has occurred. Mr. Panzer further objects to the purported Buyout Notice as being abjectly improper under the terms of the Shareholder Agreement. Among other things, because there is no Deadlock, then no party has the right to exercise his Buyout Rights. Moreover, pursuant to Section 2.05 of the Shareholder Agreement, a Buyout Notice may only be issued if, *inter alia*, an Independent Appraiser is retained by Fabuwood's Board and issues an appraisal report that determines the fair market value of the Buyout Shares. That has not happened. Thus, the even if there were a Deadlock (which there is not), the Buyout Notice would be premature.

Procedural defects aside, the substance of the Buyout Notice is contrary to the plain language of the Shareholder Agreement. Among other defects, Mr. Epstein's offer to purchase Mr. Panzer's shares of the Company according to the fair market value determined by an alleged appraisal commissioned by Mr. Epstein is not a "Buyout Right." Accordingly, Mr. Epstein is not

---

[1] Capitalized terms have the meanings ascribed to them in the Shareholders Agreement.

**HERRICK, FEINSTEIN LLP** ● Two Park Avenue ● New York, NY 10016 ● Phone: 212.592.1400 ● Fax: 212.592.1500

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021



February 9, 2021
Page 2

exercising his Buyout Rights under the Shareholder Agreement, and Mr. Panzer objects to Mr. Epstein's attempt to label his proposal a Buyout under Section 2.05.

And to the extent that the Buyout Notice and Voting Agreement constitute an offer to purchase Mr. Panzer's shares of Fabuwood, that offer is rejected. The fair market value of a Fabuwood shares is far greater than $143,000.

In sum, Mr. Panzer objects to the Deadlock Notice, the Buyout Agreement, and Voting Agreement, and rejects all offers contained therein. Mr. Epstein's attempt to label his lowball offer a "Buyout" is not a good faith attempt to amicably resolve whatever dispute may exist between the parties. It is a willful misapplication of the terms of the Shareholder Agreement and does nothing to further a peaceful resolution.

Nothing herein shall be interpreted as a waiver of any kind; Mr. Panzer reserves all rights and remedies available to him in law or equity.

Very truly yours,

*/s/ Avery S. Mehlman*

Avery S. Mehlman

cc:      Avi Lew, Esq.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT E**

Gottlieb Appraisal Report

(attached)

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021



# BUSINESS VALUATION REPORT

## FABUWOOD CABINETRY CORP

*Prepared For*

Mr. Joel Epstein

January 25, 2021

MARK S. GOTTLIEB, CPA, PC
1430 BROADWAY, SUITE 902
NEW YORK, NEW YORK 10018



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**Copyright Notice**

All rights reserved. No part of this report, including its format, may be reproduced, distributed, or transmitted in any form or by any means, including photocopying, recording, or other electronic or mechanical methods, without the prior written permission of this firm. For permission requests, write to the supervising analyst at the indicated address.

MARK S. GOTTLIEB, CPA, PC
1430 BROADWAY, SUITE 902
NEW YORK, NEW YORK 10018



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# TRANSMITTAL LETTER

January 25, 2021

Mr. Joel Epstein
c/o Fabuwood Cabinetry Corp
69 Blanchard Street
Newark, New Jersey 07105

Dear Mr. Epstein:

We have performed a valuation analysis to estimate the fair market value of a single share of stock in Fabuwood Cabinetry Corp on a controlling, non-marketable, and going concern basis as of September 30, 2020. The valuation has been performed for management planning purposes and may not be distributed or used for any other purpose without the express written consent of this firm.

This is a Summary Report which is intended to comply with the reporting requirements set forth by the American Institute of Certified Public Accountants ("AICPA") under Statement on Standards for Valuation Services ("SSVS"), Uniform Standards of Professional Appraisal Practice ("USPAP") promulgated by the Appraisal Foundation, and the business valuation standards of the National Association of Certified Valuation Analysts ("NACVA"). The depth of discussion contained in this report is specific to the needs of the client and the report's intended use.

Based upon our analysis described herein and the facts and circumstances as of the valuation date, the fair market value of a single share in Fabuwood Cabinetry Corp on a controlling, non-marketable and going concern basis is:

| | | |
|---|---|---|
| Valuation on a controlling, non-marketable, & going concern basis | $ | 28,531,904 |
| Number of shares issued and outstanding | | 200 |
| Value per share | | 142,660 |
| **Rounded** | **$** | **143,000** |
| | | |

This estimate of value resulting from this engagement is expressed as a conclusion of value and is subject to Assumptions and Limiting Conditions included herein. If you have any questions regarding these matters, please feel free to contact our office at 646-661-3800.

Respectfully Submitted By:

*Mark S. Gottlieb*

_____
Mark S. Gottlieb
Cpa/Abv/Cff, Asa , Cva, Cba, Mst

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................... 1

SOURCES OF INFORMATION ........................................................................................................ 2

Background ........................................................................................................................................ 3
Products & Services ......................................................................................................................... 4
Customer Base .................................................................................................................................. 4
Competition ....................................................................................................................................... 5
Operations ......................................................................................................................................... 6

SUBJECT COMPANY HIGHLIGHTS .............................................................................................. 8

Organization & History .................................................................................................................... 8
Operations ......................................................................................................................................... 9
Related Parties .................................................................................................................................. 9

FINANCIAL PERFORMANCE .......................................................................................................... 12

Balance Sheet ................................................................................................................................... 12
Income Statement ............................................................................................................................ 14

OPERATIONAL & FINANCIAL OBSERVATIONS ......................................................................... 17

General Observations ...................................................................................................................... 17
SWOT Analysis ................................................................................................................................. 18
Porter's 5 Forces .............................................................................................................................. 20

FINANCIAL STATEMENT ADJUSTMENTS ................................................................................... 23

Normalization Adjustments ............................................................................................................. 23

VALUATIONS STANDARD, PREMISE & APPROACHES CONSIDERED ................................... 24

Standard of Value ............................................................................................................................. 24
Premise of Value ............................................................................................................................... 24
Valuation Approaches Considered ................................................................................................. 25

   Asset-Based Approach .................................................................................................................. 25

   Market Approach ............................................................................................................................ 26

   Income Approach ........................................................................................................................... 27

VALUATION DISCOUNTS ................................................................................................................ 29


Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# TABLE OF CONTENTS

DISCOUNT FOR LACK OF CONTROL .................................................................................................................... 29

DISCOUNT FOR LACK OF MARKETABILITY ............................................................................................................. 29

VALUATION CONCLUSION ............................................................................................................................. 30

APPENDIX 1 – ASSUMPTIONS & LIMITING CONDITIONS ......................................................................................... 31

APPENDIX 2 – VALUATION CERTIFICATION ........................................................................................................ 32

APPENDIX 3 – ECONOMIC OVERVIEW .............................................................................................................. 33

APPENDIX 4 – DOCUMENT INVENTORY ............................................................................................................. 34

APPENDIX 5 – ANALYST'S QUALIFICATIONS ...................................................................................................... 36

EXHIBIT 1 - HISTORICAL BALANCE SHEETS ...................................................................................................... 37

EXHIBIT 2 - HISTORICAL BALANCE SHEETS - COMMON SIZE .................................................................................. 38

EXHIBIT 3 - HISTORICAL BALANCE SHEETS - GROWTH ANALYSIS .............................................................................. 39

EXHIBIT 4 - HISTORICAL INCOME STATEMENTS .................................................................................................. 40

EXHIBIT 5 - HISTORICAL INCOME STATEMENTS - COMMON SIZE ............................................................................... 41

EXHIBIT 6 - HISTORICAL INCOME STATEMENTS - GROWTH ANALYSIS .......................................................................... 42

EXHIBIT 7 - ADJUSTED BALANCE SHEETS ........................................................................................................ 43

EXHIBIT 8 - COMPUTATION OF NET WORKING CAPITAL REQUIREMENT ........................................................................ 44

EXHIBIT 9 - COMPUTATION OF NORMALIZED WEIGHTED AVERAGE AFTER-TAX CASH FLOW FROM OPERATIONS ........................... 45

EXHIBIT 10 - COMPUTATION OF DISCOUNT & CAPITALIZATION RATES ......................................................................... 46

EXHIBIT 11 - COMPUTATION OF WEIGHTED AVERAGE COST OF CAPITAL ...................................................................... 47

EXHIBIT 12 - COMPUTATION OF FORECASTED CASH FLOWS .................................................................................... 48

EXHIBIT 13 - COMPUTATION OF INDICATED VALUE BASED UPON DISCOUNTED CASH FLOWS ................................................ 49

EXHIBIT 14 - COMPUTATION OF INDICATED VALUE BASED UPON METHODOLOGIES SELECTED ............................................... 50



MARK S. GOTTLIEB, CPA, PC
1430 BROADWAY, SUITE 902
NEW YORK, NEW YORK 10018



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# INTRODUCTION

We have been retained as an expert to estimate the fair market value of a 100.0% equity interest in Fabuwood Cabinetry Corp.  The following summarizes our assignment:

| | |
|---|---|
| **Client Identification** | Fabuwood Cabinetry Corp. |
| **Purpose/Intended Use of Report** | Management planning. |
| **Subject Of Valuation** | Fabuwood Cabinetry Corp. |
| **Interest % To Be Valued** | 100.0% equity interest. |
| **Ownership Characteristics** | Closely-held. |
| **Valuation Date** | September 30, 2020. |
| **Report Date** | January 25, 2021. |
| **Report Type** | Summary. |
| **Premise Of Value** | Going concern. |
| **Standard Of Value** | Fair market value. |
| **Assumptions & Limiting Conditions** | See Appendix. |
| **Restrictions/Limitations In The Scope of Work Or Data Available** | None. |
| **Use Of Hypothetical Conditions** | None. |
| **Use Of Specialist** | None. |
| **Disclosure Of Subsequent Events** | None. |
| **Any Jurisdictional Exceptions** | None. |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SOURCES OF INFORMATION

| | |
|---|---|
| Date Of Field Visit | Not required, analysis performed during Covid. |
| Name & Position of Individual(s) Interviewed | Peri Friedman, Peter Nunez, and Joel Epstein. |
| Business Valuation Questionnaire Completed By | Peri Friedman. |
| Accounting Information Obtained | See Appendix 4. |
| Business Income Tax Returns | See Appendix 4. |
| Individual Income Tax Returns | See Appendix 4. |
| Industry Data | Integra (NAICS 337110); First Research (NACIS 321911) |
| Market Data | www.sec.gov |
| Economic Data | US Economy In A Snapshot, September 30, 2020, Published By The Federal Reserve Bank of New York, Research & Statistics Group. |
| Other Relevant Documents | See document index and resources used within Appendix 4. |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT INFORMATION

| Background | |
|---|---|
| Legal Name / Doing Business As, If Applicable | Fabuwood Cabinetry Corp (hereafter, "FCC" or the "Company"). |
| Address | 69 Blanchard Street Newark, New Jersey 07105. |
| Phone Number | (201) 432-6555. |
| Website Address | www.fabuwood.com. |
| Type of Entity | Domestic Business Corporation. |
| Date Business Organized | • September 4, 2008 as Woodstone Cabinetry Corp.<br>• February 3, 2009 renamed Fabuwood Cabinetry Corp. |
| State Incorporated | New York. |
| Number of Common Shares Authorized / Par Value | 200 Shares / No Par. |
| Number of Shares Issued & Outstanding | 200 Shares. |
| Number of Treasury Shares Issued & Outstanding | Not applicable. |
| Owners & Their Percentage of Ownership | • Moshe C. Panzer, 52.5%.<br>• Joel Epstein, 36.5%.<br>• Joel Weinstein, 5.0%.<br>• Raizy Freund, 6.0%. |
| Related Parties, If Applicable | See narrative herein. |
| Key Dates & Events | • Expansion to new facility in Newark, New Jersey in 2018.<br>• Switch to Vietnamese manufacturer in 2019. |
| | |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT INFORMATION

| Products & Services | |
|---|---|
| Description Of Products & Services | Manufacturer of kitchen cabinets, bathroom vanities, and accessories. |
| How are Products Or Services Used | Products are primarily sold through exclusive dealers to end consumer. |
| Composition of Customer Base | Various kitchen and bath retailers and contractors. |
| Most Significant Product or Service | Kitchen cabinets. |
| Diversification Of Product Line | Constantly developing new lines of kitchen/bath cabinets, and accessories. |
| Diversification Of Customer Base | Dealers are located throughout the United States. |
| Competitive Advantages | Brand, quality, price point. |
| Competitive Disadvantages | • Reliance on products imported from abroad.<br>• Vulnerable to US government legislation.<br>• Import lead time. |
| Are Products Proprietary? | Yes. |
| Are Sales Cyclical Or Seasonal? | No. |
| Industry Trends That May Affect Sales | • Ready to Assemble ("RTA") products are becoming widely available, but make importing, assembly, and quality control problematic.<br>• Customer material preference.<br>• Development of new colors. |
| | |
| Customer Base | |
| Customer Concentration | The largest six dealers comprise approximately 10.0% of annual sales. |
| Key Features To Acquire Customers | • Trade shows. |





MSG Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT INFORMATION

| | |
|---|---|
| | • Website. |
| | • Community of sales representatives. |
| **Pricing Policies** | Prices vary according to supply and demand, as well as the competitive environment. |
| **Sales & Credit Terms** | • Cash on delivery or net 30 days. |
| | • Accounts receivable are insured. |
| **Source of Business** | Customer relationships and online presence. |
| | |
| **Competition** | |
| **Name & Address Of Major Competitors** | • American Woodmark Corporation (NASDAQ: AMWD) 561 Shady Elm Road, Winchester, Virginia. |
| | • Fortune Brands (NYSE: FBHS) 520 Lake Cook Road Suite 300, Deerfield, IL. |
| | • Masco Corp. (NYSE: MAS) 17450 College Parkway, Livonia, Michigan. |
| | • MasterBrands Cabinets, Inc. /Mantra Cabinets (Private Company-Subsidiary of Fortune Brands) P.O. Box 420, Jasper, IN. |
| | • Waypoint Living Spaces. (Private Company Subsidiary of American Woodmark) located in Winchester, Virginia. |
| | • Wolf Home Products (Private Company) located in York, PA. |
| | • CNC Cabinetry (Private Company) located in South Plainfield, New Jersey. |
| **Size of Subject When Compared To Its Competitors** | There is one very large publicly-held company (Fortune Brands), which owns several brands that compete directly with FCC (Aristokraft Cabinets, Decorá, |


Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## SUBJECT INFORMATION

| | |
|---|---|
| | Diamond, Mastercraft, Omega Cabinetry, Woodcrafters and other).  In addition, big box stores such as Lowes and Home Depot also sell similar products. |
| **Ease Of Entering The Industry & Market** | There are significant barriers to entry, requiring: <br>• Capital. <br>• Relationships with manufacturers. <br>• Relationships with dealers. |
| | |
| **Operations** | |
| **Total Full-Time Equivalent Employees** | Approximately 749. |
| **Most Significant Managers/Employees Other Than Aforementioned Owners** | Approximately 25 managers, 150 people assemble the products, 25 people are involved in the IT process.  Other employees are warehouse, sales, administrative and other. |
| **Issues Regarding Acquiring Employee Base** | The workforce is non-union. |
| **Description & Condition Of Business Facilities** | The Company's main site located in Newark, New Jersey recently underwent an expansion to 700,000 square feet. Facilities are leased from an unrelated party and is long term. |
| **Other Issues Affecting Operations** | Relationships with foreign suppliers are vital to the business. |
| **Management's Future Expectations, Goals & Objectives** | To develop a more diverse client base without jeopardizing their existing relationships. |
| **Management Depth & Competence** | The Company's management team is professional and actively involved. Key operational decisions are made by Joel Epstein.  Moshe C. Panzer is responsible for the relationships with suppliers overseas. |
| **Product & Customer Diversification** | See above. |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT INFORMATION

| Business Risks | • Trade impasses between the United States Government and China creates additional risk as plants are expected to move to different countries. |
| --- | --- |
| | • US Trade Representative office recently deemed Vietnam a currency manipulator.  This may increase tariffs and taxes from products sourced from same. |
| | • Business is cyclical as it is dependent on consumer spending. |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT COMPANY HIGHLIGHTS

### Organization & History

Fabuwood Cabinetry Corp was incorporated on September 4, 2008 as Woodstone Cabinetry Corp ("Woodstone"). It later registered in the State of New Jersey in December 2009 and changed its name to Fabuwood on February 3, 2009. The Company is formed as a Domestic Business Corporation under the auspices of the State of New York for the purpose of manufacturing and distributing kitchen cabinets. Its founding shareholder, Moshe C. Panzer, started the business to address quality concerns of cabinets sourced from China – which he sold in another business.

Joel Epstein operated a similar company in New Jersey. Mr. Epstein merged with FCC in 2009 in exchange for an equity interest. As the business grew, Messer's. Panzer and Epstein's ownership was diluted to allow key employees a minority interest.

On July 1, 2009 the Company elected to be treated as an S-Corporation, as such for federal and state income tax purposes its net income is reported and taxed on its shareholders individual income tax returns. Said returns are prepared on a calendar year-end, utilizing the accrual basis of accounting.

Effective January 1, 2017, the Company amended its shareholder agreement to reallocate it shares amongst it shareholders.

The following is a condensed summary of the shareholder's as of the valuation date.

| Name | Duties |
|------|--------|
| **Moshe C. Panzer**<br><br>Prior to forming the Company, Mr. Panzer was actively involved in Empire State Supply Corporation, a business dedicated to supplying building maintenance products to apartment building operators. As of the valuation date, Mr. Panzer owns a 52.5% interest in Fabuwood. | • Chief Executive Officer (CEO) responsible for maintaining and developing supplier relationships and oversee the quality of the products imported. |
| **Joel Epstein**<br><br>Prior to becoming a shareholder, Mr. Epstein operated a cabinetry company based in New Jersey. This customer base was merged into FCC in exchange for a 30.0% interest. As of the valuation, Mr. Epstein owns a 36.5% interest in Fabuwood. | • Chief Operating Officer (COO) responsible for management of the Company's operations. |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT COMPANY HIGHLIGHTS

| Joel Weinstein | • Product purchasing. |
|---|---|
| Mr. Weinstein previously worked with Mr. Panzer at Empire State Supply Corporation. As of the valuation date, Mr. Weinstein owns a 5.0% interest. | |
| **Raizy Freund** | • No day-to-day functions in the business. |
| As of the valuation date, Mr. Freund owns a 6.0% interest. | |

## Operations

Historically, the Company imported kitchen cabinetry in ready to assemble ("RTA") form from eight (8) to ten (10) suppliers located in China.  However, in 2019 the Company began to source its products from manufacturers in Vietnam. Inventory is shipped to their New Jersey premises in "flat packs" and assembled for sale. In recent years the cabinet hardware is upgraded upon assembly to be more competitive with higher end products.  After assembly, the products are shipped to the dealers and contractors located throughout the United States and Canada. FCC's receivables are insured to avoid material collection issues and losses.

FCC occupies approximately 700,000 square feet located at 69 Blanchard Street in Newark, New Jersey used for warehousing, assembly, administrative offices, and showroom.  These premises are rented from an unrelated party at market rent. In addition to its shareholders, the Company employs approximately 749 full-time employees. The assembly and shipping process are labor intensive and requires various types of machinery and equipment.

## Related Parties

The following related party entities have been identified as of the valuation date.

| Entity Name | Address | Business Description |
|---|---|---|
| **Fabusure, LLC** | 69 Blanchard Street Newark, New Jersey 07105 | Holding company that holds life insurance policies paid to Oxford Insurance Company.  Incorporated May 4, 2012. |
| **Fabusure 111** | 69 Blanchard Street Newark, New Jersey 07105 | Owner of captive insurance. Incorporated July 12, 2013. |
| **Fabusure 112** | 69 Blanchard Street Newark, New Jersey 07105 | Owner of captive insurance. Incorporated July 12, 2013. |



Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT COMPANY HIGHLIGHTS

| | | |
|---|---|---|
| **Fabuwood Marketing, LLC** | 69 Blanchard Street<br>Newark, New Jersey 07105 | Holder of Fabuwood Cabinetry Trademark. Incorporated December 30, 2011. |
| **FCC Sales Corp** | 69 Blanchard Street<br>Newark, New Jersey 07105 | Receives sales commissions from FCC.  Incorporated December 31, 2012. |
| **Fabuwood Cabinetry NJ, LLC** | 69 Blanchard Street<br>Newark, New Jersey 07105 | Incorporated August 24, 2018. |
| **Fabuwood New Jersey, LLC** | 69 Blanchard Street<br>Newark, New Jersey 07105 | Incorporated August 22, 2018. |
| **Fabuwood NJ LLC** | 69 Blanchard Street<br>Newark, New Jersey 07105 | Incorporated August 22, 2018. |

The above entities are not subsidiaries of FCC, and thus not included in this valuation. If valued, the above entities are subjects of separate valuation reports.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# SUBJECT COMPANY HIGHLIGHTS

The following organization chart provides a condensed illustration of FCC's current shareholders and its most significant employees.





FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# FINANCIAL PERFORMANCE

As part of our due diligence, we analyzed the financial position and performance of FCC over the five years ending December 31, 2019 (the "analyzed period"). This financial information was obtained from the subject's accrual basis financial statements. Our analysis further was supplemented by discussions with management, which enhanced our understanding of the business. The following provides a condensed summary of same.

## Balance Sheet



### Assets

- Total assets as of December 31, 2019 are reported at $72,562,918, which approximates the prior year balance of $73,985,017.

- During the analyzed period, total assets are reported from $33,910,989 (2016) to $73,985,017 (2018).

- Assets are primarily comprised of accounts receivable, inventory, and net fixed assets.



### Liabilities

- Total liabilities as of December 31, 2019 are reported at $51,392,795, a 5.3% decrease from the prior year balance of $54,249,709.

- This decrease is primarily attributable to an decrease in accrued expenses.

- During the analyzed period, total liabilities ranges from $17,522,679 (2016) to $54,249,709 (2018).

- Total liabilities are primarily comprised of interest bearing debt.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL PERFORMANCE



**Equity**

- As of December 31, 2019 equity is reported at $21,170,123, a 7.3% increase from the prior year balance of $19,735,308.

- This increase is primarily due to 2019 net profit of $7,615,517.



**Distributions**

- In December 31, 2019 distributions are reported at $6,180,702, a 112.4% increase from the prior year distributions of $2,909,979.

- Distributions during the analyzed period range from $2,909,979 (2018) to $11,014,092 (2016).



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL PERFORMANCE

**Income Statement**



**Net Revenues**

- FCC reports net revenues of $165,910,184 in the year ended December 31, 2019.

- This amount represents a 12.5% increase from the prior year's net revenues of $147,488,663.

- During the analyzed period, net revenues are reported from $79,194,199 (2015) to $165,910,184 (2019).



**Gross Profits**

- FCC reports gross profits of $57,390,604 in the year ended December 31, 2019.

- This amount represents a 16.9% increase from the prior year's gross profits of $49,102,693.

- During the analyzed period gross profit margins range from 33.3% (2018) to 40.0% (2017).

- The average gross profit margin over the analyzed period is 36.2%.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL PERFORMANCE



**Operating Expenses**

- FCC reports operating expenses of $49,449,982 in the year ended December 31, 2019, which are primarily comprised of salaries, shipping, and trucking.

- This amount represents a 9.0% increase from the prior year's total of $45,381,968.

- Operating expenses, as a percentage of revenues, range from 22.4% (2015) to 30.8% (2019) and averages 27.3% over the analyzed period.



**Officer Compensation**

- FCC reports officer compensation of $1,410,705 in the year ended December 31, 2019.

- This amount represents a 18.6% decrease from the prior year's amount of $1,733,081.

- During the analyzed period officer compensation ranges from $903,018 (2015) to $1,733,081 (2018).



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL PERFORMANCE



**Earnings Before Interest, Taxes, Depreciation & Amortization (EBITDA)**

- FCC reports EBITDA of $11,122,427 in December 31, 2019, a 140.4% increase from the prior year's amount of $4,624,932.

- During the analyzed period EBITDA (as a percentage of revenues) ranges from 3.1% (2018) to 13.9% (2016).

- As a percentage of gross revenues, EBITDA is reported at 6.7% for year ending December 31, 2019.

**Net Income**

- FCC reports net income of $7,615,517 in December 31, 2019, a 105.1% increase from the prior year net income of $3,713,946.

- During the analyzed period net income (as a percentage of revenues) ranges from 2.5% (2018) to 12.5% (2016).

- As a percentage of net revenues, net income is reported at 4.6% in the year ending December 31, 2019.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

As a result of the aforementioned company and financial analyses we observed a number of issues that influenced our understanding of the Company. The following provides a condensed summary of same.

## General Observations

- FCC reported gross sales of $139,841,417 for the twelve months ending September 30, 2020.

- During the period analyzed, the Company's compound annual growth for net revenues is 26.1%. Management has represented that this increase is a result of dealer expansion. Outside of the effects of Covid, management expects reasonable growth as the business matures.

- The Company's 2019 EBITDA to net revenue margin is 6.7%.

- Ending inventory at December 31, 2013 per the review financial statements is $8,064,889. Beginning inventory for 2014 per the audited financial statement is $10,955,844. The difference of $2,890,955 is illustrated in the 2014 historical income statement within Cost of Sales as "Inventory Restatement." This only impacts compounded annual growth rates for the analyzed period.

- Total debt for the year ended 2019 is $35,151,616, which consists of a line of credit of $17,887,913, and term notes with current and long-term maturities of $4,630,016 and $12,633,687 respectively. Recorded debt is reported at 60.4% of total capital.

- As of the year ended 2019 Stockholder loans are stated at $51,982. These loans and amounts due are unsecured, due on demand, and bear no interest.

- The Company sells merchandise to an affiliated entity under common ownership. Sales to the affiliated entity during 2019 amounted to $733,401 of which $227,746 was outstanding at December 31, 2019.

- The Company advanced a short-term interest free loan to a related entity. The total balance of the loan as of December 31, 2019 is $109,451.

- Stockholders contributed additional paid in capital of $500,000 in 2018 and $673,828 in 2017.

- Officer compensation as a percentage of net revenue averaged 1.0%, which approximates the industry peer group.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

- Discretionary charitable contributions have been observed over the analyzed period.

In addition to the above, we also considered two different analytical tools to analyze FCC, a SWOT Analysis, and Porter's 5 Forces. In general terms, a SWOT analysis looks at the internal strengths, weaknesses, opportunities, and threats of a Company. Porter's 5 Forces is a comparative analysis that looks at the external factors within an industry. Each of the models seeks to define the Company's position in the marketplace.

## SWOT Analysis

SWOT stands for strengths, weaknesses, opportunities, and threats.  Each piece of a SWOT analysis is used as one element of comparison to existing solutions and competitors. The focus, however, remains on the Company's internal fortitude. The SWOT analysis is often considered a macro review, as it can give a sense of whether an objective is attainable.

The following matrix provides our SWOT analysis for FCC.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

### Strengths and Weaknesses

Strengths and weaknesses are internal characteristics—ones that can be controlled and/or changed, often quickly, and from the inside. The strengths outline how the entity excels and exceeds its competition. This may include forces like location, brand power, marketing, cash on hand, technology, or pricing. An entity's weaknesses, on the other hand, prevent it from performing to its fullest potential. Excess debt, lack of capital, workforce turnover, and a lack of resources are all examples of weaknesses.

| | Strengths | Weaknesses |
|---|---|---|
| **Human Resources** | • Skilled & assembled workforce in place. | |
| **Management** | • Professional management.<br>• Management structure formalized. | • Key person(s) makes all decisions. |
| **Corporate Governance** | • Legal documents are formalized | |
| **Product** | • Gross profit margins are steady.<br>• Diversified products. | |
| **Customers** | • Customer diversification. | |
| **Suppliers** | | • Limited suppliers or reliance on selective foreign suppliers. |
| **Sales & Marketing** | • Branding used for products/services.<br>• The company maintains customer records and related data.<br>• Pricing is established and well defined.<br>• Company has a clear strategy and business plans. | |
| **Assets** | • Assets are sufficient and in good condition.<br>• Intellectual property is owned. | |
| **Liabilities** | | • Company is highly levered. |
| **Commitments & Contingencies** | • Company leases its facilities at market rates or better. | |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

| Financial Management | • Financial performance equal to or better than industry norms.<br>• Accounting controls in place.<br>• Company has borrowing capacity.<br>• Audited or reviewed financial statements are prepared. | |
|---|---|---|

## Opportunities and Threats

Opportunities and threats are external factors, which may not necessarily be easy to contain. Opportunities are favorable factors which give it an edge over its competition within the industry. Threats, on the other hand, are external factors that can hinder a company's competitive advantage, such as a weaker labor force and higher costs for raw materials.

| | Opportunities | Threats |
|---|---|---|
| **Region** | • Labor market supplies skilled labor. | |
| **Industry** | • Barriers to entry are high. | |
| **Politics** | | • High governmental regulation.<br>• Tariffs in effect or under consideration. |
| **Technology** | • Improvements to technology increasing productivity and lower costs. | |
| **Social Trends** | • Industry favorably viewed by society. | |

Based upon the above, we have considered FCC's overall internal risk to be moderate to high.

## Porter's 5 Forces

Porter's 5 Forces was initially published in 1980 by Harvard Business School professor Michael E. Porter as part of his book Competitive Strategy: Techniques for Analyzing Industries and Competitors. It is commonly used to analyze a company's industry structure as well as its corporate strategy by looking at its expectations of profitability. The Porter's 5 Forces generally examines the subject on a micro-level.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

This model outlines the following five fundamental competitive forces:

1. **The potential for new entrants into the industry**
   - When the entry is easy for new companies, it means there is usually a higher degree of competition.
   - Profitable industries that yield high returns will attract new businesses. New entrants eventually will decrease profitability for other firms in the industry.
2. **Existing competition in the industry**
   - More established rivals mean a high level of competition in the industry.
   - For most industries, the intensity of competitive rivalry is a major determinant of the competitiveness of the industry.
   - Higher competition can lead to lower profits.
3. **The arrival of new goods or services on the market**
   - Newer products and services can erode those that are already established.
   - A substitute product uses a different technology to try to solve the same economic need.
   - New or alternative products in the market can lead to lower profits
4. **Supplier power**
   - When more suppliers begin to bargain, it may lead to scarcity.
   - This may enhance competition for raw materials and other resources, leading to an increase in costs and reduced company's profits.
   - The increase in either of these factors can lead to lower profits.
5. **Consumer power**
   - The ability of customers to put the firm under pressure, which also affects the customer sensitivity to price changes.
   - Consumers who have more power to bargain can lead to a drop in profitability.

Each of these forces is generally external in nature and is not the result of a company's internal structure. The forces are generally analyzed against a micro concept, such as an individual business line. In totality, Porter's 5 Forces are used to identify profitability in any segment of the economy.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# OPERATIONAL & FINANCIAL OBSERVATIONS

The following matrix provides those items we considered within the Porter's 5 Forces analysis of FCC.

| Threat of New Entrants | Competition in the Industry | Arrival of New Goods/Services | Supplier Power | Consumer Power |
|---|---|---|---|---|
| • Barriers to entry | • Number of competitors | • Number of substitute products available | • Number and size of suppliers | • Number of customers |
| • Economies of scale | • Diversity of competitors | • Buyers propensity to substitute | • Uniqueness of each supplier's product | • Size of each customer order |
| • Brand loyalty | • Industry concentration | • Relative price performance of substitute | • Subject company's ability to substitute | • Differences between competitors |
| • Capital requirements | • Industry growth | • Perceived level of product differentiation | | • Price and sensitivity |
| • Cumulative experience | • Quality differences | • Switch costs | | • Buyers ability to substitute |
| • Government policies | • Brand loyalty | | | • Buyers information availability |
| • Access to distribution channels | • Barriers to exit | | | • Switching costs |
| • Switching costs | • Switching costs | | | |

Based upon the above, we have considered FCC's overall external risk to be moderate to high.

Aside from the risks discussed above, FCC is subject to other issues that include but are not limited to:
- Risks associated with achieving its sales projections,
- Risks related to the COVID pandemic, and
- Risks due to the access of a foreign product supplier.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL STATEMENT ADJUSTMENTS

## Normalization Adjustments

To determine a fair representation of the subject's ongoing earnings we considered the necessity of adjustments to the aforementioned historical financial statements. Valuation related adjustments are often made because of the choices in accounting elections and treatments in order to minimize taxable income. This is particularly true regarding closely held businesses where there are generally few, if any, passive investors to impress through financial statements.

The objective of valuation related adjustments is to convert earnings and values from those established based upon historical costs and tax accounting regulations to amounts, which better estimate fair (market) values. These adjustments are generally made when the amount reflected on the financial statements appears to be inconsistent with fair (market) values, and/or when better estimates of fair (market) values can be made. Within the enclosed Exhibits we have provided the adjusted balance sheet as of December 31, 2019 and September 30, 2020, as well as the normalized cash flow from operations over the analyzed period. In each instance, we have provided a description of these valuation related adjustments.

The following provides a summary of same.

| | 12/31/2019 | | | | Over Analyzed Period | | | | | | | |
| | Historical | | Adjusted | | Historical (Median) | | Adjusted (Median) | | Historical (Mean) | | Adjusted (Mean) | |
| | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
| **Balance Sheet** | | | | | | | | | | | | |
| Total Assets | $ 72,562,918 | 100.0% | $ 72,562,918 | 100.0% | $45,699,060 | 100.0% | n/a | n/a | $ 52,284,730 | 100.0% | n/a | n/a |
| Total Liabilities | 51,392,795 | 70.8% | 51,340,813 | 70.8% | 27,267,719 | 59.7% | n/a | n/a | 34,306,091 | 65.6% | n/a | n/a |
| Total Equity | 21,170,123 | 29.2% | 21,222,105 | 29.2% | 18,431,341 | 40.3% | n/a | n/a | 17,978,639 | 34.4% | n/a | n/a |
| | | | | | | | | | | | | |
| **Income Statement** | | | | | | | | | | | | |
| Net Sales | $165,910,184 | 100.0% | $165,910,184 | 100.0% | 118,419,768 | 100.0% | 118,419,768 | 100.0% | $123,365,707 | 100.0% | $123,365,707 | 100.0% |
| Net Income | 7,615,517 | 4.6% | 8,901,545 | 5.4% | 8,084,617 | 6.8% | 8,901,545 | 7.5% | 8,893,795 | 7.2% | 8,180,963 | 6.6% |
| Earnings Before Interest & Taxes (EBIT) | 6,119,815 | 3.7% | 14,049,304 | 8.5% | 8,236,111 | 7.0% | 14,049,304 | 11.9% | 8,324,551 | 6.7% | 12,643,595 | 10.2% |
| Earnings Before Interest,Taxes, Depreciation & Amortization (EBITDA) | 11,122,427 | 6.7% | 19,051,916 | 11.5% | 11,122,427 | 9.4% | 15,233,136 | 12.9% | 10,592,196 | 8.6% | 14,911,240 | 12.1% |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION STANDARD, PREMISE & APPROACHES CONSIDERED

## Standard of Value

The standard of value used in this analysis is Fair Market Value. Fair market value as defined in Revenue Ruling 59-60 as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." The fair market value standard assumes that the price is transacted in cash or cash equivalents. Revenue Ruling 59-60, while used in income tax valuations, is also used in many non-tax valuations, such as for equitable distribution in matrimonial matters in the State of New York.

Revenue Ruling 59-60 also states that no general formula is applicable to the many different valuation situations, and that one should consider other factors in determining the subject company's value.  In our conclusion of value, we considered the following relevant factors, which are specified in Revenue Ruling 59-60.

- The history and nature of the business,
- The economic outlook of the United States and that of the specific industry in particular,
- The book value of the subject company's stock and the financial condition of the business,
- The earning capacity of the company,
- The dividend-paying capacity of the company,
- Whether or not the firm has goodwill or other intangible value,
- Sales of the stock and size of the block of stock to be valued, and
- The market price of publicly traded stocks or corporations engaged in similar industries or lines of business.

## Premise of Value

The premise of value considers a highest and best use concept whereby a maximum value is selected either under a going concern basis or liquidation basis, whichever is greater.

In this instance, the premise of value is Going Concern. The liquidation premise of value, whether orderly or fixed, was considered and rejected as not applicable. The Going Concern value results in a higher value for the interest than the liquidation value.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION STANDARD, PREMISE & APPROACHES CONSIDERED

The International Glossary of Business Valuation defines Going Concern as the value of a business enterprise that is expected to continue to operate into the future.  The intangible elements of going concern value result from the factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.

**Valuation Approaches Considered**

The selection of the most appropriate valuation method(s) is largely dependent upon the purpose of the valuation, the characteristics of the subject company, and the availability of reliable information requisite to the various methods.  A valuation approach is defined as "a general way of determining value using one or more specific valuation methods."

All valuation methods can be described in terms of three broad approaches to value.

| Asset-Based Approach | Market Approach | Income Approach |
|---|---|---|

**Asset-Based Approach**

The Asset Approach involves an analysis of the economic worth of a company's assets in excess of its outstanding liabilities in determining an indication of equity value.  This approach addresses the adjusted net asset value of the Company.  It is typically used for a Company that:

- Experiences, temporarily or permanently, low returns in relation to the size of its tangible assets,
- Anticipates liquidation,
- Is a non-operating entity such as holding companies,
- Lacks an established earnings history such as start-up companies,
- Has highly volatile earnings, or
- Holds assets with significant unrecorded appreciation, such as real estate.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION STANDARD, PREMISE & APPROACHES CONSIDERED

When this method is employed, adjustments are made to reflect the market value of the assets as if they were to be sold or replicated on an individual basis in a relatively short period of time.  In some instances this method does not consider the premise of value to be "going concern" and considers alternative uses. However, it does establish a "floor value" of a business. This approach can also consider either a premise of going concern or of liquidation.

Simply stated, the value of the net assets utilizing the Asset-Based Approach is determined as follows:

| -1- | -2- | -3- | -4- |
|-----|-----|-----|-----|
| Obtain the historical Subject Company's balance sheet at the valuation date. | Consider any applicable normalization adjustments. | Adjust the historical assets & liabilities. | Subtract the value of the Subject's liabilities from its assets to determine the subject's net asset value. |

In this instance we considered the Asset-Based Approach but did not employ it in the determination of fair market value.

**Market Approach**

The Market Approach utilizes information from actual transactions of comparable public or private businesses or value parameters of guideline publicly traded companies.  When applied to the valuation of an ownership interest in a closely held business, consideration is given to size, financial condition and operating performance of the business being valued relative to other companies in the same or similar line of business and subject to similar economic and environmental factors.

In this instance, we considered the Guideline Public Company Method within the Market Approach to determine value. When applying this methodology we analyzed financial metrics of publicly-traded firms in the same or similar industry.  This data is commonly found in several public databases as well as the Security and Exchange Commission's (SEC) website. Market multiples, such as, Enterprise Value to Revenue, Gross Profit and other financial parameters are considered, and if necessary, adjusted to determine the value of the subject company's value.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION STANDARD, PREMISE & APPROACHES CONSIDERED

Simply stated, the equity value of a business using the Guideline Public Company Method is determined as follows:

| -1- Select entities from the public marketplace. | -2- Compare the aggregate financial indicators of the selected peer group to the Subject Company. | -3- Consider the valuation multiples on a reported or adjusted basis. | -4- Apply the selected valuation multiples to the Subject Company to determine its initial indicated value. | -5- Adjust for items on the Subject's Balance Sheet not included in the development of the valuation multiple. |
|---|---|---|---|---|

Although we found several companies that initially seemed comparable, upon further inquiry we determined that only two potential public companies import products from foreign manufacturers.  As such, there is an insufficient number of companies to be considered as a proxy for valuation under the market approach.

**Income Approach**

The Income Approach is an earnings and cash flow-oriented approach to estimate the value of a business on a going concern basis.  This approach assumes that an equally desirable substitute for the business being valued is one that has similar investment characteristics.  The income approach involves estimating the level of economic earnings of a business and its return on investment by determining the applicable relationship between economic earnings and risk.  Generally, the earnings method is based on either historical or forecasted cash flows, depending upon which is considered representative of the expected future earnings of the business.

In this instance, we considered the Discounted Cash Flow Method within the Income Approach to determine equity value. This method is utilized when the economic earnings of the subject is expected to fluctuate or change at a pace other than that of its historical performance and when management has provided projections.  After studying same, we determined the prospective cash flow through its terminal period.  These amounts are then discounted to its present value to determine the initial equity or invested capital value.


MSG Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION STANDARD, PREMISE & APPROACHES CONSIDERED

Simply stated, the equity value of a business using the Discounted Cash Flow Method is determined as follows:

| -1- | -2- | -3- | -4- |
|---|---|---|---|
| Analyze & adjust (if necessary) the projected results of operations of the business to determine its cash flow to invested capital. | Determine the discount & capitalization rates to be applied based upon various economic factors & specific elements of the business & its industry. | Apply the present value factor of the discount rate to the projected cash flow & terminal value; the sum of which equals the Market Value to Invested Capital. | Subtract the outstanding debt at the valuation date from the Market Value to Invested Capital to compute total equity value. |

In this instance we determined the cost of equity capital from estimates derived from the Duff & Phelps Cost of Capital Study. The discount and capitalization rates are comprised from the following:

| Description | Source |
|---|---|
| Risk free rate | 20-year Treasury Bill rate of return |
| Premium over riskless rate | Duff & Phelps Cost of Capital Study |
| Company-specific risk premium | Analyst judgement |
| Sustainable growth rate | Expected growth rate of subject company |



Ultimately, the cost of equity capital is based upon the simple average of the CRSP Build-up, Duff & Phelps Build-up 1, and Duff & Phelps Build-up 2 study results.

Within the enclosed exhibits we have provided our computation of the cost of equity capital and our initial indication of value based upon the discounted cash flow method (income approach).



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION DISCOUNTS

### Discount For Lack of Control

The concept of control deals with the relationship between the interest being valued and the total enterprise.  In this engagement, we are valuing a controlling interest.  Under the fair market value standard, control is dependent upon the determination of the initial indication of value.  In other words, depending on the level of control of the subject interest, and the valuation adjustments and methodologies employed, the value may or may not require an adjustment based upon controlling attributes. We have made several adjustments to determine the normalized cash flow of the business on a controlling basis.  In this instance, when the subject is a controlling interest, no discount for lack of control (DLOC) is required.

### Discount for Lack of Marketability

A Discount for Lack of Marketability (DLOM) recognizes the fact that an ownership interest in a private/closely held business is not as marketable like the shares of a publicly traded companies because of a lack of a ready market.  Controlling ownership interests suffer from illiquidity in somewhat the same way as noncontrolling ownership interests. The marketability of an ownership interest – whether controlling or noncontrolling-is determined by the ability of the owner to quickly, at low cost, and with some degree of certainty, convert the ownership interest to cash.

In this instance we are determining value of a controlling interest.

There is no firm agreement within the valuation profession, nor any professional treatise or authoritative literature that requires a DLOM for a controlling interest. Even if a DLOM is deemed appropriate, there is very little empirical evidence or data to measure and/or support a DLOM.  Further, this modest empirical evidence has not been fully accepted or vetted by the valuation profession.

When DLOM's for a controlling interest have been employed it is often between the range of 10% to 15%. This amount is materially smaller than those appropriate for minority ownership interests, which often range from 20% to 35%.  In this instance we are employing a discount for lack of marketability of 12.50%.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# VALUATION CONCLUSION

We have performed a valuation of a 52.50% equity interest in Fabuwood Cabinetry Corp as of September, 30, 2020, on a controlling, non-marketable and going concern basis. This valuation was performed solely to assist in the determination of the fair market value for management planning purposes and the resulting estimate should not be used for any other purpose or by any other party for any purpose.  The opinion of value that results from this engagement is expressed as a conclusion of value.

The Asset-Based Approach was considered but ultimately not utilized as a proxy for fair market value.

The Market Approach was considered but not utilized to determine fair market value as there was an insufficient number of companies found.

The Income Approach was considered and utilized to determine fair market value.

The accompanying graph illustrates the indications of value(s) on a 100.0% equity interest derived from the valuation methodologies considered.



Ultimately, we utilized only the income approaches to estimate fair market value.  This reconciliation can be found within the enclosed Exhibits.

Based upon our analysis described herein and the facts and circumstances as of the valuation date, the fair market value of a single share in Fabuwood Cabinetry Corp on a controlling, non-marketable and going concern basis is:

| | |
|---|---|
| Valuation on a controlling, non-marketable, & going concern basis | $   28,531,904 |
| Number of shares issued and outstanding | 200 |
| Value per share | 142,660 |
| **Rounded** | **$    143,000** |


Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 1 - ASSUMPTIONS & LIMITING CONDITIONS

1. Information, estimates, and opinions are obtained from sources considered to be reliable. However, we assume no liability for such sources.

2. The entities and their representatives have warranted to us that the information they supplied was complete and accurate to the best of their knowledge and that the financial statement information reflects the entity's results of operations and financial condition. Information supplied by management has been accepted as correct without further verification, and we express no opinion on that information.

3. If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

4. Possession of this analysis, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose except the stated purpose in the report, by anyone but the client and attorney for the client without the previous written consent of Mark S. Gottlieb, CPA, PC and, in any event, only with proper attribution.

5. We are not required to give testimony in court, or be in attendance during any meetings, hearings, or depositions, with reference to the property being valued, unless previous arrangements have been made.

6. The various analysis presented in this report apply to this analysis only and may not be used out of the context presented herein. This analysis is valid only for the purpose or purposes specified herein.

7. The analysis contemplates facts and conditions existing or foreseeable as of the date of our analysis. Events and conditions occurring after that date have not been considered, and we have no obligation to update our analysis for such events and conditions. Accordingly, the analysis provided is valid only as of the date of our report.

8. We have assumed that there is full compliance with all applicable federal, state, and local regulations and laws unless otherwise specified in this analysis.

9. Neither the professionals who worked on this engagement nor this firm have any present or contemplated future interest in the Company, any personal interest with respect to the parties involved, or any other interest that might prevent us from performing an unbiased analysis. Our compensation is not contingent on an action or event resulting from the analysis, opinions, or conclusions in, or the use of, this analysis.

10. This estimate of value is not a fairness or solvency opinion that concludes the value to a particular party or the ability of continued operations. We do not warranty the estimated value will be realized, as value may be different to different parties.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 2 - VALUATION CERTIFICATION

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased, professional analyses, opinions and conclusions.

3.  I have no present or prospective interest in the business or property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  No other person provided significant business appraisal assistance other than the analysts signing this certification.

*Mark S. Gottlieb*

_____

Mark S. Gottlieb
CPA/ABV/CFF, ASA, CVA, CBA, MST



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 3 - ECONOMIC OVERVIEW

The following discussion and analysis of the national economy at the approximate valuation date is provided by the Research & Statistics Group of the Federal Reserve Bank of New York.  The purpose of which is to provide a representative "consensus" of the condition of the national economy and its general outlook.



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021



FEDERAL RESERVE BANK *of* NEW YORK

# U.S. Economy in a Snapshot
Research & Statistics Group
September 2020

The *U.S. Economy in a Snapshot* compiles observations of staff members of the Federal Reserve Bank of New York's Research and Statistics Group. The views, model results, and analysis presented are solely those of the individual contributors and do not necessarily reflect the position of the Federal Reserve Bank of New York or the Federal Reserve System. The analysis presented herein is based on data released through September 17, 2020.

©2020 Federal Reserve Bank of New York

**OVERVIEW**

- Consumer spending continued to recover in July.
  - Spending remained tilted toward goods and away from services compared to pre-pandemic levels.
  - Services expenditures were still significantly below their February level.
  - Consumer confidence remained low in August.

- Real business equipment spending plunged in 2020Q2, reflecting disruptions linked to the COVID-19 pandemic.
  - Shipments of nondefense capital goods ex-aircraft rebounded further in July, and new orders were modestly above shipments, suggesting some near-term momentum.

- Housing activity continued to rebound in July.
  - Single-family housing starts, new and existing home sales all rose strongly with signs of further momentum in the short term; uncertainty about the longer-term outlook remains high.

- Payroll employment continued to expand in August. The unemployment rate fell, mainly due to a further decline in temporary layoffs. The labor force participation rate and the employment-to-population ratio both increased moderately, but remained below pre-pandemic levels.
  - With the latest reading, about 48% of the drop in payroll employment between February and April has been reversed.

- Core PCE inflation remained well below the FOMC's longer-run objective.

- U.S. equity indices increased over the last month, amid rising volatility. The nominal 10-year Treasury yield rose modestly but remained low. The market-implied expected policy rate path rose moderately. The broad trade-weighted dollar index declined slightly. Oil prices were little changed on balance.

### GDP



Trillions of 2012 US$ / Trillions of 2012 US$

| Time Period | Potential GDP Growth |
|---|---|
| 2000 – 2005 | 3.1% |
| 2005 – 2010 | 1.9% |
| 2010 – 2015 | 1.5% |
| 2015 – 2020 | 1.7% |

Potential GDP

2009Q3 to 2020Q1:
2.3% Growth Rate

2000Q1 to 2007Q4:
2.6% Growth Rate

2000 2002 2004 2006 2008 2010 2012 2014 2016 2018 2020

Source: Bureau of Economic Analysis,
Congressional Budget Office via Haver Analytics    Note: Shading shows NBER recessions.

### Output is well below potential in 2020Q2

- The level of real GDP in 2020Q2 was about 10.0% below the estimate of real potential GDP from the Congressional Budget Office (CBO).
  - The 2020Q2 output gap was the largest negative output gap in the post-war era. The previous low was -7.3% in 1982Q4.
  - Even though it has fallen sharply since April, the 8.4% unemployment rate in August was still well above the CBO's estimate of its longer-run natural rate (4.38%).
  - The CBO projects that real potential GDP will grow at a relatively slow rate of about 1.4% over the next year.

- Other measures also indicated that there is considerable resource slack in the U.S. economy.
  - Despite a rebound in June and July, capacity utilization rates continued to be at very low levels.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## OVERVIEW

### Labor Market Indicators



Source: Bureau of Labor Statistics via Haver Analytics

Note: Shading shows NBER recessions.

### PCE Deflator



Source: Bureau of Economic Analysis via Haver Analytics

Note: Shading shows NBER recessions.

### Labor market conditions further improve in August

- The unemployment rate decreased from 10.2% in July to 8.4% in August.
- Nonfarm payrolls rose by about 1.4 million in August.
  - Employment in private service-providing industries increased by 984,000, with large increases in retail trade (+249,000), leisure and hospitality (+174,000), and education and health services (+147,000).
  - Employment in goods-producing industries saw an increase of 43,000, driven by increases in manufacturing (+29,000) and construction (+16,000).
  - Hiring of temporary Census workers was a major factor in the rise of government payrolls for the month.
- The employment-to-population ratio increased from 55.1% in July to 56.5% in August.

### Inflation continues to run below 2 percent

- The total PCE price index rose 0.3% in July, after increasing 0.5% in June. The core PCE price index (which excludes food and energy prices) also rose 0.3% in July, the same as in June.
  - Energy prices rose 2.5% in July, and were down 11.4% relative to one year ago. Food prices fell 0.9% and were up 4.3% compared to one year ago.
- The 12-month change in the total PCE price index rose to +1.0% and the 12-month change in the core PCE price index increased to +1.3%.
  - Core PCE inflation remained appreciably below the FOMC's 2 percent longer-run goal.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

**ECONOMIC ACTIVITY**

### GDP Growth



Source: Bureau of Economic Analysis via Haver Analytics

### Plunge in 2020Q2 real GDP less severe in 2nd estimate

- In the BEA's second estimate, real GDP plummeted at a 31.7% annual rate in 2020Q2, a less severe fall than the first estimate of -32.9%. The 4-quarter change was -9.1%.
- Real personal consumption expenditures (PCE) fell at a 34.1% annual rate in Q2, its largest decline. Even so, real PCE was revised upward in the second estimate.
- There were also upward revisions to most other categories of expenditures, with the most significant occurring in inventory investment and net exports.
- In their first reading for 2020Q2, corporate profits fell 11.1% (quarterly rate), a decline similar to that in Q1.
- Real gross domestic income dropped at a 33.1% annual rate in 2020Q2. Its 4-quarter change was -9.2%.

### Manufacturing and ISM Manufacturing Index

12 Month % Change                                Index

Industrial Production Manufacturing (Left Axis)

ISM Manufacturing Index (Right Axis)

2000 2002 2004 2006 2008 2010 2012 2014 2016 2018 2020

Source: Institute for Supply Management,
Federal Reserve Board via Haver Analytics

Note: Shading shows NBER recessions.

### Manufacturing activity continues to recover

- Manufacturing production increased 3.4% in July, after rising 7.4% in June.
  - Even so, the 12-month change in manufacturing production was -7.7%.
- The ISM Manufacturing PMI rose 1.8 percentage points in August to 56.0.
  - The largest gain in the PMI sub-indices was in New Orders, which increased 6.1 percentage points to 61.5.
  - The Employment index increased to 44.3, indicating the 12th consecutive month of employment contraction.
- All five regional Fed surveys indicated that manufacturing activity continued to expand in August.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

**HOUSEHOLDS**

## Disposable Income and Consumption



Source: Bureau of Economic Analysis,
Federal Reserve Board via Haver Analytics

Note: Shading shows NBER recessions.

## Consumption rises even as fiscal support wanes

- Nominal disposable personal income rose 0.2% in July, but it fell 0.1% once adjusted for inflation.
  - **Wages and salaries were up 1.4%, but transfers fell 1.7%, both in nominal terms.**

- Nominal personal consumption expenditures (PCE) rose 1.9% in July.
  - **At $14.2 trillion (SAAR), July nominal PCE was 4.6% below its level in February, but 17.5% higher than in April.**

- Nominal expenditures on goods were 6.1% higher in July than in February, but expenditures on services were 9.3% lower.

## Consumer Confidence



Source: Conference Board.
University of Michigan

Note: Shading shows NBER recessions.

## Consumer confidence remains low

- Consumer confidence measures were mixed in August.
  - **The Conference Board Index fell to 84.8 in August from 91.7 in July. The Michigan Index of Consumer Sentiment increased 1.6 points to 74.1.**
  - **The fall in the Conference Board's measure reflected declines in both of its main components. For the Michigan Index, the slight increase was driven mostly by improving sentiments about future conditions.**

- Employment expectations changed little in the Michigan survey.
  - **The percentage of respondents who expect unemployment to decline in the year ahead decreased from 39% to 36%.**
  - **The percentage of respondents who expect more unemployment in the year ahead decreased from 33% to 32%.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## BUSINESS SECTOR

### Equipment Investment and Capacity Utilization



4-Quarter % Change    % of Capacity

Manufacturing Capacity Utilization Rate (Right Axis)

Real Business Investment in New Equipment (Left Axis)

Source: Bureau of Economic Analysis, Federal Reserve Board via Haver Analytics

Note: Shading shows NBER recessions.

### Nondefense Capital Goods Excluding Aircraft

Bil. $, 3 MMA    Bil. $, 3 MMA

New Orders

Shipments

Source: Census Bureau via Haver Analytics    Note: Shading shows NBER recessions.

### Equipment spending plummets in 2020Q2

- Real business equipment investment dropped 35.9% (annual rate) in 2020Q2. It has fallen for five straight quarters. The 4-quarter change was -14.9%, the lowest since 2009Q3.
  - In 2020Q2, spending rose robustly for information processing equipment, but fell sharply for all other major categories of equipment. The fall was particularly acute for transportation equipment.

- Weak equipment investment has occurred alongside low levels of the manufacturing capacity utilization rate.
  - This rate was 69.2% in July, above the trough in the last recession but near or below troughs in prior recessions.
  - Historically, low utilization rates have been associated with weak equipment investment.

### Capital goods shipments rebound further in July

- Shipments of nondefense capital goods excluding aircraft rose 2.4% in July, the third consecutive increased following a plunge in April. The July level of these shipments was close to pre-pandemic levels and 5.5% above the average in 2020Q2.
  - This measure is a proxy for equipment spending that is available at a monthly frequency.

- New orders of nondefense capital goods excluding aircraft rose 1.9% in July, which was also its third consecutive increase following a drop in April.

- New orders for these goods were slightly above shipments in July.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## HOUSING SECTOR

### Housing Starts



Thousands, 3 MMA

Thousands, 3 MMA

Total Multifamily (Left Axis)

Single Family (Right Axis)

Source: Census Bureau via Haver Analytics

Note: Shading shows NBER recessions.

### New and Existing Home Sales

Thousands

Thousands

Existing Single Family Sales (Right Axis)

New Single Family Sales (Left Axis)

Source: Census and National Association of Realtors via Haver Analytics

Note: Shading shows NBER recessions.

### Housing starts continue to rebound in July

- Total housing starts rose 22.6% in July. Starts were up 23.4% in the 12 months ending in July.
  - **The rise in starts in July was the third straight increase following the large declines in March and April.**

- Single-family starts rose 8.2% in July to a level of 940,000 units (annual rate), 7.4% above the July 2019 figure.
  - **The 3-month moving average of single-family starts rose to about 846,000, similar to that of a year ago.**

- Multi-family starts rose to 556,000 in July (annual rate), 58.4% above June, and 65.0% above the July 2019 level.
  - **The 3-month moving average of multi-family starts rose to about 406,000.**

### Housing market displays strong rebound

- Single-family existing home sales increased 23.9% in July to 5.28 million units (seasonally adjusted annual rate).
  - **Single-family existing home sales are now 9.8% above a year ago.**

- Single-family new home sales increased 13.9% (SAAR) in July to 901,000.
  - **Relative to one year ago, new home sales are up 36.3%.**

- Home sales displayed significant strength in the housing market. This reflected historically low mortgage rates, reopenings and gradual resumption of economic activity. Nevertheless the ongoing pandemic and the associated high unemployment rates cast some uncertainty on the future of the housing market.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# GOVERNMENT SECTOR

## Real Government Consumption and Gross Investment



Source: Bureau of Economic Analysis via Haver Analytics

Note: Shading shows NBER recessions.

## Real State & Local Consumption & Gross Investment



Source: Bureau of Economic Analysis via Haver Analytics

Note: Shading shows NBER recessions.

## Growth of real government spending slows down

- Real government consumption and gross investment grew 2.1% over the four quarters ending in 2020Q2, down from 2.7% in Q1.

- There was a sharp divergence in developments at the federal vs. state and local levels.
  - **The four-quarter change in real federal spending was +6.8%, just above the peak rate during the 2008-09 financial crisis.**
  - **The four-quarter change in real state and local spending was -0.7%, the weakest since 2012.**

- The pickup in real federal spending was driven by payments to banks for processing and administration of Paycheck Protection Program loan applications.

## State and local sector declines sharply

- Over the four quarters ending in 2020Q2, growth of real consumption at the state and local level turned negative to – 1.38%, a rate of decline not seen since 2012.
  - **Consumption expenditures consist largely of employee salaries and make up over 80% of the sector's total spending.**

- State and local gross investment spending growth declined sharply to about 2.53% over the four quarters ending in Q2.
  - **The categories of gross investment are, in order of importance, new equipment such as computers, intellectual property products such as software, and public works and infrastructure projects.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# INTERNATIONAL DEVELOPMENTS

## Real Exports and Nonoil Imports of Goods



Source: Census Bureau via Haver Analytics   Note: Shading shows NBER recessions.

## Trade deficit widens as imports rebound

- The trade deficit was $63.6 in July up from 10.1 billion from a revised $53.5 billion in June.
  - Both exports and imports grew substantially, as they continued to rebound from the COVID shock.
  - The growth of imports was sharper, beating consensus forecasts.

- The increase in trade volumes was primarily driven by goods trade.
  - A substantial uptick in durable and consumer goods exports and imports drove the aggregate rebound in trade.

- Service trade remained depressed as tourism and business travel remained at low levels.

## Euro Area Manufacturing and Services PMIs



Source: Markit Economics via Haver.   Note: Shading shows NBER recessions.

## Euro area surveys point to slower economic recovery

- Euro area purchasing managers' indices declined in August, signaling a slower pace of economic recovery.
  - The manufacturing PMI edged down a tenth to 51.7.
  - The services PMI dropped 4.2 points to 50.5, only half a point above the break-even line of 50.

- PMI readings for both sectors had surged in May through July, on a partial return to normal activities after COVID-19 shutdowns.

- Estimates based on Google mobility data suggest that euro area economic activity remained perhaps 5% below pre-pandemic levels.
  - Full recovery would take considerable time at the pace of growth suggested by the latest PMI readings.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

**LABOR MARKET**

## Payroll Employment and Aggregate Hours



Source: Bureau of Labor Statistics via Haver Analytics

Note: Shading shows NBER recessions.

## Payroll employment continues to rebound

- Nonfarm payroll employment rose by 1.4 million in August.
  - This was primarily due to an increase in employment of 984,000 in private service-providing industries.
  - Government employment rose by 344,000, mainly reflecting the hiring of 238,000 temporary Census 2020 workers by the Federal government.

- With the August reading, monthly payroll employment was currently at the same level as in March 2015.
  - Overall, about 48% of the decline in payroll employment between February and April has been reversed, amounting to 10.6 million out of 22.1 million jobs lost.

## SA Initial Unemployment Insurance Claims



Source: Department of Labor

## Unemployment claims decline but remain high

- For the week ending September 5th, seasonally adjusted (SA) claims were 884,000, unchanged from the revised figure one week ago.
  - The Department of Labor changed its seasonal adjustment procedure last week, replacing multiplicative with additive adjustment factors. This change complicates comparisons to earlier data.

- In addition to initial claims under state programs, there were 839,000 initial claims (NSA) for Pandemic Unemployment Assistance for the week ending September 5th.
  - This represents an increase of 91,000 from one week earlier.
  - For the week ending August 22, the total number of people claiming benefits in all programs was 29,605,000.

# LABOR MARKET

### Employed Workers, Reasons for Absence



Source: Bureau of Labor Statistics via Haver Analytics

Note: Shading shows NBER recessions.

### COVID-19 further disrupts working patterns

- The seasonally adjusted number of people who have a job but are not at work due to vacations ticked up to 1.9 million from 1.8 million in July, but remains at a historical low.
  - **The all-time series low was in May 2020, where 980,000 people were not at work due to vacation. This number is 66.6% below its level in May 2019.**

- The seasonally adjusted number of people who have a job but not at work due to childcare problems remained at a historically high level after ticking down from a series high of 107,000.
  - **The number of those not at work due to childcare problems in 2020:Q2 grew 125% compared to the same time last year.**

### Growth of Average Hourly Earnings and ECI



Source: Bureau of Labor Statistics via Haver Analytics

Note: Shading shows NBER recessions.

### Average hourly earnings rise in August

- Average hourly earnings increased by 0.4% in August compared to one month prior. The 12-month change was +4.7%.
  - **Hourly earnings growth has displayed large swings over the recent months due to the large employment fluctuations in sectors with lower-paid workers.**

- Benefits of civilian workers rose 0.8% in 2020:Q2 (higher than in 2020:Q1) and 2.2% year-over-year.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

**INFLATION**

### CPI Inflation: Core Goods and Core Services



2000 2002 2004 2006 2008 2010 2012 2014 2016 2018 2020
Source: Bureau of Labor Statistics
via Haver Analytics
Note: Shading shows NBER recessions.

### 3-Year Ahead Inflation Expectations



2014   2015   2016   2017   2018   2019   2020
Source: Survey of Consumer Expectations,
Federal Reserve Bank of New York

### Core CPI inflation increases further in August

- Core CPI inflation remained very volatile, having fallen from 2.4% in February to 1.2% in June on a 12-month basis, and then rebounding to 1.7% in August.
- These large swings were primarily driven by gyrations in core goods prices, which rose in August at their strongest pace in decades.
  - **Core goods prices were up 0.4% on a 12-month basis, compared with -0.5% in July and -1.1% in June.**
- The continued weakness in inflation for important series such as owners' equivalent rent (OER) and rent of primary residence remains a source of concern.
  - **The 12-month changes in these two indices were 2.7% and 2.9%, respectively, in August, compared to 3.3% and 3.8% at the beginning of the year.**

### Inflation expectations increase slightly

- Median inflation expectations increased in August:
  - **Median expected inflation rose from 2.9% to 3.0% at the one-year horizon;**
  - **It rose from 2.7% to 3.0% at the three-year horizon.**

- Inflation uncertainty increased.
  - **The uncertainty expressed about future inflation outcomes increased for the second consecutive month at both horizons and remained elevated relative to pre-pandemic readings.**

- Inflation disagreement across respondents remained high.
  - **The difference between the 75th and 25th percentile of the distribution of inflation expectations remained substantially above its pre-pandemic level at both horizon.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## FINANCIAL MARKETS

### U.S. Equity Market Index and Volatility



Source: Bloomberg Finance L.P.

### U.S. equity markets reach all-time highs

- U.S. equity markets as measured by the S&P 500 achieved all-time highs this month.
  - **The S&P 500 index increased 1.4% between August 7 and Sept 9. As of September 9, it is up 51.9% from its recent low on March 23 and it reached an all-time high of 3580.84 on September 2.**
  - **As of September 9, the index was up 5.2% year to date.**
- Option-implied stock market volatility, as measured by the CBOE Volatility Index (VIX Index), remained elevated.
  - **The VIX Index closed at 28.81 on September 9.**
  - **On August 17, the VIX Index reached its lowest level since February 21, when it closed at 21.35.**
  - **The VIX Index remained well below its 82.69 record high on March 16, but still well above its 2019 year-end value of 13.78.**

### USD Exchange Rates



Source: Bloomberg Finance L.P.          Note: Start date 01/03/2007 = 1.

### U.S. dollar value remains roughly unchanged

- The exchange value of the dollar against a basket of global currencies decreased by 0.87% between August 7 and September 9.
  - **Over this same period the dollar was unchanged against the euro, appreciated by 0.24% against the Japanese yen, but depreciated 4.51% against the Mexican peso.**

- Since the start of 2020, the dollar has depreciated 1.35% against a basket of global currencies.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# FINANCIAL MARKETS

## US Bank Equities Performance



Source: Bloomberg Finance L.P.　　　Note: Start date 01/03/2007 = 1.

## Bank stocks performance lags behind market

- As measured by the KBW Nasdaq bank index, bank equities decreased 1.1% between August 7 and September 9, but still were 36.3% higher than their recent low on March 23.
  - As of September 9, the index was down 32.4% year to date.
- The XLF financial sector ETF increased 0.20% between August 7 and September 9, and was up 40.9% from its low on March 23.
  - As of September 9, the index was down 19.1% year to date.
- As measured by the S&P 500 Index, the broader market increased 1.4% over the same time period.

## Expected Federal Funds Rate



Source: NY Fed calculations,
Bloomberg Finance L.P.　　　Note: Estimated using OIS quotes

## Implied path for federal funds increases

- The expected path of the federal funds rate implied by rates on overnight indexed swaps (OIS) was unchanged for short maturities but moderately increased for longer maturities between August 7 and September 9.
- The market-implied path remained slightly below the median path of the FOMC's Summary of Economic Projections from June 2020 and the NY Fed's Survey of Primary Dealers from July 2020.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## FINANCIAL MARKETS

### 10-Year Treasury and Term Premium



Source: NY Fed calculations.
Federal Reserve Board

Note: 5-day moving average,
zero-coupon yield.

### Longer-term Treasury yields increase

- Longer-term Treasury yields have increased since June.
  - **The 10-year yield increased by about 13 basis points between August 7 and September 9.**
  - **The 10-year yield was 125 basis points lower than its level at the end of 2019.**

- Estimates from the Adrian-Crump-Moench term structure indicate that the term premium also increased.
  - **The 10-year term premium increased by 17 basis points between August 7 and September 9 as a five-day moving average.**

### 5-10 Year Forward Decomposition



Source: NY Fed calculations.
Federal Reserve Board

Note: 5-day moving average,
zero-coupon yield.

### Breakeven inflation increases

- Market-implied TIPS-based measures of long-term inflation expectations ("breakevens") increased in recent weeks.
  - **The five-to-ten year breakeven inflation rate was 1.69% on September 9, increasing by 17 basis points over the past month as a five-day moving average.**
- According to the Abrahams-Adrian-Crump-Moench model, the inflation risk premium increased as well.
  - **The estimated five-to-ten year inflation risk premium increased by 17 basis points as a five-day moving average.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## SPECIAL TOPIC: LABOR MARKET INDICATORS

### Permanent and Temporary Layoffs



Source: Bureau of Labor Statistics via Haver Analytics

Note: Shading shows NBER recessions.

### Share of permanent job losers continues to rise

- The share of job losers on permanent layoff continued to increase in August.
  - **The number of job losers on permanent layoff rose to 3.4 million, accounting for 40% of all laid-off workers.**

- The number of job losers on temporary layoff continued to decrease as businesses reopen.
  - **Job losers on temporary layoff accounted for 60% of all laid-off workers.**

### Labor Force Participation Rate by Race



Source: Bureau of Labor Statistics

Note: Shading shows NBER recessions.

### Labor force participation continues to recover

- Labor force participation continued to rise in August following its sharp decline in March and April.
  - **Participation rose in August by 0.7 percentage points for Hispanic workers, by 0.4 for both Whites and Asians, and by 0.2 for Blacks.**

- Participation of Asian workers has recovered 84% of its decline from February to April, and participation of Whites has recovered 50% of its decline.
  - **In contrast, participation of Hispanic workers and Black workers has recovered only 42% and 40% of its decline, respectively.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

## SPECIAL TOPIC: LABOR MARKET INDICATORS

### Workers Unable to Work due to Employer Closures



Source: Bureau of Labor Statistics

### Share of workers unable to work decreases

- The share of employed workers unable to work because of employer closures has declined across all occupations.
  - **In aggregate, the share of employed workers unable to work has declined from 20% in May to 7% in August.**

- More workers were unable to work in Service occupations than in Management and Professional occupations.
  - **In Service occupations, 15% of employed workers were unable to work in August due to employer closures.**
  - **In contrast, 7% of workers in Management, Professional, and Related occupations were unable to work due to closures.**

### Persons Unable to Work due to Employer Closures



Source: Bureau of Labor Statistics

### Share of persons unable to work falls for all groups

- The number of persons unable to work due to employer closures has fallen by 50% since May.
  - **The share of White workers unable to work due to closures declined by 54% between May and August, compared to 49% for Hispanics and 41% for Blacks.**

- The share of White persons unable to work in August was lower than the corresponding shares of Hispanic and Black workers.
  - **8.5% of White persons were unable to work due to employer closures, compared to 12.5% of Black workers and 13% of Hispanic workers.**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 4 - DOCUMENT INVENTORY

1. **Engagement Administration**
   - Signed Engagement Letters (Joel Epstein)

2. **Audited Financial Statements** prepared by Roth & Company, LLP.

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|

3. **Business Income Tax Returns** (Fabuwood Cabinetry Corp), prepared by Roth & Company, LLP.

| 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|------|

4. **Cost of Capital**
   - Duff & Phelps Cost of Capital Study

5. **Industry Data**
   - First Research (Wood/ Window Door Manufacturing, NAICS 321911 December 14, 2020)
   - Integra (Wood Kitchen Cabinet and Countertop Manufacturing December 31, 2020)
   - Reasonable Compensation Reports 2019

6. **Economic Data**
   - BVR Economic Look-Up (September 30, 2020)
   - US Economy in a Snapshot – Federal Reserve Bank of New York (September 30, 2020)
   - Livingston Survey (Insert Date) – Federal Reserve Bank of Philadelphia
   - Federal Reserve Economic Data (FRED) - Federal Reserve Bank of St. Louis

7. **Other Relevant Data**
   - Entity Organization Information (i.e., NYS Dept. of State; NJ Dept. of State)

8. **Website Contents** (www.fabuwood.com)



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 4 - DOCUMENT INVENTORY

9. **Market Data**
   - Yahoo Finance
   - Securities and Exchange Commission (www.sec.gov)

10. **BV Questionnaire**
    - Completed by Peri Friedman, VP Corporate Development



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# APPENDIX 5 - ANALYST'S QUALIFICATIONS

## MARK S. GOTTLIEB



Email: msgcpa@msgcpa.com

### Areas of Expertise
- Business Valuation
- Forensic Accounting
- Litigation Support
- Expert Witness

### Licenses, Accreditations and Certifications
- Certified Public Accountant (CPA) in New York and Connecticut
- Accredited Senior Appraiser (ASA)
- Accredited in Business Valuation (ABV)
- Certified in Financial Forensics (CFF)
- Certified Valuation Analyst (CVA)
- Certified Business Appraiser (CBA)

**BACKGROUND**

With over 30 years of experience, Mark S. Gottlieb is an accomplished forensic accounting and business valuation specialist with expertise in record reconstruction and litigation support. Mr. Gottlieb is recognized for the meticulous preparation and comprehensive research he brings to all of his professional engagements. Since forming MSG, Mr. Gottlieb leads a team of highly qualified professionals in conducting forensic accounting examinations, independent business and professional practice valuations, and a continuum of financial and economic analyses. He is frequently appointed by the court to provide these services and expert testimony. Mr. Gottlieb has also lectured extensively to many government agencies and professional organizations on accounting, tax, economic development and valuation/appraisal issues. Previously, Mr. Gottlieb was employed by the international accounting and consulting firms of PriceWaterhouseCoopers (formerly Coopers & Lybrand) and Ernst & Young (formerly Ernst & Whinney).

**EDUCATION**
- Bachelor of Business Administration in Accounting – Adelphi University (May 1983)
- Master of Science in Taxation – Long Island University (May 1993)

**PROFESSIONAL MEMBERSHIPS**
- State of New York Grievance Committee (2015 to Present)
- Brandeis Association Scholarship Fund – Treasurer (2015 to Present)
- Chelsea Reform Democratic Club – Treasurer (2018 to Present)
- New York State Society of Certified Public Accountants – Business Valuation Committee Member (2013 to Present)
- New York State Society of Certified Public Accountants – Litigation Support Committee Member (2013 to Present)
- Institute of Business Appraisals – Education Board (2011 to 2012)
- New York State Society of Certified Public Accountants – Mediation and Arbitration - Committee Member (2002)

**FACULTY POSITIONS**
- Fordham University School of Law, Adjunct Professor (Fall 2017 to Present)
- New York Law School, Adjunct Professor (Fall 2003 to Fall 2006)
- European School of Economics, Adjunct Professor (Fall 2006)
- Pace University, Adjunct Professor (Summer 1997)

**PROFESSIONAL ORGANIZATIONS**
- American Institute of Certified Public Accountants
- New York State Society of Certified Public Accountants
- National Association of Certified Valuation Analysts
- Institute of Business Appraisers
- American Society of Appraisers

*Mr. Gottlieb's current CV is available upon request.*



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 1 - HISTORICAL BALANCE SHEETS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 1**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS**
**AS OF DECEMBER 31,**

| | DOLLARS | | | | | ANALYTICS | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | **2019** | **2018** | **2017** | **2016** | **2015** | **MIN** | **MAX** | **MEAN** | **MEDIAN** |
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| Cash | $ 1,101,669 | $ 1,351,668 | $ 348,257 | $ 1,912,227 | $ 1,848,596 | $ 348,257 | $ 1,912,227 | $ 1,312,483 | $ 1,351,668 |
| Marketable Securities | - | - | - | - | - | - | - | - | - |
| Accounts Receivable | 10,321,645 | 9,107,218 | 7,258,087 | 6,654,463 | 5,327,369 | 5,327,369 | 10,321,645 | 7,733,756 | 7,258,087 |
| Inventory | 25,113,259 | 27,684,954 | 24,822,220 | 18,264,991 | 22,792,882 | 18,264,991 | 27,684,954 | 23,735,661 | 24,822,220 |
| Prepaid Income Taxes | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses | 497,382 | 524,049 | 1,044,675 | 599,089 | 410,799 | 410,799 | 1,044,675 | 615,199 | 524,049 |
| Due from Affiliate | 109,451 | - | 38,771 | - | - | - | 109,451 | 29,644 | - |
| Other Receivables | 118,191 | 211,571 | - | - | 21,400 | - | 211,571 | 70,232 | 21,400 |
| **Total Current Assets** | 37,261,597 | 38,879,460 | 33,512,010 | 27,430,770 | 30,401,046 | 27,430,770 | 38,879,460 | 33,496,977 | 33,512,010 |
| **Fixed Assets** | | | | | | | | | |
| Building, Machinery & Equipment | 38,953,825 | 36,561,015 | 15,828,721 | 9,183,580 | 6,359,578 | 6,359,578 | 38,953,825 | 21,377,344 | 15,828,721 |
| **Subtotal** | 38,953,825 | 36,561,015 | 15,828,721 | 9,183,580 | 6,359,578 | 6,359,578 | 38,953,825 | 21,377,344 | 15,828,721 |
| Less: Accumulated Depreciation | 10,839,544 | 6,455,683 | 4,038,704 | 2,850,836 | 1,832,054 | 1,832,054 | 10,839,544 | 5,203,364 | 4,038,704 |
| **Subtotal** | 10,839,544 | 6,455,683 | 4,038,704 | 2,850,836 | 1,832,054 | 1,832,054 | 10,839,544 | 5,203,364 | 4,038,704 |
| **Net Fixed Assets** | 28,114,281 | 30,105,332 | 11,790,017 | 6,332,744 | 4,527,524 | 4,527,524 | 30,105,332 | 16,173,980 | 11,790,017 |
| **Intangible Assets** | | | | | | | | | |
| Intangible Assets | - | - | - | - | 12,355 | - | 12,355 | 2,471 | - |
| Less: Accumulated Amortization | - | - | - | - | 7,337 | - | 7,337 | 1,467 | - |
| **Net Intangible Assets** | - | - | - | - | 5,018 | - | 5,018 | 1,004 | - |
| **Other Assets** | | | | | | | | | |
| Other Investments | - | - | - | - | - | - | - | - | - |
| Other Assets/Tax Credit Receivable | 7,187,040 | 3,676,320 | - | - | - | - | 7,187,040 | 2,172,672 | - |
| Restricted Cash | - | - | - | - | 184,602 | - | 184,602 | 36,920 | - |
| Security Deposits | - | 1,323,905 | 397,033 | 147,475 | 147,475 | - | 1,323,905 | 403,178 | 147,475 |
| **Total Other Assets** | 7,187,040 | 5,000,225 | 397,033 | 147,475 | 332,077 | 147,475 | 7,187,040 | 2,612,770 | 397,033 |
| **Total Assets** | $ 72,562,918 | $ 73,985,017 | $ 45,699,060 | $ 33,910,989 | $ 35,265,665 | $ 33,910,989 | $ 73,985,017 | $ 52,284,730 | $ 45,699,060 |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 1**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS**
**AS OF DECEMBER 31,**

| | DOLLARS | | | | | ANALYTICS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
| **LIABILITIES & EQUITY** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| Accounts Payable | $ 2,326,907 | $ 2,449,716 | $ 6,813,204 | $ 4,706,654 | $ 4,929,041 | $ 2,326,907 | $ 6,813,204 | $ 4,245,104 | $ 4,706,654 |
| Current Portion of Long-Term Debt | 4,630,016 | 4,028,474 | 940,258 | 568,770 | 338,165 | 338,165 | 4,630,016 | 2,101,137 | 940,258 |
| Due to Affiliates | - | - | 493,806 | 493,806 | 493,806 | - | 493,806 | 296,284 | 493,806 |
| Stockholder Distribution Payable | - | - | 321,982 | 51,982 | 51,982 | - | 321,982 | 85,189 | 51,982 |
| Customer & Security Deposits Payable | 668,062 | 1,868,097 | 503,303 | 407,810 | 510,695 | 407,810 | 1,868,097 | 791,593 | 510,695 |
| Accrued Expenses | 6,590,967 | 8,832,511 | 5,666,166 | 5,639,904 | 3,218,478 | 3,218,478 | 8,832,511 | 5,989,605 | 5,666,166 |
| **Total Current Liabilities** | 14,215,952 | 17,178,798 | 14,738,719 | 11,868,926 | 9,542,167 | 9,542,167 | 17,178,798 | 13,508,912 | 14,215,952 |
| **Long Term Liabilities** | | | | | | | | | |
| Mortgages, Notes and Bonds Payable | 12,633,687 | 16,377,797 | 2,675,912 | 1,935,602 | 1,429,440 | 1,429,440 | 16,377,797 | 7,010,488 | 2,675,912 |
| Line of Credit | 17,887,913 | 14,547,912 | 9,853,088 | 3,060,613 | 9,207,400 | 3,060,613 | 17,887,913 | 10,911,385 | 9,853,088 |
| Deferred Rent/Rent Payable | 6,603,261 | 5,754,225 | - | 14,381 | 53,689 | - | 6,603,261 | 2,485,111 | 53,689 |
| Stockholder Loans | 51,982 | 390,977 | - | 643,157 | 864,857 | - | 864,857 | 390,195 | 390,977 |
| **Total Long Term Liabilities** | 37,176,843 | 37,070,911 | 12,529,000 | 5,653,753 | 11,555,386 | 5,653,753 | 37,176,843 | 20,797,179 | 12,529,000 |
| **Total Liabilities** | 51,392,795 | 54,249,709 | 27,267,719 | 17,522,679 | 21,097,553 | 17,522,679 | 54,249,709 | 34,306,091 | 27,267,719 |
| **Stockholders' Equity** | | | | | | | | | |
| Common Stock | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Additional Paid In Capital | 6,077,998 | 6,077,998 | 5,577,998 | 4,904,170 | 4,904,170 | 4,904,170 | 6,077,998 | 5,508,467 | 5,577,998 |
| Begining Retained Earnings | 13,656,310 | 12,852,343 | 11,483,140 | 9,262,942 | 5,977,145 | 5,977,145 | 13,656,310 | 10,646,376 | 11,483,140 |
| Net Income/(Net Loss) | 7,615,517 | 3,713,946 | 11,820,604 | 13,234,290 | 8,084,617 | 3,713,946 | 13,234,290 | 8,893,795 | 8,084,617 |
| Distributions | (6,180,702) | (2,909,979) | (10,451,401) | (11,014,092) | (4,798,820) | (11,014,092) | (2,909,979) | (7,070,999) | (6,180,702) |
| Ending Retained Earnings | 15,091,125 | 13,656,310 | 12,852,343 | 11,483,140 | 9,262,942 | 9,262,942 | 15,091,125 | 12,469,172 | 12,852,343 |
| **Total Equity** | 21,170,123 | 19,735,308 | 18,431,341 | 16,388,310 | 14,168,112 | 14,168,112 | 21,170,123 | 17,978,639 | 18,431,341 |
| **Total Liabilities & Equity** | $ 72,562,918 | $ 73,985,017 | $ 45,699,060 | $ 33,910,989 | $ 35,265,665 | $ 33,910,989 | $ 73,985,017 | $ 52,284,730 | $ 45,699,060 |



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 2 - HISTORICAL BALANCE SHEETS - COMMON SIZE



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 2**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS - COMMON SIZE**
**AS OF DECEMBER 31,**

| | COMMON SIZE | | | | | ANALYTICS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| Cash | 1.5% | 1.8% | 0.8% | 5.6% | 5.2% | 0.8% | 5.6% | 3.0% | 1.8% |
| Marketable Securities | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Accounts Receivable | 14.2% | 12.3% | 15.9% | 19.6% | 15.1% | 12.3% | 19.6% | 15.4% | 15.1% |
| Inventory | 34.6% | 37.4% | 54.3% | 53.9% | 64.6% | 34.6% | 64.6% | 49.0% | 53.9% |
| Prepaid Income Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Prepaid Expenses | 0.7% | 0.7% | 2.3% | 1.8% | 1.2% | 0.7% | 2.3% | 1.3% | 1.2% |
| Due from Affiliate | 0.2% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% |
| Other Receivables | 0.2% | 0.3% | 0.0% | 0.0% | 0.1% | 0.0% | 0.3% | 0.1% | 0.1% |
| **Total Current Assets** | 51.4% | 52.6% | 73.3% | 80.9% | 86.2% | 51.4% | 86.2% | 68.9% | 73.3% |
| | | | | | | | | | |
| **Fixed Assets** | | | | | | | | | |
| Building, Machinery & Equipment | 53.7% | 49.4% | 34.6% | 27.1% | 18.0% | 18.0% | 53.7% | 36.6% | 34.6% |
| **Subtotal** | 53.7% | 49.4% | 34.6% | 27.1% | 18.0% | 18.0% | 53.7% | 36.6% | 34.6% |
| | | | | | | | | | |
| Less: Accumulated Depreciation | 14.9% | 8.7% | 8.8% | 8.4% | 5.2% | 5.2% | 14.9% | 9.2% | 8.7% |
| **Subtotal** | 14.9% | 8.7% | 8.8% | 8.4% | 5.2% | 5.2% | 14.9% | 9.2% | 8.7% |
| | | | | | | | | | |
| **Net Fixed Assets** | 38.7% | 40.7% | 25.8% | 18.7% | 12.8% | 12.8% | 40.7% | 27.3% | 25.8% |
| | | | | | | | | | |
| **Intangible Assets** | | | | | | | | | |
| Intangible Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Less: Accumulated Amortization | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Net Intangible Assets** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | | | | | | | | | |
| **Other Assets** | | | | | | | | | |
| Other Investments | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Assets/Tax Credit Receivable | 9.9% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 9.9% | 3.0% | 0.0% |
| Restricted Cash | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.0% | 0.5% | 0.1% | 0.0% |
| Security Deposits | 0.0% | 1.8% | 0.9% | 0.4% | 0.4% | 0.0% | 1.8% | 0.7% | 0.4% |
| **Total Other Assets** | 9.9% | 6.8% | 0.9% | 0.4% | 0.9% | 0.4% | 9.9% | 3.8% | 0.9% |
| | | | | | | | | | |
| **Total Assets** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |



MSG Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 2**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS - COMMON SIZE**
**AS OF DECEMBER 31,**

| | COMMON SIZE | | | | | ANALYTICS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
| **LIABILITIES & EQUITY** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| Accounts Payable | 3.2% | 3.3% | 14.9% | 13.9% | 14.0% | 3.2% | 14.9% | 9.9% | 13.9% |
| Current Portion of Long-Term Debt | 6.4% | 5.4% | 2.1% | 1.7% | 1.0% | 1.0% | 6.4% | 3.3% | 2.1% |
| Due to Affiliates | 0.0% | 0.0% | 1.1% | 1.5% | 1.4% | 0.0% | 1.5% | 0.8% | 1.1% |
| Stockholder Distribution Payable | 0.0% | 0.0% | 0.7% | 0.2% | 0.1% | 0.0% | 0.7% | 0.2% | 0.1% |
| Customer & Security Deposits Payable | 0.9% | 2.5% | 1.1% | 1.2% | 1.4% | 0.9% | 2.5% | 1.4% | 1.2% |
| Accrued Expenses | 9.1% | 11.9% | 12.4% | 16.6% | 9.1% | 9.1% | 16.6% | 11.8% | 11.9% |
| **Total Current Liabilities** | 19.6% | 23.2% | 32.3% | 35.0% | 27.1% | 19.6% | 35.0% | 27.4% | 27.1% |
| | | | | | | | | | |
| **Long Term Liabilities** | | | | | | | | | |
| Mortgages, Notes and Bonds Payable | 17.4% | 22.1% | 5.9% | 5.7% | 4.1% | 4.1% | 22.1% | 11.0% | 5.9% |
| Line of Credit | 24.7% | 19.7% | 21.6% | 9.0% | 26.1% | 9.0% | 26.1% | 20.2% | 21.6% |
| Deferred Rent/Rent Payable | 9.1% | 7.8% | 0.0% | 0.0% | 0.2% | 0.0% | 9.1% | 3.4% | 0.2% |
| Stockholder Loans | 0.1% | 0.5% | 0.0% | 1.9% | 2.5% | 0.0% | 2.5% | 1.0% | 0.5% |
| **Total Long Term Liabilities** | 51.2% | 50.1% | 27.4% | 16.7% | 32.8% | 16.7% | 51.2% | 35.6% | 32.8% |
| | | | | | | | | | |
| | | | | | | | | | |
| **Total Liabilities** | 70.8% | 73.3% | 59.7% | 51.7% | 59.8% | 51.7% | 73.3% | 63.1% | 59.8% |
| | | | | | | | | | |
| **Stockholders' Equity** | | | | | | | | | |
| Common Stock | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Additional Paid In Capital | 8.4% | 8.2% | 12.2% | 14.5% | 13.9% | 8.2% | 14.5% | 11.4% | 12.2% |
| | | | | | | | | | |
| Begining Retained Earnings | 18.8% | 17.4% | 25.1% | 27.3% | 16.9% | 16.9% | 27.3% | 21.1% | 18.8% |
| Net Income/(Net Loss) | 10.5% | 5.0% | 25.9% | 39.0% | 22.9% | 5.0% | 39.0% | 20.7% | 22.9% |
| Distributions | -8.5% | -3.9% | -22.9% | -32.5% | -13.6% | -32.5% | -3.9% | -16.3% | -13.6% |
| Ending Retained Earnings | 20.8% | 18.5% | 28.1% | 33.9% | 26.3% | 18.5% | 33.9% | 25.5% | 26.3% |
| | | | | | | | | | |
| **Total Equity** | 29.2% | 26.7% | 40.3% | 48.3% | 40.2% | 26.7% | 48.3% | 36.9% | 40.2% |
| | | | | | | | | | |
| **Total Liabilities & Equity** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |


Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 12

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 3 - HISTORICAL BALANCE SHEETS - GROWTH ANALYSIS



**EXHIBIT 3**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS - GROWTH ANALYSIS**
**AS OF DECEMBER 31,**

| | COMPOUND ANNUAL GROWTH | | | | | ANNUAL GROWTH | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2019 | 2018 | 2017 | 2016 | 2015 |
| **ASSETS** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Cash | 2.8% | 9.0% | -28.6% | 41.3% | 92.9% | -18.5% | 288.1% | -81.8% | 3.4% | 92.9% |
| Marketable Securities | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Accounts Receivable | 31.3% | 36.2% | 40.0% | 58.6% | 101.5% | 13.3% | 25.5% | 9.1% | 24.9% | 101.5% |
| Inventory | 16.6% | 24.2% | 28.7% | 25.2% | 95.7% | -9.3% | 11.5% | 35.9% | -19.9% | 95.7% |
| Prepaid Income Taxes | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Prepaid Expenses | -9.2% | -10.2% | 9.0% | -13.9% | -49.1% | -5.1% | -49.8% | 74.4% | 45.8% | -49.1% |
| Due from Affiliate | n/a | n/a | n/a | n/a | n/a | n/a | -100.0% | n/a | n/a | n/a |
| Other Receivables | n/a | n/a | n/a | n/a | n/a | -44.1% | n/a | n/a | -100.0% | n/a |
| **Total Current Assets** | 18.3% | 24.7% | 27.8% | 30.7% | 89.4% | -4.2% | 16.0% | 22.2% | -9.8% | 89.4% |
| | | | | | | | | | | |
| **Fixed Assets** | | | | | | | | | | |
| Building, Machinery & Equipment | 60.7% | 78.1% | 63.4% | 59.0% | 75.1% | 6.5% | 131.0% | 72.4% | 44.4% | 75.1% |
| **Subtotal** | 60.7% | 78.1% | 63.4% | 59.0% | 75.1% | 6.5% | 131.0% | 72.4% | 44.4% | 75.1% |
| | | | | | | | | | | |
| Less: Accumulated Depreciation | 58.9% | 56.7% | 55.7% | 63.3% | 71.3% | 67.9% | 59.8% | 41.7% | 55.6% | 71.3% |
| **Subtotal** | 58.9% | 56.7% | 55.7% | 63.3% | 71.3% | 67.9% | 59.8% | 41.7% | 55.6% | 71.3% |
| | | | | | | | | | | |
| **Net Fixed Assets** | 61.5% | 85.2% | 66.3% | 57.2% | 76.7% | -6.6% | 155.3% | 86.2% | 39.9% | 76.7% |
| | | | | | | | | | | |
| **Intangible Assets** | | | | | | | | | | |
| Intangible Assets | -100.0% | -100.0% | -100.0% | -100.0% | 72.5% | n/a | n/a | n/a | -100.0% | 72.5% |
| Less: Accumulated Amortization | -100.0% | -100.0% | -100.0% | -100.0% | 2.4% | n/a | n/a | n/a | -100.0% | 2.4% |
| **Net Intangible Assets** | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | -100.0% | n/a |
| | | | | | | | | | | |
| **Other Assets** | | | | | | | | | | |
| Other Investments | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Other Assets/Tax Credit Receivable | n/a | n/a | n/a | n/a | n/a | 95.5% | n/a | n/a | n/a | n/a |
| Restricted Cash | -100.0% | -100.0% | -100.0% | -100.0% | 0.2% | n/a | n/a | n/a | -100.0% | 0.1% |
| Security Deposits | -100.0% | 88.1% | 55.4% | 18.1% | 39.4% | -100.0% | 233.4% | 169.2% | 0.0% | 39.4% |
| **Total Other Assets** | 90.0% | 103.8% | 11.0% | -28.7% | 14.5% | 43.7% | 1159.4% | 169.2% | -55.6% | 14.5% |
| | | | | | | | | | | |
| **Total Assets** | 30.9% | 40.6% | 34.2% | 33.9% | 86.5% | -1.9% | 61.9% | 34.8% | -3.8% | 86.5% |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 3**

**FABUWOOD CABINETRY CORP**

**HISTORICAL BALANCE SHEETS - GROWTH ANALYSIS**
**AS OF DECEMBER 31,**

| | COMPOUND ANNUAL GROWTH | | | | | ANNUAL GROWTH | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2019 | 2018 | 2017 | 2016 | 2015 |
| **LIABILITIES & EQUITY** | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable | 15.5% | 21.3% | 81.9% | 103.9% | 335.3% | -5.0% | -64.0% | 44.8% | -4.5% | 335.3% |
| Current Portion of Long-Term Debt | 88.2% | 112.8% | 68.6% | 70.2% | 72.2% | 14.9% | 328.4% | 65.3% | 68.2% | 72.2% |
| Due to Affiliates | -100.0% | -100.0% | 0.0% | 0.0% | 0.0% | n/a | -100.0% | 0.0% | 0.0% | 0.0% |
| Stockholder Distribution Payable | -100.0% | -100.0% | -12.3% | -67.0% | -89.1% | n/a | -100.0% | 519.4% | 0.0% | -89.1% |
| Customer & Security Deposits Payable | 25.0% | 70.9% | 32.0% | 36.4% | 133.1% | -64.2% | 271.2% | 23.4% | -20.1% | 133.1% |
| Accrued Expenses | 75.9% | 117.9% | 143.7% | 279.5% | 721.7% | -25.4% | 55.9% | 0.5% | 75.2% | 721.7% |
| **Total Current Liabilities** | 37.3% | 55.9% | 71.7% | 102.0% | 227.9% | -17.2% | 16.6% | 24.2% | 24.4% | 227.9% |
| | | | | | | | | | | |
| **Long Term Liabilities** | | | | | | | | | | |
| Mortgages, Notes and Bonds Payable | 83.2% | 127.4% | 63.4% | 77.7% | 133.3% | -22.9% | 512.0% | 38.2% | 35.4% | 133.3% |
| Line of Credit | 39.4% | 43.9% | 42.6% | -5.1% | 171.2% | 23.0% | 47.6% | 221.9% | -66.8% | 171.2% |
| Deferred Rent/Rent Payable | 93.7% | 120.8% | -100.0% | -75.6% | -77.8% | 14.8% | n/a | -100.0% | -73.2% | -77.8% |
| Stockholder Loans | -43.0% | -18.0% | -100.0% | -13.8% | 0.0% | -86.7% | n/a | -100.0% | -25.6% | 0.0% |
| **Total Long Term Liabilities** | 48.7% | 64.1% | 34.8% | 5.1% | 125.9% | 0.3% | 195.9% | 121.6% | -51.1% | 125.9% |
| | | | | | | | | | | |
| **Total Liabilities** | 45.0% | 61.2% | 50.3% | 47.8% | 162.9% | -5.3% | 99.0% | 55.6% | -16.9% | 162.9% |
| | | | | | | | | | | |
| **Stockholders' Equity** | | | | | | | | | | |
| Common Stock | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Additional Paid In Capital | 4.4% | 5.5% | 4.4% | 0.0% | 0.0% | 0.0% | 9.0% | 13.7% | 0.0% | 0.0% |
| | | | | | | | | | | |
| Begining Retained Earnings | 21.8% | 26.1% | 31.2% | 35.0% | 17.6% | 6.3% | 11.9% | 24.0% | 55.0% | 17.6% |
| Net Income/(Net Loss) | 9.9% | -5.9% | 35.6% | 67.0% | 70.5% | 105.1% | -68.6% | -10.7% | 63.7% | 70.5% |
| Distributions | 9.9% | -6.8% | 39.5% | 69.1% | 24.6% | -112.4% | 72.2% | 5.1% | -129.5% | -24.6% |
| Ending Retained Earnings | 20.4% | 18.0% | 16.5% | 14.0% | 9.2% | 10.5% | 6.3% | 11.9% | 24.0% | 55.0% |
| | | | | | | | | | | |
| **Total Equity** | 14.2% | 16.0% | 19.2% | 22.7% | 30.2% | 7.3% | 7.1% | 12.5% | 15.7% | 30.2% |
| | | | | | | | | | | |
| **Total Liabilities & Equity** | 30.9% | 40.6% | 34.2% | 33.9% | 86.5% | -1.9% | 61.9% | 34.8% | -3.8% | 86.5% |



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 4 - HISTORICAL INCOME STATEMENTS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 4**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS**
**FOR THE YEARS ENDING DECEMBER 31,**

| | DOLLARS | | | | | ANALYTICS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
| **Revenues** | | | | | | | | | |
| Gross Sales | $ 165,910,184 | $ 147,488,663 | $ 118,419,768 | $ 105,815,720 | $ 79,194,199 | $ 79,194,199 | $ 165,910,184 | $ 123,365,707 | $ 118,419,768 |
| Less: Returns and Allowances | - | - | - | - | - | | | | |
| Net Sales | 165,910,184 | 147,488,663 | 118,419,768 | 105,815,720 | 79,194,199 | 79,194,199 | 165,910,184 | 123,365,707 | 118,419,768 |
| | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | |
| Beginning Inventory | 27,684,954 | 24,822,220 | 18,264,991 | 22,792,882 | 11,645,135 | 11,645,135 | 27,684,954 | 21,042,036 | 22,792,882 |
| Purchases | 64,229,203 | 59,571,795 | 49,390,228 | 32,322,255 | 42,045,119 | 32,322,255 | 64,229,203 | 49,511,720 | 49,390,228 |
| Freight-In | 3,920,955 | 4,741,063 | 3,373,778 | 2,179,915 | 3,487,988 | 2,179,915 | 4,741,063 | 3,540,740 | 3,487,988 |
| Allocated Overhead | 1,001,111 | 1,051,792 | 1,258,945 | 1,056,347 | 717,932 | 717,932 | 1,258,945 | 1,017,225 | 1,051,792 |
| Depreciation | 4,592,510 | 2,637,288 | 1,069,606 | 950,785 | 619,940 | 619,940 | 4,592,510 | 1,974,026 | 1,069,606 |
| Direct Labor & Quality Control | 22,547,309 | 23,308,261 | 16,848,921 | 19,246,233 | 13,149,626 | 13,149,626 | 23,308,261 | 19,020,070 | 19,246,233 |
| Shop Expenses & Supplies | 1,501,980 | 1,421,076 | 944,172 | 738,954 | 706,356 | 706,356 | 1,501,980 | 1,062,508 | 944,172 |
| Warehousing Expenses | 8,154,817 | 8,517,429 | 4,708,166 | 3,759,273 | 2,602,686 | 2,602,686 | 8,517,429 | 5,548,474 | 4,708,166 |
| Ending Inventory | (25,113,259) | (27,684,954) | (24,822,220) | (18,264,991) | (22,792,882) | (27,684,954) | (18,264,991) | (23,735,661) | (24,822,220) |
| **Total Cost of Sales** | 108,519,580 | 98,385,970 | 71,036,587 | 64,781,653 | 52,181,900 | 52,181,900 | 108,519,580 | 78,981,138 | 71,036,587 |
| | | | | | | | | | |
| **Gross Profit** | 57,390,604 | 49,102,693 | 47,383,181 | 41,034,067 | 27,012,299 | 27,012,299 | 57,390,604 | 44,384,569 | 47,383,181 |
| | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | |
| Salaries and Wages | 15,065,408 | 11,621,074 | 9,309,009 | 7,318,402 | 5,601,042 | 5,601,042 | 15,065,408 | 9,782,987 | 9,309,009 |
| Repairs and Maintenance | 1,750,207 | 1,584,457 | 487,311 | 239,533 | 215,318 | 215,318 | 1,750,207 | 855,365 | 487,311 |
| Rent | 2,353,617 | 5,486,912 | 76,499 | 67,443 | 46,694 | 46,694 | 5,486,912 | 1,606,233 | 76,499 |
| Payroll Taxes and Processing Fees | 1,641,194 | 1,303,789 | 824,667 | 653,050 | 549,423 | 549,423 | 1,641,194 | 994,425 | 824,667 |
| Employee Benefits | 1,592,166 | 1,307,299 | 551,739 | 405,449 | 267,409 | 267,409 | 1,592,166 | 824,812 | 551,739 |
| Advertising and Marketing | 522,492 | 603,540 | 774,988 | 250,446 | 281,687 | 250,446 | 774,988 | 486,631 | 522,492 |
| Bad Debt Expense | - | 301,119 | - | 175,000 | - | | 301,119 | 95,224 | |
| Bank and Credit Card Charges | 2,101,213 | 1,780,562 | 1,334,462 | 1,046,347 | 708,149 | 708,149 | 2,101,213 | 1,394,147 | 1,334,462 |
| Business Travel and Auto Expenses | 1,550,218 | 1,028,479 | 316,426 | 175,343 | 208,517 | 175,343 | 1,550,218 | 655,797 | 316,426 |
| Charitable Contributions | 20,289 | 42,286 | 232,870 | 177,283 | 32,224 | 20,289 | 232,870 | 100,990 | 42,286 |
| Computer Support and Expenses | 920,937 | 961,264 | 490,632 | 223,817 | 189,415 | 189,415 | 961,264 | 557,213 | 490,632 |
| Equipment Rental | - | - | - | - | - | | | | |
| Insurance | 2,319,677 | 3,094,294 | 1,905,911 | 2,619,164 | 2,143,721 | 1,905,911 | 3,094,294 | 2,416,553 | 2,319,677 |
| Licenses, Dues, and Fees | 393,637 | 805,843 | 354,577 | 108,137 | 62,907 | 62,907 | 805,843 | 345,020 | 354,577 |
| Meals and Entertainment | 389,574 | 332,029 | 151,240 | - | - | | 389,574 | 174,569 | 151,240 |
| Moving Expense | - | 276,273 | - | - | - | | 276,273 | 55,255 | |
| Office Expenses and Supplies | 965,626 | 944,386 | 553,806 | 405,638 | 422,840 | 405,638 | 965,626 | 658,459 | 553,806 |
| Printing and Postage | 111,006 | 246,854 | 62,369 | 23,926 | 41,556 | 23,926 | 246,854 | 97,142 | 62,369 |
| Professional Fees | 2,649,022 | - | 6,031,602 | 3,871,036 | 491,135 | - | 6,031,602 | 2,608,559 | 2,649,022 |
| Sales Commissions | 5,614,805 | 5,511,488 | 4,471,001 | 3,824,798 | 2,892,542 | 2,892,542 | 5,614,805 | 4,462,927 | 4,471,001 |
| Shipping and Trucking | 7,664,951 | 6,669,058 | 4,478,467 | 3,662,229 | 2,583,056 | 2,583,056 | 7,664,951 | 5,011,552 | 4,478,467 |
| Telephone and Internet | 175,491 | 161,498 | 114,208 | 104,626 | 79,070 | 79,070 | 175,491 | 126,979 | 114,208 |
| Trade Shows | 1,594,689 | 1,173,742 | 874,817 | 609,558 | 520,362 | 520,362 | 1,594,689 | 954,634 | 874,817 |
| Utilities | 53,763 | 145,722 | 366,202 | 302,706 | 270,750 | 53,763 | 366,202 | 227,829 | 270,750 |
| Waste Removal | - | - | 180,862 | 129,219 | 122,524 | - | 180,862 | 86,521 | 122,524 |
| **Total Operating Expenses** | 49,449,982 | 45,381,968 | 33,943,665 | 26,393,150 | 17,730,341 | 17,730,341 | 49,449,982 | 34,579,821 | 33,943,665 |
| | | | | | | | | | |
| **Income Before Other Expenses** | 7,940,622 | 3,720,725 | 13,439,516 | 14,640,917 | 9,281,958 | 3,720,725 | 14,640,917 | 9,804,748 | 9,281,958 |

**MSG** Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 4**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS**
**FOR THE YEARS ENDING DECEMBER 31,**

| | DOLLARS | | | | | ANALYTICS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** | **MIN** | **MAX** | **MEAN** | **MEDIAN** |
| **Officer Compensation** | 1,410,705 | 1,733,081 | 958,885 | 927,196 | 903,018 | 903,018 | 1,733,081 | 1,186,577 | 958,885 |
| **Depreciation and Amortization** | 410,102 | 400,962 | 352,271 | 161,935 | 142,829 | 142,829 | 410,102 | 293,620 | 352,271 |
| **Operating Income** | 6,119,815 | 1,586,682 | 12,128,360 | 13,551,786 | 8,236,111 | 1,586,682 | 13,551,786 | 8,324,551 | 8,236,111 |
| **Other Expenses (Income)** | | | | | | | | | |
| Interest Expense | 1,959,694 | 1,377,964 | 296,923 | 315,416 | 148,801 | 148,801 | 1,959,694 | 819,760 | 315,416 |
| Interest Income | - | - | - | (420) | (397) | (420) | - | (163) | - |
| (Gain)/Loss on Disposal of Asset | (67,883) | 7,217 | 10,833 | - | - | (67,883) | 10,833 | (9,967) | - |
| Other Income | (3,510,720) | (3,676,320) | - | - | - | (3,676,320) | - | (1,437,408) | - |
| **Total Other Expenses (Income)** | (1,618,909) | (2,291,139) | 307,756 | 314,996 | 148,404 | (2,291,139) | 314,996 | (627,778) | 148,404 |
| **Income Before Income Taxes** | 7,738,724 | 3,877,821 | 11,820,604 | 13,236,790 | 8,087,707 | 3,877,821 | 13,236,790 | 8,952,329 | 8,087,707 |
| **Corporate Income Taxes** | | | | | | | | | |
| Federal | - | - | - | - | - | | | | |
| State | 123,207 | 163,875 | - | 2,500 | 3,090 | - | 163,875 | 58,534 | 3,090 |
| City | - | - | - | - | - | | | | |
| **Total Taxes** | 123,207 | 163,875 | - | 2,500 | 3,090 | - | 163,875 | 58,534 | 3,090 |
| **NET INCOME (LOSS)** | $ 7,615,517 | $ 3,713,946 | $ 11,820,604 | $ 13,234,290 | $ 8,084,617 | $ 3,713,946 | $ 13,234,290 | $ 8,893,795 | $ 8,084,617 |
| | 4.6% | 2.5% | 10.0% | 12.5% | 10.2% | 2.5% | 12.5% | 8.0% | 10.0% |
| **EBIT (Earnings Before Interest & Taxes)** | $ 6,119,815 | $ 1,586,682 | $ 12,128,360 | $ 13,551,786 | $ 8,236,111 | $ 1,586,682 | $ 13,551,786 | $ 8,324,551 | $ 8,236,111 |
| | 3.7% | 1.1% | 10.2% | 12.8% | 10.4% | 1.1% | 12.8% | 7.6% | 10.2% |
| **EBITDA (Earnings Before Interest, Taxes, Depreciation & Amortization)** | $ 11,122,427 | $ 4,624,932 | $ 13,550,237 | $ 14,664,506 | $ 8,998,880 | $ 4,624,932 | $ 14,664,506 | $ 10,592,196 | $ 11,122,427 |
| | 6.7% | 3.1% | 11.4% | 13.9% | 11.4% | 3.1% | 13.9% | 9.3% | 11.4% |



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 5 - HISTORICAL INCOME STATEMENTS - COMMON SIZE



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 5**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS  - COMMON SIZE**
**FOR THE YEARS ENDING DECEMBER 31,**

| | COMMON SIZE | | | | | ANALYTICS | | | |
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | |
| Gross Sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Less: Returns and Allowances | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Net Sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Cost of Sales** | | | | | | | | | |
| Beginning Inventory | 16.7% | 16.8% | 15.4% | 21.5% | 14.7% | 14.7% | 21.5% | 17.0% | 16.7% |
| Purchases | 38.7% | 40.4% | 41.7% | 30.5% | 53.1% | 30.5% | 53.1% | 40.9% | 40.4% |
| Freight-In | 2.4% | 3.2% | 2.8% | 2.1% | 4.4% | 2.1% | 4.4% | 3.0% | 2.8% |
| Allocated Overhead | 0.6% | 0.7% | 1.1% | 1.0% | 0.9% | 0.6% | 1.1% | 0.9% | 0.9% |
| Depreciation | 2.8% | 1.8% | 0.9% | 0.9% | 0.8% | 0.8% | 2.8% | 1.4% | 0.9% |
| Direct Labor & Quality Control | 13.6% | 15.8% | 14.2% | 18.2% | 16.6% | 13.6% | 18.2% | 15.7% | 15.8% |
| Shop Expenses & Supplies | 0.9% | 1.0% | 0.8% | 0.7% | 0.9% | 0.7% | 1.0% | 0.9% | 0.9% |
| Warehousing Expenses | 4.9% | 5.8% | 4.0% | 3.6% | 3.3% | 3.3% | 5.8% | 4.3% | 4.0% |
| Ending Inventory | -15.1% | -18.8% | -21.0% | -17.3% | -28.8% | -28.8% | -15.1% | -20.2% | -18.8% |
| Total Cost of Sales | 65.4% | 66.7% | 60.0% | 61.2% | 65.9% | 60.0% | 66.7% | 63.8% | 65.4% |
| Gross Profit | 34.6% | 33.3% | 40.0% | 38.8% | 34.1% | 33.3% | 40.0% | 36.2% | 34.6% |
| **Operating Expenses** | | | | | | | | | |
| Salaries and Wages | 9.1% | 7.9% | 7.9% | 6.9% | 7.1% | 6.9% | 9.1% | 7.8% | 7.9% |
| Repairs and Maintenance | 1.1% | 1.1% | 0.4% | 0.2% | 0.3% | 0.2% | 1.1% | 0.6% | 0.4% |
| Rent | 1.4% | 3.7% | 0.1% | 0.1% | 0.1% | 0.1% | 3.7% | 1.1% | 0.1% |
| Payroll Taxes and Processing Fees | 1.0% | 0.9% | 0.7% | 0.6% | 0.7% | 0.6% | 1.0% | 0.8% | 0.7% |
| Employee Benefits | 1.0% | 0.9% | 0.5% | 0.4% | 0.3% | 0.3% | 1.0% | 0.6% | 0.5% |
| Advertising and Marketing | 0.3% | 0.4% | 0.7% | 0.2% | 0.4% | 0.2% | 0.7% | 0.4% | 0.4% |
| Bad Debt Expense | 0.0% | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.1% | 0.0% |
| Bank and Credit Card Charges | 1.3% | 1.2% | 1.1% | 1.0% | 0.9% | 0.9% | 1.3% | 1.1% | 1.1% |
| Business Travel and Auto Expenses | 0.9% | 0.7% | 0.3% | 0.2% | 0.3% | 0.2% | 0.9% | 0.5% | 0.3% |
| Charitable Contributions | 0.0% | 0.0% | 0.2% | 0.2% | 0.0% | 0.0% | 0.2% | 0.1% | 0.0% |
| Computer Support and Expenses | 0.6% | 0.7% | 0.4% | 0.2% | 0.2% | 0.2% | 0.7% | 0.4% | 0.4% |
| Equipment Rental | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Insurance | 1.4% | 2.1% | 1.6% | 2.5% | 2.7% | 1.4% | 2.7% | 2.1% | 2.1% |
| Licenses, Dues, and Fees | 0.2% | 0.5% | 0.3% | 0.1% | 0.1% | 0.1% | 0.5% | 0.3% | 0.2% |
| Meals and Entertainment | 0.2% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.2% | 0.1% | 0.1% |
| Moving Expense | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% |
| Office Expenses and Supplies | 0.6% | 0.6% | 0.5% | 0.4% | 0.5% | 0.4% | 0.6% | 0.5% | 0.5% |
| Printing and Postage | 0.1% | 0.2% | 0.1% | 0.0% | 0.1% | 0.0% | 0.2% | 0.1% | 0.1% |
| Professional Fees | 1.6% | 0.0% | 5.1% | 3.7% | 0.6% | 0.0% | 5.1% | 2.2% | 1.6% |
| Sales Commissions | 3.4% | 3.7% | 3.8% | 3.6% | 3.7% | 3.4% | 3.8% | 3.6% | 3.7% |
| Shipping and Trucking | 4.6% | 4.5% | 3.8% | 3.5% | 3.3% | 3.3% | 4.6% | 3.9% | 3.8% |
| Telephone and Internet | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Trade Shows | 1.0% | 0.8% | 0.7% | 0.6% | 0.7% | 0.6% | 1.0% | 0.7% | 0.7% |
| Utilities | 0.0% | 0.1% | 0.3% | 0.3% | 0.3% | 0.0% | 0.3% | 0.2% | 0.3% |
| Waste Removal | 0.0% | 0.0% | 0.2% | 0.1% | 0.2% | 0.0% | 0.2% | 0.1% | 0.1% |
| Total Operating Expenses | 29.8% | 30.8% | 28.7% | 24.9% | 22.4% | 22.4% | 30.8% | 27.3% | 28.7% |
| Income Before Other Expenses | 4.8% | 2.5% | 11.3% | 13.8% | 11.7% | 2.5% | 13.8% | 8.8% | 11.3% |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 5**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS  - COMMON SIZE**
**FOR THE YEARS ENDING DECEMBER 31,**

| | COMMON SIZE | | | | | ANALYTICS | | | |
| | 2019 | 2018 | 2017 | 2016 | 2015 | MIN | MAX | MEAN | MEDIAN |
|---|---|---|---|---|---|---|---|---|---|
| **Officer Compensation** | 0.9% | 1.2% | 0.8% | 0.9% | 1.1% | 0.8% | 1.2% | 1.0% | 0.9% |
| **Depreciation and Amortization** | 0.2% | 0.3% | 0.3% | 0.2% | 0.2% | 0.2% | 0.3% | 0.2% | 0.2% |
| **Operating Income** | 3.7% | 1.1% | 10.2% | 12.8% | 10.4% | 1.1% | 12.8% | 7.6% | 10.2% |
| **Other Expenses (Income)** | | | | | | | | | |
| Interest Expense | 1.2% | 0.9% | 0.3% | 0.3% | 0.2% | 0.2% | 1.2% | 0.6% | 0.3% |
| Interest Income | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| (Gain)/Loss on Disposal of Asset | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Income | -2.1% | -2.5% | 0.0% | 0.0% | 0.0% | -2.5% | 0.0% | -0.9% | 0.0% |
| **Total Other Expenses (Income)** | -1.0% | -1.6% | 0.3% | 0.3% | 0.2% | -1.6% | 0.3% | -0.4% | 0.2% |
| **Income Before Income Taxes** | 4.7% | 2.6% | 10.0% | 12.5% | 10.2% | 2.6% | 12.5% | 8.0% | 10.0% |
| **Corporate Income Taxes** | | | | | | | | | |
| Federal | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| State | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% |
| City | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Taxes** | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% |
| **NET INCOME (LOSS)** | **4.6%** | **2.5%** | **10.0%** | **12.5%** | **10.2%** | **2.5%** | **12.5%** | **8.0%** | **10.0%** |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 6 - HISTORICAL INCOME STATEMENTS - GROWTH ANALYSIS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 6**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS - GROWTH ANALYSIS**
**FOR THE YEARS ENDING DECEMBER 31,**

| | COMPOUND ANNUAL GROWTH | | | | | ANNUAL GROWTH | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** | **2019** | **2018** | **2017** | **2016** | **2015** |
| **Revenues** | | | | | | | | | | |
| Gross Sales | 26.1% | 29.8% | 31.6% | 42.6% | 52.3% | 12.5% | 24.5% | 11.9% | 33.6% | 52.3% |
| Less: Returns and Allowances | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Net Sales | 26.1% | 29.8% | 31.6% | 42.6% | 52.3% | 12.5% | 24.5% | 11.9% | 33.6% | 52.3% |
| | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | |
| Beginning Inventory | 20.4% | 22.7% | 18.6% | 44.2% | 6.3% | 11.5% | 35.9% | -19.9% | 95.7% | 6.3% |
| Purchases | 25.3% | 30.1% | 33.4% | 24.7% | 102.2% | 7.8% | 20.6% | 52.8% | -23.1% | 102.2% |
| Freight-In | 10.8% | 19.2% | 12.9% | -3.6% | 48.7% | -17.3% | 40.5% | 54.8% | -37.5% | 48.7% |
| Allocated Overhead | 11.1% | 15.5% | 28.7% | 33.7% | 21.5% | -4.8% | -16.5% | 19.2% | 47.1% | 21.5% |
| Depreciation | 76.8% | 77.4% | 59.0% | 89.0% | 132.9% | 74.1% | 146.6% | 12.5% | 53.4% | 132.9% |
| Direct Labor & Quality Control | 23.4% | 31.1% | 28.8% | 56.2% | 66.6% | -3.3% | 38.3% | -12.5% | 46.4% | 66.6% |
| Shop Expenses & Supplies | 34.7% | 43.1% | 40.7% | 47.6% | 108.4% | 5.7% | 50.5% | 27.8% | 4.6% | 108.4% |
| Warehousing Expenses | 33.7% | 45.3% | 35.0% | 40.2% | 36.1% | -4.3% | 80.9% | 25.2% | 44.4% | 36.1% |
| Ending Inventory | 16.6% | 24.2% | 28.7% | 25.2% | 95.7% | 9.3% | -11.5% | -35.9% | 19.9% | -95.7% |
| **Total Cost of Sales** | 26.5% | 31.0% | 28.5% | 39.2% | 56.0% | 10.3% | 38.5% | 9.7% | 24.1% | 56.0% |
| | | | | | | | | | | |
| **Gross Profit** | 25.3% | 27.6% | 36.7% | 48.7% | 45.6% | 16.9% | 3.6% | 15.5% | 51.9% | 45.6% |
| | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | |
| Salaries and Wages | 31.5% | 32.0% | 34.5% | 38.2% | 46.3% | 29.6% | 24.8% | 27.2% | 30.7% | 46.3% |
| Repairs and Maintenance | 55.0% | 68.6% | 35.5% | 10.6% | 9.9% | 10.5% | 225.1% | 103.4% | 11.2% | 9.9% |
| Rent | 121.9% | 234.7% | 20.5% | 24.2% | 6.8% | -57.1% | 7072.5% | 13.4% | 44.4% | 6.8% |
| Payroll Taxes and Processing Fees | 27.3% | 27.7% | 18.9% | 15.4% | 12.0% | 25.9% | 58.1% | 26.3% | 18.9% | 12.0% |
| Employee Benefits | 46.3% | 53.2% | 32.5% | 30.7% | 12.7% | 21.8% | 136.9% | 36.1% | 51.6% | 12.7% |
| Advertising and Marketing | 10.7% | 17.8% | 35.2% | -10.7% | -10.2% | -14.1% | -22.1% | 209.4% | -11.1% | -10.2% |
| Bad Debt Expense | n/a | n/a | n/a | n/a | n/a | -100.0% | n/a | -100.0% | n/a | n/a |
| Bank and Credit Card Charges | 39.9% | 45.9% | 50.3% | 63.2% | 80.3% | 18.0% | 33.4% | 27.5% | 47.8% | 80.3% |
| Business Travel and Auto Expenses | 99.6% | 114.1% | 86.3% | 89.2% | 325.8% | 50.7% | 225.0% | 80.5% | -15.9% | 325.8% |
| Charitable Contributions | n/a | n/a | n/a | n/a | n/a | -52.0% | -81.8% | 31.4% | 450.2% | n/a |
| Computer Support and Expenses | 53.9% | 73.3% | 66.3% | 44.8% | 77.5% | -4.2% | 95.9% | 119.2% | 18.2% | 77.5% |
| Equipment Rental | -100.0% | -100.0% | -100.0% | -100.0% | -100.0% | n/a | n/a | n/a | n/a | -100.0% |
| Insurance | 4.3% | 13.2% | 0.4% | 18.0% | 13.9% | -25.0% | 62.4% | -27.2% | 22.2% | 13.9% |
| Licenses, Dues, and Fees | 67.6% | 128.0% | 128.3% | 90.5% | 111.0% | -51.2% | 127.3% | 227.9% | 71.9% | 111.0% |
| Meals and Entertainment | n/a | n/a | n/a | n/a | n/a | 17.3% | 119.5% | n/a | n/a | n/a |
| Moving Expense | n/a | n/a | n/a | n/a | n/a | -100.0% | n/a | n/a | n/a | n/a |
| Office Expenses and Supplies | 25.3% | 31.9% | 21.0% | 14.0% | 35.4% | 2.2% | 70.5% | 36.5% | -4.1% | 35.4% |
| Printing and Postage | 42.8% | 90.7% | 49.5% | 13.2% | 122.5% | -55.0% | 295.8% | 160.7% | -42.4% | 122.5% |
| Professional Fees | 52.1% | -100.0% | 164.7% | 245.0% | 51.1% | n/a | -100.0% | 55.8% | 688.2% | 51.1% |
| Sales Commissions | 22.6% | 28.4% | 30.2% | 37.3% | 42.7% | 1.9% | 23.3% | 16.9% | 32.2% | 42.7% |
| Shipping and Trucking | 34.4% | 39.7% | 36.8% | 44.7% | 47.7% | 14.9% | 48.9% | 22.3% | 41.8% | 47.7% |
| Telephone and Internet | 20.5% | 23.6% | 18.2% | 23.0% | 14.4% | 8.7% | 41.4% | 9.2% | 32.3% | 14.4% |
| Trade Shows | 24.2% | 21.5% | 17.5% | 6.4% | -3.4% | 35.9% | 34.2% | 43.5% | 17.1% | -3.4% |
| Utilities | -24.1% | -9.1% | 19.7% | 19.0% | 26.7% | -63.1% | -60.2% | 21.0% | 11.8% | 26.7% |
| Waste Removal | -100.0% | -100.0% | 37.0% | 35.5% | 74.2% | n/a | -100.0% | 40.0% | 5.5% | 74.2% |
| **Total Operating Expenses** | 30.8% | 36.9% | 38.0% | 43.0% | 37.3% | 9.0% | 33.7% | 28.6% | 48.9% | 37.3% |
| | | | | | | | | | | |
| **Income Before Other Expenses** | 7.1% | -9.9% | 33.6% | 61.1% | 64.6% | 113.4% | -72.3% | -8.2% | 57.7% | 64.6% |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 6**

**FABUWOOD CABINETRY CORP**

**HISTORICAL INCOME STATEMENTS - GROWTH ANALYSIS**
**FOR THE YEARS ENDING DECEMBER 31,**

| | COMPOUND ANNUAL GROWTH | | | | | ANNUAL GROWTH | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** | **2019** | **2018** | **2017** | **2016** | **2015** |
| **Officer Compensation** | 16.3% | 27.2% | 13.1% | 18.3% | 36.3% | -18.6% | 80.7% | 3.4% | 2.7% | 36.3% |
| **Depreciation and Amortization** | 27.0% | 34.0% | 41.5% | 14.2% | 14.9% | 2.3% | 13.8% | 117.5% | 13.4% | 14.9% |
| **Operating Income** | 4.8% | -24.4% | 35.7% | 67.1% | 69.7% | 285.7% | -86.9% | -10.5% | 64.5% | 69.7% |
| **Other Expenses (Income)** | | | | | | | | | | |
| Interest Expense | 78.2% | 88.5% | 39.6% | 70.0% | 36.3% | 42.2% | 364.1% | -5.9% | 112.0% | 36.3% |
| Interest Income | -100.0% | -100.0% | -100.0% | -6.4% | -17.1% | n/a | n/a | 100.0% | -5.8% | 17.1% |
| (Gain)/Loss on Disposal of Asset | n/a | n/a | n/a | n/a | n/a | -1040.6% | -33.4% | n/a | n/a | n/a |
| Other Income | n/a | n/a | n/a | n/a | n/a | 4.5% | n/a | n/a | n/a | n/a |
| **Total Other Expenses (Income)** | -271.6% | n/a | 41.5% | 70.3% | 36.6% | 29.3% | -844.5% | -2.3% | 112.3% | 36.6% |
| **Income Before Income Taxes** | 10.3% | -4.9% | 35.6% | 67.0% | 70.5% | 99.6% | -67.2% | -10.7% | 63.7% | 70.5% |
| **Corporate Income Taxes** | | | | | | | | | | |
| Federal | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| State | 187.1% | 301.3% | -100.0% | 98.9% | 388.9% | -24.8% | n/a | -100.0% | -19.1% | 388.9% |
| City | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| **Total Taxes** | 187.1% | 301.3% | -100.0% | 98.9% | 388.9% | -24.8% | n/a | -100.0% | -19.1% | 388.9% |
| **NET INCOME (LOSS)** | **9.9%** | **-5.9%** | **35.6%** | **67.0%** | **70.5%** | **105.1%** | **-68.6%** | **-10.7%** | **63.7%** | **70.5%** |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 7 - ADJUSTED BALANCE SHEETS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## EXHIBIT 7
## FABUWOOD CABINETRY CORP
## ADJUSTED BALANCE SHEETS

| | DECEMBER 31, 2019 | | | VALUATION ADJUSTMENTS/ COMMENTS | | SEPTEMBER 30 2020 | | |
|---|---|---|---|---|---|---|---|---|
| | HISTORICAL | ADJUSTMENTS | ADJUSTED | | | HISTORICAL | ADJUSTMENTS | ADJUSTED |
| **ASSETS** | | | | | **ASSETS** | | | |
| **Current Assets** | | | | | **Current Assets** | | | |
| Cash | $ 1,101,669 | $ - | $ 1,101,669 | | Cash | $ 3,123,612 | - | $ 3,123,612 |
| Marketable Securities | - | | - | | Marketable Securities | - | | - |
| Accounts Receivable | 10,321,645 | | 10,321,645 | | Accounts Receivable | 8,593,233 | | 8,593,233 |
| Inventory | 25,113,259 | | 25,113,259 | | Inventory | 44,123,090 | | 44,123,090 |
| Prepaid Expenses | 497,382 | | 497,382 | | Prepaid Expenses | 1,319,152 | | 1,319,152 |
| Due From Affiliate | 109,451 | | 109,451 | | Due From Affiliate | - | | - |
| Other Receivables | 118,191 | 7,187,040 | 7,305,231 | To reclassify tax credits to current assets. | Other Receivables | - | 6,658,893 | 6,658,893 |
| Prepaid Income Taxes | - | | - | | Prepaid Income Taxes | - | | - |
| **Total Current Assets** | 37,261,597 | | 44,448,637 | | **Total Current Assets** | 57,159,087 | | 63,817,980 |
| | | | | | | | | |
| **Fixed Assets** | | | | | **Fixed Assets** | | | |
| Building, Machinery & Equipment | 38,953,825 | - | 38,953,825 | | Building, Machinery & Equipment | 39,802,445 | - | 39,802,445 |
| **Subtotal** | 38,953,825 | | 38,953,825 | | **Subtotal** | 39,802,445 | | 39,802,445 |
| | | | | | | | | |
| Less: Accumulated Depreciation | 10,839,544 | - | 10,839,544 | | Less: Accumulated Depreciation | 14,788,925 | - | 14,788,925 |
| **Net Fixed Assets** | 28,114,281 | | 28,114,281 | | **Net Fixed Assets** | 25,013,520 | | 25,013,520 |
| | | | | | | | | |
| **Other Assets** | | | | | **Other Assets** | | | |
| Other Investments | - | | - | | Other Investments | - | | - |
| Other Assets/Tax Credit Receivable | 7,187,040 | (7,187,040) | - | To reclass to current asset. | Other Assets/Tax Credit Receivable | 6,658,893 | (6,658,893) | - |
| Security Deposits | - | | - | | Security Deposits | - | | - |
| **Total Other Assets** | 7,187,040 | | - | | **Total Other Assets** | 6,658,893 | | - |
| | | | | | | | | |
| **Total Assets** | $72,562,918 | | $ 72,562,918 | | **Total Assets** | $88,831,500 | | $88,831,500 |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 7**

**FABUWOOD CABINETRY CORP**

**ADJUSTED BALANCE SHEETS**

| | DECEMBER 31, 2019 | | | VALUATION ADJUSTMENTS/ COMMENTS | | SEPTEMBER 30 2020 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | HISTORICAL | ADJUSTMENTS | ADJUSTED | | | HISTORICAL | ADJUSTMENTS | ADJUSTED |
| **LIABILITIES & EQUITY** | | | | | **LIABILITIES & EQUITY** | | | |
| **Current Liabilities** | | | | | **Current Liabilities** | | | |
| Accounts Payable | $ 2,326,907 | $ 6,603,261 | $ 8,930,168 | | Accounts Payable | $10,851,278 | 7,092,618 | $17,943,896 |
| Current Portion of Long-Term Debt | 4,630,016 | - | 4,630,016 | | Current Portion of Long-Term Debt | - | - | - |
| Customer & Security Deposits Payable | 668,062 | - | 668,062 | | Customer & Security Deposits Payable | 1,037,758 | - | 1,037,758 |
| Accrued Expenses | 6,590,967 | - | 6,590,967 | | Accrued Expenses | 2,105,168 | - | 2,105,168 |
| **Total Current Liabilities** | 14,215,952 | | 20,819,213 | | **Total Current Liabilities** | 13,994,204 | | 21,086,822 |
| | | | | | | | | |
| **Long-Term Liabilities** | | | | | Long-Term Liabilities | | | |
| Mortgages, Notes and Bonds Payable | 12,633,687 | - | 12,633,687 | | Mortgages, Notes and Bonds Payable | 15,933,868 | - | 15,933,868 |
| Line of Credit | 17,887,913 | - | 17,887,913 | | Line of Credit | 24,987,913 | | 24,987,913 |
| Loans from Shareholders | 51,982 | (51,982) | - | To reclass to equity. | Loans from Shareholders | 5,751,982 | (5,751,982) | - |
| Deferred Rent/Rent Payable | 6,603,261 | (6,603,261) | - | To reclass to current liability. | Deferred Rent/Rent Payable | 7,092,618 | (7,092,618) | - |
| **Long-Term Liabilities** | 37,176,843 | | 30,521,600 | | **Long-Term Liabilities** | 53,766,381 | | 40,921,781 |
| | | | | | | | | |
| **Total Liabilities** | 51,392,795 | | 51,340,813 | | **Total Liabilities** | 67,760,585 | | 62,008,603 |
| | | | | | | | | |
| **Equity** | | | | | **Equity** | | | |
| Common Stock | 1,000 | - | 1,000 | | Common Stock | 1,000 | - | 1,000 |
| Additional Paid In Capital | 6,077,998 | - | 6,077,998 | | Additional Paid In Capital | 6,077,998 | - | 6,077,998 |
| Retained Earnings | 15,091,125 | 51,982 | 15,143,107 | | Retained Earnings | 14,991,917 | 5,751,982 | 20,743,899 |
| **Total Equity** | 21,170,123 | | 21,222,105 | | **Total Equity** | 21,070,915 | | 26,822,897 |
| | | | | | | | | |
| **Total Liabilities & Equity** | $72,562,918 | | $ 72,562,918 | | **Total Liabilities & Equity** | $88,831,500 | | $88,831,500 |


MSG Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 8 - COMPUTATION OF NET WORKING CAPITAL REQUIREMENT



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 8**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF NET WORKING CAPITAL REQUIREMENT**

| | 2019 | 2018 | 2017 | 2016 | 2015 | Adjusted 2019 |
|---|---|---|---|---|---|---|
| Current Operating Assets | $ 37,261,597 | $ 38,879,460 | $ 33,512,010 | $ 27,430,770 | $ 30,401,046 | $ 44,448,637 |
| Current Operating Liabilities | 14,215,952 | 17,178,798 | 14,738,719 | 11,868,926 | 9,542,167 | 20,819,213 |
| Net Working Capital | 23,045,645 | 21,700,662 | 18,773,291 | 15,561,844 | 20,858,879 | 23,629,424 |
| | | | | | | |
| Less: Cash | 1,101,669 | 1,351,668 | 348,257 | 1,912,227 | 1,848,596 | 1,101,669 |
| Less: Marketable Securities | - | - | - | - | - | - |
| Less: Prepaid Income Taxes | - | - | - | - | - | - |
| Add: Current Portion of Long-Term Debt | 4,630,016 | 4,028,474 | 940,258 | 568,770 | 338,165 | 4,630,016 |
| Net Working Capital | 26,573,992 | 24,377,468 | 19,365,292 | 14,218,387 | 19,348,448 | 27,157,771 |
| | | | | | | |
| Divided by: Revenues | 165,910,184 | 147,488,663 | 118,419,768 | 105,815,720 | 79,194,199 | 165,910,184 |
| | | | | | | |
| Net Working Capital as a % of Revenues | 16.02% | 16.53% | 16.35% | 13.44% | 24.43% | 16.37% |
| | | | | | | |
| Average | | | | | 17.35% | |

| | Historical | Adjusted | Peer Group |
|---|---|---|---|
| Sales | $ 165,910,184 | $ 165,910,184 | $ 165,910,184 |
| Assumed Growth Rate | 10.00% | 10.00% | 10.00% |
| | | | |
| Forecasted Change in Sales | 16,591,018 | 16,591,018 | 16,591,018 |
| | | | |
| Net Working Capital as a % of Sales | 17.35% | 16.37% | 19.20% |
| | | | |
| Expected Net Working Capital Requirement | $ 2,878,542 | $ 2,715,950 | $ 3,185,475 |
| | | | |
| **AMOUNT SELECTED** | | | $ 3,185,475 |


Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 9 - COMPUTATION OF NORMALIZED WEIGHTED AVERAGE AFTER-TAX CASH FLOW FROM OPERATIONS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 9**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF NORMALIZED WEIGHTED AVERAGE
AFTER-TAX CASH FLOW FROM OPERATIONS
FOR THE PERIODS ENDING**

| | 2019 | 2018 | 2017 | 2016 | 2015 | COMMENTS |
|---|---|---|---|---|---|---|
| Historical Pre-Tax Income | $ 7,738,724 | $ 3,877,821 | $ 11,820,604 | $ 13,236,790 | $ 8,087,707 | |
| | | | | | | |
| **ADDITIONS:** | | | | | | |
| Selected Historical Owners/Officer's Salaries | 1,043,916 | 1,069,686 | 729,119 | 682,537 | 680,596 | To add back historical salaries (Panzer & Epstein). |
| Allowance for Payroll Taxes - Officers, President, & COO | 104,392 | 106,969 | 72,912 | 68,254 | 68,060 | To record allowance for payroll taxes at 10.0%. |
| Bad Debt Expense | - | 301,119 | - | 175,000 | - | To add back non-operating expenses. |
| Charitable Contributions | 20,289 | 42,286 | 232,870 | 177,283 | 32,224 | To add back discretionary expenses. |
| Moving Expense | - | 276,273 | - | - | - | To add back non-recurring fees related to new facility. |
| Professional Fees | 540,000 | - | 5,100,000 | - | - | To add back non-recurring fees related to new facility. |
| Other Cost Savings | 1,659,102 | 1,474,887 | - | - | - | To add back 1% of sales, reflecting cost cutting measures (2018, 2019). |
| Interest Expense | 1,959,694 | 1,377,964 | 296,923 | 315,416 | 148,801 | |
| | 5,327,393 | 4,649,184 | 6,431,824 | 1,418,490 | 929,681 | |
| | | | | | | |
| **SUBTRACTIONS:** | | | | | | To record reasonable compensation per 2019 RC Compensation Report (Panzer & Epstein). |
| Reasonable Officer's Salary | 826,022 | 808,083 | 790,533 | 773,364 | 756,568 | Prior years adjusted for inflation. |
| Allowance for Payroll Taxes | 82,602 | 80,808 | 79,053 | 77,336 | 75,657 | To record allowance for payroll taxes and benefits related to owners compensation at 10.0%. |
| Other Income | - | - | - | - | - | To remove New Jersey Grow tax credit. |
| (Gain)/Loss on Disposal of Asset | 67,883 | (7,217) | (10,833) | (420) | - | To remove non-operating disposals. |
| Interest Income | - | - | - | (420) | (397) | |
| | 976,507 | 881,674 | 858,753 | 850,280 | 831,828 | |
| | | | | | | |
| **NORMALIZED PRE-TAX INCOME (LOSS)** | | | | | | |
| **FROM OPERATIONS** | 12,089,610 | 7,645,331 | 17,393,675 | 13,805,000 | 8,185,560 | |
| | | | | | | |
| Provision For Income Taxes | 3,188,065 | 2,149,103 | 4,965,431 | 4,642,450 | 3,269,312 | |
| Effective Income Tax Rate | 26.4% | 28.1% | 28.6% | 33.6% | 39.9% | |
| | | | | | | |
| **NORMALIZED AFTER-TAX INCOME (LOSS)** | | | | | | |
| **FROM OPERATIONS** | 8,901,545 | 5,496,228 | 12,428,244 | 9,162,550 | 4,916,248 | |
| | | | | | | |
| **ADJUSTMENTS TO CONVERT TO CASH FLOW** | | | | | | |
| (+) Depreciation & Amortization | 5,002,612 | 3,038,250 | 1,421,877 | 1,112,720 | 762,769 | |
| | 5,002,612 | 3,038,250 | 1,421,877 | 1,112,720 | 762,769 | |
| **NORMALIZED AFTER-TAX CASH FLOW** | | | | | | |
| **FROM OPERATIONS** | 13,904,157 | 8,534,478 | 13,850,121 | 10,275,270 | 5,679,017 | |
| | | | | | | |
| Weight | 1 | - | - | - | - | |
| Weighted Amounts | 13,904,157 | - | - | - | - | |
| | | | | | | |
| Subtotal-Weighted Amounts | | | | | 13,904,157 | |
| | | | | | | |
| Subtotal-Weight | | | | | 1 | |
| | | | | | 13,904,157 | |
| | | | | | | |
| (-) Working Capital Requirement | | | | | 3,185,475 | Based on peer group analysis. |
| (-) Estimated Capital Expenditures | | | | | 3,981,844 | 2.40% of sales per peer group analysis. |
| | | | | | | |
| **WEIGHTED AVERAGE NORMALIZED AFTER-TAX** | | | | | | |
| **CASH FLOW FROM OPERATIONS** | | | | | $ 6,736,838 | |



MSG Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 10 - COMPUTATION OF DISCOUNT & CAPITALIZATION RATES



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 10**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF DISCOUNT & CAPITALIZATION RATES**
**DECEMBER 31, 2019**

| | | |
|---|---|---|
| Risk Free Rate | | 2.25% |
| Premium Over Riskless Rate (See Below) | | 16.48% |
| Company-Specific Risk Premium | | 8.00% |
| **DISCOUNT RATE** | | **26.73%** |

**Premium Over Riskless Rate Determination**

| | | Cost of Equity | Premium Over Riskless Rate |
|---|---|---|---|
| **CRSP Deciles Size Study** | | | |
| Build-up & Size Premium | | 20.90% | 18.65% |
| **Duff & Phelps Risk Premium Report Study** | | | |
| Duff & Phelps Build-up 1 | | | |
| Market Value of Equity | | | |
| Book Value of Equity (Adjusted) | | 16.12% | 13.87% |
| 5-year Average Net Income (Adjusted) | | 17.16% | 14.91% |
| Market Value of Invested Capital | | | |
| Total Assets (Adjusted) | | 16.83% | 14.58% |
| 5-year Average EBITDA (Adjusted) | | 17.04% | 14.79% |
| Revenues (In Year of Valuation) | | 16.80% | 14.55% |
| Number of Employees | | 15.87% | 13.62% |
| | Average | 16.64% | 14.39% |
| Duff & Phelps Build-up 2 | | | |
| Market Value of Equity | | | |
| Book Value of Equity (Adjusted) | | 18.08% | 15.83% |
| 5-year Average Net Income (Adjusted) | | 18.95% | 16.70% |
| Market Value of Invested Capital | | | |
| Total Assets (Adjusted) | | 18.64% | 16.39% |
| 5-year Average EBITDA (Adjusted) | | 18.86% | 16.61% |
| Revenues (In Year of Valuation) | | 18.93% | 16.68% |
| Number of Employees | | 18.54% | 16.29% |
| | Average | 18.67% | 16.42% |
| | Average of Methodologies Used | 18.73% | 16.48% |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 11 - COMPUTATION OF WEIGHTED AVERAGE COST OF CAPITAL



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 11**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF WEIGHTED AVERAGE COST OF CAPITAL**

| | SOURCE | | % |
|---|---|---|---|
| Cost of Equity | Company Specific Discount Rate | | 26.73% |
| Cost of Debt | Prime Rate | 4.75% | |
| | Company Specific Increment | 2.00% | 6.75% |
| % Equity | Market Value of Equity / Market Value of Invested Capital | | 58.03% |
| % Debt | Market Value of Debt / Market Value of Invested Capital | | 41.97% |
| Tax Rate | | | 26.37% |
| WACC Computation | Cost of Equity x % of Equity | | 15.51% |
| | (Cost of Debt x % of Debt) x (1 - Tax Rate) | | 2.09% |
| **DISCOUNT RATE - WACC** | | | 17.60% |
| Less: Expected Growth Rate | | | 10.00% |
| **CAPITALIZATION RATE - WACC** | | | **7.60%** |



Accountants
Consultants &
Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 12 - COMPUTATION OF FORECASTED CASH FLOWS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 12**

**FABUWOOD CABINETRY CORP**

**FORECASTED CASH FLOW**

| | Year Ended 12/31/2019 Adjusted | | Trailing Twelve Months December | | | | | | | | | |
| | | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | |
| | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $165,910,184 | 100.0% | 143,051,000 | 100.0% | 154,495,080 | 100.0% | 163,764,785 | 100.0% | 171,953,024 | 100.0% | 180,550,675 | 100.00% |
| *Sales Growth Rate* | | | | | *8.00%* | | *6.00%* | | *5.00%* | | *5.00%* | |
| Normalized After-Tax Income (Loss) From Operations | 8,901,545 | 5.37% | 7,681,839 | 5.37% | 8,296,386 | 5.37% | 8,794,169 | 5.37% | 9,233,877 | 5.37% | 9,695,571 | 5.37% |
| (+) Depreciation | 5,002,612 | 3.02% | 4,320,140 | 3.02% | 4,665,751 | 3.02% | 4,945,697 | 3.02% | 5,192,981 | 3.02% | 5,452,630 | 3.02% |
| (-) Estimated Capital Expenditures | 3,981,844 | 2.40% | 3,433,224 | 2.40% | 3,707,882 | 2.40% | 3,930,355 | 2.40% | 4,126,873 | 2.40% | 4,333,216 | 2.40% |
| (-) Estimated Working Capital Requirements | 3,185,475 | 1.92% | 2,746,579 | 1.92% | 2,966,306 | 1.92% | 3,144,284 | 1.92% | 3,301,498 | 1.92% | 3,466,573 | 1.92% |
| **NET CASH FLOW** | **6,736,838** | 4.06% | **5,822,176** | 3.51% | **6,287,950** | 3.79% | **6,665,227** | 4.02% | **6,998,487** | 4.22% | **7,348,412** | 4.43% |
| *Net Cash Flow Growth Rate* | | | *4.07%* | | *4.07%* | | *4.07%* | | *4.07%* | | *4.07%* | |


Accountants Consultants & Business Valuators

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 13 - COMPUTATION OF INDICATED VALUE BASED UPON DISCOUNTED CASH FLOWS



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 13**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF INDICATED VALUE**
**BASED UPON THE**
**DISCOUNTED CASH FLOW METHOD**
**(BEFORE THE APPLICATION OF DISCOUNTS)**

|  |  | Trailing Twelve Months | | | | | TERMINAL VALUE |
|---|---|---|---|---|---|---|---|
|  |  | 2020 | 2021 | 2022 | 2023 | 2024 |  |
| Net Cash Flow to Invested Capital |  | $ 5,822,176 | $ 6,287,950 | $ 6,665,227 | $ 6,998,487 | $ 7,348,412 | $ 106,358,592 |
| Discount Rate - Based Upon The Weighted Average Cost of | 17.60% | 0.9221 | 0.7841 | 0.6668 | 0.5670 | 0.4821 | 0.4821 |
| Indicated Value |  | $ 5,368,628 | $ 4,930,381 | $ 4,444,374 | $ 3,968,142 | $ 3,542,669 | $ 51,275,477 |
| Market Value to Invested Capital |  |  |  |  |  |  | 73,529,671 |
| Less: Outstanding Debt |  |  |  |  |  |  | 40,921,781 |
| **INDICATED VALUE BASED UPON THE** |  |  |  |  |  |  |  |
| **DISCOUNTED CASH FLOW METHOD** |  |  |  |  |  | **$** | **32,607,890** |

| Terminal Value Calculation | | |
|---|---|---|
| Net Cash Flow to Invested Capital in Terminal Year | $ | 7,348,412 |
| Multiplied by: 1 + Sustainable Growth Rate |  | 1.1000 |
|  |  | 8,083,253 |
| WACC Capitalization Rate |  | 7.60% |
| **TERMINAL VALUE** | **$** | **106,358,592** |



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# EXHIBIT 14 - COMPUTATION OF INDICATED VALUE BASED UPON METHODOLOGIES SELECTED



FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 12

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

**EXHIBIT 14**

**FABUWOOD CABINETRY CORP**

**COMPUTATION OF INDICATED VALUE**
**BASED UPON THE METHODOLOGIES SELECTED**

| | INDICATED VALUE | LACK OF CONTROL DISCOUNT @ 0.0% | SUBTOTAL | MARKETABILITY DISCOUNT @ 12.5% | SUBTOTAL | WEIGHT | WEIGHTED VALUE |
|---|---|---|---|---|---|---|---|
| INDICATED VALUE BASED UPON THE ASSET BASED APPROACH | $ 26,822,897 | $ - | $ 26,822,897 | 3,352,862 | $ 23,470,035 | - | $ - |
| INDICATED VALUE BASED UPON THE DISCOUNTED CASH FLOWS METHOD | 32,607,890 | $ - | 32,607,890 | 4,075,986 | $ 28,531,904 | 1.0 | 28,531,904 |

| | |
|---|---|
| Subtotal-Weighted Amount | 28,531,904 |
| Subtotal-Weight | 1.0 |
| INDICATED VALUE BASED OF OPERATING ASSETS UPON THE METHODOLOGIES SELECTED | 28,531,904 |
| NUMBER OF SHARES ISSUED AND OUTSTANDING | 200 |
| VALUE PER SHARE | 142,660 |
| ROUNDED | $ 143,000 |



At IAS Part __ of the Supreme Court of the State of
New York, held in and for the County of New York
at the Courthouse Located at 60 Centre Street, New
York, New York on ____ day of August 2021

PRESENT:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of: : Index No. /2021
 :
MOSHE CHAIM PANZER, :
 :
      Petitioner, : **ORDER TO SHOW CAUSE FOR**
 : **PRELIMINARY INJUNCTION**
 : **WITH TEMPORARY**
For a Permanent Stay of Arbitration Pursuant to : **RESTRAINING ORDER**
Article 75 of the Civil Practice Law and Rules :
 :
      -against- :
 :
JOEL EPSTEIN, :
 :
      Respondent. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

  **UPON READING AND FILING** the Verified Petition of Moshe Chaim Panzer
("Petitioner"), dated August 11, 2021, and the exhibits annexed thereto, the Emergency
Affirmation of Joshua S. Stricoff, dated August 12 2021, and the Memorandum of Law in Support
of Order to Show Cause for Emergency Injunctive Relief, dated August 13, 2021, and it appearing
that immediate and irreparable injury, loss, or damage will result unless Respondent Joel Epstein
("Respondent") is restrained before a hearing can be held, it is hereby:

  **ORDERED** that Respondent or its respective attorneys, appear and show cause before this
Court at this Courthouse located at 60 Centre Street, New York, New York, IAS Part ___ , Room
___, on the ___ day of August 2021, at _____ a.m./p.m., or as soon thereafter as counsel can
be heard (the "Hearing Date"), why an order should not be made and entered (i) enjoining and
restraining the American Arbitration Association proceeding entitled *Joel Epstein v. Moshe Chaim*

*Panzer*, AAA Case No. 1-21-0004-9666 (the "Arbitration), (ii) enjoining  Respondent from Respondent from committing the Company to any further indebtedness or renegotiating any existing indebtedness and/or financing without Petitioner's approval (iii) awarding reasonable costs, attorneys' fees and expenses, or, alternatively, (iii) providing Petitioner with discovery in aid of arbitration related to the Company's books and records, and granting Petitioner such further relief as the Court deems just and proper; and it is further

  **ORDERED** that pending the hearing and decision on the Petition, (i) the Arbitration and proceedings, hearings, conferences, and deadlines associated with the Arbitration are hereby stayed and (ii) Respondent enjoined committing the Company to any further indebtedness or renegotiating any existing indebtedness and/or financing without Petitioner's approval; and it is further

  **ORDERED** that this Order to Show Cause and all supporting papers, shall be served upon Respondent via email on or before _____, 2021; and it is further

  **ORDERED** that opposing papers, if any, shall be served by electronic filing upon counsel for Petitioner, Herrick, Feinstein LLP, Attn: Avery Mehlman, 2 Park Avenue, New York, New York 10016, amehlman@herrick.com, on or before August __, 2021; and it is further

  **ORDERED** that Petitioner shall serve reply papers, if any, on or before August ___, 2021, via NYSCEF, upon Respondent's attorneys; and it is further

  **ORDERED** that this motion shall be orally argued by counsel for the parties on the return date set forth in this Order to Show Cause.

Dated:

       ENTERED:

       _____
           J.S.C.

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of:      :   Index No.     /2021

MOSHE CHAIM PANZER,

            Petitioner,

For a Permanent Stay of Arbitration Pursuant to
Article 75 of the Civil Practice Law and Rules

       -against-

JOEL EPSTEIN,

            Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PETITIONER'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS APPLICATION FOR A PERMANENT STAY OF
## ARBITRATION PURSUANT TO CPLR 7503 AND A PRELIMINARY INJUNCTION

**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Petitioner*

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ........................................................................................................................... 2

I.      The Arbitration Should Be Permanently Stayed Because the Conditions
        Precedent to Arbitration Unequivocally Did Not Occur.................................................. 2

II.     Respondent Should be Temporarily Restrained and Preliminarily Enjoined
        from Proceeding with the Arbitration and Encumbering the Company ........................... 6

III.    Upon a Stay of Arbitration, Petitioner Should be Awarded Costs and Attorney's Fees .. 8

CONCLUSION......................................................................................................................... 9

i

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ambassador Const. Co. v. 40 Wall St. Dev. Assoc., LLC*,
   264 A.D.2d 317 (1st Dep't 1999) ...................................................................................2

*Conlon v. Concord Pools, Ltd.*,
   170 A.D.2d 754 (3d Dep't 1991) ....................................................................................7

*Hendler & Murray, P.C. v. Lambert*,
   127 A.D.2d 820 (1st Dep't 1987) ...................................................................................6

*IHG Mgmt. (Maryland) LLC v. W. 44th St. Hotel LLC*,
   163 A.D.3d 413 (1st Dep't 2018) ...................................................................................7

*Jerry Kindman & Co. v. Stollar*,
   151 A.D.2d 393 (1st Dep't 1989) ...................................................................................7

*Melvin v. Union Coll.*,
   195 A.D.2d 447 (2d Dep't 1993) ....................................................................................7

*Nobu Next Door v. Fine Arts Hous.*,
   4 N.Y.3d 839 (2005) .......................................................................................................7

*Pearls St. Dev. V. Conduit and Found. Corp.*,
   41 N.Y.2d 167 (1976) .....................................................................................................2

*Silvestre v. De Loaiza*,
   12 Misc. 3d 492 (Sup. Ct. N.Y. Cnty. 2006) .................................................................7

## Statutes

CPLR § 6301.................................................................................................................6, 7

CPLR § 6313....................................................................................................................7

ii

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

Petitioner Moshe Chaim Panzer, by and through his attorneys, Herrick, Feinstein LLP, respectfully submits this memorandum of law in support of its verified petition for a preliminary and permanent stay of the American Arbitration Association ("AAA") proceeding entitled *Epstein v. Moshe Chaim Panzer*, AAA Case No. 1-21-0004-9666 (the "Arbitration), together with other and further relief as this Court deems just and proper.

## PRELIMINARY STATEMENT

Petitioner brings this proceeding to permanently stay the Arbitration commenced Respondent. Through the Arbitration, Respondent—a minority shareholder and Vice President of Fabuwood Cabinetry Corp. (the "Company"), a successful importer and wholesaler of kitchen cabinets—seeks to oust Petitioner—the Company's majority shareholder, CEO, and President—from the Company and compel a forced buyout of Petitioner's shares for pennies on the dollar. In doing so, Respondent ignored nearly every condition precedent to invoking a buyout under the parties' Amended and Restated Shareholders Agreement (the "Agreement").

Specifically, Respondent declared a Deadlock[1], which triggers the procedures of the Agreement's Buyout provision. Not only did Respondent fail to follow the conditions precedent to declaring a Deadlock, but Respondent also failed to follow any of the procedures necessary to actually invoke his Buyout Rights. As a result, the parties are multiple steps away from arbitrating the dispute at the heart of the alleged Deadlock, to the extent that such a dispute even exists in the first instance.

Worst of all, Respondent completely shut Petitioner out from the affairs of *Petitioner's Company*, and has committed and will continue to commit the Company to large expenditures and increased indebtedness without the requisite approval from Petitioner as agreed to in the

---

[1] Unless otherwise defined herein, capitalized terms have the meanings set forth in the Petition.

1

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

shareholder's agreement. Respondent is not only putting the company at risk, but he is also jeopardizing Petitioner's personal finances, which largely guarantee the debt and ensure the liquidity of the Company. Enough is enough. Respondent should be required to follow the provisions of the shareholder's agreement during the pendency of this dispute to avoid placing Petition and the Company in an irreparable position.

Accordingly, the Court should permanently stay the Arbitration so that the parties can follow the agreed upon and binding procedures contained in their shareholder's agreement for resolving disputes of this kind. And in the meantime, the Court should also preliminarily enjoin the Arbitration from going forward and preliminarily enjoin Respondent from committing the Company to any further indebtedness or renegotiating any existing indebtedness and/or financing without Petitioner's approval, as required in the shareholder's agreement.

## STATEMENT OF FACTS

The relevant facts and circumstances are fully set forth in the accompanying (i) the Petition, and the exhibits thereto; and (ii) the Emergency Affirmation of Avery S. Mehlman, Esq. in Support of Petitioner's Motion for a Stay of Arbitration dated August 11, 2021, and the exhibits thereto, to which the Court is respectfully referred.

## ARGUMENT

### I.    The Arbitration Should Be Permanently Stayed Because the Conditions Precedent to Arbitration Unequivocally Did Not Occur

Respondent failed to satisfy critical conditions precedent to arbitration of its claim involving a Deadlock or Buyout. Under New York law, "the issue of compliance with express conditions precedent to arbitration is a question at least initially for the court, not the arbitrator." *Pearls St. Dev. V. Conduit and Found. Corp.*, 41 N.Y.2d 167, 170 (1976); *Ambassador Const. Co. v. 40 Wall St. Dev. Assoc., LLC*, 264 A.D.2d 317, 318 (1st Dep't 1999) ("The question of whether

2

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

a condition precedent has been complied with is generally an issue for the courts, particularly where the question of whether the condition precedent has been satisfied can be determined prior to resolution of the substantive claims.") (internal citations omitted).

Here, as a condition to arbitrating a Deadlock or a party's Buyout Rights under the Agreement, the Company's Board of Directors are (i) required to hold two consecutive meetings to resolve a Major Decision resulting in the alleged Deadlock; and (ii) if those meetings result in an impasse, then the Board is require to retain a nationally recognized investment bank firm to serve as an Independent Appraiser to provide a valuation report of the Company and its shares. Ver. Pet.[2] ¶¶ 19-23.  The Board never met to resolve any alleged deadlock and an Independent Appraiser with the qualifications required by the Agreement was never retained by the Company to provide the necessary valuation report.  *Id.*  ¶¶ 26-47.

Under the Agreement, the parties' may arbitrate a Buyout-related dispute, *only* "[i] neither [Petitioner] nor [Respondent] exercise their respective Buyout Rights following a Deadlock and the Major Decision causing the Deadlock has not been resolved by the Board upon expiration of Epstein's Buyout Rights, it shall be considered a Dispute subject to the Dispute resolution provisions of Section 5.06."  Ver. Pet. ¶ 24.  Accordingly, the condition precedents to Arbitration were not satisfied.

***Deadlock***. There never was a Deadlock.  Under Section 2.05 of the Agreement, a Deadlock is an impasse by the Company's Board of Directors with respect to a Major Decision (defined in Section 2.04 of the Agreement) that is submitted to the Board "at two successive meetings of the Board."  If the impasse persists after the second meeting, "then the Director who introduced the proposal for the Major Decision shall provide written notice to the other Director confirming its

---

[2] "Ver. Pet." refers to the accompanying Verified Petition.

3

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

status as a Deadlock (a "Deadlock Notice")[.]" (emphasis supplied).  After that, the parties' "have the sequential rights, but not the obligation (the "Buyout Rights"), to purchase all of the Shares ("Buyout Shares") owned by the other Shareholder and his Affiliates ("Buyout Parties") in an all-cash transaction at the Fair Market Value of the Buyout Shares determined under Section 2.05(b) ("Appraised Value")."  Ver. Pet. ¶¶ 19-23.  Thus, the existence of a Deadlock is a condition precedent to the parties' Buyout rights.

Although Respondent's Deadlock Notice alleges that the parties have disagreed on many issues purportedly constituting Major Decisions, Respondent does not allege—in either the Deadlock Notice, the Arbitration Demand, or anywhere else—that successive Board meetings were held to resolve these Major Decisions.  The reason for this omission is simple: no such Board meeting was ever held or even requested by Respondent.  In fact, the Board has not met for over a year.  Ver. Pet. ¶¶ 30-34; Ex. C.

Because the requisite Board meetings never been held, no Deadlock could possibly exist.  And if no Deadlock ever existed, no party ever had Buyout Rights.  And if no party ever had Buyout Rights, Respondent's arbitration to compel a buyout in satisfaction of his alleged Buyout Rights is premature.  Hence, a condition precedent to arbitration has not been satisfied and, as a matter of law, the Arbitration should be permanently stayed.

***Buyout Rights***.  But even if a Deadlock occurred (which it did not), the parties' Buyout Rights still would not have been triggered because the Company never retained an Independent Appraiser pursuant to the terms of the Agreement. Under Section 2.05(b), after a Deadlock was reached and a Deadlock notice was tendered—the *Company* was required to "engage a nationally recognized investment banking firm to be selected by the Board (an "Independent Appraiser") to determine the Appraised Value of the Buyout Shares," which is defined as their fair market value.

4

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

*Id.* at § 2.05(a).  The Agreement then provides Panzer with priority in exercising Buyout Rights, which are only triggered by receipt of the written valuation of the Buyout Shares prepared by the Independent Appraiser:

> If the Director responsible for providing a Deadlock Notice fails to do so on a timely basis, the other Director may provide such Deadlock Notice, with the same effect of triggering such Buyout Rights hereunder. The Buyout Rights of Panzer shall be exercisable for a period of fifteen (15) Business Days *after receipt of the written valuation of the Buyout Shares by the Independent Appraiser, by notice to the Buyout Parties (a "Buyout Notice"), accompanied by a copy of the valuation.* If Epstein has not received a Buyout Notice from Panzer within such period, the Buyout Rights of Panzer shall expire, and the Buyout Rights of Epstein shall vest and be exercisable for a period of fifteen (15) Business Days after the expiration of Panzer's Buyout Rights, by delivery of a Buyout Notice to Panzer.

*Id*; Ver. Pet. ¶¶ 35-47.

Yet again, Respondent ignored these conditions precedent.  The Company never retained Independent Appraiser from a nationally recognized investment banking firm, and no Board meeting was ever called to vote on the engagement of such an appraiser. *Id*. Instead, Respondent *unilaterally* hired Mark S. Gottlieb, CPA, PC, a solo practitioner and a far cry from a nationally recognized investment bank firm, to perform the valuation of the Company.  *Id.* ¶ 36.   Worse yet, Mr. Gottlieb served as a court appointed appraiser during Mr. Panzer's divorce proceedings.  *Id.* ¶ 40.  Respondent, moreover, did not provide Petitioner or Petitioner's counsel with a copy of Mr. Gottlieb's report together with Respondent's Buyout Notice.  In fact, Respondent did not provide a copy of Mr. Gottlieb's report until months later.  *Id.* ¶ 53. This is likely because the report is a sham; it severely undervalues the Company in furtherance of Respondent's scheme to confiscate Petitioner's shares for pennies on the dollar.

Furthermore, Respondent failed to properly sequence the events required for Buyout Rights to be invoked under the Agreement.  If Respondent had a legitimate basis for declaring a Deadlock, then Respondent would first have to send a Deadlock Notice and then, within 15 days, the Board

5

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

would have to appoint an Independent Appraiser to issue a valuation report of the Company.  Only once the parties' received the valuation could they invoke their Buyout Rights, with Petitioner having priority to invoke his rights before Respondent.  But here, Respondent commissioned a valuation report first, and then a week later, simultaneously served his Deadlock Notice and Buyout Notice before a Board meeting was ever held and before Petitioner ever had the opportunity to tender a Buyout Notice of his own and before Petitioner was even provided a copy with the valuation report, which Respondent did not provide for several months.

Accordingly, because Mr. Gottlieb (i) was not selected by the Board, (ii) not retained by the Company, (iii) not independent in any sense, and (iv) not affiliated with a nationally recognized investment firm, he does not meet the qualifications of an Independent Appraiser under the terms of the Agreement. And even if he did, his report was not provided to Petitioner in conjunction with Petitioner's Buyout Notice.  Thus, Mr. Gottlieb's lowball valuation report triggers no Buyout Rights under the Agreement.  As a result, Respondent is precluded from commencing an arbitration to enforce his purported Buyout Rights, and the Arbitration should be permanently stayed.[3]

## II. Respondent Should be Temporarily Restrained and Preliminarily Enjoined from Proceeding with the Arbitration and Encumbering the Company

It is well-settled that in order to obtain injunctive relief pursuant to CPLR 6301, the movant must demonstrate (1) the likelihood of success on the merits, (2) irreparable injury to the movant

---

[3] In the alternative, if the Court requires the parties to proceed with the arbitration, Petitioner respectfully requests discovery in aid of arbitration, namely a full inspection of the Company's books and records. *See Hendler & Murray, P.C. v. Lambert*, 127 A.D.2d 820, 820 (1st Dep't 1987) ("At bar, the respondent has requested the production of the petitioners' books and records. Under the circumstances of this case, the court did not abuse its discretion in granting the discovery requested in aid of arbitration, because the respondent has demonstrated that the documents are required to present a proper case to the arbitrator.") (internal quotation marks and citations omitted).

System.Object[]

in the absence of injunctive relief, and (3) that a balancing of the equities is in the movant's favor. *See, e.g., Nobu Next Door v. Fine Arts Hous.*, 4 N.Y.3d 839, 840 (2005); *Melvin v. Union Coll.*, 195 A.D.2d 447, 448 (2d Dep't 1993); *Jerry Kindman & Co. v. Stollar*, 151 A.D.2d 393, 395 (1st Dep't 1989); *Conlon v. Concord Pools, Ltd.*, 170 A.D.2d 754, 755 (3d Dep't 1991).

On a motion for a preliminary injunction, a court may, in its discretion, grant a temporary restraining order to prevent immediate, irreparable injury during the pendency of the preliminary injunction motion. See CPLR § 6301. A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damages will result unless the defendant is restrained before a hearing can be had. CPLR §§ 6301, 6313; *Silvestre v. De Loaiza*, 12 Misc. 3d 492, 493 (Sup. Ct. N.Y. Cnty. 2006). "A likelihood of success on the merits may be sufficiently established even where the facts are in dispute, and the evidence need not be conclusive." *IHG Mgmt. (Maryland) LLC v. W. 44th St. Hotel LLC,* 163 A.D.3d 413, 414402 (1st Dep't 2018). Here, Petitioner satisfies these requirements.

*First*, Respondent's violation of the Agreement's provisions results in an irreparable injury to Petitioner under the plain language of the Agreement:

> **Each Party acknowledges that the other Parties would be irreparably damaged in the event of a breach or threatened breach by such Party** or any of his Representatives of any of his obligations under this Agreement and hereby agrees that **in the event of a breach or a threatened breach by such Party of any such obligations, each of the other Parties, in addition to any other rights and remedies that may be available to them in respect of such breach, shall be entitled to an injunction from a court of competent jurisdiction**, without any requirement to post bond, **granting such Parties specific performance by such Party of his obligations under this Agreement**.

Ver. Pet. ¶ 25; Ex. A § 5.07 (emphasis supplied).

Injunctive relief "from a court of competent jurisdiction" is thus the parties' agreed upon contractual remedy for breaches of this kind. Petitioner merely asks that this remedy be enforced.

7

System.Object[]

Accordingly, Respondent's end run around the Agreement's Buyout procedure to commence this arbitration is an irreparable injury entitling Petitioner to an injunction.  Likewise, Respondent's flagrant violations of Section 2.04(g) of the Agreement, including but not limited to committing the Company to expenditures above $50,000 without Board or Petitioner's approval is a breach of Respondent's obligation that, under the plain language, entitle Petitioner to the injunction sought here.

*Second*, Petitioner is likely to succeed on the merits.  The Agreement speaks for itself.  Respondent does not and has never claimed to follow the Buyout procedures or the requirements to seek Board approval for large expenditures, as required by the Agreement.  No Board meetings were held to determine a Deadlock and no Independent Appraiser's report was commission or issue to trigger the parties' Buyout Rights.  Likewise, no Board has been held recently to vote on large expenditures.  Thus, Petitioner is likely to succeed on its claims.

*Third*, a balancing of the equities would weigh in favor of granting Petitioner's relief because it would maintain the status quo and prevent the parties' from being thrown in a spurious, procedurally deficient, and expensive arbitration proceeding.  Critically, the injunction would also prevent Respondent from encumbering and placing Petitioner's personal finances in jeopardy.

In sum, Petitioner satisfies each of the elements required for granted a preliminary injunction.  Therefore, the Arbitration should, at the very least, be temporarily restrained during the pending adjudication of the Petition.

### III.   Upon a Stay of Arbitration, Petitioner Should be Awarded Costs and Attorney's Fees

Section 5.07 of the Agreement further provides:

In the event that any Party files a suit to enforce the covenants contained in this Agreement or obtain any other remedy in respect of any breach thereof, the prevailing Party in the suit shall be entitled to reimbursement of the costs incurred

8

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 14

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

by such Party in conduction the suit, including reasonable attorney's fees and expenses.

Because Petitioner is forced to commence this proceeding to enforce his contractual rights, he is entitled to an award of costs, attorney's fees, and expenses under the plain language of the Agreement.

## CONCLUSION

Based on the foregoing reasons, Petitioner respectfully requests that the Court grant its motion in its entirety (i) staying the Arbitration, (ii) enjoining Respondent from Respondent from committing the Company to any further indebtedness or renegotiating any existing indebtedness and/or financing without Petitioner's approval, (iii) awarding reasonable costs, attorneys' fees and expenses, or, alternatively, (iv) providing Petitioner with discovery in aid of arbitration related to the Company's books and records, and granting Petitioner such further relief as the Court deems just and proper.

Dated:     New York, New York
           August 13, 2021

                              **HERRICK, FEINSTEIN LLP**
                              *Attorneys for Petitioner*

                         By:    */s/ Avery S. Mehlman*
                                Avery S. Mehlman
                                Joshua S. Stricoff

                              2 Park Avenue
                              New York, New York 10016
                              (212) 592-1400

9

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 14

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

### Certification of Word Count Compliance

Petitioner Moshe Chaim Panzer, through its counsel, Herrick, Feinstein LLP, hereby certifies that the body of the within Memorandum of Law contains 2,621 words (excluding the caption, tables of contents, tables of authorities, and signature block).

_/s/ Avery S. Mehlman_
Avery S. Mehlman
**Herrick, Feinstein LLP**

System.Object[]

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 15

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of:

MOSHE CHAIM PANZER,

                Petitioner,

For a Permanent Stay of Arbitration Pursuant to
Article 75 of the Civil Practice Law and Rules

         -against-

JOEL EPSTEIN,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.    /2021

**EMERGENCY AFFIRMATION
OF JOSHUA S. STRICOFF**

      JOSHUA S. STRICOFF, an attorney duly admitted to practice before the Bar of this Court, hereby affirms the following to be true under penalties of perjury:

      1.     I am an associate at Herrick, Feinstein LLP, attorneys for Petitioner Moshe Chaim Panzer.  I submit this Affirmation in support of Petitioner's Application for a Temporary Restraining Order and Preliminary Injunctive Relief preliminarily enjoining and restraining the American Arbitration Association ("AAA") proceeding entitled *Epstein v. Moshe Chaim Panzer*, AAA Case No. 1-21-0004-9666 (the "Arbitration).  Through this action, Petitioner seeks to permanently stay the Arbitration because of Respondent's failure to satisfy numerous conditions precedent to arbitration.

      2.     As detailed in the accompanying Verified Petition and Memorandum of Law, Petitioner is entitled to a temporary restraining order and preliminary injunction under Section 5.07 of the operative contract between the parties, which reads:

> ***Each Party acknowledges that the other Parties would be irreparably damaged in the event of a breach or threatened breach by such Party*** *or any of his* Representatives of any of his obligations under this Agreement and hereby agrees that ***in the event of a breach or a threatened breach by such Party of any such***

1

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM
NYSCEF DOC. NO. 15

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

*obligations, each of the other Parties, in addition to any other rights and remedies that may be available to them in respect of such breach, shall be entitled to an injunction from a court of competent jurisdiction*, without any requirement to post bond, *granting such Parties specific performance by such Party of his obligations under this Agreement*.

Ver. Pet. ¶ 25; Ex. A § 5.07 (emphasis supplied).

3.      Moreover, to the extent that Petitioner is forced to file a response or otherwise participate in the Arbitration, this application for a permanent stay could be rendered futile. Because of the dilemma posed in absence of a temporary restraints against the Arbitration, Petitioner is confronted with an immediate threat of irreparable harm.

**4.      No prior application for this or any similar relief has been made in any court.**

5.      Pursuant to Uniform Trial Court Rule § 202.7(f), at on August 12, 2021, at approximately 11:25 am, I sent an email to counsel for Respondent Joel Epstein to notify Respondent of our intention to file this application and appear at the New York State Supreme Court, New York County, located at 60 Centre Street, New York, New York, in the Commercial Division Support Office, Room 119A on August 13, 2021 at 11:30am.  A copy of this email is annexed hereto as **Exhibit 1**.

6.      For all the foregoing reasons, and those set forth in the accompanying Verified Petition and Memorandum of Law, the Court should issue the requested TRO and preliminary injunction.

Dated:  August 13, 2021
        New York, New York

_____
Joshua S. Stricoff

2

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 15

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

### Certification of Word Count Compliance

I certify that the body of the within Affirmation contains 435 words.

Joshua S. Stricoff

**Herrick, Feinstein LLP**

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 16

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

---

**Stricoff, Joshua**

---

| | |
|---|---|
| **From:** | Stricoff, Joshua |
| **Sent:** | Thursday, August 12, 2021 11:25 AM |
| **To:** | Ken.Caruso@mfsllp.com |
| **Cc:** | Mehlman,  Avery |
| **Subject:** | Moshe Chaim Panzer v. Joel Epstein |

Mr. Caruso,

Please be advised that on Friday, August  13, 2021 at 11:30am, my firm – on behalf of Moshe Chaim Panzer – will file an Order to Show Cause in New York State Supreme Court, New York County, which is located at 60 Centre Street, New York, New York, in the Commercial Division Support Office, Room 119A, seeking a stay of the AAA proceeding recently commenced by Mr. Epstein.

Thank you,



**Joshua Stricoff**
**Associate**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.1576  Office
jstricoff@herrick.com

1

**FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM**

NYSCEF DOC. NO. 17

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

New York Supreme COURT, COUNTY OF New York

Index No: _____     Date Index Issued: _____

| | **For Court Use Only:** |
|---|---|
| | IAS Entry Date |

## CAPTION   Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

MOSHE CHAIM PANZER

-against-                                                                              Plaintiff(s)/Petitioner(s)

JOEL EPSTEIN

Defendant(s)/Respondent(s)

Judge Assigned

RJI Filed Date

## NATURE OF ACTION OR PROCEEDING:   Check only one box and specify where indicated.

### COMMERCIAL

- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☒ Other Commercial (specify):  Stay Arbitration

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

### REAL PROPERTY:   Specify how many properties the application includes: _____

- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):   ☐ Residential      ☐ Commercial
  Property Address: _____

  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*

- ☐ Tax Certiorari - Section: _____  Block: _____  Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

### OTHER MATTERS

- ☐ Certificate of Incorporation/Dissolution   [see **NOTE** in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

### MATRIMONIAL

- ☐ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum (UCS-840M).*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

### TORTS

- ☐ Asbestos
- ☐ Child Victims Act
- ☐ Environmental (specify): _____
- ☐ Medical, Dental, or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

### SPECIAL PROCEEDINGS

- ☐ CPLR Article 75 (Arbitration)   [see **NOTE** in **COMMERCIAL** section]
- ☐ CPLR Article 78 (Body or Officer)
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 (Kendra's Law)
- ☐ MHL Article 10 (Sex Offender Confinement-Initial)
- ☐ MHL Article 10 (Sex Offender Confinement-Review)
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☐ Other Special Proceeding (specify): _____

## STATUS OF ACTION OR PROCEEDING:   Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION:   Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental, or Podiatric Malpractice   Date Issue Joined: _____
- ☐ Notice of Motion   Relief Requested: _____   Return Date: _____
- ☐ Notice of Petition   Relief Requested: _____   Return Date: _____
- ☒ Order to Show Cause   Relief Requested:  Stay   Return Date: _____
- ☐ Other Ex Parte Application   Relief Requested: _____
- ☐ Poor Person Application
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM

NYSCEF DOC. NO. 17

INDEX NO. 654909/2021

RECEIVED NYSCEF: 08/13/2021

| **RELATED CASES:** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | | |
|---|---|---|---|---|
| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| **PARTIES:** | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant; 3rd party plaintiff, etc.) | Attorneys and/or Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance<br>For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: PANZER, MOSHE C.<br><br>Role(s): Plaintiff/Petitioner | AVERY MEHLMAN, HERRICK, FEINSTEIN LLP, 2 Park Avenue , New York, NY  10016, 212-592-5985, amehlman@herrick.com | ☐ YES  ☒ NO | |
| ☒ | Name: EPSTEIN, JOEL<br><br>Role(s): Defendant/Respondent | 8 Frankfurt Road, Unit 301, Monroe, NY  10950 | ☐ YES  ☒ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated-   08/13/2021

2442937

Attorney Registration Number

AVERY S MEHLMAN

Signature

AVERY S MEHLMAN

Print Name

*This form was generated by NYSCEF*

**FILED: NEW YORK COUNTY CLERK 08/13/2021 11:14 AM**
NYSCEF DOC. NO. 18

INDEX NO. 654909/2021
RECEIVED NYSCEF: 08/13/2021

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF  New York**

_____x

MOSHE CHAIM PANZER

                                        **Plaintiff(s)/Petitioner(s)**

-against-

JOEL EPSTEIN

                                        **Defendant(s)/Respondent(s)**
_____x

**Index No:**

**RJI No. (if any):**


**COMMERCIAL DIVISION**

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☒ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☒ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

  In excess of $20,000,000.00

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

  APPLICATION FOR A PERMANENT STAY OF ARBITRATION PURSUANT TO CPLR 7503 AND A PRELIMINARY INJUNCTION

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

  **I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) and (c).**

**Dated:**   08/13/2021

                                        AVERY S MEHLMAN
                                        **SIGNATURE**

                                        AVERY S MEHLMAN
                                        **PRINT OR TYPE NAME**

*This form was generated by NYSCEF*